**Ellsworth D. PATTERSON, Jr.; Karen Patterson, individually and as h/w, Appellants**

v.

**GLORY FOODS, INC.; McCall Farms, Inc.; John Does 1–10.**

**No. 13–1583.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Feb. 11, 2014.

Filed: Feb. 19, 2014.

---

Ross Begelman, Esq., Paul R. Melletz, Esq., Marc M. Orlow, Esq., Begelman, Orlow & Melletz, Cherry Hill, NJ, for Appellants.

Francis V. Cook, Esq., Fox Rothschild, Lawrenceville, NJ, for Glory Foods, Inc.; McCall Farms, Inc.

Before: CHAGARES, SHWARTZ, and ALDISERT, Circuit Judges.

## OPINION

SHWARTZ, Circuit Judge.

Plaintiff Ellsworth D. Patterson, Jr. appeals the District Court's orders granting summary judgment to Defendants Glory Foods, Inc. and McCall Farms, Inc. on his claim under the New Jersey Conscientious Employee Protection Act ("CEPA") and denying his motion for reconsideration. We will affirm.

### I.

As we write principally for the benefit of the parties, we recite only the essential facts[1] and procedural history. Glory Foods, a company that sells southern-style vegetable products to wholesalers and su-

---

1. In accordance with our standard of review, *see infra* Section II, we set forth the facts in the light most favorable to Patterson. *Skerski v. Time Warner Cable Co.,* 257 F.3d 273, 278 (3d Cir.2001).

permarkets, hired Patterson as an Area Sales Manager in October 2008. Patterson began work for Glory Foods in 2008 and reported to Lisa Cliff, who in turn reported to the President of Glory Foods, Jacqueline Neal.

Before Patterson joined Glory Foods, Wakefern, a supermarket company that purchased products from Glory Foods, incurred a debt to Glory Foods of approximately $200,000.[2] When the debt was discovered, Glory Foods agreed to an accrual program with Wakefern, whereby Wakefern would advertise Glory Foods products and attempt to increase its sales of Glory Foods products in lieu of paying the money it owed. The agreement was never memorialized in writing. The accrual program ended in 2008, and Patterson had no role in it. Patterson first learned about Wakefern's failure to pay and the accrual program in mid–2009 during a conversation with his predecessor, although Patterson then understood the debt to be only $100,000. In January 2010, Patterson attended a meeting with Dan Charna, an owner of Glory Foods, and executives from McCall Farms, which was then merging with Glory Foods. During the meeting, Charna said that Wakefern "stole" $200,000 when it failed to pay the correct price for the products. JA 62. Patterson later asked Cliff about the accrual program, and she told him the program had ended before his employment began. Pat-

terson later determined that sales to Wakefern had declined significantly after the accrual program ended, so he attempted to re-start the program.

On February 24, 2010, Neal emailed the sales team, including Patterson, asking that each person review his or her clients and let her know of "comments, questions or insight" for an upcoming sales meeting. JA 32. Patterson sent a lengthy response that noted, among other things, the decline in sales to Wakefern that he attributed to the end of the accrual program. Cliff, who was copied on the email, responded to Patterson, instructing him not to email Neal directly.[3] For her part, Neal responded directly to Patterson and asked for more information. In response, Patterson wrote in an email on March 1, 2010, that "[t]here was an accrual program in place at Wakefern prior to my arrival to the company. This program was set up to recoup the $100–200,000 over payment [4] to Wakefern." JA 26. Patterson did not indicate in the email that he suspected that the accrual program was unethical or illegal.

Eleven days later, Neal and Cliff terminated Patterson's employment. Neal and Cliff told him that their decision was based on the merger between Glory Foods and McCall Farms, which occurred in January 2010, and conflicts between Patterson and Cliff.[5]

2. The parties dispute the amount of the debt. According to Patterson's supervisor, the debt was approximately $86,000. The issue is not material to the disposition of this case.

3. The record includes an email that Cliff sent to Patterson in 2009, instructing him not to send emails directly to Neal without speaking to Cliff first.

4. Cliff testified at her deposition that Wakefern incurred the debt by taking unauthorized deductions on some of its purchases, result-

ing in an underpayment, and that Patterson's description of the discrepancy as an "overpayment" was incorrect. At his deposition, Patterson also testified that the debt arose because Wakefern took unauthorized discounts on its purchases, but he, nonetheless, described this problem as an "overpayment" by Glory Foods to Wakefern.

5. Before Patterson sent his March 1, 2010 email responding to Neal, Cliff emailed him and another sales employee concerning a task that needed to be completed within two hours

Patterson and his wife filed this lawsuit on December 30, 2010, alleging: (1) wrongful termination; (2) violation of CEPA; and (3) loss of consortium. With the parties' consent, the District Court dismissed Counts 1 and 3. Discovery followed on Patterson's CEPA claim. The District Court granted summary judgment in favor of the Defendants on that claim, and denied Patterson's motion for reconsideration pursuant to Fed.R.Civ.P. 59. Patterson now appeals.

## II.

The District Court had jurisdiction in this case pursuant to 28 U.S.C. § 1332(a). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We exercise plenary review on an appeal from summary judgment, applying the same standard as the District Court. *Tri–M Grp., LLC v. Sharp,* 638 F.3d 406, 415 (3d Cir. 2011). When considering a motion for summary judgment, we "must draw all reasonable inferences from the underlying facts in the light most favorable to the non-moving party." *Skerski,* 257 F.3d at 278 (citation omitted). We will affirm an order for summary judgment only if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." *Ruehl v. Viacom, Inc.,* 500 F.3d 375, 380 n. 6 (3d Cir.2007) (internal quotation marks and citation omitted). A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find

for the non-moving party. *Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 423 (3d Cir.2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## III.

CEPA was enacted "to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such [activities]." *Abbamont v. Piscataway Twp. Bd. of Educ.,* 138 N.J. 405, 650 A.2d 958, 971 (1994). It provides, in relevant part:

> [a]n employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law ...; or (2) is fraudulent or criminal....

N.J. Stat. Ann. § 34:19–3.[6] To succeed on a CEPA claim, a plaintiff must show (1) he or she reasonably believed that his or her employer's conduct was violating a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a whistleblowing activity described in CEPA; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistleblowing activity and

---

of the email, which Patterson did not complete. Patterson later alleged that he was set up to fail at this task to justify his termination.

**6.** The statute also protects an employee who:
[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law ...; (2) is

fraudulent or criminal ...; or (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J. Stat. Ann. § 34:19–3(c). Patterson asserts a claim under this section of the statute as well, but he fails to identify any ongoing activity to which he objected or in which he refused to participate.

the adverse employment action. *Caver v. City of Trenton*, 420 F.3d 243, 254 (3d Cir.2005).[7]

### A.

Patterson contends that the fact that he was not informed of the accrual program with Wakefern and that the entire debt may not have been recouped are evidence of either a kickback scheme, or that the shareholders were not fully informed of the failure to collect this debt. Patterson's mere assertions that he believed that wrongdoing occurred, however, cannot defeat summary judgment, without some evidence to support them. *See, e.g., Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991) (holding that the party opposing summary judgment "must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations, general denials, or . . . vague statements").

■ First, while Patterson argues that a fraud or kickback scheme occurred, he cites no evidence to support that theory. At his deposition, he admitted that he had no "specific[ ]" evidence of a kickback scheme, and based his conclusion on the fact that there was no indication any Glory Foods employee attempted to recover the money Wakefern owed. JA 55–56. He stated that "[f]rom [his] experience as a sales professional any time someone don't try to recover money there's a possibility there is a kickback or some deal going on. . . ." JA 110. In other words, from Patterson's perspective, illegal activity is likely afoot any time a debt is forgiven. Forgiveness of a debt violates no law or public policy. *See Young v. Schering Corp.*, 275 N.J.Super. 221, 645 A.2d 1238, 1246 (N.J.Super.Ct.App.Div.1994) (affirming dismissal of a complaint where the challenged conduct "was not unlawful or wrongful in any way," and "did not contravene any clear mandate of public policy"). Moreover, Patterson does not explain the logic by which he inferred that such a basic business activity—Wakefern incurring and repaying a debt, and Glory Foods forgiving some of that debt—was part of some illegal scheme. Patterson's assertions of wrongdoing, unsupported by any evidence, are far too speculative to defeat summary judgment.

Second, Patterson argues that the District Court overlooked facts that demonstrated that he had a reasonable basis to believe that, by forgiving some amount of the Wakefern debt, "fraud had been committed on the shareholders of Glory Foods" and its owners because they may not have been aware of the debt forgiveness. Appellant Br. 13–14. That argument fails for two reasons. First, he provides no evidence that the shareholders were misled or not informed about the Wakefern debt. Second, Patterson's assertion that the ownership of Glory Foods was misled is contradicted by his own deposition testimony. Patterson stated during his deposition that he learned of the Wakefern debt in part when he attended a meeting at which one of the owners of

---

**7.** If a plaintiff demonstrates a prima facie case, we apply the burden-shifting analysis from federal discrimination cases, which requires that the employer articulate a legitimate, non-discriminatory reason for its actions, after which the burden shifts back to the plaintiff to show that the legitimate reason is pretextual. *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 92 (3d Cir.1999). In this case, the District Court also held that even if Patterson had presented a prima facie case, he had failed to show that Defendants' legitimate, non-retaliatory reasons for firing him—including his missed deadlines, his failure to respect the chain of command, and the merger—were pretextual. JA 185 n. 12. Because we agree with the District Court that Patterson has failed to set forth a prima facie case, we need not engage in this analysis.

Glory Foods discussed the issue. In other words, Patterson has stated that he heard details about the issue from the very people from whom he contends it was kept, thus undermining his claim of concealment.

Because Patterson has not set forth any evidence from which a reasonable person could conclude that Glory Foods employees engaged in wrongdoing, and hence cannot show "a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff," *Dzwonar v. McDevitt*, 177 N.J. 451, 828 A.2d 893, 901 (2003), the District Court correctly concluded that he cannot meet the first element of a CEPA claim.

### B.

 The District Court granted summary judgment for the additional reason that Patterson did not engage in protected whistleblowing activity. He contends that his March 1, 2010 email to Neal is protected activity. He is incorrect. His email, which he sent to Neal in response to her inquiry concerning a decline in sales, merely stated his rather banal observation that an accrual program involving free advertising had been in place, that the program had ended, and that sales had dropped as a result. Patterson's email to Neal did not mention any concern that a kickback scheme was in place, or that the underpayment had not been disclosed to shareholders. Indeed, Patterson did not even indicate to Neal his purported concern that Wakefern still owed Glory Foods money because the accrual program had not recouped the entire debt. Nothing in the email suggested that a debt was still due, that wrongdoing had occurred, or that he even believed wrongdoing had occurred. *Cf. Carlino v. Gloucester City High Sch.*, 57 F.Supp.2d 1, 35–36 (D.N.J.1999) (granting summary judgment based in part on the fact that the alleged whistleblowing message "in no way suggest[ed] any illegal conduct"); *Young*, 645 A.2d at 1248 (affirming dismissal of a complaint where the employee complained about a decision that "was not unlawful or wrongful in any way," because CEPA "was not intended to provide a remedy for wrongful discharge for employees who simply disagree with an employer's decision, where that decision is entirely lawful").

Accordingly, Patterson has not shown that he engaged in protected activity, and for this additional reason, the District Court properly granted summary judgment.[8]

### IV.

For the foregoing reasons, we will affirm the District Court's orders.[9]

---

8. The causation element of a CEPA claim requires a plaintiff to show that "a causal connection exists between the whistle-blowing activity and the adverse employment action." *Dzwonar*, 828 A.2d at 900. Because Patterson cannot identify any whistleblowing activity, we need not address this element.

9. Patterson also appeals the District Court's order denying his motion for reconsideration. *See* Notice of Appeal, Feb. 28, 2013, ECF No.

58. We will affirm the District Court's order denying Patterson's motion for reconsideration because, as the District Court concluded, his reconsideration motion merely "rehash[ed] his rejected argument" from his brief in opposition to summary judgment, Letter Order 2, Feb. 1, 2013, ECF No. 57, and we have concluded that the District Court properly granted summary judgment.

**UNITED STATES of America**

v.

**Paul SURINE, Appellant.**

No. 13–2470.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit L.A.R. 34.1(a) Dec. 16, 2013.

Filed: Feb. 19, 2014.

William C. Simmers, Esq., Office of United States Attorney, Williamsport, PA, for United States of America.

Paul Surine, Glenville, WV, pro se.

Frederick W. Ulrich, Esq., Office of Federal Public Defender, Harrisburg, PA, for Paul Surine.

Before: JORDAN, VANASKIE, and VAN ANTWERPEN, Circuit Judges.

OPINION

VANASKIE, Circuit Judge.

In 2008, Paul Surine ("Surine") pleaded guilty to one count of conspiracy to distribute and possess with intent to distribute 50 or more grams of cocaine base in violation of 21 U.S.C. § 846. The United States District Court for the Middle District of Pennsylvania sentenced him to 360 months' imprisonment to be followed by a five-year term of supervised release. In

August 2012, Surine filed a motion pursuant to 18 U.S.C. § 3582(c)(2) for a reduction in sentence based on the Fair Sentencing Act of 2010, which was denied by the District Court.[1] We appointed counsel who subsequently moved to withdraw pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), asserting that all potential grounds for appeal are frivolous. For the reasons that follow, we will affirm the order of the District Court and grant the motion to withdraw.

## I.

Between 2005 and 2007, Paul Surine oversaw the sale of a large quantity of crack cocaine from his residence in Tioga County, Pennsylvania. He enlisted several associates and even his children in this endeavor, and during this time protected himself and his business through the illegal possession and use of firearms. After his arrest on February 1, 2007, he was indicted by a federal grand jury for conspiracy to distribute and possess with intent to distribute more than 50 grams of cocaine base, distribution of and possession with intent to distribute 50 grams or more of cocaine base, and possession of a firearm in furtherance of a drug trafficking offense.

On May 30, 2008, Surine pleaded guilty to conspiracy to distribute and possess with intent to distribute more than 50 grams of cocaine base. The Presentence Report ("PSR") calculated a base offense level of 38 due to its assessment that Surine had conspired to distribute more than 4.5 kilograms of cocaine base. After a 2–level increase for the specific offense char-

acteristic of possession of a firearm, a 4–level increase for Surine's role as a leader in the conspiracy, and a 3–level decrease for timely acceptance of responsibility, the PSR calculated a total offense level of 41. Because Surine had a criminal history category of III, the Guideline range was 360 months to life.

Surine objected to the PSR's assessments regarding the amount of cocaine base distributed, his role in the organization, and his possession of a firearm. On June 11 and June 22, 2009, the District Court conducted an evidentiary hearing. Based on the testimony of several witnesses, the District Court concluded that Surine was "responsible for, at most, 3.5 kilograms of cocaine [base,]" (App.246), but affirmed the PSR's other recommendations. This resulted in a new base offense level of 36, a new total offense level of 39, and a Guideline range of 324 to 405 months' imprisonment. On August 5, 2009, the District Court held a sentencing hearing, at which it considered several sentencing factors under 18 U.S.C. § 3553(a) and then imposed a sentence of 360 months' incarceration to be followed by 5 years of supervised release. Surine was denied relief on direct appeal. *United States v. Surine*, 375 Fed.Appx. 164, 166 (3d Cir.2010).

In August 2012, Surine filed a motion pursuant to 18 U.S.C. § 3582(c)(2) for a reduction in sentence based on the Fair Sentencing Act of 2010, Pub.L. 111–220, 124 Stat. 2372 (2010). Pursuant to that legislation, U.S.S.G. § 2D1.1(c)(3) now provides for a base offense level of 34 for distribution of between 840 grams and 2.8 kilograms of cocaine base.[2] Because the

---

1. This case was initially before the Honorable James F. McClure, who died in 2010. Upon Surine's filing of the motion in 2012, the case was reassigned to the Honorable Matthew W. Brann.

2. The base offense level for distribution of more than 2.8 kilograms but less than 8.4 kilograms of cocaine base remains 36, which is consistent with Surine's current sentence. *See* U.S.S.G. § 2D1.1(c)(2).

sentencing court concluded that Surine was "responsible for, at most, 3.5 kilograms[,]" (App. 246), Surine argues that this leaves open the possibility that he might have distributed less than 2.8 kilograms, and that he is therefore entitled to a 2–level reduction and a new Guideline range of 262 to 327 months.

On May 7, 2013, after the issue was briefed with the assistance of counsel, the District Court denied the motion. Based on testimony from the June 2009 evidentiary hearing, the District Court concluded that the Government had established by a preponderance of the evidence that Surine's offense in fact involved more than 2.8 kilograms of cocaine base. Surine was therefore ineligible for a reduction in sentence under the amended Guidelines. The District Court also noted the specific aggravating factors that had caused the sentencing court to impose a term of imprisonment in the middle of the Guideline range rather than one at the bottom. For instance, the record reflects that Surine's operation had distributed cocaine base to "at least 100 to 200 individuals"; that it involved "extensive trading in firearms"; and that Surine had "brought his children into it, got them addicted to crack cocaine and then had them participate in the conspiracy[.]" (App. 265.) The record also includes Surine's lengthy and violent criminal history. (App. 266.) Thus, because the factors listed in 18 U.S.C. § 3553(a) militated against leniency in Surine's case, the District Court concluded that it would not grant sentencing relief to Surine even if he were technically eligible.

## II.

The District Court had jurisdiction over this case under 18 U.S.C. §§ 3582(c)(2) and 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

Counsel may seek to withdraw from representation if, "after a conscientious examination" of the record, *Anders,* 386 U.S. at 744, 87 S.Ct. 1396, he or she is "persuaded that the appeal presents no issue of even arguable merit." 3d Cir. L.A.R. 109.2(a). If we concur with this assessment, we "will grant counsel's *Anders* motion, and dispose of the appeal without appointing new counsel." *Id.*

When presented with an *Anders* brief, our inquiry is two-fold: "(1) whether counsel adequately fulfilled [Third Circuit L.A.R. 109.2(a)'s] requirements; and (2) whether an independent review of the record presents any nonfrivolous issues." *United States v. Youla,* 241 F.3d 296, 300 (3d Cir.2001). The *Anders* brief must "satisfy the court that counsel has thoroughly examined the record in search of appealable issues," and also "explain why the issues are frivolous." *Id.* While "[c]ounsel need not raise and reject every possible claim[,] . . . at a minimum, he or she must meet the 'conscientious examination' standard." *Id.* If we find that "the *Anders* brief initially appears adequate on its face," in the second step of our analysis we will "confine our scrutiny to those portions of the record identified by . . . [the] *Anders* brief," as well as "those issues raised in Appellant's *pro se* brief." *Id.* at 301.

Counsel here identifies one potentially appealable issue, which is the same issue pressed by Surine, *i.e.,* whether the District Court erred in denying Surine's motion for a sentence reduction. Both Surine's counsel and the Government argue that this issue is frivolous. Our independent review of the record confirms that there are no non-frivolous issues for appeal.

## III.

Surine argues that the District Court erred in denying his motion for a sentence

reduction under 18 U.S.C. § 3582(c)(2). We have previously explained the District Court's obligations with respect to a motion under that statutory provision:

> [A] district court [is authorized] to reduce a sentence already imposed where two requirements are satisfied: (1) the defendant's initial sentence must have been "based on a sentencing range that has subsequently been lowered by the Sentencing Commission," and (2) the sentence reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." [18 U.S.C. § 3582(c)(2) ]; *United States v. Doe*, 564 F.3d 305, 309 (3d Cir.2009). If these two requirements are satisfied, a court may then exercise its discretion— "after considering the factors set forth in [18 U.S.C. § ] 3553(a) to the extent that they are applicable," 18 U.S.C. § 3582(c)(2), as well as the factors contained in the commentary to the Commission's policy statements, U.S.S.G. § 1B1.10, cmt. n. 1(B)—to determine whether a reduction in sentence is warranted (as well as the extent of any such reduction).

*United States v. Flemming*, 617 F.3d 252, 257 (3d Cir.2010). Where the denial of relief under § 3582(c)(2) involves a legal question concerning eligibility, we apply *de novo* review. *United States v. Sanchez*, 562 F.3d 275, 277 (3d Cir.2009). "By contrast, when the district court determines that a defendant is eligible for relief but declines to reduce his sentence, our review is for an abuse of discretion." *United States v. Weatherspoon*, 696 F.3d 416, 420 (3d Cir.2012) (citing *Sanchez*, 562 F.3d at 277 n. 4).

To satisfy the first requirement for resentencing, Surine must establish that he was sentenced "based on a sentencing range that has subsequently been lowered by the Sentencing Commission," 18 U.S.C. § 3582(c), which here would mean a showing that his conduct involved distribution of less than 2.8 kilograms of cocaine base. At sentencing, the Government bears the burden of proving drug quantities by a preponderance of the evidence. *United States v. Self*, 681 F.3d 190, 201 (3d Cir. 2012). Where, as here, there is no drug seizure, the Guidelines counsel the court to "approximate the quantity of the controlled substance" based on a number of factors, including "the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved." U.S.S.G. § 2D1.1, cmt. n. 5.

Here the District Court relied on a detailed record developed at the June 2009 evidentiary hearing. Based on that record, the District Court reached the conservative estimate that Surine was "responsible for, at most, 3.5 kilograms of cocaine." (App.246.) In fact the primary dispute at the hearing was not whether Surine was responsible for distributing less than that amount; it was whether Surine was responsible for distributing considerably more. (App. 243–46 (detailing witness testimony that Surine distributed "most of" 4.7 kilograms of cocaine base and may have distributed up to 7.14 kilograms).)

■ We review the District Court's findings of fact concerning the quantity of drugs involved for clear error. *United States v. Paulino*, 996 F.2d 1541, 1545 (3d Cir.1993). Based on this record, the District Court did not clearly err in its finding that Surine was responsible for the distribution of more than 2.8 kilograms of cocaine base. We agree that Surine is ineligible for resentencing on this basis.

■ The District Court found in the alternative that Surine was not entitled to resentencing because the factors listed in 18 U.S.C. § 3553(a) militated against le-

niency in his case. We need not restate the ample grounds for the District Court's decision in this regard. We conclude that the District Court did not abuse its discretion in denying relief to Surine under 18 U.S.C. § 3582(c)(2).

## IV.

In conclusion, we find that counsel's *Anders* brief reflects a conscientious examination of the record. Our independent review of the submissions, including Surine's brief and the Government's response to it, confirms that there are no non-frivolous grounds for appeal. We will affirm the District Court's order of May 7, 2013, and grant counsel's motion to withdraw.

**UNITED STATES of America**

**v.**

**Freddie SINKLER, Jr., Appellant.**

**No. 13–3264.**

United States Court of Appeals, Third Circuit.

Feb. 20, 2014.

Christy H. Fawcett, Esq., Office of United States Attorney, Harrisburg, PA, for Plaintiff–Appellee.

Laurence C. Kress, Esq., Harrisburg, PA, for Defendant–Appellant.

Before: McKEE, Chief Judge, CHAGARES and SHWARTZ, Circuit Judges.

## OPINION

SHWARTZ, Circuit Judge.

Freddie Sinkler, Jr., appeals from the judgment of the United States District Court for the Middle District of Pennsylvania sentencing him to 24 months' incarceration for violating the terms of his supervised release. We will affirm.

### I

On October 1, 2001, Sinkler pled guilty to one count of distribution and possession with intent to distribute in excess of 50 grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1). On February 20, 2003, the District Court sentenced Sinkler to 212 months' imprisonment and five years of supervised release. Sinkler's prison term was subsequently reduced to 134 months,

and on February 29, 2012, he was released from prison and began his period of supervised release. During his period of supervised release, Sinkler participated in the Court–Assisted Re–Entry ("CARE") program.

On July 12, 2013, the United States Probation Office filed a Petition alleging that Sinkler had violated two conditions of his supervised release: the statutory condition that he not commit another crime and the special condition that he "reside and satisfactorily participate" in a residential reentry program. App. 16–17. The Petition alleged that he violated the first condition on three separate occasions. First, he was charged with fleeing or attempting to elude the police while they were making a routine traffic stop. The criminal charges were reduced to summary traffic citations and Sinkler was ordered to pay a fine. Second, Sinkler was charged with providing a false name to police investigating a domestic dispute. The charges were dismissed after Sinkler completed community service. Third, Sinkler was charged with simple assault. He pled guilty to a count of harassment and the assault charge was withdrawn. Finally, Sinkler failed to comply with the rules of the residential reentry program and was discharged from the program. The conduct surrounding Sinkler's arrests for fleeing or eluding and simple assault, if proven, constituted Grade A violations of his supervised release. U.S.S.G. § 7B1.1(a)(2). The conduct surrounding the harassment and false identification to law enforcement charges, as well as the violation of the special condition, if proven, constituted Grade C violations. *Id.* § 7B1.1(a)(3).

The District Court held a supervised release revocation hearing on July 18, 2013. At the hearing, the Government informed the District Court that Sinkler agreed to plead guilty to the Grade C

violation, the Government would not pursue the Grade A violations, and each side would "argue in terms of sentence." App. 19. The District Court then asked Sinkler personally whether he understood that he would plead guilty to violating the Grade C violation concerning his failure to comply with the reentry facility's rules, waive a factual hearing concerning that violation, and be sentenced based on that violation. Sinkler confirmed that he understood, the District Court accepted the plea, and the parties presented their sentencing arguments.

During his argument, Sinkler's counsel noted that the Guideline range for the Grade C violation for failure to comply with the special condition was 8 to 14 months of imprisonment. He also explained the circumstances underlying the Grade A violations. Specifically, he stated that Sinkler had difficulty adjusting after his release from prison and while "some of the violations that are not being pursued are criminal in nature," he argued that "some of them I think stemmed from a reaction on his part that he didn't want to go back to jail, sort of a panicked reaction to any contact with law enforcement." App. 21. He also contended that Sinkler lacked "coping skills," and that the staff at the reentry facility had made "some unreasonable demands," leading to Sinkler's Grade C violation. App. 21–22. Sinkler also spoke on his own behalf, apologizing for his inability to comply with the CARE program, explaining the circumstances surrounding his failure to complete the residential reentry program, and describing his difficulty adjusting to jail.

In response, the Government argued that the residential reentry program's requirements were reasonable and that, to the extent that Sinkler's conduct reflected a fear of returning to jail, his decision to flee from the police "ensured that he will go back to jail." App. 27. The Government also described the facts concerning his arrest for fleeing from the police, arguing that those incidents "bel[ied]" the "remorse" Sinkler expressed at the hearing. App. 27–28.

The District Court then imposed a sentence of 24 months' imprisonment, 10 months above the upper end of the Guideline range for a Grade C violation but significantly below the Guideline range of 51 to 63 months for a Grade A violation. The District Court demonstrated that it was familiar with Sinkler's involvement in the CARE program by noting the positive things he accomplished and how those involved with the program "really extended themselves so that he could be a successful person on supervised release," App. 31, including providing assistance in resolving his arrests. The District Court also noted the facts surrounding those arrests and the view of all involved, including Sinkler, that he would not benefit from an additional term of supervised release given his lack of success during supervision. The District Court also acknowledged the importance of work and Sinkler's family obligations, and stated that it had "considered the factors listed in 18 U.S.C. § 3553" in fashioning its sentence. App. 32

Sinkler challenges the procedural reasonableness of his sentence on three grounds. Specifically, he contends that the District Court: (1) erroneously found that he had committed Grade A violations and improperly based its sentence on those findings; (2) failed to give meaningful consideration to the factors listed in § 3553(a); and (3) failed to provide a written statement of reasons for its sentence.

## II

The District Court had jurisdiction over this case pursuant to 18 U.S.C. § 3231. We exercise jurisdiction over Sinkler's ap-

peal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1). We generally review the procedural and substantive reasonableness of a district court's sentence upon revocation of supervised release for abuse of discretion. *United States v. Clark,* 726 F.3d 496, 500 (3d Cir.2013).

Here, the Government contends that Sinkler has forfeited his challenge to the District Court's consideration of the conduct underlying the Grade A violations by failing to object. If that is the case, we apply plain error review. *United States v. Vazquez–Lebron,* 582 F.3d 443, 445 (3d Cir.2009). A defendant bears the burden of establishing plain error under Fed. R.Crim.P. 52(b) [1] and must prove that: (1) the District Court erred; (2) the error was "plain," meaning that it was "clear" or "obvious"; and (3) the error affected substantial rights. *Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citing *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). If these three prongs are met, then the appellate court may "exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 467, 117 S.Ct. 1544 (quotation marks, citations, and alterations omitted).

### III

### A

We first consider Sinkler's contention that the District Court found he committed Grade A violations. Sinkler never made such a claim before the District Court and thus the plain error standard applies. He cannot show plain error occurred. Indeed, contrary to his contention, the District Court expressly stated that it was sentencing Sinkler based solely on the one Grade C violation for failing to comply with the special condition of his release that required him to complete the residential reentry program. The District Court noted that the Grade A violations had been addressed through the CARE program so that it was "entirely appropriate under the circumstances ... that the [C]ourt would be focused on the Grade C violation." App. 30. Sinkler clearly knew this, as he focused his argument on the Guideline range for a Grade C violation, 8 to 14 months. Thus, Sinkler's assertion that the District Court found that he committed a Grade A violation is meritless and therefore cannot satisfy the plain error standard.

■ To the extent he also challenges the District Court's consideration of the facts underlying the Grade A violations in imposing sentence on the Grade C violation, we agree with the Government that this challenge is also subject to plain error review. First, Sinkler did not object to the Government's characterization or reference to his arrests that were the basis of the Grade A violations. Second, Sinkler introduced the facts surrounding his arrest for fleeing or eluding the police [2] when he argued that the arrest "stem[med] from a reaction on his part that he didn't want to go back to jail, sort of a panicked reaction to any contact with law enforcement." App. 21. By making an argument concerning his motive for committing the illegal activity that led to him to be charged

---

1. Rule 52(b) states "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed.R.Crim.P. 52(b).

2. Sinkler also argues that the District Court improperly relied on his arrest for simple assault. To the contrary, the District Court clearly discounted the facts concerning that arrest, noting "we don't know the background of that." App. 30.

with fleeing or eluding, he opened the door to the Government's response to that argument with additional facts surrounding that arrest and the Court's consideration of it. Thus, given his failure to object to the District Court's consideration of such facts and his affirmative use of them, he did not preserve any objection for appeal and plain error review applies.

Here, no error, plain or otherwise, occurred. The District Court may consider relevant information in sentencing, including uncharged conduct or acquitted conduct. *See, e.g., United States v. Watts,* 519 U.S. 148, 156, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam) (affirming reliance on acquitted conduct); *United States v. Ciavarella,* 716 F.3d 705, 736 (3d Cir.2013) (noting that a "court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy" (quoting U.S.S.G. § 6A1.3 (a))). Thus, the District Court was authorized to consider conduct that constituted Grade A violations even though it did not lead to convictions in any court and was not the object of the supervised release violation on which Sinkler was being sentenced.

Accordingly, the District Court appropriately considered the facts concerning the fleeing and eluding charge when sentencing Sinkler for the Grade C violation.

**B**

■ Sinkler next challenges the adequacy of the District Court's explanation of its sentence. To be procedurally reasonable, a district court's sentence upon revocation of supervised release must reflect "rational and meaningful consideration [of] the relevant § 3553(a) factors," as required by § 3583(e).[3] *United States v. Doe,* 617 F.3d 766, 769 (3d Cir.2010) (internal quotation marks omitted). Consideration of other § 3553(a) factors, however, is not prohibited. *See Clark,* 726 F.3d at 501. A "district court need not make explicit findings as to each of the § 3553(a) factors if the record makes clear that the court took the factors into account in sentencing," and addressed any colorable § 3553(a) arguments a defendant raised. *United States v. Merced,* 603 F.3d 203, 215 (3d Cir.2010) (internal quotation marks and citation omitted).

Here, the District Court showed its consideration of the appropriate § 3553(a) factors. First, the District Court demonstrated its familiarity with Sinkler and his personal background through its role overseeing his participation in the CARE program, and it considered the facts surrounding the alleged violations of the conditions of his supervised release. The District Court also affirmed Sinkler's own explanation that he acts irrationally when he gets upset, which the District Court

**3.** Section 3583(e) directs the district court to consider the following factors set forth in § 3553(a): (a)(1) (the nature and circumstances of the offense and the history and characteristics of the defendant); (a)(2)(B) (the need for the sentence imposed to afford adequate deterrence to criminal conduct); (a)(2)(C) (the need for the sentence imposed to protect the public from further crimes of the defendant); (a)(2)(D) (the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner); (a)(4) (the applicable Guidelines or policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. § 994(a)(3)); (a)(5) (the Guidelines or policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. § 994(a)(2)); (a)(6) (the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct); and (a)(7) (the need to provide restitution to any victims of the offense). 18 U.S.C. §§ 3583(e), 3553(a).

had observed through his poor performance on supervised release despite the assistance of the CARE program. The District Court probed his plans for his future and acknowledged his attempts to reform his behavior and reenter the community during his release, although those attempts proved unsuccessful. Moreover, the District Court considered and rejected a sentence involving additional supervised release based, in part, on the Probation Office's conclusion that additional supervised release would not be helpful, which Sinkler conceded. The District Court also noted the importance of work and Sinkler's family obligations, and stated that it had considered the additional § 3553(a) factors.

In short, the District Court adequately considered the relevant § 3553(a) factors and addressed Sinkler's arguments before imposing the above-Guidelines sentence.

### C

█ Sinkler also argues that the District Court erred by not providing a written statement of reasons as set forth in 18 U.S.C. § 3553(c)(2) for imposing the above-Guidelines sentence. Congress imposed § 3553(c)(2)'s written statement requirement to improve data collection for use in reports to Congress. *See* 28 U.S.C. § 994(w)(1). The statement of reasons form that Section 3553(c)(2) requires contains checkboxes for the sentencing judge to indicate both whether a sentence was within or outside of the Sentencing Guidelines and the particular Guideline relied upon to reach the sentence. The form is then gathered, together with judgments of conviction and demographic information concerning the offender, and used by the Sentencing Commission to prepare reports to Congress. 28 U.S.C. § 994(w)(3). The forms typically do not contain narrative explanations for the sentence imposed. The absence of either a form or reasons for a particular sentence on such a form, however, does not mean the record lacks a recitation of the sentencing court's reasons. Thus, even assuming that the written statement of reasons requirement of § 3553(c)(2) applies to supervised release revocations,[4] the failure to provide such a statement "is not cause for remand if the departure is otherwise permissible and the district court's reasoning is persuasive." *United States v. Cooper*, 394 F.3d 172, 176 (3d Cir.2005).[5] Here, as we have explained, the District Court adequately stated on the record its reasons for imposing an above-Guidelines sentence and demonstrated its consideration of the § 3553(a) factors. Accordingly, we decline to remand based on the absence of a written statement of reasons.

### IV

For the foregoing reasons, we will affirm the judgment of the District Court.

---

4. At least one circuit has held that the written statement of reasons requirement does not apply in supervised release revocations because § 3583(e), which governs the revocation of supervised release, does not reference § 3553(c)(2). *United States v. Cotton*, 399 F.3d 913, 915–16 (8th Cir.2005).

5. The case on which Sinkler relies, *United States v. Johnson*, 640 F.3d 195 (6th Cir. 2011), is not to the contrary. There, the Sixth Circuit held only that the district court was required to state its reason for departure on the record. *Id.* at 207–08 (analyzing the transcript of the sentencing hearing). The requirement that a district court explain its reasons for departing upward, which was satisfied here for the reasons we have explained, is distinct from the requirement of a written statement of reasons, which is to be recorded on a form and provided to the Sentencing Commission in accordance with 28 U.S.C. § 994(w)(1)(B). *See* 18 U.S.C. § 3553(c)(2).

**In re David M. KISSI, Petitioner.**

**United States of America, Plaintiff–Appellee,**

v.

**David M. Kissi, Defendant–Appellant.**

Nos. 13–237, 13–6879.

United States Court of Appeals, Fourth Circuit.

Submitted: Aug. 28, 2013.

Decided: Sept. 13, 2013.

David M. Kissi, Appellant Pro Se. Jonathan Biran, Biran Kelly LLC, Baltimore, Maryland; Kristi Noel O'Malley, Office of the United States Attorney, Greenbelt, Maryland, for Appellee.

Before GREGORY, SHEDD, and DUNCAN, Circuit Judges.

Dismissed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In these consolidated appeals, David M. Kissi seeks to appeal the district court's orders denying relief on his 28 U.S.C.A. § 2255 (West Supp.2013) motion and his motion for reconsideration. The orders are not appealable unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B) (2006). A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2006). When the district court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see Miller–El v. Cockrell,* 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). When the district court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the motion states a debatable claim of the denial of a constitutional right. *Slack,* 529 U.S. at 484–85, 120 S.Ct. 1595.

We have independently reviewed the record and conclude that Kissi has not made the requisite showing. Accordingly, we deny a certificate of appealability and dismiss the appeals. We deny Kissi's motion for bail or release pending appeal as we find he has not presented a substantial question of law or fact justifying his release. *See United States v. Steinhorn,* 927 F.2d 195, 196 (4th Cir.1991). We also grant Kissi's motions to supplement his informal brief and to accept pro se briefs, deny as unnecessary his motion for permission to file these appeals, and deny his motion to appoint counsel. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*DISMISSED.*

Sonia L. HENDY, Plaintiff–Appellant,

v.

Marion N. BELLO, Defendant–
Appellee.

No. 13–1060.

United States Court of Appeals,
Fourth Circuit.

Submitted: Jan. 17, 2013.

Decided: Feb. 6, 2014.

Timothy F. Maloney, Matthew M. Bryant, Joseph, Greenwald & Laake, P.A., Greenbelt, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, Neil R. White, Assistant United States Attorney, Office of the United States Attorney, Greenbelt, Maryland, for Appellee.

Before DUNCAN, DAVIS, and FLOYD, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This appeal arises out of an altercation between Postal Service employees Sonia Hendy and Marion Bello at the Westlake Post Office in Bethesda, Maryland, where they both worked. The fracas occurred on July 25, 2012, one day after Bello, Hendy's direct supervisor, issued Hendy a "Notice of No–Time Served (7) Day Suspension."

On July 26, 2012, in Maryland state court, Hendy filed a petition for a peace order restraining Bello from contacting Hendy or going to their mutual workplace. That court issued interim and temporary peace orders *ex parte*. The United States government, on behalf of Bello, removed the suit to federal court under 28 U.S.C. § 1442(a)(1), the federal officer removal statute, before the hearing for a final peace order. The District of Maryland then dismissed the action for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) on the ground of sovereign immunity. Hendy appeals.

## I.

On appeal, Bello argues that the case is no longer justiciable because it is moot, as Hendy can no longer obtain relief for the July 25, 2012, incident under Maryland law. This argument, however, is based on a misreading of the Maryland Code of Courts & Judicial Procedure. Md. Code Ann., Cts. & Jud. Proc. § 3–1503(a) states that a petitioner may file an action for a peace order for any qualifying act that "occurred within 30 days before the filing of the petition." Hendy did just that. The statute also sets a timeframe for the final peace order hearing, but notes that the proceeding may be "continued for good cause." *Id.* § 3–1505(b)(1)(ii). Here, the state court case was dismissed only because it was removed to federal court; if removal were improper, the statute does not bar Maryland courts from resuming jurisdiction and Hendy from obtaining a peace order. Because this case is based on Hendy's original timely petition, it does not matter that Hendy is time-barred from filing for a new peace order based on the original July 25, 2012, altercation. It is similarly immaterial that, had a peace order been granted in 2012, it would have already expired. *See id.* § 3–1505(f); § 3–1506(a)(2). We therefore reject Bello's assertion of mootness and turn to the merits.

## II.

Hendy challenges the propriety of removal under 28 U.S.C. § 1442(a)(1) and *Mesa v. California*, 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989). Section 1442(a)(1) allows federal officers or those "acting under" any "agency" or "officer" of the United States to remove to federal court suits brought against them in state court, when they were acting "in an official or individual capacity, for or relating to

any act under color of such office." We find that these requirements have been met. As a postal worker, Bello acted under an "officer" of the United States, *Mesa,* 489 U.S. at 125, 109 S.Ct. 959, and the dispute related to a federal workplace disciplinary action, which is "closely connected with[ ] the performance of [her] official functions," *Jefferson Cnty. v. Acker,* 527 U.S. 423, 447, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999). We also find that *Mesa's* colorable federal defense requirement was met at the time the district court dismissed the action. *See North Carolina v. Cisneros,* 947 F.2d 1135, 1139 (4th Cir. 1991).

### III.

■ Next, Hendy challenges the district court's dismissal for lack of subject-matter jurisdiction. We review de novo a dismissal under Fed.R.Civ.P. 12(b)(1). *Vulcan Materials Co. v. Massiah,* 645 F.3d 249, 261 (4th Cir.2011).

The government of the United States enjoys sovereign immunity from suit unless it expressly waives such immunity. *United States v. McLemore,* 45 U.S. 286, 288, 4 How. 286, 11 L.Ed. 977 (1846). A suit against a government officer in her official capacity is really "a suit against the official's office," and so officers acting within their authority generally also receive sovereign immunity. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *see also Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 687, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). Therefore, we must ask whether Congress has waived sovereign immunity on these facts. There are two possible sources of waiver: The Federal Tort Claims Act ("FTCA"), 62 Stat. 982 (1948), codified at 28 U.S.C. §§ 1346(b), 2671–2680, and the Postal Reorganization Act of 1970 ("PRA"), Pub.L.

91–375, 84 Stat. 722, codified at 39 U.S.C. § 101 et seq. Neither is applicable here.

The FTCA waives sovereign immunity for tortious acts of federal employees working in the scope of their federal employment, including post office employees. 28 U.S.C. § 1346(b)(1); 39 U.S.C. § 409(c). However, the FTCA by its plain terms applies only to suits seeking money damages, and Hendy's does not. 28 U.S.C. § 1346(b).

On the other hand, the PRA authorizes the Postal Service "to sue and be sued in its official name." *See* 39 U.S.C. § 401(1). Although "sue and be sued" clauses are generally liberally construed, they are not absolute waivers of sovereign immunity. *See Loeffler v. Frank,* 486 U.S. 549, 554–55, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988) (quoting *Fed. Housing Administration v. Burr,* 309 U.S. 242, 245, 60 S.Ct. 488, 84 L.Ed. 724 (1940)). "Sue and be sued" clauses do not waive sovereign immunity in several circumstances: (1) for types of suits that are "not consistent with the statutory or constitutional scheme"; (2) when "necessary to avoid grave interference with the performance of a governmental function"; or (3) for other reasons that demonstrate congressional intent to apply the "sue and be sued" clause narrowly. *Id.* The first two exceptions apply here: Hendy seeks a state-law injunction that would prohibit a supervisor at the Westlake Post Office from coming to her federal workplace. It is inconsistent with the principle of federal supremacy to allow such interference with the performance of a federal employee's duties. Moreover, in prohibiting a federal employee from entering her federal workplace, waiving sovereign immunity would disturb the federal agency's internal functions. This could not have been Congress's intent.

Finally, we also note that, even if we construed the "sue and be sued" clause to

waive immunity for this type of claim, "[a]n absence of immunity does not result in liability if the substantive law in question is not intended to reach the federal entity." *U.S. Postal Service v. Flamingo Indus.*, 540 U.S. 736, 744, 124 S.Ct. 1321, 158 L.Ed.2d 19 (2004). By its plain terms, the Maryland statutory scheme does not apply to the post office—or any other governmental or business entity. Md.Code Ann., Cts. & Jud. Proc. § 3–1501(h) (noting that a peace order may be filed against an "individual" who committed an enumerated act).

## IV.

We therefore affirm the district court's dismissal of this suit for lack of subject-matter jurisdiction on sovereign-immunity grounds.

*AFFIRMED.*

**UNITED STATES Of America,**
**Plaintiff–Appellee,**

**v.**

**Domonic Devarrise USHER,**
**Defendant–Appellant.**

**No. 12–5015.**

United States Court of Appeals,
Fourth Circuit.

Submitted: Jan. 31, 2014.

Decided: Feb. 7, 2014.

C. Burell Shella, Shella & Associates, PC, Durham, North Carolina, for Appellant. Thomas G. Walker, United States Attorney, Jennifer P. May–Parker, Joshua L. Rogers, Assistant United States Attorneys, Raleigh, North Carolina, for Appellee.

Before WYNN, DIAZ, and THACKER, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

A jury convicted Domonic Devarrise Usher on one count of conspiracy to commit violations of the Hobbs Act (interference with commerce by robbery), 18 U.S.C. § 1951(b) (2012) (Count 1), seven counts of interference with commerce by robbery, 18 U.S.C. §§ 2, 1951(a) (2012) (Counts 2, 4, 6, 8, 10, 12, and 14), and seven counts of carrying and using a firearm during and in relation to a crime of violence, 18 U.S.C. §§ 2, 924(c)(1)(A) (2012) (Counts 3, 5, 7, 9, 11, 13, and 15). The district court sentenced Usher to 235 months' imprisonment on the conspiracy and each of the robbery convictions to run concurrently with each other; a mandatory consecutive eighty-four months' imprisonment on Count Three; and mandatory consecutive 300 months' imprisonment on each of the remaining four § 924(c) convictions, resulting in a cumulative sentence of 2119 months' imprisonment. On appeal, Usher contends that the district court erred by allowing the prosecutor to repeat the testimony of witnesses, during his original trial, which ended in a mistrial, and his second trial. He also argues that the district court's imposition of consecutive sentences on the § 924(c) convictions in Counts 5, 7, 9, 11, 13, and 15 violates the Eighth Amendment's protection against cruel and unusual punishment. We affirm.

I.

■ Usher first argues that the prosecutor's conduct of repeating witness answers during their testimony resulted in needlessly repetitive and cumulative evidence and violated Fed.R.Evid. 403. To warrant reversal for prosecutorial misconduct, the defendant must show that the prosecutor engaged in improper conduct that prejudiced his substantial rights so as to deny him a fair proceeding. *United States v. Allen*, 491 F.3d 178, 191 (4th Cir.2007).

In his opening brief, Usher does not allege that he was prejudiced by the prosecutor's conduct, nor does he point to any evidence in the record showing "that such remarks or conduct prejudiced the defendant to such an extent as to deprive the defendant of a fair trial." *Allen*, 491 F.3d at 191; *see also* Fed. R.App. P. 28(a)(8)(A) (requiring the appellant's brief to contain "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"). Thus, we affirm Usher's convictions.

II.

■ Usher also contends that his 2119–month sentence is disproportionate to his crimes, because no one suffered physical harm and the total economic loss was less than thirty-thousand dollars. Be-

cause Usher did not challenge the sentence on this basis below, our review is for plain error. *See United States v. Ming Hong,* 242 F.3d 528, 532 (4th Cir.2001).

Congress mandates a minimum seven-year sentence for an initial conviction under 18 U.S.C. § 924(c)(1)(A)(ii), and a mandatory minimum sentence of twenty-five years for a second or subsequent § 924(c) conviction. 18 U.S.C. § 924(c)(1)(C)(i). Sentences imposed under § 924(c) cannot "run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed." 18 U.S.C. § 924(c)(1)(D)(ii). The district court appropriately imposed an 84–month sentence for Usher's first firearm conviction (Count 3) and six consecutive twenty-five-year terms of imprisonment on Counts 5, 7, 9, 11, 13, and 15.

We find no plain error in the district court's sentence. "Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history." *Harmelin v. Michigan,* 501 U.S. 957, 994–95, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). Indeed, this court has held that stacked mandatory sentences under § 924(c), while seemingly excessive, do not contravene the Constitution. *See, e.g., United States v. Khan,* 461 F.3d 477, 495 (4th Cir.2006) (lengthy mandatory sentences imposed on defendants by "count-stacking" provisions of 18 U.S.C. § 924(c) did not constitute cruel and unusual punishment). We have held likewise in other contexts in which the sentence was within statutory bounds. *See, e.g., Jones v. Purvis,* 646 F.2d 127, 128 (4th Cir.1981) (per curiam) (sentence did not violate the Eighth Amendment where it was "well within the statutory authoriza-tion"); *United States v. Bandy,* 415 F.2d 322, 323 (4th Cir.1969) (per curiam) (same, where the sentence "was within the limits of the applicable statute").

### III.

Accordingly, we affirm Usher's convictions and the 2119–month sentence imposed by the district court. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

**Vinaben Manubhai PATEL; Manubhai Patel, Petitioners,**

v.

**Eric H. HOLDER, JR., Attorney General, Respondent.**

**No. 13–1882.**

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 4, 2014.

Decided: Feb. 18, 2014.

Rishi P. Oza, Robert Brown LLC, Cleveland, Ohio, for Petitioners. Stuart F. Delery, Assistant Attorney General, Linda S. Wernery, Assistant Director, Lindsay B. Glauner, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for Respondent.

Before KING, AGEE, and KEENAN, Circuit Judges.

Petition denied by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Vinaben Manubhai Patel and Manubhai Patel, natives and citizens of India, petition for review of an order of the Board of Immigration Appeals ("Board") dismissing their appeal from the immigration judge's order finding that Vinaben Patel, the primary petitioner, was not eligible for adjustment of status. The Petitioners claim that the Board erred in this regard. We deny the petition for review.

We review administrative findings of fact for substantial evidence and will consider those findings conclusive unless any reasonable adjudicator would have been compelled to conclude to the contrary. Legal issues determined by the Board are reviewed de novo. *Abdel–Rahman v. Gonzales*, 493 F.3d 444, 448 (4th Cir.2007). We have thoroughly reviewed the record and conclude that the factual findings are supported by substantial evidence and there was no error regarding the legal issues.

Accordingly, we deny the petition for review. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*PETITION DENIED.*

CORNERSTONE TITLE & ESCROW, INC.; Sean Adetula, Plaintiffs–Appellants,

v.

EVANSTON INSURANCE COMPANY, Defendant–Appellee.

No. 13–1318.

United States Court of Appeals, Fourth Circuit.

Argued: Jan. 29, 2014.

Decided: Feb. 19, 2014.

Stephan Young Brennan, Iliff, Meredith, Wildberger & Brennan, P.C., Pasadena, Maryland, for Appellants. Paul Newman Farquharson, Semmes, Bowen & Semmes, Baltimore, Maryland, for Appellee.

Before AGEE, FLOYD, and THACKER, Circuit Judges.

Reversed and remanded by unpublished opinion. Judge AGEE wrote the opinion, in which Judge FLOYD and Judge THACKER joined.

Unpublished opinions are not binding precedent in this circuit.

AGEE, Circuit Judge:

The Maryland Attorney General sued Cornerstone Title & Escrow, Inc., alleging that Cornerstone and others engaged in a scheme to defraud homeowners on the brink of foreclosure. In response, Cornerstone sought coverage from its professional liability insurer, Evanston Insurance Company, but Evanston denied any duty to defend under the policy. Cornerstone and its owner then filed a breach-of-contract action against Evanston in the District of Maryland. That court entered summary judgment in Evanston's favor, finding that at least two policy exclusions barred coverage for the underlying action. Cornerstone appealed.

For the reasons explained below, we reverse and remand the judgment of the district court. Not all the claims found in the underlying complaint fall within the two exclusions that the district court identified, so those two exclusions do not defeat Evanston's duty to defend and, by extension, duty to indemnify.

I.

A.

Evanston issued a "Service and Technical Professional Liability Insurance" policy to Cornerstone, which provides that Evanston will pay "the amount of Damages and Claims Expenses ... because of any (a) act, error or omission in Professional Services rendered ... or (b) Personal In-

jury committed by [Cornerstone]." (J.A. 67–68.) The policy also says that Evanston will "investigate, defend and settle any Claim to which coverage under this policy applies." (J.A. 68.) Taken together, these provisions require Evanston to defend and indemnify Cornerstone for covered claims.

This case implicates four of the policy's exclusions:

- Exclusion (a): applying to claims "based upon or arising out of any dishonest, deliberately fraudulent, malicious, willful or knowingly wrongful act or omissions committed by or at the direction of [Cornerstone]." (J.A. 70.).

- Exclusion (n): applying to claims "based upon or arising out of [Cornerstone] gaining any profit or advantage to which [Cornerstone] is not legally entitled." (J.A. 70.)

- Exclusion (x): applying to claims "based upon or arising out of the actual or alleged theft, conversion, misappropriation, disappearance, or any actual or alleged insufficiency in the amount of, any escrow funds, monies, monetary proceeds, or any other assets, securities, negotiable instruments, ... irrespective of which individual, party, or entity actually or allegedly committed or caused in whole or part the [excluded act]." (J.A. 65.)

- Exclusion (cc): applying to claims "based upon or arising out of the Real Estate Settlement Procedures Act (RESPA) or any similar state or local legislation." (J.A. 66.)

If a "[c]laim" falls within one of these exclusions, then the policy "[d]oes [n]ot [a]pply." (J.A. 69.)

### B.

In 2008, the Maryland Attorney General sued Cornerstone and ten co-defendants, alleging that the defendants collectively violated two Maryland statutes: the Protection of Homeowners in Foreclosure Act and the Consumer Protection Act. According to the complaint, the defendants violated these statutes by scheming to "take title to homeowners' residences and ... strip the equity that the homeowners ha[d] built up in their homes." (J.A. 109.) The complaint identified thirteen specific property transactions in which the defendants, including Cornerstone, acted wrongfully; it asked the court for a variety of relief, including restitution.

The alleged scheme worked by preying on homeowners close to losing their homes in foreclosure.[1] The "Lewis Defendants" marketed foreclosure-consulting services for a fee and, with the help of a colluding mortgage broker (Thomas), would convince their consulting clients to enter sale-leaseback agreements. Under such an agreement, a homeowner would sell her home to the Lewis Defendants and rent it back. The Lewis Defendants pitched the arrangement as a way to resolve the homeowner's delinquency while allowing the homeowner to rebuild her credit and keep her home. The reality was much different. Once a sale was consummated, the Lewis Defendants would tell a homeowner that unspecified closing fees and charges had consumed any equity proceeds and convince the homeowner to sign her check for the settlement proceeds back to the Lewis Defendants. Then, the Lewis Defendants would charge the homeowner monthly rent payments that were much higher than the original mortgage payments—driving the homeowner out of her home and ending

---

1. As explained below, we assume that the allegations of the underlying complaint are true for purposes of determining whether Evanston owes Cornerstone a duty to defend.

any chance for her to repurchase it in the future.

Cornerstone "provide[d] settlement services for the sale-leaseback transactions," and the Attorney General alleged that Cornerstone failed to "deliver to homeowners the checks for proceeds due to them at settlement or afterwards." (J.A. 116.) Cornerstone instead "deliver[ed] the homeowners' [unendorsed] checks to the Lewis Defendants or to Defendant Thomas, who deliver[ed] the checks to the Lewis Defendants." (J.A. 116.) The complaint alleged that Cornerstone never "disclose[d] [to the homeowners] the fact that it provide[d] homeowners' checks to other parties" (J.A. 116), and alleged that this failure to disclose amounted to "a failure to state material facts" in violation of the Maryland Consumer Protection Act. (J.A. 129.) In addition, by acting as the settlement agent, "Cornerstone participated in and provided substantial assistance to the ... [equity-stripping] scheme." (J.A. 129.)

The Attorney General sought to hold Cornerstone responsible not just for its own alleged failure to disclose, but also for its co-defendants' acts. The Attorney General pled that it was the defendants' "concerted action that [made] the enterprise possible" (J.A. 109), so each defendant was "jointly and severally liable" for the acts of every other co-defendant (J.A. 124, 130). Applying this theory, the Attorney General asserted that Cornerstone was liable for a laundry list of statutory violations committed by its co-defendants, including:

- Failing to provide a written foreclosure consulting contract or written sale-leaseback agreement;
- Requiring homeowners to pay a membership fee before receiving foreclosure consulting services;

- Obtaining an interest in a person's home while offering that same person foreclosure consulting services;
- Representing that the services were offered to save a homeowner from foreclosure;
- Failing to disclose the nature of the foreclosure services provided, the material terms of the sale-leaseback agreement, the terms of the rental agreement that followed, and the terms of any subsequent repurchase;
- Failing to disclosure specific terms of the sale-leaseback agreements that statutes require to be disclosed;
- Failing to provide several statutorily required forms and notices in connection with the foreclosure counseling and the sale-leaseback agreements;
- Failing to determine whether the borrower has the reasonable ability to make lease payments and repurchase her home;
- Misleading consumers about whether they are entitled to proceeds of settlement and whether those proceeds would be placed in escrow accounts;
- Taking consumers' settlement checks; and
- Recording land deeds and encumbering properties before the homeowners' rescission period expired.

Cornerstone sought coverage under the policy from Evanston, requesting that Evanston defend Cornerstone against the complaint and indemnify it for any liability. Evanston denied coverage. Although Cornerstone denied the Attorney General's allegations, it eventually agreed to a settlement in which it agreed to pay $100,100 in restitution.

## C.

In March 2012, Cornerstone sued Evanston, alleging that the insurer breached

both its duty to defend and its duty to indemnify under the policy. Cornerstone moved for summary judgment on the duty-to-defend issue and Evanston responded by filing its own cross-motion for partial summary judgment. Among other things, Evanston argued that the Attorney General's suit fell within policy exclusions (a), (n), (x), and (cc) and thus no duty to defend, or indemnify, arose.

The district court granted Evanston's motion for partial summary judgment, denied Cornerstone's cross-motion, and sua sponte entered judgment on Cornerstone's duty-to-indemnify claim. Of relevance here, the court concluded—based on the "gravamen" of the complaint—that the Attorney General's complaint "only alleged conduct that meets exclusions of the policy-(n) and (x), at minimum[.]" *Cornerstone Title & Escrow, Inc. v. Evanston Ins. Co.,* No. WMN–12–746, 2013 WL 393286, at *3, *7 (D.Md. Jan. 30, 2013). The court stated that misappropriation and illegal gains were "precisely" what the Attorney General alleged in his complaint against Cornerstone. *Id.* at *7. Therefore, the district court concluded that Evanston had no duty to defend and, consequently, no duty to indemnify, but did not address exclusions (a) or (cc).

Cornerstone filed this timely appeal, over which we have jurisdiction under 28 U.S.C. § 1291.

## II.

The district court decided this case on summary judgment, and we review that decision de novo. *See Turner v. United States,* 736 F.3d 274, 280 (4th Cir.2013). In doing so, we apply "the same legal standards as the district court and view[ ] all the facts and reasonable inferences therefrom in the light most favorable to the non moving party," Cornerstone. *Id.* "Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks and citation omitted).

## III.

As the parties agree, Maryland law applies to this diversity case. The district court focused on the law concerning the duty to defend, correctly reasoning that Evanston would have no duty to indemnify if it had no duty to defend, because the duty to defend is broader. *See Cowan Sys., Inc. v. Harleysville Mut. Ins. Co.,* 457 F.3d 368, 372 (4th Cir.2006).

In Maryland, the duty to defend "should be construed liberally in favor of the policyholder," *Pac. Emp'rs Ins. Co. v. Eig,* 160 Md.App. 416, 864 A.2d 240, 248 (2004), and it attaches "when there exists a *potentiality* that the claim could be covered by the policy," *id.* (emphasis in original; internal quotation marks omitted). Even a slim possibility can constitute a "potentiality." *Compare Walk v. Hartford Cas. Ins. Co.,* 382 Md. 1, 852 A.2d 98, 106 (2004) (defining a potentiality as "a reasonable potential that the issue triggering coverage will be generated at trial" (quotation marks omitted)), *with Litz v. State Farm Fire & Cas. Co.,* 346 Md. 217, 695 A.2d 566, 572 (1997) ("If there is a possibility, even a remote one, that the plaintiffs' claims could be covered by the policy, there is a duty to defend."). And "any doubts about the potentiality of coverage must be resolved in favor of the insured." *Cowan Sys.,* 457 F.3d at 372.

To determine whether the insurer must defend, Maryland courts ask two questions: "(1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? [and] (2) do the allegations in the [underlying]

tort action potentially bring the tort claim within the policy's coverage?" *Id.* (alterations in original). "The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit." *St. Paul Fire & Marine Ins. Co. v. Pryseski,* 292 Md. 187, 438 A.2d 282, 285 (1981).

### A.

In answering the first question noted above, "[i]nsurance contracts are treated as any other contract, and [Maryland courts] measure such an agreement by its terms." *United Servs. Auto. Ass'n v. Riley,* 393 Md. 55, 899 A.2d 819, 833 (2006). We must construe the policy as a whole, and a word should be accorded "its usual, ordinary and accepted meaning unless there is evidence that the parties intended to employ it in a special or technical sense." *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.,* 390 Md. 449, 889 A.2d 387, 393 (2006) (quotation marks omitted). "In addition, [Maryland courts] examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Cole v. State Farm Mut. Ins. Co.,* 359 Md. 298, 753 A.2d 533, 537 (2000) (quotation marks omitted). "[I]f no ambiguity in the terms of the insurance contract exists, a court will enforce those terms." *Nat'l Union Fire Ins. Co. of Pittsburgh v. David A. Bramble, Inc.,* 388 Md. 195, 879 A.2d 101, 109 (2005). But "if an insurance policy is ambiguous, it will be construed liberally in favor of the insured and against the insurer *as drafter of the instrument,*" *Dutta v. State Farm Ins. Co.,* 363 Md. 540, 769 A.2d 948, 957 (2001) (quotation marks omitted; emphasis in original), at least if extrinsic evidence cannot resolve the ambiguity, *Clendenin Bros.,* 889 A.2d at 394. We must find policy language ambiguous if it "suggests more than one meaning to a reasonably prudent layperson." *State Farm Mut.*

*Auto. Ins. Co. v. DeHaan,* 393 Md. 163, 900 A.2d 208, 226 (2006).

In interpreting the insurance contract, we should take special care to interpret exclusion provisions narrowly. *See Megonnell v. United Servs. Auto. Ass'n,* 368 Md. 633, 796 A.2d 758, 772 (2002). "[S]ince exclusions are designed to limit or avoid liability, they will be construed more strictly than coverage clauses and must be construed in favor of a finding of coverage." *Id.* (quotation marks omitted). And, in all cases, the insurer bears the burden of showing that an exclusion applies. *See Prop. & Cas. Ins. Guar. Corp. v. Beebe–Lee,* 431 Md. 474, 66 A.3d 615, 624 (2013); *see also Trice, Geary & Myers, LLC v. Camico Mut. Ins. Co.,* 459 Fed. Appx. 266, 274 (4th Cir.2011) (unpublished) (applying Maryland law).

### B.

In answering the second question, courts evaluate the "causes of action actually alleged by the plaintiff in [the underlying] lawsuit." *Reames v. State Farm Fire & Cas. Ins.,* 111 Md.App. 546, 683 A.2d 179, 186 (1996); *see also Sheets v. Brethren Mut. Ins. Co.,* 342 Md. 634, 679 A.2d 540, 542 (1996) ("[W]e must assume that the facts in the [underlying] complaint are true."). We do not consider the merits of the underlying suit at the duty-to-defend stage; "the underlying tort suit need only *allege* action that is *potentially covered* by the policy, no matter how attenuated, frivolous, or illogical that allegation may be." *Sheets,* 679 A.2d at 544 (emphasis in original). The policyholder—but not the insurer—may also introduce extrinsic evidence at this step to establish a potentiality of coverage. *Aetna Cas. & Sur. Co. v. Cochran,* 337 Md. 98, 651 A.2d 859, 866 (1995).

Finally, and critically, if the complaint at issue contains some covered claims and

some non-covered claims, then the insurer must defend the entire action. *See Perdue Farms, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 448 F.3d 252, 258 (4th Cir.2006) ("Under Maryland's comprehensive duty to defend, if an insurance policy potentially covers any claim in an underlying complaint, the insurer ... must typically defend the entire suit, including non-covered claims.").

With these basic principles in mind, we consider each of the parties' exclusion-related arguments.

### IV.

### A.

■ Evanston first argues that exclusion (n), sometimes called the personal-profits exclusion, defeats coverage. In its view, exclusion (n) applies whenever an underlying action suggests that the policyholder gained an illegal benefit or superior position. Evanston contends that the Attorney General's complaint alleged such an advantage because Cornerstone did not deliver the settlement checks to the selling homeowners, thereby taking part in an equity-stripping scheme.

Even if we were to adopt Evanston's reading of the relevant exclusion, we do not agree with its view of the complaint. Our disagreement leads us to conclude that exclusion (n) does not bar coverage to Cornerstone.

The Attorney General's complaint did not allege that any particular "profit" or "advantage" inured to Cornerstone's benefit, as exclusion (n) requires. To the contrary, the complaint alleged that all the relevant benefits and funds went to the Lewis Defendants and, perhaps, Thomas. It was the Lewis Defendants, after all, who "stripped" the equity from homeowners' homes by contriving false fees and other reasons to obtain the homeowners' settlement proceeds. Evanston admits as much. (*See* Evanston's Br. 17 ("The result of this scheme allowed *the Lewis Defendants* to wrongfully take the homeowners' equity." (emphasis added)).) Although Cornerstone collected the settlement proceeds, the complaint does not suggest that it ever retained them. *See Perdue Farms*, 448 F.3d at 256 n. 3 (finding personal-profits exclusion inapplicable where the underlying plaintiffs "never alleged that [the defendant] gained any advantage from its unlawful conduct"). There is no allegation that Cornerstone should not have collected the settlement proceeds because, as a settlement agent, the company was required to do so. *Cf.* Obligation of Title Insurance Companies to Conduct Annual Review of Settlement Agents, 85 Md. Op. Att'y Gen. 306, 315 (2000) ("Funds are normally escrowed as a part of a real estate settlement."). While the homeowners' equity and money might be an illegal profit or advantage that went to someone after settlement, those assets went to parties other than "the Insured" under the terms of Cornerstone's policy with Evanston.

We also observe that exclusion (n) would not apply because the underlying complaint did not allege illegal profiteering by Cornerstone. Instead, the complaint alleged illegal conduct that produced incidental gains. Put another way: the Attorney General could have succeeded on its claims against Cornerstone without showing that Cornerstone received a single dollar or any other advantage, legal or illegal. In fact, many of the claims for which Cornerstone was allegedly jointly and severally liable did not involve money at all, but instead alleged wrongful disclosures and misrepresentations. (*See* J.A. 109 (defining Cornerstone as a "Foreclosure Rescue Defendant"); J.A. 126–30 (listing actions for which all Foreclosure Rescue Defendants were responsible).) *Cf. Fed. Ins. Co.*

*v. Kozlowski*, 18 A.D.3d 33, 792 N.Y.S.2d 397, 403 (2005) (explaining that personal-profits exclusion did not relieve insurer of duty to pay defense costs where underlying actions also contained allegations relating to "alleged misstatements and omissions" that were "archetypical of claims that encompass both excluded and covered behavior"). The underlying nondisclosure claims, at a minimum, do not "arise out of" the illegal profit or advantage itself, so those allegations of the complaint do not fall within the exclusion. *Perdue Farms*, 448 F.3d at 256 n. 3 ("[T]he alleged ERISA violations do not 'aris[e] out of' illegal profiteering, because 29 U.S.C. § 1140 proscribes specified conduct, not profit."); *see also Brown & LaCounte, LLP v. Westport Ins. Corp.*, 307 F.3d 660, 664 (7th Cir.2002) (distinguishing between cases involving "allegations of breaches of fiduciary duty where the dispute concerned the illegality of the actions taken or profits received" and case involving an "unequivocal[ ] alleg[ation] that [the defendant] reaped an illegal profit").

Though Evanston argues otherwise, it makes no difference that Cornerstone received fees for the settlement services that it provided at closing when the houses were conveyed to the Lewis Defendants. The complaint does not allege that Cornerstone overcharged or that it failed to provide bona fide settlement services. Under the plain terms of exclusion (n), Cornerstone's receipt of legally justified funds does not defeat policy coverage. *See, e.g., St. Paul Mercury Ins. Co. v. Foster*, 268 F.Supp.2d 1035, 1045 (C.D.Ill.2003) (finding personal-profits exclusion inapplicable where policyholder might have been "legally entitled to retain" the funds in question). More importantly, as the district court held in an unchallenged ruling and as Evanston acknowledged at argument, the Attorney General's complaint did not seek damages for the "consideration or ex-penses paid to [Cornerstone] for services or goods." *Cornerstone*, 2013 WL 393286, at *5 (alteration in original). Because the Attorney General's claims did not touch upon Cornerstone's settlement fees, those fees could hardly have been a "profit" or "advantage" that spurred the underlying claim. *See, e.g., Axis Reinsurance Co. v. Telekenex, Inc.*, 913 F.Supp.2d 793, 803 (N.D.Cal.2012) (finding personal-profits exclusion did not bar coverage for spoliations sanction even though spoilative act might have also provided business advantage, where court did not premise the sanction on the act creating the advantage); *In re Donald Sheldon & Co., Inc.*, 186 B.R. 364, 369 (S.D.N.Y.1995) (holding that exclusion did not apply where the "alleged personal profits … were not the basis of the liability for which recovery was sought").

Finally, Evanston has not persuaded us that some undefined personal benefit flowed to Cornerstone merely because the Attorney General sought restitution as a remedy under the complaint. To be sure, a restitution award sometimes suggests that the defendant enjoyed some gain, as "restitution [in the Consumer Protection Act context] aims at disgorgement of unjust enrichment, not compensation for damages." *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 874 A.2d 919, 953 (2005). But in a case that involves "concerted action"—that is, a case like the underlying action here—the restitution award doesn't necessarily aim to disgorge benefits *from particular defendants*. Instead, the award serves to disgorge the benefits going to *the* scheme as a whole. A conspiring Consumer Protection Act defendant will therefore face potential restitution anytime any of his co-conspirators enjoyed some benefit. *Id.* ("As tortfeasors acting in concert are responsible for the damages each caused, so too are Consumer Protection Act violators who act in concert responsible for the

unjust enrichment each gained at the consumers' expense."). A defendant who enjoyed no personal gain could still be ordered to pay restitution if he were part of a broader concerted action that produced benefits to a fellow co-defendant. *See, e.g., State v. Cottman Transmissions Sys., Inc.,* 86 Md.App. 714, 587 A.2d 1190, 1201 (1991) (ordering defendant to pay restitution where another party received improper fees but defendant "indirectly" assisted other party in deception); *see also J.P. Morgan Secs. Inc. v. Vigilant Ins. Co.,* 21 N.Y.3d 324, 970 N.Y.S.2d 733, 992 N.E.2d 1076, 1082–83 (2013) (finding that personal-profit exclusion would not apply where disgorgement payment made by defendant "did not actually represent the disgorgement of [the defendant's] own profits," but rather "represented the improper profits acquired by third-part[ies]"). The restitution request therefore does not serve as any guarantee of personal gain on Cornerstone's part.

In sum, the personal-profits exclusion—exclusion (n)—does not defeat Evanston's duty to defend and the district court erred in granting partial summary judgment to Evanston in that regard.

### B.

■ Alternatively, Evanston references the Attorney General's allegations that Cornerstone misdirected settlement checks and maintains that exclusion (x) also bars coverage. This improper delivery, it says, amounts to conversion.[2] Evanston's argument suffers from a fatal flaw: the improper delivery seen here did not amount to conversion.

In Maryland, the payee of a check (here, the homeowner) must receive the check before he or she can bring a conversion action based on a misuse or improper delivery of it. *See* Md.Code Ann., Comm. L. § 3–420(a) ("An action for conversion of an instrument may not be brought by ... a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee."). Where the payee has not received the check, the payee retains a cause of action against the drawer (in this case, Cornerstone) for the liability reflected in the check, but, at least at that point in time, cannot bring a conversion action. *See Jackson v. 2109 Brandywine, LLC,* 180 Md.App. 535, 952 A.2d 304, 321 (2008). In this case, Cornerstone allegedly misdirected the settlement checks before they ever reached the hands of the homeowners. Thus, the necessary element of delivery for a Maryland conversion action to the payee was absent at the time of the allegedly wrongful transfer by Cornerstone.

Even if we could overlook this basic issue and assume that the Cornerstone's act of "improper delivery" fell within exclusion (x), we would still find that other allegations in the Attorney General's complaint are not within the ambit of that exclusion and therefore the duty to defend is triggered. For instance, the underlying complaint faults Cornerstone for failing to disclose certain facts. And, as we have now previously described, the underlying complaint attempts to impose liability on Cornerstone for acts of its co-defendants that have no connection at all to misdirected checks. Among other things, the Attorney General sought to hold Cornerstone responsible for acts such as failing to make required statutory disclosures, recording deeds prematurely, and making misleading statements about the services that the defendants provided. Those claims do not arise from theft, conversion, misappropriation, or any of the other acts described in

---

**2.** On appeal, Evanston invokes only the conversion portion of the exclusion.

.. 

exclusion (x), and consequently require coverage under the policy.

■ At argument, Evanston pressed two other points that we need only briefly address. First, Evanston evoked a notion reminiscent of the one that the district court adopted—that the "gravamen" of the underlying complaint should decide whether it warrants coverage. But as we have already discussed, the well-established rule in Maryland says otherwise. Where covered and uncovered claims arise in the same action, the insurer must defend, regardless of what the gravamen of the action might be. *See, e.g., Cont'l Cas. Co. v. Bd. of Educ. of Charles Cnty.*, 302 Md. 516, 489 A.2d 536, 542 (1985); *Back Creek Partners, LLC v. First Am. Title Ins. Co.*, 213 Md.App. 703, 75 A.3d 394, 400 (2013); *Zurich Ins. Co. v. Principal Mut. Ins. Co.*, 134 Md.App. 643, 761 A.2d 344, 348 (2000); *Balt. Gas & Elec. Co. v. Commercial Union Ins. Co.*, 113 Md.App. 540, 688 A.2d 496, 512 (1997). Indeed, in *Utica Mutual Insurance Co. v. Miller*, 130 Md.App. 373, 746 A.2d 935, 941–42 (2000), the Court of Special Appeals of Maryland found that an underlying complaint triggered the duty to defend even though the "gravamen" of that complaint was plainly excluded, where other claims were not. Second, Evanston questioned whether Cornerstone faced a genuine prospect of liability from the acts of its co-defendants. As should be clear by now, we need not answer that question to determine whether the insurer must defend. The insurer has a duty to defend a covered claim even when the claim can be called "frivolous." *Back Creek Partners*, 75 A.3d at 400.

In short, exclusion (x) also does not defeat Evanston's duty to defend the Attorney General's suit and the district court erred in awarding Cornerstone partial summary judgment in that regard.

## C.

Evanston suggests that we affirm on alternative grounds, particularly that exclusions (a) and (cc) exclude coverage. As noted earlier, the district court did not address these policy exclusions. "Although we are not precluded from addressing [alternative grounds for affirmance], we deem it more appropriate to allow the district court to consider them, if necessary, in the first instance on remand." *Q Int'l Courier Inc. v. Smoak*, 441 F.3d 214, 220 n. 3 (4th Cir.2006); *see also United States ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 184 (4th Cir.2013) ("The district court did not reach this argument, having found grounds for dismissal elsewhere. We decline to address this issue for the first time on appeal."). Accordingly, we will remand the case for further proceedings so that the district court can address the parties' arguments as to exclusions (a) and (cc) in the first instance.

## V.

For these reasons, we reverse the district court's grant of summary judgment to Evanston on the duty-to-defend issue. Because the district court's decision on the duty-to-indemnify matter rested solely on its erroneous duty-to-defend decision, we must reverse that decision as well. We direct the district court to enter partial summary judgment in Cornerstone's favor on the duty-to-defend issue as to exclusions (n) and (x). We remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED.*

Oscar Guevara BELTRAN, Petitioner,

v.

Eric H. HOLDER, JR., Attorney
General, Respondent.

No. 13–1741.

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 7, 2014.

Decided: Feb. 19, 2014.

W. Rob Heroy, Goodman, Carr PLLC, Charlotte, North Carolina, for Petitioner. Stuart F. Delery, Assistant Attorney General, David V. Bernal, Assistant Director, Jesse M. Bless, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for Respondent.

Before KEENAN and WYNN, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Petition dismissed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Oscar Guevara Beltran, a native and citizen of Mexico, petitions for review of an order of the Board of Immigration Appeals ("Board") dismissing his appeal from the immigration judge's decision pretermitting his application for cancellation of removal. Because the petition for review was not filed within thirty days of the Board's order, we dismiss for lack of jurisdiction.

The Board's decision was issued on May 8, 2013. Pursuant to 8 U.S.C. § 1252(b)(1) (2012), Guevara Beltran had thirty days, or until Friday, June 7, 2013, to timely file the petition for review. The Supreme Court has held that this time period is "jurisdictional in nature and must be construed with strict fidelity to [its] terms." *Stone v. INS,* 514 U.S. 386, 405, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995). It is "not subject to equitable tolling." *Id.* Because Guevara Beltran did not file his petition until Monday, June 10, 2013, the petition for review was untimely filed.

Accordingly, we dismiss the petition for review for lack of jurisdiction. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*PETITION DISMISSED.*

Beverly WALKER, Plaintiff–Appellant,

v.

UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORPORATION; University of Maryland Medical Center; Renee Ellen Fox, MD; Jennifer Fitzgerald, Defendants–Appellees.

No. 13–1803.

United States Court of Appeals,
Fourth Circuit.

Submitted: Jan. 31, 2014.

Decided: Feb. 19, 2014.

Suzanne M. Tsintolas, Law Office of Suzanne M. Tsintolas, Washington, D.C., for Appellant. Natalie C. Magdeburger, Pessin Katz Law, P.A., Towson, Maryland, for Appellees.

Before SHEDD, DUNCAN, and WYNN, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Beverly Walker appeals the district court's order treating the Appellees' motion to dismiss as a motion for summary judgment and granting summary judgment in favor of the Appellees on Walker's claims of age and race discrimination and defamation. We have reviewed the record and find no reversible error. Accordingly, we affirm the district court's order. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Christopher James MILLS, a/k/a**
**Christopher James Nichols,**
**Defendant–Appellant.**

**No. 13–4344.**

United States Court of Appeals,
Fourth Circuit.

Submitted: Jan. 31, 2014.

Decided: Feb. 19, 2014.

Matthew M. Robinson, Robinson & Brandt, P.S.C., Covington, Kentucky, for Appellant. Timothy J. Heaphy, United States Attorney, R. Andrew Bassford, Assistant United States Attorney, Roanoke, Virginia; Mythili Raman, Assistant United States Attorney, Denis J. McInerney, Thomas E. Booth, United States Department of Justice, Washington, D.C., for Appellee.

Before MOTZ and AGEE, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Christopher James Mills appeals his conviction and 254–month sentence for conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846 (2012). On appeal, Mills raises several arguments: that the district court denied him a fair trial by denying his motion in limine and permitting evidence concerning a home invasion;

that the district court abused its discretion in denying his motions for a mistrial and a new trial; that the evidence presented by the Government resulted in a constructive amendment to the indictment; that his sentence is procedurally unreasonable; and that the district court unconstitutionally increased his statutory mandatory minimum sentence. Finding no reversible error, we affirm.

■ Mills first contends that the district court erred in denying his motion in limine and permitting the Government to present evidence pertaining to a home invasion, in violation of Fed.R.Evid. 403 and 404(b). Even if we were to assume that the district court erroneously admitted the evidence, we conclude that any such error was harmless. *See United States v. Abu Ali,* 528 F.3d 210, 231 (4th Cir.2008) (providing standard of review).

■ Second, Mills contends that the district court erred in denying his motions for a mistrial and for a new trial based on the Government's alleged prosecutorial misconduct. We review claims of prosecutorial misconduct "to determine whether the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Scheetz,* 293 F.3d 175, 185 (4th Cir.2002) (internal quotation marks omitted). To prevail on a claim of prosecutorial misconduct, "the defendant must show that the prosecutor's remarks or conduct were improper and ... that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial." *Id.* Upon review, we conclude that the Government did not engage in any improper conduct. Thus, the district court did not abuse its discretion in denying Mills' motions for a mistrial or for a new trial. *See United States v. Robinson,* 627 F.3d 941, 948 (4th Cir.2010) (providing standard of review for denial of motion for new trial);

*United States v. Wallace,* 515 F.3d 327, 330 (4th Cir.2008) (providing standard of review for motion for mistrial).

Third, Mills contends that his conviction should be overturned because the Government constructively amended the indictment by introducing evidence of a home invasion and drug activity involving drugs other than cocaine and dating back to the 1990s. "[A]fter an indictment has been returned[,] its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States,* 361 U.S. 212, 215–16, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). "When the government, through its presentation of evidence ... broadens the bases for conviction beyond those charged in the indictment, a constructive amendment—sometimes referred to as a fatal variance—occurs." *United States v. Allmendinger,* 706 F.3d 330, 339 (4th Cir.) (internal quotation marks and citation omitted), *cert. denied,* — U.S. —, 133 S.Ct. 2747, 186 L.Ed.2d 194 (2013); *see United States v. Foster,* 507 F.3d 233, 242 (4th Cir.2007) ("When considering a constructive amendment claim, it is the broadening of the bases for a defendant's conviction that is important—nothing more.") (internal quotation marks and brackets omitted). Constructive amendments are fatal "because the indictment is altered to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment." *Foster,* 507 F.3d at 242 (internal quotation marks omitted).

■ On review, we conclude that the Government's evidence did not amount to a constructive amendment to the indictment. *See United States v. Malloy,* 568 F.3d 166, 177 (4th Cir.2009) (providing standard of review). The brief mention of a home invasion did not "create[ ] a substantial likelihood that [Mills] was convict-

ed of an uncharged offense." *United States v. Johnson*, 719 F.3d 660, 668 (8th Cir.2013) (internal quotation marks omitted). Further, we conclude that evidence of transactions involving drugs other than powder cocaine did not constructively amend the indictment, considering the continuous nature of Mills' drug transactions with his alleged coconspirators. *See United States v. Dowdell*, 595 F.3d 50, 68 (1st Cir.2010) (stating that because " § 841(a)(1) prohibits distribution of any controlled substance regardless of type," "drug identity had no bearing on the substance of the charge").

■ Fourth, Mills contends that his sentence is procedurally unreasonable because the district court sentenced him to fourteen months more than the statutory mandatory minimum sentence. In reviewing a sentence, this court must first ensure that the district court did not commit any "significant procedural error," such as failing to properly calculate the applicable Guidelines range, failing to consider the 18 U.S.C. § 3553(a) (2012) factors, or failing to adequately explain the sentence. *Gall v. United States*, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). The district court is not required to "robotically tick through § 3553(a)'s every subsection." *United States v. Johnson*, 445 F.3d 339, 345 (4th Cir.2006). However, the district court "must place on the record an 'individualized assessment' based on the particular facts of the case before it. This individualized assessment need not be elaborate or lengthy, but it must provide a rationale tailored to the particular case at hand and adequate to permit 'meaningful appellate review.'" *United States v. Carter*, 564 F.3d 325, 330 (4th Cir.2009) (quoting *Gall*, 552 U.S. at 50, 128 S.Ct. 586) (internal citation and footnote omitted). On review, we conclude that the district court committed no procedural error and,

thus, did not abuse its discretion in imposing the within-Guidelines sentence. *See United States v. Lynn*, 592 F.3d 572, 576, 578 (4th Cir.2010) (providing standard of review).

■ Finally, Mills contends that the district court violated the Fifth Amendment by increasing his statutory mandatory minimum sentence from ten years to twenty years based on his prior drug conviction, where that conviction was neither charged in the indictment nor submitted to a jury. Mills essentially challenges the viability of *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), in light of the Supreme Court's recent decision in *Alleyne v. United States*, —— U.S. ——, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013). Mills' challenge fails, however, because we remain "bound by *Almendarez–Torres* unless and until the Supreme Court says otherwise," which it has not. *United States v. Graham*, 711 F.3d 445, 455 (4th Cir.2013); *see also Alleyne*, 133 S.Ct. at 2160 n. 1 (2013); *United States v. Cheek*, 415 F.3d 349, 354 (4th Cir.2005).

Accordingly, we affirm the district court's judgment. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

UNITED STATES of America,
Plaintiff–Appellee,

v.

Terence C. RIDLEY, Defendant–
Appellant.

No. 13–7458.

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 10, 2014.

Decided: Feb. 19, 2014.

Terence C. Ridley, Appellant Pro Se. Kevin Michael Comstock, Assistant United States Attorney, Delnisea Monique Broadnax, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

Before NIEMEYER, MOTZ, and SHEDD, Circuit Judges.

Dismissed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Terence C. Ridley seeks to appeal the district court's order denying relief on his 28 U.S.C. § 2255 (2012) motion. The order is not appealable unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B) (2012). A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2012). When the district court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see Miller–El v. Cockrell*, 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). When the district court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the motion states a debatable claim of the denial of a constitutional right. *Slack*, 529 U.S. at 484–85, 120 S.Ct. 1595.

We have independently reviewed the record and conclude that Ridley has not made the requisite showing. Accordingly, we deny a certificate of appealability and dismiss the appeal. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*DISMISSED.*

Robert James PETRICK, Petitioner–
Appellant,

v.

Felix TAYLOR, Administrator,
Pasquotank Correctional Inst.,
Respondent–Appellee.

No. 13–7544.

United States Court of Appeals,
Fourth Circuit.

Submitted: Jan. 29, 2014.

Decided: Feb. 19, 2014.

Robert James Petrick, Appellant Pro Se.

Before KEENAN and THACKER, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Dismissed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Robert James Petrick seeks to appeal the district court's order accepting the recommendation of the magistrate judge and denying relief on his 28 U.S.C. § 2254 (2012) petition. The order is not appealable unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A) (2012). A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2012). When the district court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see Miller–El v. Cockrell*, 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). When the district court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the petition states a debatable claim of the denial of a constitutional right. *Slack*, 529 U.S. at 484–85, 120 S.Ct. 1595.

We have independently reviewed the record and conclude that Petrick has not made the requisite showing. Under our decision in *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir.1998), "a state prisoner must exhaust all available state remedies before he can apply for federal habeas relief." Although Petrick alleged that he filed a MAR in state court, he provided no evidence of that filing. Accordingly, it is unclear what grounds for relief Petrick raised in that motion, whether any of the claims he asserts in his Section 2254 petition were presented to the North Carolina Court of Appeals, or on what grounds the state court dismissed his motion. We therefore conclude that the district court's ruling that Petrick failed to demonstrate that he exhausted his state court remedies is not "debatable." *See Slack*, 529 U.S. at 484–85, 120 S.Ct. 1595. Accordingly, we deny Petrick's motion for appointment of counsel, deny a certificate of appealability, and dismiss the appeal. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this Court and argument would not aid the decisional process.

*DISMISSED.*

Robbie COLLINS, Petitioner–Appellant,

v.

Anthony PADULA, Respondent–Appellee.

No. 13–7589.

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 11, 2014.

Decided: Feb. 19, 2014.

Robbie Collins, Appellant Pro Se. Donald John Zelenka, Senior Assistant Attorney General, Alphonso Simon, Jr., Assistant Attorney General, Columbia, South Carolina, for Appellee.

Before AGEE and DIAZ, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Remanded by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Robbie Collins seeks to appeal the district court's order accepting the recommendation of the magistrate judge and denying relief on his 28 U.S.C. § 2254 (2012) petition. The notice of appeal was received in the district court shortly after expiration of the appeal period. Because Collins is incarcerated, the notice is considered filed as of the date it was properly delivered to prison officials for mailing to the court. *See* Fed. R.App. P. 4(c)(1); *Houston v. Lack*, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988). Although the record indicates that Collins did not give the notice of appeal to prison officials until after expiration of the appeal period, Collins claimed in the notice that he had sent an earlier notice of appeal to the district court. The record does not contain any earlier notice of appeal or reveal when Collins may have given any such notice of appeal to prison officials for mailing. Accordingly, we remand the case for the limited purpose of allowing the district court to obtain this information from the parties and to determine whether the filing was timely under Fed. R.App. P. 4(c)(1)

and *Houston v. Lack*. The record, as supplemented, will then be returned to this court for further consideration.

*REMANDED.*

Jerome J. BROWN, Plaintiff-Appellant,

v.

HOFFMAN COMPANY, LLC;
President Lauren K. Douglas,
Defendants-Appellees.

No. 13-2398.

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 5, 2014.

Decided: Feb. 20, 2014.

Jerome Julius Brown, Sr., Appellant Pro Se.

Before NIEMEYER, SHEDD, and AGEE, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Jerome J. Brown appeals the district court's order dismissing his civil complaint for lack of subject matter jurisdiction. We have reviewed the record and find no re-

versible error. Accordingly, we affirm for the reasons stated by the district court. *See Brown v. Hoffman Co.,* No. 1:13–cv01364–LMB–TRJ (E.D. Va. filed Nov. 7, 2013; entered Nov. 15, 2013). We grant Brown leave to proceed in forma pauperis. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Damion ROSCOE, Defendant–Appellant.**

**No. 13–4345.**

United States Court of Appeals,
Fourth Circuit.

Submitted: Jan. 30, 2014.

Decided: Feb. 20, 2014.

James Wyda, Federal Public Defender, LaKeytria Felder, Assistant Federal Public Defender, Greenbelt, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Justin S. Herring, Assistant United States Attorney, Baltimore, Maryland, for Appellee.

Before DUNCAN, KEENAN, and FLOYD, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Damion Roscoe admitted to violating the terms of his supervised release by absconding from supervision. He appeals from the twenty-four-month revocation sentence imposed by the district court. He contends that this sentence was plainly unreasonable. We affirm.

We will affirm a sentence imposed after revocation of supervised release if it is within the prescribed statutory range and not plainly unreasonable. *United States v. Crudup,* 461 F.3d 433, 439–40 (4th Cir. 2006). First we consider whether the sentence imposed is procedurally or substantively unreasonable. *Id.* at 438. In this initial inquiry, we take a more deferential posture concerning issues of fact and the exercise of discretion than that undertaken for the reasonableness review for Guidelines sentences. *United States v. Moulden,* 478 F.3d 652, 656 (4th Cir.2007). If we find the sentence procedurally or substantively unreasonable, we must then decide whether it is "plainly" so. *Id.* at 657.

Here, the district court correctly calculated and considered the advisory policy statement range, considered the relevant factors, and gave the parties an opportunity to present argument. The sentence was procedurally reasonable. *See United States v. Thompson,* 595 F.3d 544, 547 (4th Cir.2010). The court also sufficiently explained its reasons for imposing a sentence outside the policy statement range. *See Crudup,* 461 F.3d at 440.

Roscoe contends that, in determining the sentence, the district court improperly

considered the seriousness of the offense and the need for the sentence imposed to promote respect for the law. Because Roscoe did not object in the district court to the explanation of his sentence, we review for plain error. *United States v. Hargrove,* 625 F.3d 170, 183–84 (4th Cir. 2010); *see United States v. Olano,* 507 U.S. 725, 732–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

The district court's consideration of the seriousness of the offense and the need to promote respect for the law was in conjunction with its consideration of the factors in 18 U.S.C. § 3583(e) (2012). Specifically, Roscoe's failure to respect the terms of the court's supervised release order is relevant to the nature and circumstances of his offense, his history and characteristics, and the need to protect the public from further crimes by Roscoe. "Although § 3583(e) enumerates the factors a district court should consider when formulating a revocation sentence, it does not expressly prohibit a court from referencing other relevant factors omitted from the statute." *United States v. Webb,* 738 F.3d 638, 641 (4th Cir.2013). Because the district court properly considered the seriousness of the offense and promoting respect for the law in conjunction with the enumerated factors, we find no plain error by the district court. *See id.* at 642 (concluding that reference to non-enumerated factor does not render revocation sentence procedurally unreasonable when considered in conjunction with enumerated 18 U.S.C. § 3553(a) (2012) factors).

Accordingly, we conclude that the twenty-four-month revocation sentence is not plainly unreasonable. We therefore affirm the revocation judgment. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Corey Jamel DAVIS, Defendant–Appellant.**

**No. 13–4376.**

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 11, 2014.

Decided: Feb. 20, 2014.

Thomas P. McNamara, Federal Public Defender, Stephen C. Gordon, Assistant Federal Public Defender, Raleigh, North Carolina, for Appellant. Thomas G. Walker, United States Attorney, Jennifer P. May–Parker, Kristine L. Fritz, Assistant United States Attorneys, Raleigh, North Carolina, for Appellee.

Before KING, AGEE, and FLOYD, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

**250**

PER CURIAM:

Corey Jamel Davis appeals the district court's judgment revoking his supervised release and imposing a twenty-four month prison term. Davis argues that the district court erred in finding that he engaged in criminal conduct while on release. We affirm.

We review a district court's decision to revoke supervised release for abuse of discretion. *United States v. Pregent,* 190 F.3d 279, 282 (4th Cir.1999). A district court need only find a violation of a condition of supervised release by a preponderance of the evidence. 18 U.S.C. § 3583(e)(3) (2012); *Johnson v. United States,* 529 U.S. 694, 700, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000). We review for clear error factual determinations underlying the conclusion that a violation occurred. *United States v. Miller,* 557 F.3d 910, 914 (8th Cir.2009); *United States v. Whalen,* 82 F.3d 528, 532 (1st Cir.1996).

After review of the record and the parties' briefs, we conclude that the district court did not abuse its discretion in revoking Davis' supervised release. A preponderance of the evidence supports the finding that Davis violated the terms of his supervised release by engaging in the criminal offense of felony possession of heroin while on release. N.C. Gen.Stat. §§ 90–89(2)j, 90–95(a)(3), (d)(1) (2013); *State v. Matias,* 354 N.C. 549, 556 S.E.2d 269, 270–71 (2001); *State v. Brown,* 310 N.C. 563, 313 S.E.2d 585, 589 (1984).

Accordingly, we affirm the district court's judgment. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

David **ALUVALE,** Plaintiff–Appellant,

v.

**TRULAND SYSTEMS CORPORATION,** Defendant–Appellee.

No. 13–2029.

United States Court of Appeals, Fourth Circuit.

Submitted: Jan. 31, 2014.

Decided: Feb. 20, 2014.

David Aluvale, Appellant Pro Se. Kevin D. Holden, Crystal L. Tyler, Jackson Lewis PC, Richmond, Virginia, for Appellee.

Before WYNN and FLOYD, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

David Aluvale appeals the district court's order granting summary judgment to Defendant on Aluvale's claim of discriminatory discharge under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e to 2000e–17 (West 2003 & Supp.2013). We have reviewed the record and find no reversible error. Accordingly, we affirm for the reasons stated by

the district court. *Aluvale v. Truland Sys. Corp.*, No. 1:13–cv–00178–AJT–TRJ (E.D. Va. Aug. 16, 2013); *see* Summ. J. Tr. 12–18, Aug. 16, 2013. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

**UNITED STATES of America,** Plaintiff–Appellee,

v.

**Danny POSTON, Defendant–Appellant.**

No. 13–4583.

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 11, 2014.

Decided: Feb. 20, 2014.

Charles T. Berry, Fairmont, West Virginia, for Appellant. Zelda Elizabeth Wesley, Assistant United States Attorney, Clarksburg, West Virginia, for Appellee.

Before FLOYD and THACKER, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Danny Poston appeals the seventy-months, within-Guidelines sentence imposed by the district court after he pled guilty to possession with intent to distribute in excess of twenty-eight grams of cocaine base within 1000 feet of a protected location, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 860 (2012), and 18 U.S.C. § 2 (2012). On appeal, Poston's counsel has filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), stating that there are no meritorious grounds for appeal but questioning whether Poston's sentence is reasonable and whether trial counsel was ineffective for lodging an erroneous objection to the presentence investigation report ("PSR") that later had to be withdrawn. Despite being given notice of the opportunity to do so, Poston has not filed a pro se supplemental brief. We affirm.

Poston questions the reasonableness of his sentence. We review a sentence for reasonableness, applying an abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). In so doing, we first examine the sentence for significant procedural error, including whether the district court properly calculated the advisory Guidelines range, considered the parties' arguments in light of the 18 U.S.C. § 3553(a) (2012) factors, selected a sentence based on clearly erroneous facts, and adequately explained the sentence. *Gall*, 552 U.S. at 51, 128 S.Ct. 586. When considering the substantive reasonableness of the sentence, we "take into account the totality of the circumstances." *Id.* If the sentence is

within or below the Guidelines range, we presume on appeal that the sentence is reasonable. *United States v. Yooho Weon,* 722 F.3d 583, 590 (4th Cir.2013).

We have thoroughly reviewed the transcript of Poston's sentencing hearing and conclude that the district court's sentence is reasonable. The district court properly calculated the advisory Guidelines range, considered the relevant § 3553(a) factors, and tailored its sentence to Poston's specific circumstances. The district court thoroughly explained the reasons for its within-Guidelines sentence, holding that Poston's extensive criminal history, background of drug dealing, and evidence of continuing drug activity indicated a high risk of recidivism, warranting a higher sentence. Because the district court adequately explained the reasons for its sentence, we conclude that Poston's within-Guidelines sentence is entitled to the presumption of reasonableness.

Lastly, Poston contends that his counsel was ineffective for lodging an erroneous objection to the PSR and then withdrawing the objection. Claims of ineffective assistance of counsel "are generally not cognizable on direct appeal." *United States v. Benton,* 523 F.3d 424, 435 (4th Cir.2008); *see United States v. King,* 119 F.3d 290, 295 (4th Cir.1997). Instead, to allow for adequate development of the record, a defendant must ordinarily bring his claims in a 28 U.S.C. § 2255 (2012) motion. *King,* 119 F.3d at 295. However, we can entertain such claims on direct appeal only if it conclusively appears from the record that defense counsel did not provide effective representation. *Id.; United States v. Richardson,* 195 F.3d 192, 198 (4th Cir. 1999).

Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant must satisfy two prongs in order to prove an ineffective

assistance of counsel claim: (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) that the deficient performance was prejudicial. *Id.* at 687, 688, 104 S.Ct. 2052; *see Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (discussing showing of prejudice required in context of guilty plea). Our thorough review of the record leads us to conclude that Poston has failed to conclusively demonstrate that his trial counsel was ineffective. We therefore decline to address this claim on direct appeal.

In accordance with *Anders,* we have reviewed the record in this case and have found no meritorious grounds for appeal. We therefore affirm the district court's judgment. This court requires that counsel inform Poston, in writing, of the right to petition the Supreme Court of the United States for further review. If Poston requests that a petition be filed, but counsel believes that such a petition would be frivolous, then counsel may move in this court for leave to withdraw from representation. Counsel's motion must state that a copy thereof was served on Poston.

We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Derrick Keith USSERY, Sr., a/k/a**
**Boogaloo, Defendant–**
**Appellant.**

No. 13–7181.

United States Court of Appeals,
Fourth Circuit.

Submitted: Jan. 31, 2014.

Decided: Feb. 20, 2014.

Derrick Keith Ussery, Sr., Appellant Pro Se. Jennifer P. May–Parker, Evan Rikhye, Assistant United States Attorneys, Joshua Bryan Royster, Office of the United States Attorney, Raleigh, North Carolina, for Appellee.

Before NIEMEYER, KING, and KEENAN, Circuit Judges.

Dismissed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Derrick K. Ussery, Sr., seeks to appeal the district court's orders denying relief on his 28 U.S.C. § 2255 (2012) motion and his Fed.R.Civ.P. 60(b) motion for reconsideration. The orders are not appealable unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B) (2006). A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2006). When the district court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see Miller–El v. Cockrell,* 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). When the district court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the motion states a debatable claim of the denial of a constitutional right. *Slack,* 529 U.S. at 484–85, 120 S.Ct. 1595.

We have independently reviewed the record and conclude that Ussery has not made the requisite showing. Accordingly, we deny a certificate of appealability, deny as moot Ussery's motion to place his case in abeyance pending our decision in *Miller v. United States,* 735 F.3d 141 (4th Cir. 2013) as moot, and dismiss the appeal. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*DISMISSED.*

254

Jarrett D. HOLDEN, Petitioner–
Appellant,

v.

Harold CLARKE, Director of VA.
D.O.C., Respondent–Appellee.

No. 13–7629.

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 7, 2014.

Decided: Feb. 20, 2014.

Jarrett D. Holden, Appellant Pro Se.

Before NIEMEYER, DUNCAN, and
WYNN, Circuit Judges.

Dismissed by unpublished PER
CURIAM opinion.

Unpublished opinions are not binding
precedent in this circuit.

PER CURIAM:

Jarrett D. Holden seeks to appeal the
district court's order denying relief on his
28 U.S.C. § 2254 (2012) petition. The or-
der is not appealable unless a circuit jus-
tice or judge issues a certificate of appeal-
ability. 28 U.S.C. § 2253(c)(1)(A) (2012).
A certificate of appealability will not issue
absent "a substantial showing of the denial
of a constitutional right." 28 U.S.C.
§ 2253(c)(2) (2012). When the district
court denies relief on the merits, a prison-
er satisfies this standard by demonstrating
that reasonable jurists would find that the
district court's assessment of the constitu-
tional claims is debatable or wrong. *Slack
v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct.

1595, 146 L.Ed.2d 542 (2000); *see Miller–
El v. Cockrell,* 537 U.S. 322, 336–38, 123
S.Ct. 1029, 154 L.Ed.2d 931 (2003). When
the district court denies relief on procedur-
al grounds, the prisoner must demonstrate
both that the dispositive procedural ruling
is debatable, and that the petition states a
debatable claim of the denial of a constitu-
tional right. *Slack,* 529 U.S. at 484–85,
120 S.Ct. 1595.

We have independently reviewed the
record and conclude that Holden has not
made the requisite showing. Accordingly,
we deny a certificate of appealability, deny
leave to proceed in forma pauperis, and
dismiss the appeal. We dispense with oral
argument because the facts and legal con-
tentions are adequately presented in the
materials before this court and argument
would not aid the decisional process.

*DISMISSED.*

Victor A. FERMAN, a/k/a Victor
Alberto Ferman Molina,
Petitioner,

v.

Eric H. HOLDER, Jr., Attorney
General, Respondent.

No. 13–2106.

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 11, 2014.

Decided: Feb. 20, 2014.

Victor A. Ferman, Petitioner Pro Se. Michael Christopher Heyse, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for Respondent.

Before WILKINSON, KING, and SHEDD, Circuit Judges.

Petition dismissed in part, denied in part by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Victor A. Ferman, a native and citizen of El Salvador, petitions for review of an order of the Board of Immigration Appeals ("Board") dismissing his appeal from the immigration judge's order and denying his motion to remand. Ferman's request for cancellation of removal under 8 U.S.C. § 1229b(b)(1) (2012) was denied because he failed to show that his removal would result in "exceptional and extremely unusual hardship" to his qualifying relatives. We dismiss in part and deny in part the petition for review.

Under 8 U.S.C. § 1252(a)(2)(B)(i) (2012), entitled "Denials of discretionary relief," "no court shall have jurisdiction to review any judgment regarding the granting of relief under section … 1229b," which is the section governing cancellation of removal. *See Obioha v. Gonzales*, 431 F.3d 400, 405 (4th Cir.2005) ("It is quite clear that the gatekeeper provision [of § 1252(a)(2)(B)(i) ] bars our jurisdiction to review a decision of the BIA to actually deny a petition for cancellation of removal or the other enumerated forms of discretionary relief."). However, this court does have jurisdiction over constitutional claims and questions of law. 8 U.S.C. § 1252(a)(2)(B)(i), (D). *Jean v. Gonzales*, 435 F.3d 475, 480 (4th Cir.2006). "[A]n 'exceptional and extremely unusual hard-

ship' determination is a subjective, discretionary judgment that has been carved out of appellate jurisdiction." *Romero–Torres v. Ashcroft*, 327 F.3d 887, 888 (9th Cir. 2003). Indeed, we have concluded that the issue of hardship is committed to agency discretion and thus is not subject to appellate review. *Okpa v. INS*, 266 F.3d 313, 317 (4th Cir.2001).

Because Ferman does not raise a constitutional claim or a question of law regarding the dismissal of his appeal from the immigration judge's order denying cancellation of removal, we lack jurisdiction and dismiss in part the petition for review.

A motion to remand in order to consider new evidence that is filed while an appeal to the Board is pending is held to the same legal standard as a motion to reopen. *See Onyeme v. INS*, 146 F.3d 227, 234 (4th Cir.1998). Such a motion must state the new facts to be proven at a hearing and must be supported by affidavits or other evidentiary material. *See* 8 C.F.R. § 1003.2(c)(1) (2013). Further, such motion shall not be granted unless the evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing. *Id.* The movant must also demonstrate that the new evidence would likely change the result in the case. *See Matter of Coelho*, 20 I. & N. Dec. 464, 473 (B.I.A.1992). The Board's denial of a motion to remand and reopen is reviewed for abuse of discretion. *See Hussain v. Gonzales*, 477 F.3d 153, 155 (4th Cir.2007).

We also recognize three independent grounds on which a motion to reopen removal proceedings may be denied: "(1) the alien has not established a *prima facie* case for the underlying substantive relief sought; (2) the alien has not introduced previously unavailable, material evidence; and (3) where relief is discretionary, the

alien would not be entitled to the discretionary grant of relief." *Onyeme,* 146 F.3d at 234 (citing *INS v. Abudu,* 485 U.S. 94, 104–05, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988)). We will reverse the denial of a motion to reopen only if it is "arbitrary, irrational, or contrary to law." *Mosere v. Mukasey,* 552 F.3d 397, 400 (4th Cir.2009) (internal quotation marks omitted).

We conclude that the Board did not abuse its discretion. Ferman did not show that the new evidence was previously unavailable. Nor did he show that the evidence established a prima facie case for cancellation of removal.

Accordingly, we dismiss in part and deny in part the petition for review. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*PETITION DISMISSED IN PART; DENIED IN PART.*

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Timothy JONES, a/k/a Dog, a/k/a
Digity, a/k/a Digity Chemist,
Defendant–Appellant.**

No. 13–7676.

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 10, 2014.

Decided: Feb. 20, 2014.

Timothy Jones, Appellant Pro Se. Shailika K. Shah, Office of the United States Attorney, Raleigh, North Carolina, for Appellee.

Before NIEMEYER, MOTZ, and SHEDD, Circuit Judges.

Dismissed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Timothy Jones seeks to appeal the district court's order denying relief on his 28 U.S.C. § 2255 (2012) motion. The order is not appealable unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B) (2012). A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2012). When the district court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see Miller–El v. Cockrell,* 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). When the district court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the motion states a debatable claim of the denial of a constitutional right. *Slack,* 529 U.S. at 484–85, 120 S.Ct. 1595.

We have independently reviewed the record and conclude that Jones has not made the requisite showing. Accordingly, we deny a certificate of appealability and dismiss the appeal. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*DISMISSED.*

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ernest PERRY, Defendant–Appellant.**

No. 13–7806.

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 7, 2014.

Decided: Feb. 20, 2014.

Ernest Perry, Appellant Pro Se. Stephen Wiley Miller, Assistant United States Attorney, David Vincent Harbach, II, Office of the United States Attorney, Richmond, Virginia, for Appellee.

Before KING, AGEE, and KEENAN, Circuit Judges.

* We note that Fed.R.Civ.P. 59(e) does not apply to a criminal motion under 18 U.S.C. § 3582.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Ernest Perry appeals the district court's orders denying his motion for reduction of sentence under 18 U.S.C. § 3582(c)(2) (2012) and denying his motion for reconsideration. We have reviewed the record and find no reversible error. Accordingly, we affirm for substantially the reasons stated by the district court.* *See United States v. Goodwyn,* 596 F.3d 233 (4th Cir. 2010); *United States v. Perry,* No. 3:08–cr–00399–HEH–1, 2012 WL 8466131 (E.D.Va. Sept. 22, 2013; Sept. 13, 2013). We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

**Lydia DAGENAIS, Plaintiff–Appellant,**

v.

**Carolyn W. COLVIN, Defendant–Appellee.**

No. 13–2128.

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 10, 2014.

Decided: Feb. 20, 2014.

*See United States v. Goodwyn,* 596 F.3d 233, 235 n. * (4th Cir.2010).

Lydia Dagenais, Appellant Pro Se. Alex Gordon, Assistant United States Attorney, Baltimore, Maryland, for Appellee.

Before NIEMEYER, KING, and DUNCAN, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Lydia Dagenais appeals the district court's order granting summary judgment in favor of the Appellee on Dagenais' complaint for review of the Social Security Administration's denial of disabled widow's insurance benefits. We have reviewed the record and find no reversible error. Accordingly, we affirm for the reasons stated by the district court. *Dagenais v. Colvin*, No. 1:12–cv–02446–SAG, 2013 WL 3187886 (D.Md. June 19, 2013). We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

---

**In re Dennis SHIPMAN, Petitioner.**

No. 13–2259.

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 11, 2014.

Decided: Feb. 20, 2014.

Dennis Shipman, Petitioner Pro Se.

Before MOTZ, KING, and DUNCAN, Circuit Judges.

Petition denied by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Dennis Shipman petitions for a writ of mandamus seeking an order directing the district court to act in two emergency appeals filed in his bankruptcy case, which has since been dismissed. We conclude that Shipman is not entitled to mandamus relief.

Mandamus relief is a drastic remedy and should be used only in extraordinary circumstances. *Kerr v. United States Dist. Court,* 426 U.S. 394, 402, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976); *United States v. Moussaoui,* 333 F.3d 509, 516–17 (4th Cir. 2003). Further, mandamus relief is available only when the petitioner has a clear right to the relief sought. *In re First Fed. Sav. & Loan Ass'n,* 860 F.2d 135, 138 (4th Cir.1988).

The relief sought by Shipman is not available by way of mandamus. Accordingly, although we grant leave to proceed in forma pauperis, we deny the petition for

writ of mandamus. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*PETITION DENIED.*

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Curtis Lakoy EDMONDS, a/k/a Rude Boy, Defendant–Appellant.**

**No. 13–4110.**

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 11, 2014.

Decided: Feb. 21, 2014.

Geoffrey W. Hosford, HOSFORD & HOSFORD, P.C., Wilmington, North Carolina, for Appellant. Thomas G. Walker, United States Attorney, Jennifer P. May–Parker, Kristine L. Fritz, Assistant United States Attorneys, Raleigh, North Carolina, for Appellee.

Before NIEMEYER, MOTZ, and KEENAN, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Curtis Edmonds was convicted by a jury of conspiracy to distribute and possess with intent to distribute fifty grams or more of cocaine base, in violation of 21 U.S.C. § 846 (2012), and three counts of distribution of five grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1) (2012), and 18 U.S.C. § 2 (2012). Edmonds was initially sentenced to life imprisonment on the conspiracy count and concurrent 360–month sentences on the distribution counts. We affirmed. *See United States v. Edmonds,* 679 F.3d 169, 175–77 (4th Cir.2012) (*Edmonds I* ). The Supreme Court subsequently vacated our opinion in *Edmonds I* and remanded for consideration in light of *Dorsey v. United States,* —— U.S. ——, 132 S.Ct. 2321, 183 L.Ed.2d 250 (2012). *See Edmonds v. United States,* —— U.S. ——, 133 S.Ct. 376, 184 L.Ed.2d 4 (2012). Our reissued opinion concluded that *Dorsey* did not affect our holding except as to the mandatory life sentence that Edmonds faced on the conspiracy charge; we therefore vacated the sentence and remanded for consideration of the Fair Sentencing Act. *United States v. Edmonds,* 700 F.3d 146, 147–48 (4th Cir.2012) (*Edmonds II* ). The district court resentenced Edmonds in accordance with our mandate, and Edmonds now appeals, challenging the substantive reasonableness of his 360–month sentence.*

We review a sentence for reasonableness, applying an abuse of discretion standard. *Gall v. United States,* 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007).

---

* We note that of the 360–month distribution counts. the mandate rule forecloses reconsideration concurrent sentences imposed on the

*See United States v. Susi,* 674 F.3d 278, 283 (4th Cir.2013) (discussing mandate rule).

In so doing, we first examine the sentence for significant procedural error. If there is none, we consider the substantive reasonableness of the sentence, "tak[ing] into account the totality of the circumstances." *Id.* If the sentence is within or below the Guidelines range, we presume on appeal that the sentence is reasonable. *United States v. Yooho Weon,* 722 F.3d 583, 590 (4th Cir.2013).

After a thorough review of the appellate record, we conclude that Edmonds' sentence is entitled to the presumption of reasonableness that attaches to a within-Guidelines sentence. Edmonds' sentence was driven by his career offender status, and, in sentencing Edmonds, the district court placed particular emphasis on his long criminal history, noting that leniency in the state court had been rewarded with further law-breaking, which the court concluded required a lengthier sentence to deter Edmonds and protect the public from his conduct. Therefore, because the district court adequately explained the reasons for its within-Guidelines sentence in terms of the factors in 18 U.S.C. § 3553(a) (2012), we conclude that its sentence is substantively reasonable.

Accordingly, we affirm the district court's judgment. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Efrain LOPEZ–PEREZ, a/k/a Hector
Terronez–Gomez, Defendant–
Appellant.**

**No. 13–4481.**

United States Court of Appeals,
Fourth Circuit.

Submitted: Jan. 28, 2014.

Decided: Feb. 21, 2014.

Thomas P. McNamara, Federal Public Defender, Stephen C. Gordon, Assistant Federal Public Defender, Raleigh, North Carolina, for Appellant. Thomas G. Walker, United States Attorney, Jennifer P. May–Parker, Yvonne V. Watford–McKinney, Assistant United States Attorneys, Raleigh, North Carolina, for Appellee.

Before DAVIS, KEENAN, and FLOYD, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Efrain Lopez–Perez * appeals the thirty-seven-month sentence imposed by the district court. Lopez–Perez pled guilty to illegal re-entry after removal as an aggravated felon, in violation of 18 U.S.C. § 1326(a), (b)(2) (2012). On appeal, Lo-

---

* The parties recognize that Lopez–Perez's true name is Hector Terronez-Gomez.

pez–Perez argues that his sentence is substantively unreasonable. We affirm.

We review a sentence for reasonableness, applying an abuse of discretion standard. *Gall v. United States,* 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). If there is no significant procedural error, we examine the substantive reasonableness of the sentence, "tak[ing] into account the totality of the circumstances." *Id.* If the sentence is within or below the Guidelines range, we presume on appeal that the sentence is reasonable. *United States v. Yooho Weon,* 722 F.3d 583, 590 (4th Cir. 2013).

After a thorough review of the record, we conclude that the district court considered all of Lopez–Perez's arguments and weighed them in light of the 18 U.S.C. § 3553(a) (2012) factors. The district court concluded that Lopez–Perez's long criminal history and repeated attempts to re-enter the United States showed a lack of respect for the law and a likelihood that Lopez–Perez would seek to enter the United States again, warranting a sentence at the high-end of the advisory Guidelines range. We conclude that Lopez–Perez has not presented sufficient grounds to disregard the presumption of reasonableness that attaches to the district court's within-Guidelines sentence.

Accordingly, we affirm the district court's judgment. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this Court and argument would not aid the decisional process.

*AFFIRMED.*

Carlos ORTIZ, Petitioner–Appellant,

v.

UNITED STATES of America, Respondent–Appellee.

No. 13–6447.

United States Court of Appeals, Fourth Circuit.

Submitted: Jan. 28, 2014.

Decided: Feb. 21, 2014.

William B. Norman, Norman & Tayeh, LLC, Westlake, Ohio, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland; Sujit Raman, Assistant United States Attorney, Mara Zusman Greenberg, Office of the United States Attorney, Greenbelt, Maryland, for Appellee.

Before DAVIS, KEENAN, and FLOYD, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Carlos Ortiz appeals the district court's orders denying his petition for a writ of audita querela and his motion filed pursuant to Fed.R.Civ.P. 59(e). Ortiz argues that the district court improperly construed his petition as asserting claims under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and failed to address his contention that his life sentence amounts to a miscarriage of jus-

tice. The Government has asked that we consider Ortiz's appeal as a petition for authorization to file a successive 28 U.S.C. § 2255 (2012) motion and deny it. For the reasons set forth within, we affirm the district court's orders and deny the Government's motion as moot. *See, e.g., United States v. Richter,* 510 F.3d 103, 104 (2d Cir.2007) (per curiam) (reviewing "de novo a district court's grant or denial of a writ of audita querela").

Under the All Writs Act, federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a) (2012). However, prisoners may not resort to such writs when their challenges would be cognizable under § 2255 or to otherwise circumvent the statutory limits on collateral attacks. *See United States v. Rhines,* 640 F.3d 69, 72 (3d Cir.2011); *United States v. Gamboa,* 608 F.3d 492, 494–95 (9th Cir. 2010); *cf. In re Vial,* 115 F.3d 1192, 1194 n. 5 (4th Cir.1997) (en banc) (stating that § 2255 is not inadequate or ineffective to test legality of detention merely because petitioner is unable to obtain relief under § 2255). As the Supreme Court has explained, § 1651 "is a residual source of authority to issue writs that are not otherwise covered by statute," and, "[w]here a statute specifically addresses [a] particular issue . . . , it is that authority, and not the All Writs Act, that is controlling." *Carlisle v. United States,* 517 U.S. 416, 429, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996) (internal quotation marks omitted).

Here, Ortiz's contention that his convictions and sentence are invalid under *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), and our subsequent decision in *United States v. Promise,* 255 F.3d 150 (4th Cir.2001) (en banc), is exactly the variety of claim cognizable under § 2255. Contrary to Ortiz's suggestion, whether his claim is construed as arising from statutory or constitutional error is inconsequential. 28 U.S.C. § 2255(a). In either event, the fact that Ortiz's challenge is procedurally barred due to the restrictions on successive collateral attacks does not justify his proceeding under the All Writs Act. *See Richter,* 510 F.3d at 104; *United States v. Holt,* 417 F.3d 1172, 1174–75 (11th Cir.2005); *United States v. Torres,* 282 F.3d 1241, 1244–47 (10th Cir.2002); *In re Davenport,* 147 F.3d 605, 608 (7th Cir.1998).

We also reject Ortiz's suggestion that a miscarriage of justice or violation of the Suspension Clause[1] might permit his petition for a writ of audita querela.[2] *Richter,* 510 F.3d at 104. First, Ortiz's vague assertions regarding the insufficiency of the evidence supporting his life sentence fail to indicate that, had the question been properly submitted to the jury, it would not have found him eligible for that sentence. *See McCleskey v. Zant,* 499 U.S. 467, 494, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); *Trenkler v. United States,* 536 F.3d 85, 99–100 (1st Cir.2008). Equally unavailing is Ortiz's implication that the limits on his ability to successively attack his convictions unconstitutionally deny him the benefit of changes in the law, as none of the

---

1. U.S. Const. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.").

2. Although the district court did not specifically address Ortiz's claims of a miscarriage

of justice, we find no reason to remand. *See Patel v. Napolitano,* 706 F.3d 370, 372 (4th Cir.2013) (reviewing de novo issue district court did not address), *petition for cert. filed,* —— U.S. ——, 134 S.Ct. 1282, 188 L.Ed.2d 299, 82 U.S.L.W. 3319, 2014 WL 684079 (U.S. Nov. 15, 2013) (No. 13–606).

authority on which Ortiz relies is retroactively applicable to cases on collateral review. *See Lyons v. Lee,* 316 F.3d 528, 535 (4th Cir.2003); *see also Richter,* 510 F.3d at 104; *Carrington v. United States,* 503 F.3d 888, 890 (9th Cir.2007); *In re Vial,* 115 F.3d at 1197–98.

Accordingly, we affirm the district court's orders denying the petition for writ of audita querela and Rule 59(e) motion and deny as moot the Government's motion to dismiss and recharacterize Ortiz's appeal. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Johnny Mack BROWN, Defendant–**
**Appellant.**

**No. 13–7689.**

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 10, 2014.

Decided: Feb. 21, 2014.

Johnny Mack Brown, Appellant Pro Se. Donald Ray Wolthuis, Assistant United States Attorney, Roanoke, Virginia, for Appellee.

Before NIEMEYER, MOTZ, and KING, Circuit Judges.

Dismissed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Johnny Mack Brown seeks to appeal the district court's orders denying relief on his 28 U.S.C. § 2255 (2012) motion and denying his motion for reconsideration. The order is not appealable unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B) (2012). A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2012). When the district court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see Miller–El v. Cockrell,* 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). When the district court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the motion states a debatable claim of the denial of a constitutional right. *Slack,* 529 U.S. at 484–85, 120 S.Ct. 1595.

We have independently reviewed the record and conclude that Brown has not made the requisite showing. Accordingly, we deny a certificate of appealability and dismiss the appeal. We dispense with oral argument because the facts and legal con-

tentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*DISMISSED.*

**Anthony Fred MARTIN,**
**Plaintiff–Appellant,**

v.

**Officer C. BLINKLEY, Defendant–**
**Appellee.**

**No. 13–7694.**

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 19, 2014.

Decided: Feb. 21, 2014.

Anthony Fred Martin, Appellant Pro Se.

Before MOTZ, KEENAN, and THACKER, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Anthony Fred Martin appeals the district court's order accepting the recommendation of the magistrate judge and dismissing his 42 U.S.C. § 1983 (2006) complaint under 28 U.S.C. § 1915(e)(2)(B)

(2012). We have reviewed the record and find no reversible error. Accordingly, we affirm for the reasons stated by the district court. *Martin v. Blinkley,* No. 4:13–cv–01568–DCN, 2013 WL 5316345 (D.S.C. Sept. 20, 2013). We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

**Esperanza GUERRERO,**
**Plaintiff–Appellant,**

v.

**Amy T. WEEKS, Defendant–Appellee.**

**No. 13–2411.**

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

Esperanza Guerrero, Appellant Pro Se. Robert Mark Falconi, Blankingship & Keith, PC, Fairfax, Virginia; Mary McGowan, Blankingship & Keith, PC, Manassas, Virginia, for Appellee.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Esperanza Guerrero appeals the district court's order denying relief on her complaint raising claims under 42 U.S.C. § 1983 (2006); Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (2006); Title II of the Americans With Disabilities Act of 1990, 42 U.S.C. § 12132 (2006); and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (2012). We have reviewed the record and find no reversible error. Accordingly, although we grant leave to proceed in forma pauperis, we affirm for the reasons stated by the district court. *Guerrero v. Weeks,* No. 1:13–cv–00837–JCC–JFA, 2013 WL 5234248 (E.D.Va. Sept. 16, 2013). We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

**In re Arthur RODGERS, Petitioner.**

**No. 13–2472.**

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

Arthur Rodgers, Petitioner Pro Se.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Petition denied by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this petition for a writ of mandamus, Arthur Rodgers asks that we order the district court to take appropriate action to ensure that prison officials properly mail Rodgers' legal correspondence. Rodgers also seeks our review of the district court's October 16, 2013 order, which denied Rodgers' motions for a preliminary injunction, for immediate relief, to appoint counsel, to compel discovery, and for a default judgment, and to allow an appeal from that order. We conclude that Rodgers is not entitled to mandamus relief.

Mandamus relief is a drastic remedy and should be used only in extraordinary circumstances. *Kerr v. U.S. Dist. Court,* 426 U.S. 394, 402, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976); *United States v. Moussaoui,* 333 F.3d 509, 516–17 (4th Cir.2003). Further, mandamus relief is available only when the petitioner has a clear right to the relief sought. *In re First Fed. Sav. & Loan Ass'n,* 860 F.2d 135, 138 (4th Cir. 1988).

Rodgers has not demonstrated his clear right to the relief sought, as the district court's docket reveals that many of his filings have been received and properly docketed. Further, we decline to review the district court's October 16, 2013 order by way of mandamus because mandamus may not be used as a substitute for appeal. *In re Lockheed Martin Corp.,* 503 F.3d 351, 353 (4th Cir.2007).

Accordingly, we deny the petition for writ of mandamus. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*PETITION DENIED.*

**Ramona Claire OSBORN; John Henry Osborn, II; Roberta Lynn Osborn, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 13–2385.

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

Ramona Claire Osborn, John Henry Osborn, II, and Roberta Lynn Osborn, Appellants Pro Se.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Ramona Claire Osborn, John Henry Osborn, II, and Roberta Lynn Osborn appeal the district court's order denying relief on their civil complaint. We have reviewed the record and find no reversible error. Accordingly, we affirm for the reasons stated by the district court. *Osborn v. United States,* No. 1:13–cv–02159–RDB (D.Md. Sept. 30, 2013). We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Napoleon GOODSON, IV, Defendant–Appellant.**

No. 13–4657.

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

J. Preston Strom, Jr., Strom Law Firm, L.L.C., Columbia, South Carolina, for Appellant. Robert Frank Daley, Jr., Mark C. Moore, Assistant United States Attorneys, Columbia, South Carolina, for Appellee.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Napoleon Goodson, IV, appeals the district court's order granting his 18 U.S.C. § 3582(c)(2) (2012) motion and reducing his sentence by twelve months, and a subsequent order denying reconsideration. Counsel has filed a brief pursuant to *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), stating that there are no meritorious issues for appeal and concluding that the district court did not abuse its discretion in reducing Goodson's sentence by twelve months. Goodson has filed a pro se supplemental brief challenging the denial of his motion to reconsider the court's order granting a reduction.

In accordance with *Anders,* we have reviewed the record in this case and have found no meritorious issues for appeal or reversible error. We therefore affirm the district court's orders for the reasons stated by the district court. *United States v. Goodson,* No. 3:93–cr–00471–JFA–1, 2013 WL 4017644 (D.S.C. Aug. 6, 16, & 22, 2013). This court requires that counsel inform Goodson, in writing, of the right to petition the Supreme Court of the United States for further review. If Goodson requests that a petition be filed, but counsel believes that such a petition would be frivolous, then counsel may move in this court for leave to withdraw from representation. Counsel's motion must state that a copy thereof was served on Goodson. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

**Gregory RICHARDSON,**
**Plaintiff–Appellant,**

v.

**Commonwealth of VIRGINIA,**
**Defendant–Appellee.**

No. 13–7330.

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

Gregory Richardson, Appellant Pro Se.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Dismissed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Gregory Richardson appeals the district court's order denying authorization to file his 42 U.S.C. § 1983 (2006) complaint. Richardson is required to file a motion for leave to file a complaint under a pre-filing injunction imposed by the district court.

We have reviewed the record and find no reversible error. Accordingly, we deny Richardson leave to proceed in forma pauperis, deny Richardson's motion for appointment of counsel, and dismiss for the reasons stated by the district court. *Richardson v. Commonwealth of Va.*, No. 3:13–cv–00275–REP (E.D.Va. July 30, 2013). We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*DISMISSED.*

**Milton Leon TERRY, Petitioner–Appellant,**

v.

**Harold CLARKE, Director of the Virginia Department of Corrections, Respondent–Appellee.**

No. 13–7336.

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

Milton Leon Terry, Appellant Pro Se. Steven Andrew Witmer, Senior Assistant Attorney General, Richmond, Virginia, for Appellee.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Dismissed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Milton Leon Terry seeks to appeal the district court's order accepting the recommendation of the magistrate judge and denying relief on his 28 U.S.C. § 2254 (2012) petition. The order is not appealable unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A) (2012). A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2012). When the district court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see Miller–El v. Cockrell*, 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). When the district court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the petition states a debatable claim of the denial of a constitutional right. *Slack*, 529 U.S. at 484–85, 120 S.Ct. 1595.

We have independently reviewed the record and conclude that Terry has not made the requisite showing. Accordingly, we deny a certificate of appealability, deny leave to proceed in forma pauperis, and dismiss the appeal. We dispense with oral argument because the facts and legal contentions are adequately presented in the

materials before this court and argument would not aid the decisional process.

*DISMISSED.*

In re Yagoub M. MOHAMED, a/k/a
Mohammed A. Yagoub,
Petitioner.

No. 13–2063.

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 11, 2014.

Decided: Feb. 25, 2014.

Yagoub M. Mohamed, Petitioner Pro Se.

Before SHEDD, DAVIS, and FLOYD, Circuit Judges.

Petition denied by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Yagoub M. Mohamed petitions for a writ of mandamus, alleging that the district court has unduly delayed in acting on his petition for a writ of error coram nobis. He seeks an order from this court directing the district court to act. Our review of the district court's docket reveals that, on December 31, 2013, the court denied Mohamed's petition. Accordingly, because the district court recently decided Mohamed's case, we deny the mandamus petition as moot. We grant leave to proceed in forma pauperis and deny Mohamed's motion to expedite the decision. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*PETITION DENIED.*

YU HUA ZHENG, Petitioner,

v.

Eric H. HOLDER, Jr., Attorney
General, Respondent.

No. 13–2079.

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 18, 2014.

Decided: Feb. 25, 2014.

Zhiyuan Qian, Law Offices of Gerald Karikari, P.C., New York, New York, for Petitioner. Stuart F. Delery, Assistant Attorney General, William C. Peachey, Assistant Director, Jonathan Robbins, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for Respondent.

Before DUNCAN, AGEE, and DAVIS, Circuit Judges.

270

Petition dismissed by unpublished per curiam opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Yu Hua Zheng, a native and citizen of the People's Republic of China, petitions for review of an order of the Board of Immigration Appeals ("Board") dismissing his appeal from the immigration judge's order denying his application for cancellation of removal under 8 U.S.C. § 1229b (2012). We dismiss the petition for review.

Under 8 U.S.C. § 1252(a)(2)(B)(i) (2012), "no court shall have jurisdiction to review . . . any judgment regarding the granting of relief under section . . . 1229b." *See Sorcia v. Holder*, 643 F.3d 117, 124–25 (4th Cir.2011) (finding no jurisdiction to review discretionary denial of cancellation of removal absent constitutional claim or question of law).

Here, the immigration judge found, and the Board agreed, that Zheng failed to meet his burden of establishing that his United States citizen wife and two children would suffer an exceptional and extremely unusual hardship if he is removed to China.

"[A]n 'exceptional and extremely unusual hardship' determination is a subjective, discretionary judgment that has been carved out of our appellate jurisdiction." *Romero–Torres v. Ashcroft*, 327 F.3d 887, 888 (9th Cir.2003); *see, e.g., Barco–Sandoval v. Gonzales*, 516 F.3d 35, 36 (2d Cir. 2008); *Memije v. Gonzales*, 481 F.3d 1163, 1164 (9th Cir.2007); *Martinez v. Attorney Gen.*, 446 F.3d 1219, 1221–22 (11th Cir. 2006); *see also Obioha v. Gonzales*, 431 F.3d 400, 405 (4th Cir.2005) ("It is quite clear that the gatekeeper provision [of § 1252(a)(2)(B)(i) ] bars our jurisdiction to review a decision of the [Board] to actually deny a petition for cancellation of remov-

al."). Indeed, this court has concluded that the issue of hardship is committed to agency discretion and thus is not subject to appellate review. *Okpa v. INS*, 266 F.3d 313, 317 (4th Cir.2001). Nevertheless, we retain jurisdiction to review colorable constitutional claims and questions of law. 8 U.S.C. § 1252(a)(2)(D); *Gomis v. Holder*, 571 F.3d 353, 358 (4th Cir.2009).

We have reviewed Zheng's claims of error and conclude that he fails to raise a constitutional claim or a question of law regarding the dispositive finding that he did not establish that his removal would be an exceptional and extremely unusual hardship. Accordingly, we dismiss the petition for review. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*PETITION DISMISSED.*

Adonay Sword Yada Al–Ali Father ALLAH, Petitioner–Appellant,

v.

Harold W. CLARKE, Director of the Virginia Department of Corrections, Respondent–Appellee.

No. 13–7337.

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

Adonay Sword Yada Al–Ali Father Allah, Appellant Pro Se. Leah A. Darron, Office of the Attorney General of Virginia, Richmond, Virginia, for Appellee.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Dismissed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Adonay Sword Yada Al–Ali Father Allah seeks to appeal the district court's order accepting the recommendation of the magistrate judge and denying relief on his 28 U.S.C. § 2254 (2012) petition. The order is not appealable unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A) (2012). A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2012). When the district court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see Miller–El v. Cockrell,* 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). When the district court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the petition states a debatable claim of the denial of a constitutional right. *Slack,* 529 U.S. at 484–85, 120 S.Ct. 1595.

We have independently reviewed the record and conclude that Allah has not made the requisite showing. Accordingly, we deny a certificate of appealability, deny leave to proceed in forma pauperis, and dismiss the appeal. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*DISMISSED.*

David **ALUVALE**, Plaintiff–Appellant,

v.

**TRULAND SYSTEMS**, Defendant–Appellee.

No. 13–2220.

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

David Aluvale, Appellant Pro Se. Kevin D. Holden, Crystal L. Tyler, Jackson Lewis PC, Richmond, Virginia, for Appellee.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

David Aluvale appeals the district court's order dismissing his complaint for lack of jurisdiction. We have reviewed the record and find no reversible error. Accordingly, we affirm for the reasons stated by the district court. *Aluvale v. Truland Sys.*, No. 1:13–cv–00791–AJT–TRJ (E.D. Va. filed Sept. 16, 2013 & entered Sept. 17, 2013). We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

UNITED STATES of America,
Plaintiff–Appellee,

v.

**Maurice HARDY, a/k/a Reece,**
Defendant–Appellant.

No. 13–4513.

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

Craig M. Sandberg, Muslin & Sandberg, Chicago, Illinois, for Appellant. Rod J. Rosenstein, United States Attorney, Christine Marie Celeste, Office of the United States Attorney, Baltimore, Maryland, for Appellee.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Dismissed in part; affirmed in part by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Maurice Hardy appeals his conviction and 192–month sentence following his Fed. R.Crim.P. 11(c)(1)(C) guilty plea to conspiring to distribute and possess with intent to distribute five kilograms or more of cocaine, one kilogram or more of heroin, and a quantity of cocaine base, in violation of 21 U.S.C. § 846 (2012). In accordance with *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), Hardy's counsel has filed a brief certifying that there are no meritorious grounds for appeal but questioning whether (1) the district court adequately complied with Rule 11 when accepting Hardy's plea, (2) Hardy's sentence is reasonable, and (3) Hardy received the effective assistance of counsel. Although informed of his right to do so, Hardy has not filed a supplemental brief. The Government moves to dismiss Hardy's appeal to the extent the issues he raises are barred by the appellate waiver in Hardy's plea agreement, which, in pertinent part, waives Hardy's right to appeal his conviction or a sentence equal to or less than 192 months' imprisonment. We grant in part and deny in part the Government's motion.

Pursuant to a plea agreement, a defendant may waive his appellate rights under

18 U.S.C. § 3742 (2012). *See, e.g., United States v. Manigan,* 592 F.3d 621, 627 (4th Cir.2010). A valid waiver will preclude appeal of a given issue if the issue is within the scope of the waiver. *United States v. Blick,* 408 F.3d 162, 168 (4th Cir.2005). Whether a defendant validly waived his right to appeal is a question of law that we review de novo. *Id.*

Here, Hardy does not contest the validity of his appellate waiver, and the record indicates that it was knowing and voluntary. Accordingly, Hardy's appellate waiver is enforceable, and his challenge to the reasonableness of his sentence falls squarely within the scope of his waiver. We therefore grant in part the Government's motion and dismiss Hardy's appeal of his sentence.

To the extent Hardy challenges the voluntariness of his plea, that claim is outside the scope of the waiver. The district court fully complied with Rule 11 when accepting Hardy's plea and ensured that the plea was knowing and voluntary and, therefore, final and binding. *United States v. Lambey,* 974 F.2d 1389, 1394 (4th Cir.1992) (en banc). Finally, because there is no clear indication that Hardy's counsel was deficient, we decline to review this claim on direct appeal. *See United States v. Copeland,* 707 F.3d 522, 531 n. 7 (4th Cir.) (providing standard), *cert. denied,* —— U.S. ——, 134 S.Ct. 126, 187 L.Ed.2d 89 (2013).

In accordance with *Anders,* we have reviewed the entire record and have found no unwaived meritorious grounds for appeal. We therefore dismiss the appeal in part and affirm in part. This court requires that counsel inform Hardy, in writing, of his right to petition the Supreme Court of the United States for further review. If Hardy requests that a petition be filed, but counsel believes that such a petition would be frivolous, counsel may move in this court for leave to withdraw from representation. Counsel's motion must state that a copy thereof was served on Hardy. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*DISMISSED IN PART; AFFIRMED IN PART.*

**Murray ADKINS, III, Petitioner–Appellant,**

v.

**Leroy CARTLEDGE, Respondent–Appellee.**

**No. 13–7349.**

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

Joshua Snow Kendrick, Kendrick & Leonard, P.C., Greenville, South Carolina, for Appellant. William Edgar Salter, III, Assistant Attorney General, Donald John Zelenka, Senior Assistant Attorney General, Columbia, South Carolina, for Appellee.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Dismissed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Murray Adkins, III, seeks to appeal the district court's order accepting the recommendation of the magistrate judge and dismissing as untimely his 28 U.S.C. § 2254 (2012) petition. The order is not appealable unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A) (2012). A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2012). When the district court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see Miller–El v. Cockrell*, 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). When the district court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the petition states a debatable claim of the denial of a constitutional right. *Slack*, 529 U.S. at 484–85, 120 S.Ct. 1595.

We have independently reviewed the record and conclude that Adkins has not made the requisite showing. Accordingly, we deny a certificate of appealability and dismiss the appeal. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*DISMISSED.*

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ehren VAN WART, Defendant–Appellant.**

**No. 13–7371.**

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

Ehren Van Wart, Appellant Pro Se. Barbara Suzanne Skalla, Assistant United States Attorney, Greenbelt, Maryland; Justin S. Herring, Office of the United States Attorney, Baltimore, Maryland, for Appellee.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Dismissed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Ehren Van Wart seeks to appeal the district court's order denying relief on his 28 U.S.C. § 2255 (2012) motion. The order is not appealable unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B) (2012). A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2012). When the district

court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see Miller-El v. Cockrell,* 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). When the district court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the motion states a debatable claim of the denial of a constitutional right. *Slack,* 529 U.S. at 484–85, 120 S.Ct. 1595.

We have independently reviewed the record and conclude that Van Wart has not made the requisite showing. Accordingly, we deny a certificate of appealability and dismiss the appeal. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*DISMISSED.*

**Iris Sapp GANTT, Plaintiff—Appellant,**

v.

**Colvin Thomas MORGAN, a/k/a Tom Morgan, a/k/a C.T. Morgan, a/k/a Colvin T. Morgan; Thurmo Medical Sleep Products, Inc., Defendants–Appellees.**

No. 13–2168.

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

Iris Sapp Gantt, Appellant Pro Se. John F. Bloss, Higgins Benjamin PLLC, Greensboro, North Carolina; Daniel Charles Nash, Morgan, Herring, Morgan, Green & Rosenblutt, LLC, High Point, North Carolina, for Appellees.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Iris Sapp Gantt, a pro se civil litigant, appeals the district court's order dismissing Gantt's civil action for lack of subject matter jurisdiction. We have reviewed the record and find no reversible error. *See Durden v. United States,* 736 F.3d 296, 300 (4th Cir.2013) (stating that dismissals for lack of subject matter jurisdiction are reviewed de novo). Accordingly, we affirm for the reasons stated by the district court. *See Gantt v. Morgan,* No. 1:12–cv–01123–TDS–JLW (M.D.N.C. Sept. 4, 2013). We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

James David Wesley **CARR**,
Plaintiff–Appellant,

v.

Evelyn **SEIFERT**, Warden; Nicky Seifert, Unit Manager; David Ballard, Warden, M.O.C.C.; John P. Sullivan, P.D.; Don Morris, D.A.; David Proctor, M.D., Defendants–Appellees.

No. 13–7443.

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

James David Wesley Carr, Appellant Pro Se.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

James David Wesley Carr appeals the district court's order accepting the recommendation of the magistrate judge and dismissing his 42 U.S.C. § 1983 (2006) complaint under 28 U.S.C. § 1915(e)(2)(B) (2012). We have reviewed the record and find no reversible error. Accordingly, we affirm for the reasons stated by the district court. *See Carr v. Seifert,* No. 3:13–cv–00040–GMG–JSK (N.D.W.Va. Aug. 21, 2013). We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

UNITED STATES of America,
Plaintiff–Appellee,

v.

Juan Bautista **ALOMIA–TORRES**, a/k/a Juan Baustista–Alomia, a/k/a Luis Antonio Torres, a/k/a Edward Martinez, a/k/a Luis Alfredo Martinez, a/k/a John the Jamaican, a/k/a John, Defendant–Appellant.

No. 13–7485.

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

Juan Bautista Alomia–Torres, Appellant Pro se. Michael E. Savage, Jennifer A. Youngs, Assistant United States Attorneys, Charlotte, North Carolina, for Appellee.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Dismissed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Juan Bautista Alomia–Torres seeks to appeal the district court's order treating his Fed.R.Civ.P. 60(b) motion as a successive 28 U.S.C. § 2255 (2012) motion, and dismissing it on that basis. He also seeks to appeal the order denying his motion for reconsideration. The orders are not appealable unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B) (2012). A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2012). When the district court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see Miller– El v. Cockrell*, 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). When the district court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the motion states a debatable claim of the denial of a constitutional right. *Slack*, 529 U.S. at 484–85, 120 S.Ct. 1595.

We have independently reviewed the record and conclude that Alomia–Torres has not made the requisite showing. Accordingly, we deny a certificate of appealability and dismiss the appeal.

Additionally, we construe Alomia–Torres' notice of appeal and informal brief as an application to file a second or successive § 2255 motion. *United States v. Winestock*, 340 F.3d 200, 208 (4th Cir.2003). In order to obtain authorization to file a successive § 2255 motion, a prisoner must assert claims based on either:

(1) newly discovered evidence that … would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

(2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h) (2012). Alomia–Torres' claims do not satisfy either of these criteria. Therefore, we deny authorization to file a successive § 2255 motion.

We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*DISMISSED.*

Zerell McCLURKIN, Plaintiff–Appellant,

v.

Bill BYER, Commissioner SCDC; Warden Larry Carledge; Sergeant Lawless; Sergeant Cotter, Defendants–Appellees.

No. 13–7506.

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

Zerell McClurkin, Appellant Pro Se.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Zerell McClurkin appeals the district court's order accepting the recommendation of the magistrate judge and denying relief on his 42 U.S.C. § 1983 (2006) complaint. We have reviewed the record and find no reversible error. Accordingly, with respect to the issues raised on appeal, we affirm for the reasons stated by the district court.* *McClurkin v. Byer,* No. 2:13–cv–01507–RMG, 2013 WL 3746027 (D.S.C. July 15, 2013). We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED.*

---

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Owen ODDMAN, a/k/a Star, Defendant–Appellant.**

**No. 13–7531.**

United States Court of Appeals, Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

Owen Oddman, Appellant Pro Se. Richard Lee Edwards, Amy Elizabeth Ray, Assistant United States Attorneys, Jill Westmoreland Rose, Office of the United States Attorney, Asheville, North Carolina; Adam Christopher Morris, Office of the United States Attorney, Charlotte, North Carolina, for Appellee.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Dismissed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

---

\* McClurkin failed to pursue nearly all issues raised below and instead focused on the district court's and magistrate judge's finding that he should seek a remedy under the South Carolina Tort Claims Act. Therefore, the issues not pursued on appeal are waived. *See* 4th Cir. R. 34(b) (directing appealing parties to present specific arguments in an informal brief and stating that this court's review is limited to the issues raised in the informal brief). *See also Wahi v. Charleston Area Med. Ctr., Inc.,* 562 F.3d 599, 607 (4th Cir.2009) (limiting appellate review to arguments raised in the brief in accordance with Fed. R.App. P. 28(a)(9)(A)); *Williams v. Giant Food Inc.,* 370 F.3d 423, 430 n. 4 (4th Cir.2004) (noting that appellate assertions not supported by argument are deemed abandoned).

PER CURIAM:

Owen Oddman seeks to appeal the district court's order dismissing as successive his 28 U.S.C. § 2255 (2012) motion. The order is not appealable unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B) (2012). A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2012). When the district court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see Miller–El v. Cockrell*, 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). When the district court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the motion states a debatable claim of the denial of a constitutional right. *Slack*, 529 U.S. at 484–85, 120 S.Ct. 1595.

We have independently reviewed the record and conclude that Oddman has not made the requisite showing. Accordingly, we deny a certificate of appealability and dismiss the appeal. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*DISMISSED.*

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Linda TRIBBY, Defendant–Appellant.**

**No. 13–7533.**

United States Court of Appeals,
Fourth Circuit.

Submitted: Feb. 20, 2014.

Decided: Feb. 25, 2014.

Linda Tribby, Appellant Pro Se. Jasmine Hyejung Yoon, Office of the United States Attorney, Alexandria, Virginia, for Appellee.

Before DUNCAN, DIAZ, and FLOYD, Circuit Judges.

Dismissed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Linda Tribby seeks to appeal the district court's order denying relief on her 28 U.S.C. § 2255 (2012) motion. The order is not appealable unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B) (2012). A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2012). When the district court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the

district court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see Miller–El v. Cockrell,* 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). When the district court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the motion states a debatable claim of the denial of a constitutional right. *Slack,* 529 U.S. at 484–85, 120 S.Ct. 1595.

We have independently reviewed the record and conclude that Tribby has not made the requisite showing. Accordingly, we deny Tribby's motion for a certificate of appealability and dismiss the appeal. We also deny Tribby's motion for appointment of counsel. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*DISMISSED.*

Bettye BARNES, Plaintiff–Appellant,

v.

BTN, INCORPORATED, doing business as Boomtown Casino, Defendant–Appellee.

No. 13–60328
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Jan. 17, 2014.

Revised Feb. 10, 2014.

Bettye Barnes, Mobile, AL, pro se.

David Wallace Stewart, Matthew Jason Sumrall, Copeland, Cook, Taylor & Bush, P.A., Biloxi, MS, for Defendant–Appellee.

Before WIENER, OWEN, and HAYNES, Circuit Judges.

PER CURIAM: *

Plaintiff Bettye Barnes appeals the district court's entry of judgment as a matter of law in favor of Defendant Boomtown Casino on her premises liability claim. For the reasons set forth below, we dismiss the appeal in part and affirm the judgment of the district court.

## I

Barnes was a patron at the Boomtown Casino in Biloxi, Mississippi on February 6, 2009 through February 7, 2009. In the early morning hours of February 7, Barnes and two companions left the Grill Café, a second-floor restaurant within the casino, and proceeded to an escalator. They descended down that escalator to the first floor. While on the escalator, however, Barnes lost her balance and fell backwards, allegedly sustaining serious injuries.

Barnes filed this lawsuit against Boomtown, proceeding pro se, seeking compensation for the injuries she allegedly suffered. Her complaint contended that the reason for her fall was that she "slipped on grease and french fries" that she picked up on her shoes from the floor of the Grill Café. The district court held a trial on April 15, 2013. Barnes rested her case-in-chief after two days and Boomtown moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a)(1). The district court granted this motion on the grounds that Barnes had failed to present legally sufficient evidence of Boomtown's negligence. The district court also stated that, in the alternative, Barnes had failed to present legally sufficient evidence on the elements of damages and proximate cause. Barnes now appeals this judgment along with other rulings of the district court.

## II

At the outset, we note that we construe pro se appellants' briefs liberally and

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

apply less stringent standards to parties proceeding pro se than to parties represented by counsel.[1] But pro se parties must still brief the issues and reasonably comply with the Rules of Appellate Procedure.[2] Granting Barnes's briefs this permissive construction, Barnes raises five issues on appeal: that the district court erred in granting judgment as a matter of law, that the district court erred in limiting or excluding certain testimony by Barnes's lay witnesses, that the district court erred in excluding certain medical and damages experts, that the district court should have granted Barnes a continuance, and finally, that the magistrate judge was impermissibly biased due to an alleged prior affiliation with the law firm representing the defendant.[3] We address these arguments in turn.

## A

The first two issues raised by Barnes on appeal, that the district court erred in granting judgment as a matter of law and in limiting the testimony of certain witnesses at trial, cannot be reviewed by this court as Barnes has failed to provide this court with a trial transcript as required by Federal Rule of Appellate Procedure 10(b). Even though this court granted Barnes an additional 15 days, on November 25, 2013, to order a transcript, she nevertheless failed to do so. While we construe the briefs of pro se litigants leniently, it is within this court's discretion to dismiss an appeal for failure to include a transcript.[4]

An inquiry into the appropriateness of a district court's order granting judgment as a matter of law turns on whether there was a legally sufficient evidentiary basis for a reasonable jury to find for the opposing party.[5] But an appellant who "intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence ... must include in the record a transcript of all evidence relevant to that finding or conclusion."[6]

Barnes's appeal of the district court's order granting judgment as a matter of law simply cannot be resolved without the aid of a trial transcript.[7] It is impossible to divine whether she presented sufficient evidence at trial to survive a motion for

---

1. *Yang v. Holder*, 664 F.3d 580, 589 (5th Cir.2011) (citing *Grant v. Cuellar*, 59 F.3d 523, 524 (5th Cir.1995)).

2. *Id.*

3. Boomtown alleges that the ruling on the Judgment as a Matter of Law is the only issue on appeal as it is the only order listed on the Notice of Appeal. Federal Rule of Appellate Procedure 3(c)(1)(B) requires that a notice of appeal must "designate the judgment, order, or part thereof being appealed." However, we generously interpret the scope of the notice of appeal of a pro se plaintiff and "require a showing of prejudice to preclude review of issues 'fairly inferred' from the notice and subsequent filings." *Williams v. Henagan*, 595 F.3d 610, 616 (5th Cir.2010) (per curiam) (quoting *Morin v. Moore*, 309 F.3d 316, 321 (5th Cir.2002)). "We consider not only the notice, but also the appellant's brief, in determining the fairly inferred scope of the

appeal." *Id.* As such, we consider all of these issues properly raised on appeal.

4. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1289 (5th Cir.1995).

5. *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 272 (5th Cir.2012).

6. FED R.APP P. 10(b)(2).

7. *Richardson v. Henry*, 902 F.2d 414, 415–16 (5th Cir.1990) (dismissing an appeal of the sufficiency of the evidence because the appellant failed to provide a trial transcript); *see also McNeil v. BMC Software Inc.*, 306 Fed. Appx. 889, 892–93 (5th Cir.2009) ("This Court cannot conduct meaningful appellate review of a district court's decision to grant judgment as a matter of law without the testimony that would support or refute that determination.").

judgment as a matter of law without any record of the evidence presented at trial. Additionally, Barnes's appeal of the district court's exclusion of certain testimony at trial can also not be resolved without the aid of a trial transcript. Without a record of the specific testimony that was excluded, there is no way to determine whether the exclusion was appropriate or proper.[8] Therefore, because Barnes has failed to order a trial transcript, her appeal as to these issues is dismissed and the scope of our review is limited to Barnes's challenges of rulings by the district court that do not depend on having a transcript of the trial proceedings.

## B

Barnes appeals a number of the district court's pre-trial evidentiary rulings. The district court excluded testimony by Barnes's damages and medical experts, prohibited the submission of medical records not produced in discovery, and forbade any of Barnes's lay witnesses from offering expert opinions. We note at the outset that pro se plaintiffs are still charged with knowing and following the law and the rules of procedure.[9]

The district court granted Boomtown's motion to exclude the testimony of two damages experts designated by Barnes: Jerry L. Pough and Floyd Pough. The Poughs were small-business consultants that Barnes intended to testify regarding "[l]oss of wages, present value of damages, medical expenses, life care plan, and loss

of earning capacity." The district court granted the motion to exclude on two alternative grounds: Barnes failed to comply with Rule 26 of the Federal Rules of Civil Procedure and Barnes failed to show that "the proffered testimony [was] reliable" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[10] Barnes did not submit any expert reports or opinions, and did not disclose any data, methodology, or reasoning that would substantiate or form the basis for the testimony. In fact, the designation of the Poughs as experts contained a statement from the Poughs that read, "Pough and Associates do not profess to be experts." The district court's decision to exclude the testimony came six months after the magistrate judge had previously warned Barnes that she must comply with Rule 26 of the Federal Rules of Civil Procedure and had threatened that "her expert designation may be stricken" if she did not comply.

If a party fails to properly and timely designate an expert witness, Federal Rule of Civil Procedure 37 prohibits the use of that witness to supply evidence at trial unless the failure was "substantially justified or harmless."[11] In reviewing the district court's ruling, we consider four factors: (1) the explanation for the failure to comply with the Rules; (2) the importance of the testimony; (3) the potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice.[12] We review a district court's decision to exclude experts not properly

---

**8.** *Cf. Grant v. McLeod,* No. 94–10036, 1994 WL 523792, at *1 (5th Cir. Sept. 12, 1994) (unpublished) ("[W]ithout the trial transcript, the Court cannot determine whether their testimony would have been cumulative and properly excluded.").

**9.** *See Teemac v. Henderson,* 298 F.3d 452, 457 & n. 11 (5th Cir.2002).

**10.** 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**11.** *Brumfield v. Hollins,* 551 F.3d 322, 330 (5th Cir.2008).

**12.** *Id.; Barrett v. Atl. Richfield Co.,* 95 F.3d 375, 380 (5th Cir.1996).

designated for an abuse of discretion.[13]

Under this four-factor test, we conclude that the district court did not abuse its discretion in excluding the testimony of the Poughs. Barnes offered no explanation at the trial court and does not offer one on appeal as to why she failed to comply with Rule 26(a)(2). Barnes has also presented no evidence as to why the Poughs testimony would have been important to her case. But even if we assume that the Poughs testimony was significant to Barnes's case for proving damages, the exclusion of the testimony did not prejudice Barnes's substantial rights. Even if compliance with Rule 26 were excused, the district court's exclusion of their testimony would still have been justified under *Daubert*. "The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the rule 702 test" by showing that it is both "reliable and relevant."[14] Barnes presented no evidence of reliability at the district court. Further, the fact that the testimony could have been central to proving damages only bolsters our conclusion that the testimony needed to be properly grounded and introduced so that Boomtown could reasonably respond to it.[15] Finally, a continuance would not have solved this defect. Barnes was provided with ample opportunity and leeway to comply with Rule 26. The magistrate judge had already granted her an extension to properly designate her experts. And, as mentioned above, the fact that the Poughs denied being experts at all belies any argument that time was the only obstacle to the Poughs' testimony. In sum, Barnes's failure to designate her experts properly is not excused and the district court did not abuse its discretion by excluding her experts.

■ Barnes also appeals the district court's exclusion of the expert testimony of medical physicians that were not timely or properly designated. Barnes listed several physicians in her initial disclosures but did not originally designate them as experts. In excluding their testimony, the district court explained that, "[t]he record before the Court, including Plaintiff's disclosures, does not include statements or summaries of opinions of any of the physicians she has listed. These experts were not, and have not been properly designated and, as a result, will not be permitted to testify as experts during trial." Barnes purported to designate these physicians as experts in her "Answer to Defendant's Supplement of Experts" simply by listing their names and addresses. No expert reports, opinions, resumes, or any other materials designating them as experts were filed in the district court. Barnes has made no attempt to explain her failure to comply with the Federal Rules, nor has she presented any evidence that the proposed testimony would pass muster under *Daubert*. Further this designation occurred five months after the end of the discovery window. It was not an abuse of discretion to prevent these physicians from testifying as experts.[16]

---

**13.** *United States v. Hall*, 500 F.3d 439, 443 (5th Cir.2007).

**14.** *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–61 (5th Cir.2002).

**15.** *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir.1990) ("We shall assume *arguendo* that expert testimony was significant to Geiserman's case—so much the more reason to be sure its introduction was properly grounded.").

**16.** *See Barrett*, 95 F.3d at 382 ("Appellants' repeated dilatory behavior even in the face of explicit warnings and the apparent inability of the experts to produce relevant opinions within the specified time frame renders hollow any claims of unfair prejudice.").

Barnes assails other of the district court's pre-trial evidentiary rulings, but all are similarly non-persuasive. "Generally, we review a district court's evidentiary rulings for an abuse of discretion."[17] Barnes challenges the district court's ruling that she could not enter certain medical records into evidence. The district court's ruling, however, only prevented Barnes from entering medical records not produced in discovery into evidence—and she had successfully produced extensive medical records and bills in connection with her disclosures. The district court also prohibited Barnes or her lay witnesses from testifying to the content of these medical records unless such testimony was consistent with the Rules of Evidence. Contrary to Barnes's assertion, adherence to the Rules of Evidence does not abridge her First Amendment rights. The district court did not abuse its discretion in making either of these rulings and Barnes does not point to any specific statements or documents that she alleges should have been admitted into evidence.

## C

■ Barnes appeals the district court's denial of a continuance of the trial date. Barnes moved for a continuance alleging health problems and that she required more time to respond to Boomtown's discovery production. The district court denied this motion because "[t]he parties [had] been aware of the pending trial date for nearly a year." We review a district court's denial of a motion for a continuance for an abuse of discretion.[18] "[T]he movant must show that the denial [of the continuance] resulted in specific and compelling or serious prejudice" in order to demonstrate an abuse of discretion.[19] On appeal, Barnes alleges generally that the denial of the continuance prejudiced her because she was not "mentally capable of representing herself" at the time of trial. However, Barnes fails to present any specific facts that suggest that she was seriously prejudiced by the district court's denial. Nor does she demonstrate with any specificity that she was prejudiced by the failure of Boomtown to produce certain discovery information at an earlier time. Without more than general allegations of injury, we conclude that the district court did not abuse its discretion in denying the continuance.

## D

■ Finally, Barnes alleges that the magistrate judge assigned to this case previously worked for the defense counsel's law firm and therefore had a conflict of interest in participating in this case that prejudiced Barnes. Barnes does not present any evidence of this allegation. Further, Barnes never moved at the district court level for the magistrate judge to be recused, and this argument is waived.[20] Finally, even if this allegation were true, prior employment at a law firm representing a litigant before the court does not create a per se requirement of recusal and evidence of bias must be presented.[21]

\* \* \*

17. *Anderson v. Siemens Corp.*, 335 F.3d 466, 471 (5th Cir.2003).

18. *United States v. Walters*, 351 F.3d 159, 170 (5th Cir.2003).

19. *United States v. Barnett*, 197 F.3d 138, 144 (5th Cir.1999) (internal quotation marks omitted).

20. *Stephenson v. Paine Webber Jackson & Curtis, Inc.*, 839 F.2d 1095, 1096 n. 3 (5th Cir. 1988) (stating that plaintiff waives recusal challenge by not raising it until appeal).

21. *Cf. Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 482–84 (5th Cir.2003) (finding that a judge did not abuse his discretion when he denied plaintiffs' motion to recuse himself because of previous employment with counsel

For the foregoing reasons, the appeal is DISMISSED IN PART and the judgment of the district court is AFFIRMED.

Javier L. OLIVA, Plaintiff–Appellant,

v.

Warden J. RUPERT; Unknown Party, Transporting Officer # 1; Unknown Party, Transporting Officer # 2; Lieutenant Unknown Matthews; Lieutenant Unknown Corn; Johnson Unknown, Defendants–Appellees.

No. 13–40601
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Jan. 24, 2014.

representing the defendant in earlier litiga-

tion).

Javier L. Oliva, Lovelady, TX, pro se.

Before JOLLY, SMITH, and CLEMENT, Circuit Judges.

PER CURIAM: *

Javier Oliva, Texas prisoner # 1409172, appeals the dismissal of his *in forma pauperis* 42 U.S.C. § 1983 suit pursuant to 28 U.S.C. § 1915A(b)(1) as frivolous and for failure to state a claim. In his first amended complaint, Oliva raised Eighth Amendment claims against Warden J. Rupert and two unnamed transporting officers arising from Oliva's fall while exiting a prison van.

A complaint is frivolous if it lacks "an arguable basis in law or fact," and dismissal on that ground is reviewed for abuse of discretion. *Berry v. Brady,* 192 F.3d 504, 507 (5th Cir.1999). Dismissal for failure to state a claim is reviewed *de novo,* applying the standard used to review a dismissal under Federal Rule of Civil Procedure 12(b)(6). *Hart v. Hairston,* 343 F.3d 762, 763–64 (5th Cir.2003).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (internal quotation marks and citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "[C]onclusory allegations or legal conclusions masquerading as factual

conclusions will not suffice to prevent a motion to dismiss." *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993). Because the district court dismissed the complaint both as frivolous and for failure to state a claim, the dismissal is reviewed *de novo. See Geiger v. Jowers,* 404 F.3d 371, 373 (5th Cir.2005).

Oliva's allegations against the two transporting officers state, at most, claims for negligence and therefore not valid § 1983 claims. *See Daniels v. Williams,* 474 U.S. 327, 332–36, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Oliva does not allege facts showing either that Rupert was directly involved in the events at issue or that there was a sufficient causal connection between Rupert's conduct and those events. *See Thompkins v. Belt,* 828 F.2d 298, 304 (5th Cir.1987). Nor has Oliva pleaded facts sufficient to state a valid claim that Rupert failed to supervise or train the transporting officers. *See Goodman v. Harris Cnty.,* 571 F.3d 388, 395 (5th Cir.2009). Finally, though Oliva contends that the district court erred by denying him leave to amend his complaint for a second time, he fails to show that the court abused its discretion, particularly given the futility of the claims that he sought to add through the amendment. *See* FED.R.CIV.P. 15(a)(2); *Jones v. Robinson Prop. Grp., L.P.,* 427 F.3d 987, 994 (5th Cir.2005).

The appeal is without arguable merit and is DISMISSED as frivolous. *See Howard v. King,* 707 F.2d 215, 219–20 (5th Cir.1983); 5TH CIR. R. 42.2. The dismissal of this appeal as frivolous and the district court's dismissal as frivolous and for failure to state a claim count as one strike each for purposes of § 1915(g). *See*

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not·be published and is not precedent except under

the limited circumstances set forth in 5TH CIR. R. 47.5.4.

*Adepegba v. Hammons,* 103 F.3d 383, 387–88 (5th Cir.1996). We caution Oliva that once he accumulates three strikes, he may not proceed *in forma pauperis* in any civil action or appeal filed while he is incarcerated or detained in any facility unless he is under imminent danger of serious physical injury. *See* § 1915(g). Oliva's motion for appointment of counsel is DENIED.

**James Eli HUFF, II, Plaintiff–Appellant,**

**v.**

**Latoina NEAL; Scott Fauver; Unknown Named Federal Bureau of Prisons Medical Staff; United States of America, Defendants–Appellees.**

No. 12–20762.

United States Court of Appeals, Fifth Circuit.

Jan. 27, 2014.

James Eli Huff, II, Big Spring, TX, pro se.

Fred Turner Hinrichs, Assistant U.S. Attorney, U.S. Attorney's Office, Houston, TX, for Defendants–Appellees.

Before JONES, ELROD, and HAYNES, Circuit Judges.

PER CURIAM: *

James Eli Huff, II, a federal prisoner proceeding *pro se*, filed suit against Latoina Neal, Scott Fauver, unknown medical staff at the federal Bureau of Prisons ("BOP"), and the United States of America (collectively, the "defendants"), asserting claims pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and the Federal Tort Claims Act ("FTCA"). The district court granted summary judgment to the defendants on the *Bivens* claims and dismissed the FTCA claims. Because Huff failed to exhaust his administrative remedies with respect to the *Bivens* claims and because the defendants' actions underlying the FTCA claims fell within the discretionary function exception, we AFFIRM.

## I.

Huff was incarcerated at the Federal Correctional Institution in Big Spring, Texas.[1] On July 6, 2007, Huff informed Corrections Officer John Skidmore that a violent prison gang, the Hermanos Pistoleros Latinos ("Pistoleros"), had threatened several inmates over mealtime seating arrangements. The next day, in investigating this claim, Lieutenant Neal openly called Huff into her office; after he left, she called three Pistoleros into her office. According to Huff, Lieutenant Neal's "open investigation procedure" portrayed Huff as a snitch. Huff then reported to Officer Skidmore that he had been threatened by a Pistoleros member for being a snitch. On July 10, 2007, Captain Fauver approved the placement of two Pistoleros gang members into Huff's unit. Two days

later, on July 12, 2007, three Pistoleros gang members entered Huff's cell and, while yelling "pinche ratto," violently attacked him. Huff was placed in the Special Housing Unit ("SHU") following the attack. Medical personnel noted that Huff had an injured nose; multiple abrasions and bruises on his forehead, neck, arms, torso, legs and bottoms of his feet; footprints on his back; a brain stem concussion that caused vision impairment, headaches, and dizziness; and psychological injuries.

On July 20, 2007, Huff was released from the SHU. At that time, according to Huff, he "wanted to file a formal complaint against [Lieutenant] Neal but feared more retaliation. [Lieutenant] Jackson inform[ed] Huff that Captain Fauver is investigating the incident and to just wait for his determination." Lieutenant Jackson again informed Huff that the investigation was ongoing on August 3, 2007.

Huff filed an informal complaint (form BP–8) with Captain Fauver on August 20, 2007, stating "his reluctance to file a complaint fearing more retaliation, and complaining about [Lieutenant] Neal's conduct portraying Huff as a snitch." On November 13, 2007, Huff filed a formal complaint (form BP–9).

On June 25, 2009, Huff filed a lawsuit against the defendants in their individual and official capacities, bringing claims under *Bivens* and the FTCA. Huff alleged that the defendants retaliated against him and failed to protect his safety. The defendants moved for summary judgment on the *Bivens* claims brought against them in their individual capacities, arguing that

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1. We present the facts, as we must, in the light most favorable to Huff. *See Gulf and Miss. River Transp. Co., Ltd. v. BP Oil Pipeline Co.*, 730 F.3d 484, 488 (5th Cir.2013).

Huff had failed to exhaust his administrative remedies. Huff contended that he had properly exhausted his remedies and, in the alternative, that the exhaustion requirement should be excused. The district court granted the motion on failure-to-exhaust grounds.[2] The defendants later filed a motion to dismiss the FTCA claims pursuant to Federal Rule of Civil Procedure 12(b)(1), which the district court also granted, concluding that the defendants' alleged actions fell within the discretionary function exception and that therefore subject matter jurisdiction was lacking.[3] The district court denied Huff's motion for reconsideration. Huff timely appealed.

## II.

### A.

Huff challenges the district court's grant of summary judgment in favor of the defendants on his *Bivens* claims. We review a summary judgment *de novo. Dillon v. Rogers,* 596 F.3d 260, 266 (5th Cir.2010). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). If the moving party bears his burden of showing that no genuine issue exists, the burden then shifts to the nonmoving party to produce evidence or set forth specific facts showing the existence of a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We view the evidence and draw inferences therefrom in the light most favorable to the non-moving party. *Mississippi River,* 730 F.3d at 488.

### B.

■ Huff was required to exhaust administrative remedies for his *Bivens* claims. Huff argues that he properly exhausted administrative remedies because he timely initiated the BOP's administrative process when he notified BOP staff of the imminent threats of assault by gang members. Huff contends that there is no genuine issue of material fact as to whether the defendants had subjective knowledge that he faced serious harm. In support of his position, Huff relies on *Smith v. Brenoettsy,* in which we stated that "all that we (and the Supreme Court) have required is that the official ... be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists." 158 F.3d 908, 912 (5th Cir. 1998) (internal quotation marks omitted) (citing *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

Huff's reliance on *Farmer* is misplaced. Under the Prison Litigation Reform Act ("PLRA"), an inmate must exhaust available administrative remedies offered by the agency before bringing a civil rights claim against officials in their individual capacities. 42 U.S.C. § 1997e(a) (as amended 1996); *Woodford v. Ngo,* 548 U.S. 81, 93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ("[T]he PLRA exhaustion requirement requires proper exhaustion."). In *Porter v. Nussle,* the Supreme Court announced that the "PLRA's exhaustion

---

**2.** The district court dismissed Huff's *Bivens* claims against the defendants in their official capacities based on sovereign immunity. Huff explicitly waives any challenge to the dismissal of his *Bivens* claims against the defendants in their official capacities.

**3.** The district court also dismissed the FTCA claims pursuant to Rule 12(b)(6). Because we ultimately conclude that the district court was correct in dismissing the claims for lack of jurisdiction, we do not reach the failure-to-state-a-claim issue.

requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The defendants in an inmate's lawsuit "must establish beyond peradventure all of the essential elements of the defense of exhaustion to warrant summary judgment in their favor." *Dillon*, 596 F.3d at 266 (citation omitted).

The BOP has a four-step process for resolving grievances by inmates. First, an inmate must attempt to informally resolve the issue with the staff. 28 C.F.R. § 542.13(a). The Inmate Handbook for the facility in which Huff was incarcerated instructs that an inmate must attempt informal resolution by filing a form BP–8. Second, if informal resolution is unsuccessful, the inmate must submit a formal written Administrative Remedy Request (form BP–9) to the warden within twenty days after the date on which the basis for the request occurred. 28 C.F.R. § 542.14. Third, if the inmate is not satisfied with the warden's response, he may submit an appeal (form BP–10) to the Regional Director within twenty days of the date of the warden's response. 28 C.F.R. § 542.15. Fourth, if the inmate is not satisfied with the Regional Director's response, the inmate may submit an appeal (form BP–11) to the General Counsel within thirty days of the Regional Director's response. 28 C.F.R. § 542.15. An inmate has not exhausted his administrative remedies until his claim has been denied at all levels.

The defendants' summary judgment evidence consisted of an affidavit from Jennifer Hansen, the Senior Attorney–Advisor for the BOP, and authenticated computerized records. In her affidavit, Hansen outlined the procedures set forth above and attested, in pertinent part, to the following. The BOP does not retain copies of rejected administrative requests but instead returns them to the inmate. A review of BOP computerized administrative remedy records revealed that Huff failed to exhaust administrative remedies relative to the July 12, 2007, incident and the related issues he raised in his complaint. Because Huff's claims involved allegations of staff misconduct, he should have filed his request for an administrative remedy at the institution level via a BP–9 within twenty days of the incident. Huff attempted to file a BP–9 regarding the July 12, 2007, incident on November 13, 2007. That request was rejected on November 27, 2007, as untimely because it was not filed within twenty days of the incident.

In response to the defendants' motion for summary judgment, Huff asserted, among other things, that he reasonably relied on Lieutenant Jackson's statements that Captain Fauver was investigating the incident and that Huff should wait until Captain Fauver's report was issued to proceed with a complaint. Huff submitted an affidavit in which he attested that he exhausted his administrative remedies to the fullest extent permitted by "BOP Program Statement 1330.16" and that the defendants failed to respond to his BP–8 request for an informal resolution. Huff attached a verified "Administrative Remedy Compendium," asserting that: Lieutenant Jackson and BOP staff told Huff on August 17, 2007, that Captain Fauver's investigation was ongoing; on August 20, 2007, Huff filed a BP–8 to the attention of Captain Fauver, stating that he was reluctant to file a complaint because he feared retaliation; Huff was transferred on October 23, 2007, to a facility in Arkansas; on November 13, 2007, Huff filed a BP–9, stating that he had not received a response to his BP–8. Huff also attached, among other

things, copies of his August 20, 2007, and November 13, 2007, filings.

The district court determined that there was no genuine issue of material fact as to whether Huff had exhausted his administrative remedies. The district court explained that "the only evidence Huff cited was his own declaration containing conclusory statements that he exhausted administrative remedies, that the BOP did not comply with its own regulations," and that it delayed its response to his request for informal resolution. The district court also concluded that Huff was not excused from the exhaustion requirement.

■ Huff argues that his evidence shows that he properly exhausted because he began informal resolution on August 20, 2007, was transferred to a facility in Arkansas on October 23, 2007, and filed a BP–9 on November 13, 2007, as soon as he received his property. He also contends that, under the "Best Evidence Rule," the defendants' computer-generated spread sheets of his alleged remedy filings is not competent summary judgment evidence of whether he attempted to exhaust administrative remedies. Federal Rule of Civil Procedure 56 sets out the standards for summary judgment and generally requires that evidence be sworn, certified, or verified material for a court to consider it. Rule 56(c), (e); *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5th Cir.1987). Hansen attested that the computer records were "computerized inmate records maintained by the BOP in the ordinary course of business" and that her affidavit was based on her own personal knowledge or information acquired through the performance of her official duties. Hansen swore that "[a] thorough review of BOP computerized administrative remedy records revealed that [Huff] ha[d] failed to exhaust his administrative remedies with respect to the issues raised

in his Complaint." Therefore, we agree with the district court that the defendants put forth competent summary judgment evidence.

Under 28 C.F.R. § 542.14(a), Huff was required to file both the informal resolution request and the formal administrative remedy request within twenty days of the complained of incident. As noted above, the incident occurred on July 12, 2007. Huff argues that he began the informal resolution request on August 20, 2007. Huff's own evidence establishes that both his purported August 20, 2007, informal resolution request and November 13, 2007, BP–9 were submitted more than twenty days after the incident. Huff's unsupported allegations that he did exhaust his remedies are insufficient to defeat the motion for summary judgment. As the district court reasoned, conclusory allegations supported by conclusory affidavits are insufficient to require a trial. *See Shaffer v. Williams*, 794 F.2d 1030, 1033 (5th Cir. 1986). Therefore, Huff fails to raise a genuine issue of material fact as to whether he properly exhausted administrative remedies.

■ Huff argues, in the alternative, that he should be excused from the exhaustion requirement because Lieutenant Jackson told him that he should wait until Captain Fauver completed his investigation to file a grievance. Huff also argues that he should be excused because his fear of retaliation rendered his administrative remedies unavailable. We have held that "the exhaustion requirement 'may be subject to certain defenses such as waiver, estoppel, or equitable tolling.'" *Days v. Johnson*, 322 F.3d 863, 866 (5th Cir.2003) (quoting *Wendell v. Asher*, 162 F.3d 887, 890 (5th Cir.1998)), *overruled by implication on other grounds by Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). We have recognized, as a basis for

excuse, circumstances where administrative remedies are inadequate because prison officials have ignored or interfered with a inmate's pursuit of an administrative remedy. *Holloway v. Gunnell*, 685 F.2d 150, 154 (5th Cir.1982). An inmate may be excused from the exhaustion requirement if the inmate can demonstrate that he relied on an officer's statement and that such reliance effectively rendered his administrative remedies unavailable. *Dillon*, 596 F.3d at 268. However, "[a]n administrative remedy does not become unavailable simply because a prisoner has not timely or properly filed a grievance and is consequently later barred from seeking further administrative relief." *Id.* at 267 n. 1 (citing *Woodford*, 548 U.S. at 83–84, 126 S.Ct. 2378).

The district court relied on *Johnson v. Ford*, 261 Fed.Appx. 752 (5th Cir.2008) (unpublished), in rejecting Huff's argument that he was excused from the exhaustion requirement. In *Johnson*, as here, an inmate argued that he should be excused from exhaustion because he was advised to proceed through informal resolution and was advised by the warden that the matter was being investigated. 261 Fed.Appx. at 757. We were not persuaded: "[The inmate's] argument that he relied on the Warden's order of an investigation ... does not serve to excuse his untimely filing of his grievance in the face of a clear ... deadline to file a formal grievance." *Id.* at 757.

Similarly, the evidence here demonstrates that the applicable grievance procedure, including the relevant deadlines, was available to Huff.[4] Huff's knowledge of the grievance procedure generally is evinced by his filing of a BP–8, the first step of the procedure, in August 2007 and his awareness of the BOP Program Statement, which provides the timeliness standards for the procedure. *See, e.g., Alexander v. Tippah Cnty.*, 351 F.3d 626, 630 (5th Cir.2003) (remedies were available because inmate had knowledge of grievance procedures); *Ferrington v. La. Dep't of Corrs.*, 315 F.3d 529, 532 (5th Cir.2002) (remedies were available because the inmate "was well aware of the general procedural requirements described in the inmate handbook"). Moreover, Huff has not alleged that BOP officials provided him with contrary deadlines. Instead, Huff asserts in his affidavits that Lieutenant Jackson told him to delay filing a BP–9 until after Captain Fauver's investigation concluded.[5] But Huff points to only one such statement that was made within twenty days following the incident (i.e., on July 20, 2007). Huff's assertion regarding Lieutenant Jackson's statement, which is merely a reiteration of an allegation in his complaint, is insufficient to raise a fact issue regarding whether BOP officials' actions rendered his remedies unavailable, given Huff's knowledge of the grievance proce-

4. Huff also argues that he was under the impression that BOP policy required him to wait twenty days from the answer to his informal remedy request to file a formal grievance. In fact, however, the BP–9 was required to be filed within twenty days of the incident. *See* 28 C.F.R. § 542.14. The only evidence in the record that Huff was actually confused about the administrative procedures is an Inmate Request to Staff in which Huff asked when a BP–9 needed to be filed. But this request was submitted in 2010, not in 2007, when the events at issue took place. This 2010 Inmate Request cannot be used to demonstrate Huff's confusion over the administrative procedures in 2007.

5. To the extent that Huff also argues, based on Lieutenant Jackson's statement, that promissory and equitable estoppel should excuse his untimely exhaustion, we consider this to be subsumed by the broader excuse-from-exhaustion argument, which we ultimately reject.

dures.[6] Huff also sets forth a generalized fear of retaliation but does not allege any specific acts or threats of retaliation by any specific officers. *See Brown v. Civigenics*, 439 Fed.Appx. 370, 371 (5th Cir. 2011) (unpublished) (concluding that a generalized fear of retaliation does not amount to an excuse in light of the Fifth Circuit's "strict approach to the exhaustion requirement"). The district court was also correct to conclude that this conclusory assertion regarding the fear of retaliation was insufficient, without more, to require a trial on the *Bivens* claims. Viewing the record in the light most favorable to Huff, there is no genuine issue of material fact as to whether Huff was excused from the exhaustion requirement.

Huff argues a number of other reasons as to why he should be excused from the exhaustion requirement, but each is unavailing. Huff contends that the exhaustion requirement should be excused because the prison failed to adhere to its own policy requiring the Remedy Coordinator to be flexible and accept untimely informal resolution requests. However, the facility's policy did not require prison officials to accept an untimely submission, only that "consideration should be given." Huff also argues that administrative remedies were rendered unavailable because his injuries prevented him from filing a timely request. We have held that an inmate's "personal inability" may render a grievance system "unavailable" for purposes of the exhaustion requirement. *Days*, 322 F.3d at 867. Although Huff alleges in his complaint, more definite statement, and compendium that he sustained injuries as a result of the Pistoleros' attack, his summary judgment evidence went only to the nature of his injuries and did not demonstrate that his injuries prevented him from properly exhausting administrative remedies. These conclusory allegations cannot satisfy Huff's summary judgment burden.

## III.

### A.

Huff also challenges the dismissal of his failure to protect claim under the FTCA. We review *de novo* a district court's dismissal under Rule 12(b)(1). *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 251 (5th Cir.2006). Under Rule 12(b)(1), a case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir.1998). Courts may dismiss for lack of subject matter jurisdiction based on: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint, supplemented by undisputed facts, plus the court's resolution of disputed facts. *Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir.1986). When subject matter jurisdiction is challenged, the plaintiff has the burden of demonstrating that subject matter jurisdiction exists. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir.1981).

### B.

As the sovereign, the United States is immune from suit, except to the extent that it has waived its immunity and has consented to be sued. *F.D.I.C. v. Meyer*, 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). The FTCA acts as a limited

---

**6.** Relying on *Dillon*, 596 F.3d 260, Huff argues that his remedies were unavailable. However, in *Dillon*, there was a lack of evidence as to what the inmate knew or "could have discovered" about the relevant deadlines. *Id.* at 269. Here, by contrast, the record reflects that Huff could have discovered when a BP–9 was due.

waiver of sovereign immunity allowing the United States to be sued for "injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b); *see United States v. Muniz*, 374 U.S. 150, 151, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963) (confirming the right of a federal prisoner to sue under the FTCA for injuries received during incarceration). Courts strictly construe waivers of sovereign immunity and resolve all ambiguities in favor of the sovereign. *Lane v. Pena*, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996). Under the discretionary function exception, the waiver of immunity does not apply to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see Guile v. United States*, 422 F.3d 221, 229 (5th Cir.2005). Huff has the burden of proving subject matter jurisdiction by alleging a claim that was facially outside the discretionary function exception. *See St. Tammany Parish ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 315 (5th Cir.2009).

To determine whether the discretionary function exception applies, we conduct a two-pronged inquiry. *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 713 F.3d 807, 810 (5th Cir.2013). We ask first whether the challenged act "involv[ed] an element of judgment or choice." *Gaubert*, 499 U.S. at 322, 111 S.Ct. 1267 (inter-

nal quotation marks and citation omitted). If so, we ask next "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* at 322–23, 111 S.Ct. 1267 (internal quotation marks and citation omitted). The exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 323, 111 S.Ct. 1267 (internal quotation marks and citation omitted).

The district court applied the *Gaubert* test and concluded that the discretionary function exception applied because the BOP exercises "significant judgment in fulfilling its statutory obligation to provide for the safekeeping" of inmates and that the discretionary safekeeping of inmates was the type of action for which the FTCA was designed to shield the government from liability.[7]

■ Huff complains that Lieutenant Neal's "open investigation procedure" portrayed him as a snitch and that Captain Fauver disregarded his health and safety by placing two Pistoleros into his housing unit. Huff contends that the district court erred when it applied the discretionary function exception because, under 18 U.S.C. § 4042(a), the BOP shall "provide suitable quarters and provide for the safekeeping, care, and subsistence" of those in its charge, the defendants' obligation to protect him from harm was statutory, rather than discretionary. Citing *Castro v. United States*, 560 F.3d 381 (5th Cir. 2009), *vacated*, *Castro v. United States*, 608 F.3d 266 (5th Cir.2010) (*en banc*), Huff argues that the defendants did not possess the discretion to violate his Eighth Amendment right against cruel and unusual punishment. Huff's reliance on *Castro*

---

7. Huff argues that the district court erred by considering the jurisdictional question *sua sponte*. We disagree. The district court was obliged to undertake an analysis of the appli-

cability of the discretionary function exception and dismiss this action for lack of subject matter jurisdiction under Rule 12(b)(1).

is misplaced because that case has since been overturned by the *en banc* court. *Castro*, 608 F.3d 266. Huff provides little analysis of this argument and does not cite any case besides the overturned opinion in *Castro*. Though *pro se* litigants' briefs are liberally construed, *pro se* litigants must still brief the issues. *Grant v. Cuellar*, 59 F.3d 523, 524 (5th Cir.1995). Therefore, Huff has waived the issue by failing to brief it adequately. *United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir.2010) ("A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it." (citations omitted)).

The discretionary function exception "does not apply if 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'" *Buchanan v. United States*, 915 F.2d 969, 971 (5th Cir.1990) (quoting *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). Although § 4042 mandates that the BOP ensure the safekeeping of inmates, the Supreme Court has observed that a prison's internal security is normally left to the discretion of prison administrators. *Whitley v. Albers*, 475 U.S. 312, 321–22, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) ("Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (internal quotation marks omitted)).

In addition, we have stated that the BOP must "provide for the safekeeping, care, and subsistence of all federal prisoners, but [§ 4042(a) ] does not indicate the manner in which the duty must be fulfilled." *Spotts v. United States*, 613 F.3d 559, 567 (5th Cir.2010). In other words, because § 4042 does not prescribe a specific course of action, the BOP has discretion to decide how best to fulfill its duty.[8]

Because the duty to maintain safekeeping of inmates is a discretionary one, we now turn to the two-pronged inquiry for the discretionary function exception. The placement of Pistoleros in a particular unit of the prison and the investigation of alleged threats inside the prison "involv[ed] an element of judgment or choice," thereby satisfying the first prong. *Gaubert*, 499 U.S. at 322, 111 S.Ct. 1267. Indeed, the placement of any inmates on any occasion, as well as the investigation of any internal issue at any time, inherently requires that prison officials exercise their discretion to make a choice regarding the proper course of action in furtherance of safekeeping. Moreover, this is the type of conduct that the discretionary function was designed to shield because "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." *Buchanan*, 915 F.2d at 971 (internal quotation marks omitted). Public policy demands that these decisions be made by prison officials, not judges. Therefore, the BOP officials' actions in this case fell within the discretionary function exception.[9]

---

8. Huff argues that BOP policy provides specific courses of actions that BOP employees must follow in order to fulfill their duty under § 4042(a), but he has not pointed to a rule, regulation, or policy statement showing that the defendants lacked discretion in handling his placement. The BOP has discretion within the bounds of § 4042.

9. Regardless of whether Huff purports to rely on a negligence theory or intentional-tort theory, the conduct underlying Huff's FTCA claims falls within the discretionary function exception. The exception does not depend on the inmate-plaintiff's theory. *See Patel*, 398 Fed.Appx. at 29 (citing *Gaubert*, 499 U.S. at 322, 111 S.Ct. 1267) (applying discretionary function exception to bar plaintiff's claim that BOP officials acted "either negligently or de-

Our conclusion comports with a recent unpublished opinion in which we held that "decisions regarding the transfers and classifications of prisoners generally fall within the discretionary function exception." *Patel v. United States,* 398 Fed. Appx. 22, 29 (5th Cir.2010) (unpublished).

■ Huff raises a series of other issues that are meritless. He argues that the district court erred when it denied his motion for leave to amend his complaint after the defendants filed their motion to dismiss his FTCA claims. Futility of amendment is a permissible basis for denial of a motion to amend. *Wright v. Allstate Ins. Co.,* 415 F.3d 384, 391 (5th Cir. 2005). Because the court lacks subject matter jurisdiction over Huff's FTCA claims, amendment to his complaint would have been futile. Likewise, Huff argues that the district court erred when it denied an opportunity for discovery on the jurisdictional issues that were intertwined with his FTCA claims. A district court's decision to delay summary judgment for further discovery is reviewed for an abuse of discretion. *Raby v. Livingston,* 600 F.3d 552, 561 (5th Cir.2010). Huff has not indicated how any fact he hopes to discover would show that the district court's determination on the jurisdiction issue was erroneous. We have stated that a nonmovant "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts." *Id.* Therefore, the district court's denial of Huff's motion for an evidentiary hearing was not erroneous.

■ In addition, Huff argues that his due process rights were violated when the district court denied his motion to reconsider the dismissal of his FTCA claims and his motion to amend. "We review the district court's denial of a motion for reconsideration under an abuse of discretion standard." *Ramon v. Casellas,* 165 F.3d 23, *1 (5th Cir.1998) (unpublished). Huff has not provided grounds for relief from the judgment. The district court therefore did not abuse its discretion.

■ Finally, Huff argues that he district court abused its discretion when it denied his motion for the appointment of counsel without an analysis of the relevant factors. Huff had no automatic right to counsel and the district court was required to appoint counsel only if the case presented exceptional circumstances. *Ulmer v. Chancellor,* 691 F.2d 209, 212 (5th Cir. 1982). Although there is no comprehensive definition of exceptional circumstances is practical, we have stated that a number of factors should be considered in ruling on requests for appointed counsel. These include: (1) the type and complexity of the case; (2) whether the indigent is capable of adequately presenting his case; (3) whether the indigent is in a position to investigate adequately the case; and (4) whether the evidence will consist in large part of conflicting testimony so as to require skill in the presentation of evidence and in cross-examination. *Id.* at 213. Huff filed thorough pleadings and responses to the defendants' motions that adequately addressed the complexities of the case. Therefore, the district court did not abuse its discretion in denying Huff's motion for the appointment of counsel.

We AFFIRM.

liberately" in transferring plaintiff to facility without capacity to treat plaintiff's medical

conditions).

Jorge VILLANUEVA, Petitioner–
Appellant,

v.

William STEPHENS, Director, Texas
Department of Criminal Justice, Cor-
rectional Institutions Division, Re-
spondent–Appellee.

No. 12–70015.

United States Court of Appeals,
Fifth Circuit.

Jan. 27, 2014.

Margaret Loraine Schmucker, Austin, TX, for Petitioner–Appellant.

Matthew Dennis Ottoway, Assistant Attorney General, Office of the Attorney General, Austin, TX, for Respondent–Appellee.

Before DENNIS, CLEMENT, and OWEN, Circuit Judges.

PER CURIAM: *

Jorge Villanueva was convicted and sentenced to death for the murder of Maria Jova Montiel. He requests a certificate of appealability (COA) to appeal the district court's denial of federal habeas relief. The request is denied in part and granted in part.

I

In January 1995, Villanueva was charged with capital murder during the course of a burglary and aggravated sexual assault of Montiel in Harris County, Texas. The trial court appointed Allen C. Isbell and Gilbert Villarreal to represent Villanueva, and together, they filed multiple motions on Villanueva's behalf. Three weeks before trial, both attorneys requested permission to withdraw because of false complaints Villanueva had lodged against them with the Texas State Bar. The court granted the withdrawal, appointed Jerry Guerinot and Anthony Osso to represent Villanueva, and continued the trial date to September 1996 in order to give new counsel time to prepare.

Guerinot and Osso filed a motion to adopt all motions filed by prior counsel and filed additional motions in preparation. Less than three weeks prior to trial, Philip M. Campa filed a motion to be substituted as Villanueva's retained trial attorney. Concerned that the trial date was so close, the trial court extensively questioned Villanueva about the change in counsel. This questioning revealed that Campa had never tried a death penalty case. The court also apprised Villanueva that death penalty cases have distinct procedures, that paying for counsel raised the issue of payment for experts, and that the court was unwilling to grant any further continuances. Despite these considerations, Villanueva reiterated his choice to have Campa represent him and the court allowed the substitution of counsel. Thereafter, the State reindicted Villanueva under a new case number, and trial commenced in October 1996. The trial lasted seven days.

The trial record shows that on August 28, 1994, Villanueva was drinking with friends when he told them that he had looked inside Montiel's window and saw "her body on the floor with blood all over." He eventually gave in to his friends' urging to call the police and an anonymous 911 call was made. After the police

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

arrived at Montiel's home, her neighbor told them to investigate the man living across the street, referring to Villanueva, because he had been harassing her. When questioned by the police about various scratches on his face and body, Villanueva attributed them to a fight with his wife. Villanueva's wife, however, denied a fight had occurred. He later claimed his scratches came from cutting weeds and from his cat.

Villanueva agreed to accompany the police to their station and consented to the collection of blood, hair, and saliva samples. A few months later, the DNA test results connected Villanueva to the crime and he was arrested. After waiving his rights, Villanueva confessed to the murder. In his statement, he described how he had raped Montiel, strangled her, and left her dead on the bed. He also confessed to having stolen a radio from her kitchen, which he gave to a friend the following day.

The jury found Villanueva guilty of capital murder. During the punishment phase, Campa did not call any witnesses at Villanueva's request. Campa asked Villanueva several questions on the record to demonstrate that Villanueva had instructed Campa not to call family members or any other witnesses to testify at this phase. After considering two special issue questions, the jury sentenced Villanueva to death.

Villanueva unsuccessfully sought appellate review of his conviction and sentence[1] and subsequently failed in his state habeas application as well.[2] Villanueva then filed a federal petition for writ of habeas corpus, which was denied. Villanueva now seeks a COA from this court raising six ineffective assistance of counsel claims. He argues his trial counsel was ineffective in: (1) failing to secure a hearing and rulings on the motions filed by his prior counsel; (2) failing to interview and procure witnesses for the guilt-innocence phase of trial; (3) failing to investigate facts relevant to expert testimony and evidence in support of the prosecution's case; (4) failing to conduct competent voir dire of the venire; (5) failing to effectively direct-examine and cross-examine witnesses, and committing other evidentiary errors; and (6) failing to present any evidence during the punishment phase of trial.

## II

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petitioner must obtain a COA before he can appeal a district court's denial of requested habeas relief.[3] A COA will not issue unless the petitioner makes a "substantial showing of the denial of a constitutional right."[4] Such a showing is made by demonstrating that "the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further."[5] Until a COA has been issued, federal courts lack jurisdiction to rule on the merits of appeals from habeas petitioners.[6]

---

1. *Villanueva v. State,* No. 72,612 (Tex.Crim. App. Sept. 23, 1998) (unpublished).

2. *Ex parte Villanueva,* No. 49,591–01 (Tex. Crim.App. Oct. 31, 2001) (unpublished).

3. 28 U.S.C. § 2253(c)(1).

4. *Id.* § 2253(c)(2).

5. *ShisInday v. Quarterman,* 511 F.3d 514, 520 (5th Cir.2007) (alterations and emphasis in original).

6. *Miller–El v. Cockrell,* 537 U.S. 322, 335–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (citing 28 U.S.C. § 2253(c)(1)).

All six of Villanueva's issues assert the denial of his constitutional right to effective assistance of counsel.[7] Violations of this right are assessed under the well-established *Strickland v. Washington*[8] test, which requires the petitioner to demonstrate that (1) "counsel's representation fell below an objective standard of reasonableness," and that (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[9] Recognizing that "the purpose of the effective assistance guarantee ... is not to improve the quality of legal representation" but instead "to ensure that criminal defendants receive a fair trial," the Supreme Court has explained that "[j]udicial scrutiny of counsel's performance must be highly deferential."[10]

### III

■ Villanueva first faults Campa for not reurging and litigating the motions filed by prior counsel. Campa, however, did file a "Motion To Adopt All Motions Of Prior Appointed Counsel," which the state trial court granted both orally and in writing. Based on these facts, the district court denied this claim in summary fashion without addressing Villanueva's arguments. We conclude that Villanueva failed to demonstrate that reasonable jurists would disagree with the district court's denial of this *Strickland* claim.

According to Villanueva, Campa was deficient because he failed to incorporate Villanueva's original case number within the text of his motion. While that number was printed at the top of the motion, some-

one penciled over it with "730975"—Villanueva's new case number following his reindictment. Villanueva therefore contends that this motion must have been filed under 730975 and that all prior motions bearing the original case number were never considered. Villanueva also cites to Campa's affidavit, in which Campa states that it was an "oversight" on his part that the motion did not include the old case number in order to foreclose the assertion that this was a trial strategy.

Villanueva's argument fails to meet his *Strickland* burden; accordingly, the district court's denial was not unreasonable. First, although Campa's affidavit admits to an oversight, Villanueva provides the court with no basis upon which to find that an attorney's omission of a previous case number within the text of a motion is objectively unreasonable. Furthermore, even if we were to hold that Villanueva established deficient performance, he has not shown that he was prejudiced as a result. Villanueva assumes that Campa's motion was separately filed and that the previous motions were never considered— he shows no evidence that this actually occurred. Nor does he present any evidence to show that there is a reasonable probability that, but for Campa's error, the trial would have had a different result. Accordingly, we deny a COA on this claim.

### IV

Villanueva next claims that Campa failed to investigate his case, both before and after trial began. While the district court denied this claim as "vague and specula-

---

7. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.").

8. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

9. *Strickland,* 466 U.S. at 687–88, 694, 104 S.Ct. 2052.

10. *Id.* at 689, 104 S.Ct. 2052.

tive," Villanueva contends that reasonable jurists could find that Campa's investigations were inadequate because Campa never interviewed the police officers or suppression hearing witnesses, and because he failed to hire a private investigator and criminologist. He further disagrees with the district court's rejection of the presumptive-prejudice test from *United States v. Cronic*,[11] which does not inquire into counsel's actual performance or require the defendant to show the effect it had on the trial in order to find prejudice in some circumstances.[12]

■ Under *Strickland*, an attorney has a duty to make reasonable investigations,[13] but a petitioner "who alleges a failure to investigate on the part of his counsel must allege *with specificity* what the investigation would have revealed and how it would have altered the outcome of the trial."[14] Although the presumptive-prejudice test in *Cronic* does not require inquiry into counsel's actual performance, the Supreme Court explicitly limited the scope of this test to "circumstances that are so likely to prejudice the accused," such as "the complete denial of counsel" or where designation of counsel was "either so indefinite or so close upon the trial as to amount to a denial of effective and substantial aid in that regard."[15] Neither was true in this case. Villanueva had assistance from counsel, and while Campa was hired three weeks before trial was originally scheduled to begin, this substitution occurred at Villanueva's request and after extensive questioning by the trial court to ensure that Villanueva understood the implications.

■ Barring *Cronic*, Villanueva must satisfy the general *Strickland* burden of stating with specificity how he was prejudiced by the failure to investigate. Villanueva's claim fails to meet this standard. The district court correctly notes that Villanueva did not identify what information Campa would have gleaned from interviewing the police officers or what additional investigation would have revealed that would have helped in the suppression hearing. Nor does Villanueva identify what evidence would have been revealed had Campa used a private investigator or a criminologist. We deny a COA on this claim.

### V

■ Villanueva next argues that Campa failed to investigate and utilize the forensic evidence properly. He asserts that independent DNA testing should have been conducted both during and after trial, and that Campa should have retained an expert to assess the State's protocols given the allegations of noncompliance with DNA lab procedures.

11. 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

12. *Cronic*, 466 U.S. at 659–60, 104 S.Ct. 2039 ("Circumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.") (citing *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158 (1932)). Villanueva argues in the alternative that his defense was prejudiced based on the evidentiary errors Campa made, which are addressed in Part VII.

13. *See Strickland*, 466 U.S. at 691, 104 S.Ct. 2052.

14. *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir.2010) (emphasis added) (quoting *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)).

15. *Cronic*, 466 U.S. at 658–60, 104 S.Ct. 2039.

Reasonable jurists could not debate the district court's denial of this *Strickland* claim because Villanueva does not demonstrate how Campa's actions were objectively unreasonable. He fails to explain why Campa should have conducted independent DNA testing prior to trial. Additionally, Campa's cross-examination of the State's experts and closing argument were sufficient to address any alleged noncompliance with lab procedure.[16] Accordingly, we also deny a COA on this claim.

## VI

■ Villanueva contends that Campa did not competently conduct voir dire because he failed to pursue potentially disqualifying issues. The district court held that Villanueva "inadequately briefed this claim in state court" because while he listed questions that Campa should have asked, Villanueva "did not link any unasked questions to any purportedly biased juror." Accordingly, under *Cullen v. Pinholster*,[17] the district court held that it was foreclosed from considering Villanueva's "new" arguments of prejudice in specific jurors since habeas review is limited to "what a state court knew and did." We agree.

In *Pinholster*, the Supreme Court held that review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits."[18] AEDPA limits federal court review of state court decisions for contrary or unreasonable applications of "clearly established Federal law," which can only be determined by confronting the facts that were before the state court when it rendered its decision.[19] This circuit further explained that under *Strickland*, a petitioner alleging deficient performance during jury selection must identify "any particular juror [who] was in fact prejudiced" and must establish that had counsel's questioning focused on a specific area of bias, the bias would have been found.[20] The petitioner must also show prejudice caused by the deficiency such that "there is reasonable probability that the result of the proceedings would have been different."[21] Because Villanueva did not identify specific examples of bias that failed to be elicited due to deficient questioning or demonstrate how Campa's acts during voir dire affected the outcome of his case, reasonable jurists could not disagree with the district court's denial of his claim. We therefore deny a COA.

## VII

Villanueva's next *Strickland* claim argues that Campa was inept at direct examination and cross-examination and committed numerous evidentiary errors that prejudiced his defense. Villanueva identifies four categories in which Campa failed to make adequate objections: (1) hearsay objections, (2) leading questions and narrative answers, (3) chain of custody and authentication, and (4) speculative and conclusory testimony. In addition, Villanueva asserts that even if each trial error individually did not amount to *Strickland*

---

16. *See Harrington v. Richter*, —— U.S. ——, 131 S.Ct. 770, 791, 178 L.Ed.2d 624 (2011) ("In many instances cross-examination will be sufficient to expose defects in an expert's presentation.").

17. —— U.S. ——, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011).

18. *Pinholster*, 131 S.Ct. at 1398.

19. *Id.* at 1398–99 (quoting 28 U.S.C. § 2254(d)(1)).

20. *See Neville v. Dretke*, 423 F.3d 474, 483 (5th Cir.2005).

21. *Id.; see also Clark v. Collins*, 19 F.3d 959, 965 (5th Cir.1994).

prejudice, the cumulative effect of the errors did. We deny a COA on all of these claims.

■ Villanueva first objects to the district court's holding that the state habeas court reasonably found no constitutional error in counsel's failure to make hearsay objections. The district court cited examples to demonstrate the inconsequential effect of the unobjected-to evidence. Rather than contesting these specific examples, Villanueva argues that they are not representative of Campa's deficiencies. However, just as with his previous arguments, Villanueva provides no basis upon which to consider whether reasonable jurists could disagree. Without particular allegations as to the examples the district court failed to consider, Villanueva has not established how counsel's performance was deficient. Accordingly, we decline to grant a COA on this subclaim.

■ Villanueva next asserts that Campa failed to object when the prosecutor repeatedly led witnesses and allowed "devastating" narrative testimony. This court has held that the "failure to object to leading questions and the like is generally a matter of trial strategy as to which [this court] will not second guess coun-

sel." [22] We have further held that there can be no *Strickland* claim where a petitioner fails to "explain how those instances likely would have resulted in a different trial outcome." [23] Villanueva's sole argument is that the district court imposed a higher burden of proof for prejudice in violation of the Supreme Court's decision in *Berger v. United States*, [24] in which the Court held that prejudice to the accused can be presumed where there is prosecutorial misconduct. [25] However, *Berger* involved a level of misconduct not alleged here. [26] Furthermore, *Berger* concerned government misconduct whereas Villanueva challenges his retained counsel's performance. [27] Accordingly, the policies underlying *Berger* do not apply here. [28] Because Villanueva presents no basis from which reasonable jurists could find prejudice, we deny a COA on this subclaim.

■ Villanueva next argues that Campa should have objected to the introduction of State's Exhibits 56 and 85 through 89 since they were not properly authenticated. Although the district court denied this claim because Villanueva did not establish gaps in the chain of custody, Villanueva asserts that the "issue is not that Campa failed to

22. *Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir. 1993).

23. *See id.*

24. 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

25. *See Berger*, 295 U.S. at 89, 55 S.Ct. 629.

26. *Id.* ("[W]e have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential."); *see also id.* at 84 & n. *, 55 S.Ct. 629 (prosecutor misstated evidence, deliberately misunderstood witness state-

ments, assumed prejudicial facts not in evidence, and more).

27. *Id.* at 80, 55 S.Ct. 629.

28. *See id.* at 88, 55 S.Ct. 629 ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.... Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.").

object to evidence where there was a 'gap in chain of custody'" but that "Campa failed to object to evidence that had not been properly authenticated." However, Villanueva failed to identify with specificity how these exhibits were improperly authenticated or, that *even if* they were not, that these exhibits could not have possibly been authenticated.[29] Because reasonable jurists could not disagree that Villanueva failed to show deficiency or prejudice, we deny a COA on this subclaim.

■ Villanueva next contends that Campa failed to object to conclusory and speculative statements made by witnesses. As stated previously, this court has held that the "failure to object to leading questions and the like is generally a matter of trial strategy as to which [this court] will not second guess counsel."[30] This case bears no resemblance to cases where federal courts have considered evidentiary errors despite an asserted trial strategy.[31] Accordingly, we also decline to grant a COA on this subclaim.

Lastly, Villanueva argues that the cumulative effect of Campa's failures to object prejudiced the outcome of his case. The district court held that even if Campa had made each of the objections Villanueva argues he should have made, the objections would not have lessened the impact of the other evidence in this case. In any event, as explained above, the lack of objections were either determined to be reasonable strategy or to not be errors at all. Because Villanueva failed to show that Campa was ineffective, there is nothing to cumulate.[32] We therefore deny a COA on this subclaim.

## VIII

■ In his final *Strickland* claim, Villanueva asserts that Campa failed to present mitigating evidence during the punishment phase of his trial. Because Villanueva instructed Campa not to call any mitigating witnesses, he would ordinarily be precluded from bringing a *Strickland* claim under *Schriro v. Landrigan*.[33] He argues, however, that his waiver was invalid because Campa inadequately advised him regarding the importance of mitigating evidence and because his waiver was not "informed

---

**29.** In his application, Villanueva specifies state evidentiary rule violations that were not presented in his state habeas application. Accordingly, we are precluded from considering these "new" arguments. *See supra* note 19 and accompanying text.

**30.** *E.g., Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir.1993).

**31.** *See supra* notes 26–28 and accompanying text.

**32.** *E.g., United States v. Hall*, 455 F.3d 508, 520 (5th Cir.2006) ("Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions.").

**33.** 550 U.S. 465, 478, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007) ("[I]t [i]s not objectively unreasonable for [a] court to conclude that a defendant who refuse[s] to allow the presentation of any mitigating evidence could not es-

tablish *Strickland* prejudice...."); *Sonnier v. Quarterman*, 476 F.3d 349, 362 (5th Cir.2007) ("[W]hen a defendant blocks his attorney's efforts to defend him, including forbidding his attorney from interviewing his family members for purposes of soliciting their testimony as mitigating evidence during the punishment phase of the trial, he cannot later claim ineffective assistance of counsel."); *see also Clark v. Thaler*, 673 F.3d 410, 418–19 (5th Cir.2012) ("When a petitioner argues that his attorney failed to investigate mitigation evidence, the Supreme Court has said the proper inquiry is 'not whether counsel should have presented a mitigation case,' but 'whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was *itself reasonable*.'" (alterations in original) (quoting *Wiggins v. Smith*, 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003))).

and knowing." [34] The State contends that no "informed and knowing" requirement exists for waiver of the right to present mitigating evidence, and that Villanueva's claim is indistinguishable in its operative facts from the claim rejected by the Supreme Court in *Landrigan*. Questions as to this claim are adequate to deserve encouragement to proceed further. We therefore grant a COA on his final claim.

\* \* \*

For the foregoing reasons, we DENY in part and GRANT in part the petition for a COA.

Kimberly M. JOHNSON,
Plaintiff–Appellant

v.

MAESTRI MURRELL PROPERTY MANAGEMENT, Defendant–Appellee.

No. 12–31175.

United States Court of Appeals, Fifth Circuit.

Feb. 3, 2014.

---

**34.** *See Clark,* 673 F.3d at 422.

310

Charlotte C. Mcdaniel McGehee, Baton Rouge, LA, for Plaintiff–Appellant.

Susan W. Furr, Esq., Phelps Dunbar, L.L.P., Baton Rouge, LA, for Defendant–Appellee.

Before BARKSDALE, PRADO, and HAYNES, Circuit Judges.

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

PER CURIAM: *

Plaintiff–Appellant Kimberly Johnson ("Johnson") filed suit under Title VII against Defendant–Appellee Maestri–Murrell Property Management ("Maestri–Murrell") claiming that Maestri–Murrell unlawfully discriminated against her when it denied her employment based on her race. The district court granted summary judgment in favor of Maestri–Murrell and dismissed the lawsuit with prejudice. We reverse and remand.

## I. BACKGROUND

This is the second appeal from the underlying action. In the first appeal, this Court reviewed the district court's grant of Maestri–Murrell's motion for summary judgment. *Johnson v. Maestri–Murrell Prop. Mgmt., LLC (Johnson I)*, 487 Fed. Appx. 134, 135 (5th Cir.2012) (per curiam) (unpublished). In granting summary judgment, the district court reasoned that Johnson could not establish a prima facie case of discrimination because Johnson had not presented any evidence of causation. *Id.* at 137. Upon de novo review, we concluded that "[w]hether or not the evidence is deemed direct or circumstantial or both, it is clear that Johnson has established a prima facie case of racial discrimination, and the district court should have denied Maestri–Murrell's summary judgment motion." *Id.* We thus reversed and remanded "for further proceedings consistent with this opinion." *Id.* at 139.

On remand, the district court set a deadline for the parties to submit any motions for leave to re-urge summary judgment. Maestri–Murrell obtained leave and moved for reconsideration of its summary judgment motion, re-urging that Johnson was

not qualified for the property manager position she applied for—a ground that the district court had purportedly not reached. The district court agreed with Maestri–Murrell, granted summary judgment, and dismissed the case with prejudice. Johnson timely appealed and asks this Court to reassign the case to a new district judge upon remand. The EEOC, as amicus curiae, filed a brief in support of Johnson.

## II. DISCUSSION

First, we address the district court's application of the remand order from *Johnson I*. Because we reverse the district court on the ground that it violated the remand order, we need not reach the substantive merits of the qualification issue raised on appeal. Second, we address Johnson's request to have the matter reassigned to a new district court judge upon remand.[1]

### A. The District Court's Application of the Remand Order

"We review de novo a district court's interpretation of our remand order, including whether the law-of-the-case doctrine or the mandate rule forecloses any of the district court's actions on remand." *Gene & Gene, L.L.C. v. BioPay, L.L.C.*, 624 F.3d 698, 702 (5th Cir.2010). Under the law of the case doctrine, "an issue of law or fact decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *Id.* at 702 (citation and internal quotation marks omitted). "The doctrine

is 'based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter.'" *Id.* (quoting *United States v. U.S. Smelting Ref. & Mining Co.*, 339 U.S. 186, 198, 70 S.Ct. 537, 94 L.Ed. 750 (1950)). "Exceptions to the doctrine allow reexamination of issues decided on appeal only if '(i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work a manifest injustice.'" *Id.* (quoting *Fuhrman v. Dretke*, 442 F.3d 893, 897 (5th Cir.2006)).

The mandate rule is a "specific application of the general doctrine of law of the case." *United States v. Lee*, 358 F.3d 315, 321 (5th Cir.2004) (citation and internal quotations marks omitted). "Absent exceptional circumstances, the mandate rule compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." *Id.*

In granting summary judgment, the district court treated Johnson's claim as built solely upon circumstantial evidence. A Title VII discrimination case, however, "can be established through either direct or circumstantial evidence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir.2003). In the absence of direct evidence of discrimination, a court evaluates the discrimination claim under the *McDonnell Douglas* burden-shifting framework.[2] *West v. Nabors*

---

**1.** Maestri–Murrell alternatively suggests that, even if Johnson satisfied her prima facie burden, "summary judgment was undoubtedly proper as to plaintiff's claim for reinstatement, front pay, and back pay to, at the very least, the date when defendant learned of plaintiff's dishonesty." However, Maestri–Murrell does not suggest that it had moved for summary judgment as to the recovery

period, or that the district court granted partial summary judgment as such. This alternate request is therefore not properly before this Court as there is no judgment to review. *See, e.g., Am. River Transp. Co. v. U.S. Mar. Servs., Inc. (In re Am. River Transp. Co.)*, 490 F.3d 351, 356 n. 28 (5th Cir.2007).

**2.** The *McDonnell Douglas* framework requires a plaintiff to first demonstrate a prima facie

*Drilling USA, Inc.*, 330 F.3d 379, 384 (5th Cir.2003). Conversely, when a plaintiff presents direct evidence of discrimination, the *McDonnell Douglas* analysis is inapplicable. *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 892 n. 3 (5th Cir.2012).

The district court's grant of summary judgment violated the mandate rule in two respects, each of which independently requires reversal. First, regarding Johnson's direct evidence case, the district court ignored this Court's holding in *Johnson I* that Johnson presented sufficient direct evidence of discrimination to survive summary judgment. Second, regarding Johnson's circumstantial evidence case, the district court improperly relitigated Johnson's qualifications under the *McDonnell Douglas* analysis after *Johnson I* had decided the issue.

### 1. *Johnson's Direct Evidence Case*

Maestri–Murrell contends that the *Johnson I* Court "apparently found [Kimball's] statement insufficient alone to satisfy the direct evidence proof structure, opting instead to rely on the *McDonnell Douglas* analysis." Because "direct evidence proves the occurrence of discrimination without the need for inference," Maestri–Murrell continues, the *Johnson I* Court indicated that it did not apply a direct evidence analysis when it "[drew] all inferences from [the evidence] in Johnson's favor" to arrive at its holding. We disagree.

■ A plain reading of this Court's opinion in *Johnson I* reveals that it held Johnson's direct evidence of discrimination sufficient to survive summary judgment.

The opinion provides two sections offering two separate analyses—one entitled "Evidence of Racial Discrimination" and the other entitled "*McDonnell Douglas* Framework"—each independently finding that summary judgment was premature. *Johnson I*, 487 Fed.Appx. at 136–38. In the section entitled "Evidence of Racial Discrimination," the opinion is replete with statements that Johnson's direct evidence of racial discrimination was sufficient to defeat summary judgment:

> Whether or not the evidence is deemed direct or circumstantial or both, it is clear that Johnson has established a prima facie case of racial discrimination, and the district court should have denied Maestri–Murrell's summary judgment motion.
>
> . . .
>
> This case presents direct evidence of racial discrimination—sworn deposition testimony by Curtis that Kimball stated to her that she did not think that Maestri–Murrell wanted an African American as assistant manager at Azalea Point.
>
> . . .
>
> The district court erred in disregarding Kimball's alleged comments that Maestri–Murrell would not consider hiring an African American. To the contrary, the comments provide, at a minimum, evidence sufficient to defeat summary judgment.
>
> . . .
>
> The remarks, if true, provide evidence of discrimination.
>
> . . .

case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The burden of production then shifts to the defendant to establish a legitimate, nondiscriminatory reason for its adverse employment action. *Id.* at 802–03, 93 S.Ct. 1817. If the employer meets its burden, the plaintiff then bears the burden of persuading the trier-of-fact, by a preponderance of the evidence, that the employer intentionally discriminated against the plaintiff because of the plaintiff's protected status. *Id.* at 807, 93 S.Ct. 1817. *See generally Laxton*, 333 F.3d at 578–79.

The evidence included Johnson's resume, which, unlike other resumes that Maestri Murrell supplied during the EEOC's investigation and discovery, had no comments written on it by Kimball indicating her views. It also included the Curtis deposition.

*Id.* at 137.

This Court concluded, in the same section, that "[v]iewing all of this evidence and drawing all reasonable inferences from it in Johnson's favor, a jury could reasonably find that Kimball had screened Johnson out based on race prior to hiring Cedatol." *Id.* Maestri–Murrell's argument regarding the Court's drawing of inferences is inapposite; the Court was simply applying the summary judgment standard. *See id.* ("On summary judgment, the district court was required to view the evidence and draw all reasonable inferences from the evidence in the light most favorable to Johnson." (citation omitted)). Only after holding that Johnson had sufficient direct evidence to survive summary judgment did we proceed to *additionally* apply the *McDonnell Douglas* framework, consistent with our conclusion that "[w]hether or not the evidence is deemed direct or circumstantial or both, it is clear that Johnson has established a prima facie case of racial discrimination." *Id.* Accordingly, this Court in *Johnson I*, without having to apply the *McDonnell Douglas* framework, held that Johnson's direct evidence was sufficient to defeat summary judgment and remanded "for further proceedings consistent with this opinion." *Id.* at 139.

On remand from *Johnson I*, the district court applied only the *McDonnell Douglas* framework when it granted summary judgment and dismissed all claims. In so doing, the district court disregarded this Court's prior holding that summary judgment was inappropriate because Johnson had presented sufficient direct evidence of discrimination. *See Turner*, 675 F.3d at 892 n. 3 (stating that the *McDonnell Douglas* analysis is inapplicable where there is direct evidence of discrimination). Accordingly, the district court violated the mandate rule when it granted summary judgment and must be reversed.

### 2. *Johnson's Circumstantial Evidence Case*

■ With respect to Johnson's circumstantial evidence case, Maestri–Murrell argues that the district court's ruling did not violate the mandate rule because this Court's opinion in *Johnson I* "did not address in any detail the alternate ground for summary judgment upon which defendant's motion for reconsideration was based (qualifications)." Maestri–Murrell, however, cites no law—nor are we aware of any—to support the proposition that the law of the case doctrine and the mandate rule foreclose relitigation of only those issues discussed "in detail."

On the contrary, the Court need only have "expressly or impliedly *decided*" the issue. *Lee*, 358 F.3d at 321 (emphasis added). In *Johnson I*, this Court impliedly decided the issue of qualification when it held, upon de novo review, that Johnson met her prima facie burden on summary judgment. 487 Fed.Appx. at 138. In fact, in *Johnson I*, Maestri–Murrell fully briefed the very same arguments regarding Johnson's qualifications that the district court adopted in its grant of summary judgment, and those arguments are now before us once again. *See* Brief on Behalf of Appellee at 20–26, *Johnson I*, 487 Fed. Appx. 134 (No. 11–30914), 2012 WL 6018917, at *20–26. Having held in *Johnson I* that Johnson satisfied her prima facie burden on summary judgment, we necessarily decided the qualification issue that the district court and Maestri–Murrell now rely upon. *See, e.g., Johnson v. Loui-*

siana, 351 F.3d 616, 621–22 (5th Cir.2003) (requiring plaintiff to establish a prima facie case by evidence that, *inter alia*, she was qualified for the available position); *Alpha/Omega Ins. Servs., Inc. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 279 (5th Cir.2001) (holding that if an issue was "fully briefed to the appellate court and . . . [a] necessary predicate[ ] to the [court's] ability to address the issue or issues specifically discussed, [those issues] are deemed to have been decided tacitly or implicitly, and their disposition is law of the case"). Indeed, we explicitly stated that Johnson "appeared to be qualified" for the position. *Johnson I*, 487 Fed. Appx. at 138.

The district court therefore failed to follow our remand order with respect to Johnson's circumstantial evidence case because this Court's holding in *Johnson I* foreclosed its relitigation of the qualification issue. Accordingly, the district court violated the mandate rule and must be reversed.

## B. Johnson's Request for Reassignment upon Remand

According to Johnson, the district court's failure to follow *Johnson I* demonstrates the district judge's substantial difficulty in putting out of his mind his view that Johnson's discrimination claim is built upon circumstantial evidence. Therefore, Johnson continues, the matter should be reassigned to a new judge upon remand.

The " 'power to reassign pending cases is an extraordinary one'; it is 'rarely invoked.' " *Johnson v. Sawyer*, 120 F.3d 1307, 1333 (5th Cir.1997) (quoting *In re*

---

**3.** At oral argument, Johnson expressed concern that "there's no jury request in this matter" and that the case was set for a bench trial. Johnson later answered in the affirmative when asked whether a jury trial would be an acceptable alternative to reassignment.

*John H. McBryde*, 117 F.3d 208, 228–29 (5th Cir.1997)). This Court has used two different tests. The first test is:

(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*In re DaimlerChrysler Corp.*, 294 F.3d 697, 700–01 (5th Cir.2002) (citation omitted). The second test asks if the facts "might reasonably cause an objective observer to question [the judge's] impartiality." *Id.* at 701 (citation and internal quotation marks omitted).

■ Here, the single instance of the district court's failure to follow *Johnson I* does not warrant this rarely invoked extraordinary remedy. *See Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) (stating that "judicial rulings alone almost never constitute a valid basis" for finding bias or partiality (citation omitted)). As the Supreme Court has held, judicial rulings in and of themselves "can only in the rarest circumstances evidence the degree of favoritism or antagonism required" to warrant recusal. *Id.* Because Johnson does not present any evidence that the district judge directed hostility toward her, we deny Johnson's request for reassignment.[3]

---

We do not have authority, on this appeal, to determine whether such relief is proper because Johnson did not previously file a motion requesting a jury trial, which the district court must decide in the first instance.

## III. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment is REVERSED, and this matter is REMANDED for further proceedings consistent with this opinion. Johnson's request to have the matter reassigned upon remand is DENIED.

**UNITED STATES of America,**
**Plaintiff–Appellee**

v.

**Juan Luis RAMIREZ; Alejandro Cabrera; Jorge Salas–Leyva, also known as Jorge Sala, Defendants–Appellants.**

No. 12–41217.

United States Court of Appeals,
Fifth Circuit.

Feb. 3, 2014.

Terri Lynn Hagan, Assistant U.S. Attorney, Ernest Gonzalez, Assistant U.S. Attorney, U.S. Attorney's Office, Plano, TX, for Plaintiff–Appellee.

Bobbie Peterson Cate, Esq., Sherman, TX, Todd Alan Durden, Durden Law Firm, Keller, TX, Seth Kretzer, Law Offices of Seth Kretzer, Houston, TX, for Defendants–Appellants.

Before REAVLEY, PRADO, and OWEN, Circuit Judges.

PER CURIAM: *

Juan Luis Ramirez, Alejandro Cabrera, and Jorge Salas–Leyva appeal their convictions for drug and money laundering conspiracy. Ramirez and Salas–Leyva also challenge their sentences. The Government concedes error on the sufficiency of the evidence for the money laundering conspiracy as to Cabrera. We agree and find no other error. We therefore AFFIRM the convictions for the drug conspiracy as to all defendants and the money laundering conspiracy as to Ramirez and Salas–Leyva, but we REVERSE Cabrera's conviction for money laundering conspiracy and REMAND for resentencing.

I.

Cabrera argues first that his prosecution in the instant case violated his plea agree-

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

ment with the Government in a prior case. "Whether the Government has breached a plea agreement is a question of law we review de novo." *United States v. Harper,* 643 F.3d 135, 139 (5th Cir.2011).

■ In the prior case, Cabrera pleaded guilty to an indictment charging him with conspiracy to distribute methamphetamine. In return for the plea, the Government agreed not to prosecute Cabrera in the Eastern District of Texas for other charges based on conduct underlying the plea. The instant prosecution was not a breach of the agreement because, although one of the codefendants overlapped in the two cases, the conduct underlying the two offenses was not the same. In the methamphetamine case, Cabrera was charged with a conspiracy lasting from 2007 through July 23, 2009, to distribute 500 grams or more of a mixture or substance containing methamphetamine, and that as part of the offense Cabrera possessed one pound of methamphetamine on July 23, 2009. The factual basis for the offense showed that Cabrera and another defendant intended for a third individual to sell the methamphetamine in Longview or Shreveport. In the instant case, Cabrera was charged with a much larger conspiracy lasting from January 2006 through July 13, 2011, to distribute five kilograms or more of cocaine, and with conspiracy to commit money laundering, in the Eastern District of Texas. Given the different time frames, co-defendants, controlled substances, and general locations of the two offenses, it would not be reasonable for Cabrera to believe that his plea agreement in the methamphetamine case barred his prosecution for the instant cocaine offense. *See, e.g., United States v. Lewis,* 476 F.3d 369, 387–88 (5th Cir.2007) (an alleged breach of a plea agreement is determined in part based on defendant's reasonable understanding of the agreement). Fur-

thermore, there was no double jeopardy violation in light of the different elements to be proven in each case. *See Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

## II.

All three defendants argue that venue was improper in the Eastern District of Texas. They assert that the evidence at trial showed that the drug operations and activity were in Dallas, that all co-conspirators lived in Dallas, and that stash houses were located in Dallas. They contend that the evidence failed to show that the offenses occurred in the Eastern District of Texas. We disagree.

We will affirm a conviction where the defendant challenges venue if, viewing the evidence in the light most favorable to the Government, a rational jury could find that the Government established venue by a preponderance of the evidence. *United States v. Garcia Mendoza,* 587 F.3d 682, 686 (5th Cir.2009). In a conspiracy case, venue is proper in any district where the agreement was formed or an overt act occurred. *Id.*

■ Here, although many acts in the conspiracies occurred in Dallas, which is in the Northern District of Texas, there was also evidence of significant acts occurring within the Eastern District of Texas, especially in and around Lufkin. The evidence showed that two individuals involved in the conspiracy, Melesio Noyola and Jonathan Beltran, lived in Lufkin, where multiple-kilogram shipments of cocaine were delivered. Some of the cocaine was then further distributed to Louisiana. Money was also delivered to and sent from Lufkin. These acts were all in furtherance of the conspiracies and supported venue in the Eastern District of Texas. *See id.* ("Venue can be based on evidence of any single act that initiated, perpetuated, or complet-

ed the crime."); *see also* 18 U.S.C. § 3237(a). The evidence also supported a conclusion that Ramirez and others traveled through the Eastern District of Texas in furtherance of the conspiracy as they distributed cocaine and transported drug proceeds. *See Garcia Mendoza,* 587 F.3d at 687 (regularly transporting contraband through a district "would support venue, for one co-conspirator's travel through a judicial district in furtherance of the crime alleged establishes venue as to all co-conspirators").

### III.

All defendants also challenge the sufficiency of the evidence to support their convictions. Because all three defendants timely moved for a judgment of acquittal, we review the challenge to the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the Government, and asking whether any rational jury could have found all of the essential elements of the offense beyond a reasonable doubt. *United States v. Davis,* 735 F.3d 194, 198 (5th Cir.2013).

In order to convict the defendants of the conspiracy to distribute cocaine, the Government had to prove "(1) an agreement between two or more persons to violate the narcotics laws, (2) the defendant's knowledge of the agreement, and (3) the defendant's voluntary participation in the conspiracy." *United States v. Zamora,* 661 F.3d 200, 209 (5th Cir.2011) (internal quotation marks and citation omitted). The Government also had to prove that the overall scope of the conspiracy involved at least five kilograms of cocaine. *See United States v. Turner,* 319 F.3d 716, 721–22 (5th Cir.2003).

The evidence here showed that the defendants were part of a wide-ranging operation involving the Gulf cartel moving large amounts of cocaine and money between Mexico and the United States. The operation was headed in Mexico by Salas–Leyva's cousin, who was known as El Tigre, and involved numerous drivers, middlemen, and other participants. The evidence incriminated all three defendants in the conspiracy.

Trial testimony showed that a co-conspirator named Gumercindo Chavarria delivered multiple shipments of cocaine in quantities of seven to eight kilograms to Ramirez. Ramirez also made introductions allowing Noyola and Beltran to sell cocaine to a person named Peter Mingo. Ramirez himself also delivered cocaine to Mingo for resale in Louisiana. Noyola, Beltran, Mingo, and Chavarria all testified to transactions implicating Ramirez.

 With respect to Cabrera, co-conspirators Jesus Jaimes and Jorge Villegas–Jaimes (Villegas) both testified about deliveries of cocaine to Cabrera and to Cabrera's partner, Jose Gaona. Jaimes testified that he delivered approximately 120 kilograms of cocaine to both men and that approximately 50 kilograms went directly to Cabrera at Cabrera's home. Villegas believed that Cabrera received approximately 70 kilograms. Cabrera argues that the evidence was insufficient because Jaimes and Villegas were criminals and not credible. A conviction may be based even on uncorroborated testimony of a co-conspirator, however, as long as the testimony is not incredible as a matter of law. *See United States v. Valdez,* 453 F.3d 252, 257 (5th Cir.2006). Because Jaimes's and Villegas's testimony did not relate to facts that the witnesses could not have observed or to events which could not possibly have happened, the testimony was not incredible as a matter of law and the evidence was sufficient. *See id.*

 The evidence was also sufficient to support the conviction of Salas–Leyva.

Contrary to the defendant's argument, testimony from Fred Gutierrez showed that Gutierrez purchased cocaine directly from Salas–Leyva on several occasions and that on multiple occasions he obtained cocaine from Salas–Leyva's brothers, who worked for Salas–Leyva. Another co-conspirator, Abraham Barragan–Serrato, testified that at least ten shipments of 30 kilograms of cocaine were sent from Mexico through McAllen to Salas–Leyva. Furthermore, Chavarria testified that beginning in February 2009, he delivered seven to eight kilograms of cocaine to Salas–Leyva on two or three occasions. Jesus Davila also testified that he purchased cocaine from El Tigre and that in 2007 El Tigre sent him to Salas–Leyva, after which Salas–Leyva delivered cocaine to Davila and collected the proceeds of Davila's cocaine sales. Based on the above, we conclude that the evidence was more than sufficient to show that the defendants knew about the conspiracy and intentionally joined in the agreement to distribute five kilograms or more of cocaine.

In order to convict the defendants of money laundering, the Government had to prove "(1) that there was an agreement between two or more persons to commit money laundering; and (2) that the defendant[s] joined the agreement knowing its purpose and with the intent to further the illegal purpose." *United States v. Threadgill,* 172 F.3d 357, 366 (5th Cir.1999). Proof of an overt act is not required. *United States v. Fuchs,* 467 F.3d 889, 906 (5th Cir.2006). The indictment here alleged four objects of the conspiracy involving the promotion of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (a)(2)(A), and the concealment of the proceeds of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (a)(2)(B)(i). We will affirm the convictions if the evidence was sufficient as to one of the objects. *Fuchs,* 467 F.3d at 906.

The defendants contend that the evidence was insufficient because it showed merely that money was transported hidden in vehicles as part of the drug offense, without the use of wires, financial institutions, or financial transactions. They argue that the money was payment for past drug shipments and that their conduct involved merely concealing the money itself during transportation rather than transporting money to conceal the nature, location, source, ownership, or control of the funds. *See, e.g., Cuellar v. United States,* 553 U.S. 550, 568, 128 S.Ct. 1994, 2006, 170 L.Ed.2d 942 (2008); *see also* § 1956(a)(2)(B)(i). The Government contends that, at the least, the evidence was sufficient to prove promotion money laundering. We agree.

The sufficiency of the evidence with respect to promotion money laundering is necessarily a fact-intensive inquiry, dependent on the circumstances of each case. *See United States v. Trejo,* 610 F.3d 308, 315 (5th Cir.2010). To prove a conviction for money laundering under § 1956(a)(1)(A), the government must prove that "(1) the financial transaction in question involves the proceeds of unlawful activity, (2) the defendant had knowledge that the property involved in the financial transaction represented proceeds of an unlawful activity, and (3) the financial transaction was conducted with the intent to promote the carrying on of a specified unlawful activity." *United States v. Valuck,* 286 F.3d 221, 225 (5th Cir.2002).

█ The evidence and circumstances here showed that Ramirez personally participated in the transportation of multiple shipments of both cocaine and money concealed in vehicles. Ramirez was directly compensated for the transportation. On more than one occasion, he turned the money over to another co-conspirator for

further transportation into Mexico. Ramirez further directed other participants, such as Noyola and Beltran, on where to deliver cocaine. The evidence showed that Salas–Leyva similarly received and delivered numerous shipments of cocaine. On multiple occasions Salas–Leyva collected money on behalf of El Tigre and delivered the funds to other co-conspirators for transportation. Salas–Leyva regularly handled funds in excess of a quarter million dollars, and at one point he gave Noyola $180,000 to transport to El Tigre. Ramirez and Salas–Leyva were clearly involved in multiple financial transactions when they delivered drug proceeds to others. *See United States v. Garcia Abrego*, 141 F.3d 142, 161 (5th Cir.1998) (transferring over $100,000 to the care or possession of another was a transaction for purposes of establishing a money laundering offense).

To show that the defendants had the specific intent to promote unlawful activity, the Government had to show more than the defendants' knowing promotion, but rather that the defendants acted intentionally to promote the unlawful activity. *See Trejo*, 610 F.3d at 314. Here, the evidence did more than show that funds were frequently transported in a manner designed to prevent detection while en route to Mexico, which undoubtedly promoted the conspiracy. More than that, the evidence of Ramirez's and Salas–Leyva's extensive participation in the drug operation, and their leadership roles in the activity by directing others, supports a conclusion that both knew the funds were drug proceeds, knew they were being transported out of the United States, and intended the transactions to further the progress of the unlawful drug conspiracy. *See, e.g., id.* at 315 (defendant's knowledge of inner workings of drug organization or extensive involvement in the operation may be sufficient to show intent to promote unlawful

purpose of money laundering). We are satisfied based on the circumstances here that the Government proved the essential elements of money laundering with respect to Ramirez and Salas–Leyva.

■ The Government concedes on appeal that the evidence was insufficient to show that Cabrera joined an agreement to commit money laundering knowing the purpose of the agreement and with intent to further that purpose. Cabrera's conviction on the money laundering count is therefore reversed and the case is remanded for the district court to resentence Cabrera.

### IV.

Ramirez and Salas–Leyva both challenge sentencing enhancements applied when determining their sentencing ranges under the Sentencing Guidelines. "We review a district court's interpretation and application of the sentencing guidelines *de novo* and its findings of fact for clear error." *United States v. Reagan*, 725 F.3d 471, 493 (5th Cir.2013).

### A.

■ Ramirez contends that the district court erred by overruling six objections to the presentence report (PSR). He does not specify in his brief how the court erred in its analysis, however. An appellant may not incorporate by reference arguments made in his district court pleadings, and conclusional and inadequately briefed arguments are waived. *See, e.g., Yohey v. Collins*, 985 F.2d 222, 224–25 (5th Cir. 1993). Moreover, we discern no clear error in the district court's determinations based on the drug quantity attributed to Ramirez or Ramirez's role in the offense.

Ramirez also argues for the first time on appeal that the district court erred when

determining his offense level for money laundering by applying Chapter 3 enhancements along with the cross-reference of § 2S1.1. The Government concedes that the court's determination of the money laundering offense level was erroneous but argues that the error was harmless and did not affect Ramirez's substantial rights. We agree.

The district court used the *adjusted* offense level for the drug conspiracy (which included Chapter 3 enhancements) as the *base* offense level for money laundering and then added two levels pursuant to § 2S1.1(b)(2)(B) to arrive at a total offense level of 42. This offense level, along with Ramirez's criminal history category of III, yielded an advisory guideline range of 360 months to life. Under the grouping rules, this was Ramirez's guideline range because the money laundering offense level was higher than the offense level for the drug offense. *See* U.S.S.G. § 3D1.1.

However, the base offense level for money laundering should have been determined from the drug quantity alone without considering any Chapter 3 enhancements applicable to the drug offense. *See* U.S.S.G. § 2S1.1, cmt. 2(C). That procedure would have yielded a total offense level for money laundering of 38. Nevertheless, Ramirez's guideline range would not have changed because his total offense level for the drug conspiracy was 40, which yielded the same range of 360 moths to life under the guidelines' grouping rules. *See* U.S.S.G. § 3D1.1 & Sentencing Table. Therefore, Ramirez cannot show a reasonable probability that he would have received a lesser sentence. *See, e.g., United States v. Lopez*, 923 F.2d 47, 51 (5th Cir. 1991) ("[W]here the sentence imposed falls within a guideline range that remains unaffected regardless of the merits of the appeal, no substantial rights of the defendant are implicated.").

## B.

With respect to Salas–Leyva, the jury specifically found that the drug conspiracy involved "5 kilograms or more" of cocaine. This finding exposed Salas–Leyva to a statutory maximum sentence of not less than ten years or more than life. *See* 21 U.S.C. § 841(b)(1)(A). The district court then determined for guidelines purposes that Salas–Leyva was responsible for at least 150 kilograms. Salas–Leyva argues that this finding was erroneous because the court relied on evidence of drug quantities from a different and unrelated conspiracy. Salas–Leyva is incorrect. Numerous witnesses, including Chavarria, Noyola, Robles, Fernandez–Olver, Gutierrez, and Barragan–Serrato, testified about Salas–Leyva's involvement with a voluminous amount of cocaine and large amounts of money. Gutierrez and Barragan–Serrato both testified that Salas–Leyva handled approximately 300 to 400 kilograms of cocaine. The context of the testimony shows that the witnesses were discussing the instant conspiracy. The district court discussed all of the above witnesses at sentencing. The court's drug quantity determination was not implausible in light of the record as a whole, and the court did not clearly err in its determination. *See United States v. Betancourt*, 422 F.3d 240, 246 (5th Cir.2005).

Salas–Leyva also argues that the district court improperly applied a fourlevel enhancement to the drug offense for a leadership role pursuant to U.S.S.G. § 3B1.1(a) because the evidence showed only that he was involved in selling cocaine without any managerial role. The district court specifically found, and the evidence showed, however, that Salas–Leyva occupied a high-level position within El Tigre's drug organization. He received well over 300 kilograms of cocaine for further distri-

bution and delivered six-figure cash amounts to others to take back to Mexico. The evidence also showed that he recruited other participants and directed their activity because *inter alia* he instructed his brothers to deliver cocaine to other co-conspirators. The district court's conclusion that Salas–Leyva recruited accomplices and exercised control was plausible in light of the evidence as a whole, and the enhancement was not clearly erroneous. *See United States v. Brown,* 727 F.3d 329, 341 (5th Cir.2013).

■■■ Like Ramirez, Salas–Leyva argues, also for the first time on appeal, that the district court misapplied the cross-reference in § 2S1.1 by including Chapter 3 enhancements for the drug offense as part of the offense level for the money laundering conspiracy, specifically the leadership role. *See* § 2S1.1, cmt. 2(C). Because this argument was not raised in the district court, our review is limited to plain error. *See United States v. Whitelaw,* 580 F.3d 256, 259 (5th Cir.2009). We disagree with the defendant that the district court misapplied the enhancement. Unlike the determination for Ramirez, the district court here did not apply the adjusted offense level for the drug offense as the base offense level for the money laundering offense. Instead, the PSR shows that the base offense level for money laundering was determined solely from the underlying drug quantity before the leadership role enhancement was applied, as contemplated by § 2S1.1, cmt. 2(C). The PSR then notes that the leadership enhancement applied because Salas–Leyva was in charge of the operation in the Dallas area and had subordinates working for him. The trial evidence supported the enhancement because several witnesses, including Chavarria, Noyola, and Cruz, testified that they delivered drugs and money to Salas–Leyva and were also given money to take back to Mexico. The money ranged in amounts from $180,000 to $260,000. It was not implausible to find that Salas–Leyva occupied a leadership role in the money laundering, and the district court's sentence enhancement was not a clear or obvious error. Because there was no error in applying the leadership role enhancement, there is no merit in Salas–Leyva's argument that he should have received a safety valve reduction. *See* U.S.S.G. § 5C1.2(a)(4).

■■ Finally, Salas–Leyva argues that the district court should have granted his request, made during the sentencing hearing, for a continuance so that he could call his brothers as witnesses to rebut Gutierrez's testimony that Salas–Leyva exercised control over them in directing the delivery of cocaine. In denying the continuance, the district court noted that Salas–Leyva knew about the probation department's position when the PSR was distributed several months before the sentencing hearing but he did not subpoena the witnesses. Moreover, as noted by the Government, the district court's leadership role enhancement for the drug offense was based on the testimony of other witnesses, in addition to Gutierrez. Salas–Leyva fails to show that the district court's denial of the continuance was arbitrary or unreasonable or that he suffered serious prejudice. *See United States v. Barnett,* 197 F.3d 138, 144 (5th Cir.1999); *United States v. Peden,* 891 F.2d 514, 519–20 (5th Cir.1989).

## V.

For the foregoing reasons, the convictions and sentences of Ramirez and Salas–Leyva are AFFIRMED. The conviction of Cabrera for the drug conspiracy is AFFIRMED, but Cabrera's conviction for the money laundering conspiracy is RE-

VERSED and the case is REMANDED for resentencing.

**Charles J. DAVIS, Jr., Petitioner–Appellant**

v.

**William STEPHENS, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent–Appellee.**

No. 13–40799.

United States Court of Appeals, Fifth Circuit.

Feb. 3, 2014.

Charles J. Davis, Rosharon, TX, pro se.

Before DAVIS, SOUTHWICK, and HIGGINSON, Circuit Judges.

PER CURIAM: *

Charles J. Davis, Jr., Texas prisoner # 1509783, was convicted of sexual assault of a child and tampering with a witness; he was sentenced to 50 years in prison for the assault conviction and two years in prison for the tampering conviction. Davis seeks a certificate of appealability (COA) to appeal the dismissal with prejudice of

his 28 U.S.C. § 2254 petition as time barred. A COA may be issued only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). When the district court's denial of § 2254 relief is based on procedural grounds without analysis of the underlying constitutional claims, "a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).

Under 28 U.S.C. § 2244(d)(1), in pertinent part, a petitioner must file his § 2254 petition within one year from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." § 2244(d)(1)(A). In general, direct review is concluded either when the Supreme Court rejects a petition for certiorari or rules on its merits, or when the 90 days allowed for a petition of certiorari to the Supreme Court following the entry of judgment by the state court of last resort expires. *Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir.2003). However, "[i]f the defendant stops the appeal process before that point, the conviction becomes final when the time for seeking further direct review in the state court expires." *Id.*

The one-year period is tolled during the pendency of a properly filed application for state collateral review. § 2244(d)(2). However, state applications filed after the expiration of the limitations period do not toll the limitation period. *Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir.2000).

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR R. 47.5.4.

Davis avers that the district court erred in failing to accord him an additional 90 days for the filing of a petition for a writ of certiorari in the United States Supreme Court following the March 3, 2010, denial of his petition for discretionary review (PDR). Davis contends that with the additional 90 days, his conviction became final on June 1, 2010, and that the limitations period thus expired a year later or June 1, 2011. He asserts that because he filed his state habeas application at the earliest on May 11, 2011, it served to toll the limitations period until its denial on August 10, 2011. Thus, Davis avers that his § 2254 petition deemed filed on August 19, 2011, was timely.

Reasonable jurists could debate whether the district court was correct in finding that, for limitations purposes, Davis's conviction was final on March 3, 2010, when the Texas Court of Criminal Appeals denied Davis's out-of time PDR, rather than June 1, 2010, when the ninety-day period for filing a petition for a writ of certiorari in the Supreme Court expired. *See Jimenez v. Quarterman*, 555 U.S. 113, 121, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009) (holding that "where a state court grants a criminal defendant the right to file an out-of-time direct appeal during state collateral review" ... the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review must reflect the conclusion of the out-of-time direct appeal, or the expiration of the time for seeking review of that appeal; *Womack v. Thaler*, 591 F.3d 757, 757–58 (5th Cir.2009) (remanding in light of *Jimenez* where petitioner had filed an out-of-time PDR)); *Roberts*, 319 F.3d at 694 (explaining that expiration of time for seeking direct review includes the 90 days allowed for a petition to the Supreme Court). Consequently, reasonable jurists could debate the propriety of the district court's procedural rul-

ing. *See Slack*, 529 U.S. at 484, 120 S.Ct. 1595. Moreover, Davis's petition also raises reasonably debatable claims of the denial of constitutional rights. *See Jimenez*, 555 U.S. at 118 n. 3, 129 S.Ct. 681; *Slack*, 529 U.S. at 484, 120 S.Ct. 1595; *Womack*, 591 F.3d at 758; *Houser v. Dretke*, 395 F.3d 560, 562 (5th Cir.2004).

We therefore grant a COA, vacate the district court's dismissal of Davis's § 2254 petition, and remand the matter to the district court for further proceedings. We express no opinion on the ultimate disposition of Davis's § 2254 petition.

MOTION GRANTED; JUDGMENT VACATED; CASE REMANDED.

**Dean VICKNAIR, Plaintiff–Appellant**

v.

**LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS; State of Louisiana, Defendants–Appellees.**

No. 13–30244.

United States Court of Appeals, Fifth Circuit.

Feb. 4, 2014.

Dan Michael Scheuermann, Esq., Law Offices of Dan M. Scheuermann, Baton Rouge, LA, for Plaintiff–Appellant.

Mary Louise Blackley, Assistant Attorney General, Office of the Attorney General, Shreveport, LA, David Glen Sanders, Assistant Attorney General, Louisiana Department of Justice, Baton Rouge, LA, for Defendants–Appellees.

Before BARKSDALE, PRADO, and HAYNES, Circuit Judges.

PER CURIAM: *

Dean Vicknair filed this action against the Louisiana Department of Public Safety and Corrections (DPS) and the State of Louisiana, claiming violations of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.,* and Louisiana Revised Statutes § 23:967. Defendants were awarded summary judgment under Federal Rule of Civil Procedure 56 on Vicknair's retaliatory-reassignment and constructive-discharge claims, but denied it on whether he had been suspended in retaliation for filing his first of two complaints with the Equal Employment Opportunity Commission (EEOC). During discovery, Vicknair failed repeatedly to produce certain documents for DPS; it was awarded sanctions. At trial on the one remaining claim (retaliation for filing first EEOC complaint), the court excluded, based on attorney-client privilege, an e-mail between the assistant to the superintendent of DPS and its general counsel. After Vicknair completed his case-in-chief, Defendants moved successfully under Rule 50 for judgment as a matter of law. Vicknair challenges the summary judgment, sanctions, exclusion of the e-mail, and judgment as a matter of law. AFFIRMED.

I.

Vicknair began working at DPS in 1989, as a temporary, part-time clerk in the records unit of the office of motor vehicles. Subsequently, he was employed full time, and promoted several times, first to work in insurance compliance, and then in more technical roles, as DPS began using the Internet. In 1999, Vicknair moved to the

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

data processing unit, as a computer-support specialist, to develop a website for DPS. He was promoted to programmer and worked on Lotus Notes administration.

In February 2004, Vicknair left DPS to work at the Department of Transportation and Development. That June, he testified as part of DPS' internal investigation (sexual harassment) against his former DPS manager, Selvaratnam.

In November 2005, in the wake of Hurricane Katrina, DPS rehired Vicknair. Approximately three and one-half years later, in April 2009, Selvaratnam, now DPS' IT director, reassigned Vicknair to fill a vacancy. According to Vicknair, the new position had "the same responsibilities", but he felt "micromanaged" by his supervisor, Artall.

Almost immediately after the reassignment, there was tension between Artall and Vicknair, including one episode in which Artall refused to sign leave slips when Vicknair sought leave for a death in the family, and another, in which Artall erroneously accused Vicknair of failing to complete assignments.

Vicknair approached Tillman, compliance program director for DPS' equal-employment-opportunity section (DPS' EEOC director), and Boudreaux, DPS' undersecretary for the office of management and finance, claiming a hostile-work environment. Boudreaux transferred Vicknair temporarily from Artall's supervision, pending an investigation. Several days later, Vicknair filed grievances with DPS against Artall, for a hostile-work environment; the next week, against Selvaratnam, for retaliation.

In late June, Vicknair accepted DPS' proposed solution for his grievance against Artall: for Artall, people-skills and management training; for Vicknair, transfer to a different supervisor. DPS later closed, for insufficient evidence, Vicknair's grievance against Selvaratnam.

In late August, Vicknair began the process to file his first EEOC complaint, including delivering the results of his own investigation—a timeline—to Tillman, DPS' EEOC director, claiming retaliatory reassignment by Selvaratnam because of Vicknair's participation in the 2004 investigation of Selvaratnam. He signed the complaint in early September.

That November, DPS internal-affairs investigators interviewed Vicknair, concerning his inclusion of certain e-mails in the timeline he had delivered to Tillman. Vicknair admitted using an encrypted database—the "mail-journaling database"—to which only he had access, to locate and copy emails from third parties within DPS. One such e-mail was from Jones, confidential assistant to DPS' deputy secretary Edmonson, to DPS' general counsel, commenting on the internal investigation of Selvaratnam. As a result of that interview with Vicknair, on 4 November 2009, undersecretary Boudreaux suspended Vicknair with pay, pending a full investigation.

That 23 November, Vicknair filed a second EEOC complaint. He claimed the suspension constituted retaliation for filing his first EEOC complaint and stated he would most likely be terminated after his suspension.

By a 21 December letter of intent to terminate, Boudreaux informed Vicknair he had violated DPS' IT policies (Email & Internet Usage, User Responsibilities) and other DPS policies (Lawful Orders, Conduct Unbecoming an Employee). In his 22 December response to Boudreaux's letter, Vicknair elected to retire on 26 December; in a 28 December e-mail to the EEOC, Vicknair attached that response to Boudreaux's letter, requesting it be included

as an amendment to his second EEOC complaint.

Vicknair filed this action in August 2010. He claimed harassment, retaliation, and a hostile-work environment, in violation of Title VII and Louisiana Revised Statutes § 23:967. Prior to then, in early November 2009, DPS internal-affairs investigators sought initially to secure documents Vicknair had copied. DPS continually requested return of the e-mails, first as part of that internal investigation, and later in requests for production of documents in this action. Document discovery closed in September 2011.

In October 2011, coinciding with the ongoing discovery disputes, DPS moved for summary judgment on all claims. In May 2012, DPS expressed concern to Vicknair's counsel over Jones' e-mail to DPS' general counsel being included as an exhibit in support of Vicknair's opposition to DPS' second summary-judgment motion. DPS informed Vicknair of its intent to move to compel if it did not receive confirmation that all requested documents had been produced. By late June 2012, DPS still had not received copies of the requested files or access to Vicknair's electronic database.

Therefore, that July, DPS moved to compel production and requested a protective order and sanctions. The court granted DPS' motion in October 2012, requiring Vicknair to produce a paper copy of every e-mail and a copy of the drive on which they were stored, as well as awarding DPS $250 in court costs and attorney's fees, respectively.

Earlier that year, in February, summary judgment had been awarded against Vicknair's retaliatory-reassignment and constructive-discharge claims. It had been denied, however, for his claim, based on his second EEOC complaint, that DPS retaliated against him by suspending him for

filing his first EEOC complaint (claimed retaliation by Selvaratnam).

Trial was held in February 2013 on that remaining claim. In his case-in-chief, Vicknair presented evidence that DPS employees expected him, as Lotus Notes administrator, to be able to access their accounts, although he was not authorized to peruse employee e-mails without prior authorization. Vicknair testified Selvaratnam despised him, should never have been promoted, and should have been fired. Vicknair maintained he had done nothing unethical, and, as the systems administrator, "had the keys to the kingdom".

During his case-in-chief, when Vicknair attempted to introduce Jones' email to DPS' general counsel, DPS objected, noting its repeated attempts to have the document excluded on privilege grounds. The court questioned Vicknair's counsel; and, in support of the e-mail's admission, Vicknair provided the following offer of proof: he had obtained the file while searching the mail-journaling database, filtering for his name, to find out "[w]hat else have they hidden from me?". The court ruled the attorney-client privilege applied and, therefore, did not allow the e-mail in evidence.

Also during Vicknair's case-in-chief, DPS' deputy secretary, Edmonson, was called, out of order, as a witness by DPS. He testified he had no qualms about reprimanding or even firing friends if they disobeyed rules, and he did not hold grudges against employees for filing grievances.

As discussed *supra*, Boudreaux suspended Vicknair on 4 November 2009 and signed the 21 December 2009 letter of intent to terminate him. The decisions to suspend and terminate Vicknair, conveyed by Boudreaux, were at the core of his retaliation claim being tried. Neverthe-

less, he did *not* call Boudreaux as a witness.

After Vicknair completed his case-in-chief, DPS moved under Rule 50 for judgment as a matter of law. In granting the motion, the court ruled: "[T]he plaintiff has not established that there is any evidence that should go to the jury, upon which a reasonable jury could make a decision that the appointing authority, Ms. Boudreaux, made the decision to suspend Mr. Vicknair with pay, pending an investigation[, as retaliation for Vicknair's having] testified previously ... or [having] filed a grievance against Mr. Selvaratnam or against Mr. Artall".

## II.

Vicknair challenges: the summary judgment against his retaliatory-reassignment and constructive-discharge claims; the discovery sanctions; the Jones-e-mail's exclusion at trial; and the judgment as a matter of law on his retaliation claim for filing his first EEOC complaint.

For the three merits claims, and although Vicknair's briefing is unclear, we construe his briefs to advance three interrelated and overlapping theories of retaliation: retaliatory reassignment, constructive discharge, and retaliatory suspension. As discussed, summary judgment was awarded DPS for the first two issues; for the third, it was awarded judgment as a matter of law.

Vicknair maintains he asserted a claim on another ground: imposition of a hostile-work environment. Vicknair presented evidence of a hostile-work environment, however, as part of his retaliatory-reassignment and constructive-discharge theories, rather than as a separate claim. *See, e.g., Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir.1992) (treating constructive discharge as aggravated hostile-work-environment claim), *aff'd*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

And, although Vicknair cites Louisiana Revised Statutes § 23:967 as a basis for relief in his complaint, there is no mention of that statute in his briefs. Therefore, the state-law issues are not considered. *E.g., Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 653 (5th Cir.2004) ("Issues not raised or inadequately briefed on appeal are waived.") (citations omitted).

## A.

A summary judgment is reviewed *de novo*, applying the same standard as did the district court. *E.g., Feist v. La., Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 452 (5th Cir.2013) (citation omitted). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law". Fed. R.Civ.P. 56(a). In determining whether to grant summary judgment, the court views the facts and evidence in the light most favorable to the non-movant, Vicknair. *E.g., Dameware Dev., LLC v. Am. Gen. Life Ins. Co.*, 688 F.3d 203, 206–07 (5th Cir.2012) (citation omitted).

## 1.

"The antiretaliation provision [42 U.S.C. § 2000e–3(a)] seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (citation and internal quotation marks omitted). Title VII does not prohibit all retaliation, but rather those employment actions that are "materially adverse, one[s] that would dissuade a reasonable worker from making or supporting a charge of discrimination". *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir.2009) (alterations,

citation, and internal quotation marks omitted). "A plaintiff establishes a *prima facie* case of retaliation by showing (i) he engaged in a protected activity, (ii) an adverse employment action occurred, and (iii) there was a causal link between the protected activity and the adverse employment action." *Hernandez v. Yellow Transp., Inc.,* 670 F.3d 644, 657 (5th Cir.) (citation omitted), *cert. denied,* —— U.S. ——, 133 S.Ct. 136, 184 L.Ed.2d 29 (2012). Once plaintiff makes a *prima facie* showing, the burden shifts to the employer to present "a legitimate, non-discriminatory or nonretaliatory reason" for the challenged action. *McCoy v. City of Shreveport,* 492 F.3d 551, 557 (5th Cir. 2007) (citations omitted). The burden on the employer entails production rather than persuasion. *Id.* (citation omitted). If the employer presents a legitimate reason, plaintiff "bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose". *Id.* (citation omitted).

In the context of summary judgment, "plaintiff's subjective belief, without more, that an adverse employment action was retaliatory is insufficient to survive summary judgment". *Gollas v. Univ. of Tex. Health Sci. Ctr. at Hous.,* 425 Fed.Appx. 318, 321 (5th Cir.2011) (citing *Byers v. Dall. Morning News, Inc.,* 209 F.3d 419, 427 (5th Cir.2000)).

Where, as here for the retaliatory-reassignment claim, lateral reassignment constitutes the claimed adverse employment action, the surrounding circumstances are considered. *E.g., Aryain v. Wal–Mart Stores Tex. LP,* 534 F.3d 473, 485 (5th Cir.2008) (finding such transfer did not constitute adverse employment action where there was no change in pay and father of college-age plaintiff requested transfer). There was no evidence Vicknair suffered a reduction in salary; instead, he received a change in his salary range. Likewise, he did not present evidence of a loss of standing with his fellow employees, a decrease in benefits, a loss of prestige, or a lessening of responsibilities. *See, e.g., Magiera v. City of Dallas,* 389 Fed.Appx. 433, 438 (5th Cir.2010) (citing, *inter alia, Stewart,* 586 F.3d at 332).

■ Even assuming *arguendo* the reassignment constitutes an adverse employment action, Vicknair must establish a causal link between the protected activity (his involvement in the 2004 investigation), and the adverse employment action (in 2009). Although Vicknair believed his reassignment in April 2009 to being under Artall was in retaliation for his participation in the 2004 sexual-harassment investigation of Selvaratnam, his subjective belief is not enough to establish the requisite causal link between the adverse employment action and the protected conduct. Accordingly, summary judgment against this claim was proper.

### 2.

■ Vicknair was required to exhaust administrative remedies, by filing an EEOC complaint, before seeking judicial relief because "a primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in attempt to achieve non-judicial resolution of employment discrimination claims". *Pacheco v. Mineta,* 448 F.3d 783, 788–89 (5th Cir.2006) (citation omitted). In district court, DPS maintained the second EEOC complaint, for retaliation, did not put DPS on the requisite notice of the constructive-discharge claim. The court pretermitted the question of whether Vicknair exhausted administrative remedies and dismissed the constructive-discharge claim on the merits.

In any event, we "may affirm the district court's decision on any basis presented to the district court". *Haverda v. Hays Cnty., Tex.*, 723 F.3d 586, 591 (5th Cir. 2013) (citation and internal quotation marks omitted). Accordingly, we turn first to exhaustion *vel non*.

Although EEOC claims are construed somewhat broadly to "protect[ ] unlettered lay persons making complaints", that broad construction extends "as far as, but no further than, the scope of the EEOC investigation which could reasonably grow out of the administrative charge". *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 578 (5th Cir.1993) (citation and internal quotation marks omitted). "However, 'a charging party's rights should [not] be cut off merely because he fails to articulate correctly the legal conclusion emanating from his factual allegations.'" *Simmons–Myers v. Caesars Entm't Corp.*, 515 Fed.Appx. 269, 272 (5th Cir.) (alteration in original) (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir.1970)), *cert. denied*, —— U.S. ——, 134 S.Ct. 117, 187 L.Ed.2d 36 (2013). Instead, the court asks whether the charge "stated sufficient facts to trigger an EEOC investigation and to put an employer on notice of the existence and nature of the charges". *Id.* at 272–73. (citations omitted).

Even assuming Vicknair adequately amended his second EEOC complaint by forwarding to the EEOC a copy of his response to Boudreaux's letter of intended termination, the amended complaint cannot be construed so broadly as to encompass the constructive-discharge claim. Vicknair's second EEOC complaint expressly claimed retaliation, and nothing else, for filing his first EEOC complaint. The reasonable scope of an EEOC investigation of that second EEOC complaint would encompass DPS' response to Vicknair's filing the first EEOC complaint, in-

cluding DPS' investigation of his use of the mail-journaling system and DPS' subsequent decision to suspend or terminate Vicknair. Nothing in the facts alleged in the second EEOC complaint put DPS on notice of a possible constructive-discharge claim. Therefore, Vicknair failed to exhaust administrative remedies and cannot seek judicial relief on that claim. Summary judgment was proper.

**B.**

█ We review for abuse of discretion sanctions imposed by the district court under Rule 37(b) (failure to comply with a court's discovery order). *E.g., Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 488 (5th Cir.2012). Conclusions of law are reviewed *de novo;* findings of fact, for clear error. *Id.* (citation omitted). Rule 37(b) permits, *inter alia*, striking pleadings, dismissing the action, and rendering a default judgment against the noncompliant party. Fed.R.Civ.P. 37(b)(2)(A). Sanctions must be both just and specifically related to the claim at issue in the discovery order. *KeyBank Nat'l Ass'n v. Perkins Rowe Assocs., LLC*, 539 Fed.Appx. 414, 419 (5th Cir.2013) (per curiam) (citing *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)). The movant for sanctions need not demonstrate willfulness for "sanctions which are less harsh than a dismissal or default judgment". *Chilcutt v. United States*, 4 F.3d 1313, 1322 (5th Cir.1993).

After well over a year of attempting to secure production of the e-mail correspondence copied from the mail-journaling database, DPS moved to compel production and simultaneously moved for a protective order and sanctions. In granting the motion and awarding to DPS $250 in attorney's fees and costs, respectively, the dis-

trict court noted DPS' multiple attempts to obtain the information and the inconsistency between Vicknair's claim he did not have access to the e-mails and his inclusion of a confidential, undisclosed e-mail (Jones' e-mail to DPS' general counsel) in his opposition to DPS' second summary-judgment motion. The court also rejected Vicknair's proposed solutions, including having DPS search its own systems for a log file to track Vicknair's previous access or for DPS' attorneys to drive to Baton Rouge with a laptop to have Vicknair transfer the database digitally. The court granted minimal sanctions in response to Vicknair's refusal to satisfy his discovery obligations. Those sanctions were both just and related to the discovery order. There was no abuse of discretion.

## C.

■ Evidentiary rulings by the district court are reviewed for abuse of discretion. *E.g., United States v. Pruett,* 681 F.3d 232, 243 (5th Cir.2012); *see* Fed.R.Evid. 103 (Rulings on Evidence). "The application of the attorney-client privilege is a question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents." *United States v. Nelson,* 732 F.3d 504, 517–18 (5th Cir. 2013) (citation and internal quotation marks omitted); *see* Fed.R.Evid. 501 (Privilege in General). The application of controlling law is reviewed *de novo;* factual findings, for clear error. *Nelson,* 732 F.3d. at 518 (citation omitted).

The party asserting privilege bears the burden to show: "(1) a confidential communication; (2) to a lawyer or subordinate; (3) for the primary purpose of securing a legal opinion, legal services, or assistance in the legal proceeding". *Id.* (citing *United States v. Robinson,* 121 F.3d 971, 974 (5th Cir.1997)). Courts also require the party asserting privilege to have a reason-

able expectation the communication is confidential, either by the intrinsic nature of the communication or the subjective intent of the assertor. *Robinson,* 121 F.3d at 976 (citations omitted). The fact a communication takes place between a lawyer and a client is not enough, alone, to invoke the privilege. *Id.* (citation omitted). Likewise, the privilege must be asserted specifically as to a particular document. *See In re Santa Fe Int'l Corp.,* 272 F.3d 705, 713 (5th Cir.2001).

At trial, when Vicknair attempted to introduce the e-mail from Jones to DPS' general counsel, DPS objected, claiming the document was both "subject to attorney-client privilege" and "not presented to [DPS] in the regular course of discovery". After the court found Jones' e-mail was "an attorney-client document", Vicknair made an offer of proof: he had come upon the document while searching the mail-journaling database and had printed the e-mail because it referenced his case. The court ruled: "[I]t's still attorney-client privilege. This was directed by a client to the attorney and another client".

There is no reversible error. The confidential document was between the "confidential assistant" to DPS' deputy secretary and its general counsel, concerning a pending internal investigation.

## D.

■ Judgment as a matter of law under Rule 50 is proper when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue". Fed.R.Civ.P. 50(a)(1). The district court's decision to grant or deny a motion for judgment as a matter of law is reviewed *de novo. E.g., Cardenas v. United of Omaha Life Ins. Co.,* 731 F.3d 496, 499 (5th Cir.2013) (citation omitted). We

apply the same standards as did the district court, reviewing all evidence in the record, drawing reasonable inferences in favor of the non-movant, and refraining from encroaching upon the province of the jury in making credibility determinations or weighing evidence. *E.g., Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 362 (5th Cir.2004) (citations omitted).

Where the person who makes the decision to terminate an employee is *not* the person accused of harboring retaliatory animus, plaintiff is required to "demonstrate that those with discriminatory intent had influence or leverage over the official decisionmaker", in order to "impute ... discriminatory attitudes to the formal decisionmaker". *Russell v. Univ. of Tex. of Permian Basin*, 234 Fed.Appx. 195, 203 (5th Cir.2007) (alterations and internal quotation marks omitted) (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir.2000)); *see also Staub v. Proctor Hosp.*, —— U.S. ——, 131 S.Ct. 1186, 1190 n. 1, 1193–94, 179 L.Ed.2d 144 (2011) (applying similar standard in Uniformed Services Employment and Reemployment Rights Act context, including providing description of fable underlying cat's-paw theory, referenced *infra*); *LeMaire v. La. Dep't of Transp. and Dev.*, 480 F.3d 383, 390 (5th Cir.2007) ("Evidence of [Selvaratnam's] specific involvement in the decision would be significant, since [Selvaratnam] had the greatest motivation to retaliate against [Vicknair]".).

To develop a *prima facie* case of retaliation based on Vicknair's filing his first EEOC complaint, he had to show an adverse employment action that was linked to that complaint. Accepting DPS' decisions to suspend and terminate Vicknair as requisite adverse employment actions, he was required to show a causal link between his first EEOC complaint and those decisions. As noted, Boudreaux, who con-

veyed those decisions, was *not* called as a witness by Vicknair in his case-in-chief, after which judgment as a matter of law was granted. Arguably, as the person who could have served as the most likely link, or "cat's paw", between Vicknair and Selvaratnam, perhaps Boudreaux could have provided testimony to allow a reasonable jury to find for Vicknair. The second possible link, Edmonson, called out of turn by DPS, testified he had no qualms about reprimanding or firing friends if they disobeyed the rules, and that he did not hold grudges against employees for filing grievances or complaints.

Drawing all inferences in favor of Vicknair, a reasonable jury lacked a legally sufficient basis to link Boudreaux, as the decisionmaker, to a retaliatory motive. Instead of supporting retaliation, trial testimony served to reinforce the extensiveness and seriousness of Vicknair's unauthorized access to DPS e-mails, and thus the legitimacy of DPS' decisions to suspend and terminate Vicknair for his violations of internal policies. Accordingly, judgment as a matter of law was proper on the claim of retaliation for Vicknair's filing his first EEOC complaint.

### III.

For the foregoing reasons, the sanctions order and judgment are AFFIRMED.

Suzanne Margaret BASSO,
Petitioner–Appellant,

v.

William STEPHENS, Director, Texas
Department of Criminal Justice, Correctional Institutions Division, Respondent–Appellee.

No. 14–70005.

United States Court of Appeals,
Fifth Circuit.

Feb. 4, 2014.

Winston Earle Cochran, Jr., Attorney, League City, TX, for Petitioner–Appellant.

Ellen Stewart–Klein, Assistant Attorney General, Office of the Attorney General, Austin, TX, for Respondent–Appellee.

Before DAVIS, PRADO, and HAYNES, Circuit Judges.

PER CURIAM: *

Petitioner requests a certificate of appealability ("COA") to appeal the federal district court's denial of habeas corpus re-

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

lief under 28 U.S.C. § 2254. Because reasonable jurists would not find the district court's rejection of Petitioner's claims under the Eighth Amendment to be debatable, we deny Petitioner's application for a COA and associated motion for stay of execution.

## I.

Petitioner was convicted of capital murder in the death of Louis "Buddy" Musso. The facts of the offense are summarized in the opinion issued by the Texas Court of Criminal Appeals ("TCCA") on direct appeal.[1] A jury found Petitioner guilty on August 27, 1999, and the trial court imposed a sentence of death by lethal injection on September 1, 1999. On January 15, 2003, the TCCA affirmed Petitioner's conviction.[2] On October 6, 2003, the United States Supreme Court denied Petitioner's petition for writ of certiorari.[3]

On September 20, 2006, the TCCA denied Petitioner's initial post-conviction application for state habeas relief.[4] On January 26, 2009, the United States District Court for the Southern District of Texas denied Petitioner's first petition for a writ of habeas corpus under 28 U.S.C. § 2254.[5] On January 5, 2010, this court denied Petitioner's application for a certificate of appealability.[6] The United States Supreme Court denied Petitioner's subsequent petition for certiorari on October 4, 2010,[7] and denied her petition for rehearing on November 29, 2010.[8]

On July 19, 2013, the trial court entered an order scheduling Petitioner's execution for February 5, 2014. Petitioner then filed a motion through counsel challenging Petitioner's competence to be executed pursuant to Article 46.05 of the Texas Code of Criminal Procedure. Following a hearing where the trial court heard expert testimony regarding Petitioner's mental health, the trial court entered findings that Petitioner was competent to be executed.[9] The TCCA affirmed those findings on February 3, 2014.[10]

Petitioner then filed her second petition[11] for writ of habeas corpus under 28 U.S.C. § 2254. Her petition raised two sets of arguments, all of which had been considered and rejected by the TCCA.

---

1. *Basso v. State*, No. 73672, 2003 WL 1702283 (Tex.Crim.App. Jan. 15, 2003) (en banc).

2. *Id.*

3. *Basso v. Texas*, 540 U.S. 864, 124 S.Ct. 174, 157 L.Ed.2d 116 (2003).

4. *Ex parte Basso*, No. WR–63672–01, 2006 WL 2706771 (Tex.Crim.App. Sept. 20, 2006).

5. *Basso v. Quarterman*, No. H–07–3047, 2009 WL 9083708 (S.D.Tex. Jan. 26, 2009).

6. *Basso v. Thaler*, No. 09–70012, 359 Fed. Appx. 504 (5th Cir.2010).

7. *Basso v. Thaler*, —— U.S. ——, 131 S.Ct. 181, 178 L.Ed.2d 108 (2010).

8. *Basso v. Thaler*, —— U.S. ——, 131 S.Ct. 692, 178 L.Ed.2d 522 (2010).

9. Tex. Ct.'s Findings of Fact (Rec.Doc.3–3).

10. *Basso v. State*, No. 77032, 2014 WL 467514 (Tex.Crim.App. Feb. 3, 2014) (Rec. Doc.5–5).

11. Although this is Petitioner's second petition for writ of habeas corpus filed in federal court, it is not barred under the habeas statute. As Respondent does not contest, the bar on "successive" applications does not apply to a claim of incompetence to be executed under the Eighth Amendment that is brought when the challenge is first ripe. *Panetti v. Quarterman*, 551 U.S. 930, 945–47, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007); *see also Green v. Thaler*, 699 F.3d 404, 410 n. 3 (5th Cir. 2012) ("[T]he district court was correct not to treat Green's motion as a successive filing[ ] but rather as a petition for a writ of habeas corpus.").

First, Petitioner argued that Article 46.05 of the Texas Code of Criminal Procedure violates the Eighth Amendment of the United States Constitution on various grounds. Second, Petitioner argued that the Texas court's finding that she is competent to be executed was unreliable. As explained in the district court's thorough memorandum opinion and order, the district court found no merit to these arguments. On February 3, 2014, therefore, the district court denied habeas relief, denied a motion to stay the execution, and declined to issue a COA. Petitioner's present appeal and application for a COA followed, accompanied by a motion for stay of execution.

## II.

Petitioner must obtain a COA to appeal the district court's denial of any petition brought under 28 U.S.C. § 2254.[12] A COA may be issued only after the petitioner "has made a substantial showing of the denial of a constitutional right." [13] To meet this standard, Petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." [14] As we have previously observed in death penalty cases, "any doubts as to whether a COA should issue must be resolved in the petitioner's favor." [15]

To understand whether reasonable jurists would debate the claim, we must consider the standard applicable to federal habeas review of state proceedings.[16] To receive federal habeas relief on her claim, Petitioner must show that the TCCA's findings regarding Petitioner's competence to be executed were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." [17] Importantly, "[t]he question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." [18]

## III.

On appeal, Petitioner first argues that the district court erred by addressing her arguments regarding Article 46.05 of the Texas Code of Criminal Procedure under the Due Process Clause and failing to address her constitutional challenge under the Eighth Amendment. This is not, however, a fair reading of the district court's memorandum opinion. The district court based its reasoning principally on the Supreme Court's decision in *Panetti v. Quar-*

---

12. 28 U.S.C. § 2253(c); *Blue v. Thaler*, 665 F.3d 647, 653 (5th Cir.2011).

13. 28 U.S.C. § 2253(c)(2).

14. *See Miller–El v. Cockrell*, 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 483–84, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (internal quotation marks omitted)).

15. *Blue*, 665 F.3d at 653 (citation and internal quotation marks omitted).

16. *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir.2000).

17. 28 U.S.C. § 2254(d).

18. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007); *see also Harrington v. Richter*, —— U.S. ——, 131 S.Ct. 770, 786–87, 178 L.Ed.2d 624 (2011).

*terman,* 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007), which interpreted and applied the Eighth Amendment.

■ Petitioner also argues, as she did before the Texas court and the federal district court, that the Eighth Amendment imposes a "requirement of heightened reliability in death penalty cases." We agree with Petitioner that the Eighth Amendment incorporates a unique "need for reliability" during certain stages of capital trials and sentencing proceedings "once the death penalty is in play." [19] However, as Justice Powell explained in his controlling concurrence to *Ford,* this heightened reliability requirement specifically does not apply during the determination of competence to be executed:

> [T]he State has a substantial and legitimate interest in taking petitioner's life as punishment for his crime.... [T]he only question raised is not *whether,* but *when,* his execution may take place. This question is important, but it is not comparable to the antecedent question whether petitioner should be executed at all. It follows that this Court's decisions imposing heightened procedural requirements on capital trials and sentencing proceedings ... do not apply in this context.[20]

We have previously acknowledged the importance of this distinction in *Caldwell v. Johnson,* 226 F.3d 367, 373 (5th Cir. 2000). No reasonable jurist would find that the district court's rejection of this argument is debatable.

Petitioner also argues that the Eighth Amendment is violated by Article 46.05 as it is written, regardless of how Article 46.05 was actually applied in Petitioner's case. In Petitioner's view, the federal dis-

trict court erred by failing to address the constitutionality of Article 46.05, and instead focusing narrowly on the procedures to which Petitioner was subjected. Article 46.05(h) provides that "[a] defendant is incompetent to be executed if the defendant does not understand: (1) that he or she is to be executed and that the execution is imminent; and (2) the reason he or she is being executed." In Petitioner's view, three characteristics of this provision are contrary to the Eighth Amendment. First, the statute requires Petitioner to carry the burden of proof on both parts of the two-part test for competence established by *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). Second, the statute places the burden of proof on Petitioner to demonstrate incompetence by a preponderance of the evidence. Third, the statute fails to require adequate consideration of Petitioner's history of delusional thinking and other mental illness.

As the district court correctly observed, however, this case does not require a broad inquiry into whether the text of Article 46.05 explicitly requires Texas courts to comply with the Eighth Amendment in all cases. Each of the standards applicable under 28 U.S.C. § 2254(d) restrict a federal habeas court's analysis to a state court's "decision" in a particular prisoner's case. Accordingly, so long as the Texas court's decision regarding Petitioner's competence was not contrary to clearly established federal law, did not constitute an unreasonable application of clearly established federal law, and did not rely on an unreasonable determination of the facts, we have no basis under 28 U.S.C. § 2254(d) to engage in a more wide-rang-

---

**19.** *See United States v. Fields,* 483 F.3d 313, 335–36 (5th Cir.2007).

**20.** *Ford,* 477 U.S. at 425, 106 S.Ct. 2595 (Powell, J., concurring in part and concurring in the judgment) (citations omitted).

ing constitutional analysis of Article 46.05.[21] Applying the appropriate standards in the present case, the district court rejected each of Petitioner's arguments regarding the Texas court's application of Article 46.05. As explained below, no reasonable jurist could find this result debatable.

### A.

█ Initially, we reject Petitioner's argument regarding the relationship between the two subsections of Article 46.05(h) and the Supreme Court's two-part test for competence to be executed under the Eighth Amendment. This test is described in Justice Powell's concurring opinion in *Ford*, which the Supreme Court has subsequently recognized as the controlling opinion.[22] This test requires a determination of whether a prisoner understands both "the fact of [the] impending execution" and "the reason for it."[23] In Petitioner's case, the Texas court's findings of fact demonstrate that this two-part test was correctly applied. As the Texas court explained, Petitioner understands "that her execution is imminent and scheduled for February 5, 2014," and "that she is being executed because she killed complainant Louis 'Buddy' Musso."[24] The Texas court's inquiry under Article 46.05 was therefore faithful to the Eighth Amendment as interpreted in *Ford*. Whether Article 46.05 could potentially be applied in other proceedings so as to deviate from the requirements of *Ford* is irrelevant to Petitioner's case. Reasonable jurists could not debate that the district court was correct to reject Petitioner's first argument.

### B.

█ Petitioner also challenges the burden and standard of proof applied in this case under Article 46.05. But Petitioner identifies no clearly established federal law "as determined by the Supreme Court of the United States" that prevents the State of Texas from requiring Petitioner to prove by a preponderance of the evidence that she is incompetent to be executed.[25] Indeed, we have previously rejected an argument identical to Petitioner's in at least one unpublished case, *Lewis v. Quarterman*, 272 Fed.Appx. 347, 352 (5th Cir. 2008). The Sixth Circuit has also considered such an argument and rejected it.[26] The Eleventh Circuit, sitting *en banc* in

---

21. For the same reasons, the Texas court did not act unreasonably in failing to address explicitly the constitutionality of Article 46.05. As the Supreme Court has observed, "a state court need not cite or even be aware of our cases" to survive habeas review, so long as the state court's decision-making is not contrary to or an unreasonable application of clearly established federal law. *Harrington v. Richter*, —— U.S. ——, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011).

22. *See Panetti*, 551 U.S. at 949, 127 S.Ct. 2842 ("When there is no majority opinion, the narrower holding controls. *See Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). Under this rule Justice Powell's opinion constitutes 'clearly established' law for purposes of § 2254 and sets the minimum procedures a State must pro-

vide to a prisoner raising a *Ford*-based competency claim.").

23. *Ford*, 477 U.S. at 422, 106 S.Ct. 2595 (Powell, J., concurring in part and concurring in the judgment).

24. Tex. Ct.'s Findings of Fact ¶ 41 (Rec. Doc.3–3).

25. *See* 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

26. *Coe v. Bell*, 209 F.3d 815, 828 (6th Cir. 2000) (upholding "the placement of the burden of proof on Coe to prove by a preponderance of the evidence that he is incompetent to be executed").

2011, stated more broadly that "no United States Supreme Court decision has ever suggested, much less held, that a burden of proof standard on its own can so wholly burden *an Eighth Amendment right* as to eviscerate or deny that right." [27]

These authorities strongly support the rejection of Petitioner's argument. Additionally, Justice Powell held in his controlling concurrence in *Ford* that the Eighth Amendment requires only that a competence determination comport with "due process" and "basic fairness." [28] At trial, the Due Process Clause permits a state court to "presume that the defendant is competent and require him to shoulder the burden of proving his incompetence by a preponderance of the evidence." [29] Contrary to Petitioner's arguments regarding *Panetti* and *Ford*, we have found no indication that the Supreme Court would impose any stricter requirements in an Eighth Amendment analysis during a determination of competence to be executed than during a Due Process analysis of competence to be tried. Reasonable jurists, therefore, would not debate that the Texas court's resolution of Petitioner's claims represents a reasonable application of federal law as determined by the Supreme Court.

## C.

Petitioner also argues that Article 46.05 is unconstitutional because it does not explicitly require consideration of Petitioner's history of delusional thinking and other mental illness. Indeed, in *Panetti v. Quarterman*, 551 U.S. 930, 958, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007), the Supreme Court held that a Texas court applying Article 46.05 had violated the Eighth Amendment by treating "a prisoner's delusional belief system as irrelevant" to the *Ford* inquiry. The Supreme Court did not suggest, however, that this constitutional violation arose out of any inherent defect in the Texas statute. Focusing instead on the Texas court's conduct of its proceedings, the Supreme Court concluded that the Texas court's "denial of certain of petitioner's motions rest[ed] on an implicit finding" that did not comport with a "reasonable application of the controlling standard in *Ford*." [30]

■ In our view, therefore, whether or not Article 46.05 explicitly requires Texas courts to give the proper attention to a prisoner's delusional belief system under *Panetti*, Article 46.05 clearly does not prevent Texas courts from doing so. For example, we concluded in *Green v. Thaler*, 699 F.3d 404, 418 (5th Cir.2012), that a Texas court had "closely follow[ed] the requirements laid out in *Ford* and *Panetti* ... [and] applied the correct standard" during a competence determination under Article 46.05. In the present case, the Texas court also extensively considered "the defendant's allegations of delusional experiences" during the evidentiary hearing.[31] The Texas court concluded, however, that Petitioner "was not experiencing delusions or hallucinations" and instead at-

---

27. *Hill v. Humphrey*, 662 F.3d 1335, 1338 (11th Cir.2011) (en banc).

28. *Ford*, 477 U.S. at 426–27, 106 S.Ct. 2595 (Powell, J., concurring in part and concurring in the judgment); *see also Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir.2007).

29. *See Cooper v. Oklahoma*, 517 U.S. 348, 355, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996)

(citing *Medina v. California*, 505 U.S. 437, 446–49, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992)).

30. *Panetti*, 551 U.S. at 952–53, 127 S.Ct. 2842.

31. Tex. Ct.'s Findings of Fact ¶ 38 (Rec. Doc.3–3).

tributed Petitioner's reports of delusional experiences to her "history of malingering and engaging in attention-seeking behavior," including "falsif[ying] psychiatric and physical symptoms." [32]

In other words, the Texas court's inquiry did not end upon verifying Petitioner's awareness of the reasons for her execution. Instead, the Texas court complied with *Panetti* by performing an additional analysis of Petitioner's rational understanding of the reasons for her execution in light of Petitioner's alleged delusions.[33] We therefore conclude that no reasonable jurist would find that the district court's rejection of this claim is debatable.

## IV.

■ Petitioner also has made several arguments regarding the Texas court's factual findings, which in Petitioner's view were "incorrect and unreliable." In particular, Petitioner argues that the deference ordinarily due to factual findings under 28 U.S.C. § 2254(e)(1) is "less appropriate when the findings are crafted by a party." It is true that, on at least two occasions, the Supreme Court has expressly criticized "courts' verbatim adoption of findings of fact prepared by prevailing parties." [34] Though we also found this practice to be troubling in *Green*, however, we concluded that this practice is not contrary to "clearly established Federal law" and does not reduce the deference otherwise owed to a state court's factual findings during habeas proceedings.[35] In the present case, therefore, precedent bound the district court to decline Petitioner's request to apply a heightened standard of factual scrutiny. Moreover, the Supreme Court has observed that a state court's decision is subject to the same deferential standards under 28 U.S.C. § 2254(d) where the decision "is unaccompanied by an explanation," and all its findings and conclusions are therefore implicit.[36] There is therefore no indication in the Supreme Court's jurisprudence that findings proposed by a litigant undermine these standards in any way.

Petitioner's brief may also be read to argue that the Texas court failed to analyze whether Petitioner understood her own "role in the offense," particularly where the offense was carried out by more than one party. As Petitioner herself has acknowledged during these proceedings, however, this is a "novel" argument that has not been addressed by the Supreme Court.[37] We therefore cannot conclude that reasonable jurists would debate whether the state court's resolution of Petitioner's claims resulted from an unreasonable application of clearly established federal law as determined by the Supreme Court.[38] In any event, a defendant's acknowledgment and acceptance of responsibility for her particular role in an offense are distinct from whether she understands why she is being punished.

---

**32.** *Id.* ¶¶ 22–25.

**33.** *See Panetti*, 551 U.S. at 958, 127 S.Ct. 2842; *Green*, 699 F.3d at 418.

**34.** *Jefferson v. Upton*, 560 U.S. 284, 293–94, 130 S.Ct. 2217, 176 L.Ed.2d 1032 (2010); *Anderson v. City of Bessemer City*, 470 U.S. 564, 572, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

**35.** *Green*, 699 F.3d at 416.

**36.** *See Harrington*, 131 S.Ct. at 784.

**37.** *See* Petitioner–Appellant's Mot. for Leave to File a Second Petition at 12, *Basso v. Stephens*, 5th Cir. No. 14–20060 (Jan. 30, 2014) ("The latter is a novel issue; Scott Panetti, for example, was a sole actor.").

**38.** *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412–13, 120 S.Ct. 1495.

Here, although Petitioner has continued to deny that she was primarily responsible for the victim's death, the Texas court found explicitly that Petitioner "understands ... that she is being executed because she killed complainant Louis 'Buddy' Musso." [39] Assuming only for the sake of argument that the Eighth Amendment actually imposes a "role in the offense" requirement, the Texas court fulfilled this purported requirement during the competence determination in this case. Accordingly, no reasonable jurist would debate that the district court properly rejected this argument.

■ Finally, Petitioner argues that the Texas court's findings do not fairly characterize the totality of the psychiatric evidence presented. We need not repeat each of the detailed factual findings of the Texas court, which were carefully reviewed by the federal district court in its memorandum opinion. After due consideration, we agree with the district court's observation that the Texas court's factual findings regarding Petitioner's competence are well supported by the record. Significantly, Petitioner does not dispute that both of the testifying experts, Dr. Quijano and ·Dr. Moeller, concluded that Petitioner was competent to be executed. [40] Nor does Petitioner contest that Dr. Moeller testified "that [Petitioner] was not delusional or psychotic 'even at her worst.' " [41] In her

petition, Petitioner emphasizes Dr. Quijano's statement that Petitioner would not necessarily remain competent if taken off her medication, but Dr. Moeller also gave testimony regarding his contrary view. As the district court concluded, because it is the province of the finder of fact "to weigh conflicting evidence and inferences, and determine the credibility of witnesses," [42] the Texas court was well within its bounds to find Dr. Moeller's opinion on this point more persuasive than Dr. Quijano's. Because these findings satisfy the standards of *Ford* and *Panetti*, therefore, the Texas court's conclusion as to Petitioner's competence was not an unreasonable application of Supreme Court precedent.

Moreover, in the absence of clear and convincing evidence as to Petitioner's incompetence, the Texas court's factual findings are entitled to a presumption of reasonableness under 28 U.S.C. § 2254(e)(1). Accordingly, jurists of reason would not debate the district court's rejection of Petitioner's arguments regarding the reliability of the Texas court's factual findings.

## V.

For the reasons set forth above and for the reasons set forth in the district court's memorandum opinion, none of the challenges raised by Petitioner are sufficient to merit the grant of a COA. We therefore deny Petitioner's application for a COA

---

**39.** Tex. Ct.'s Findings of Fact ¶ 41 (Rec. Doc.3–3).

**40.** Tr. of Competence Hr'g at 181 (Rec.Doc.5–2) (Dr. Quijano: "Right now she's not delusional.... The time I saw her she was not delusional."); Report of Dr. Quijano at 11 (Rec. Doc. 5–1 at 78) ("The defendant understood the reason why she was being executed. She said that her execution meant that she would die for killing Buddy. She said she will be executed because she 'hurt somebody,' he died, and she will die for it."); Report of Dr. Moeller at 7 (Rec. Doc. 5–4 at 8) ("I don't

believe that she has a delusional disorder.... In my medical opinion, Ms. Basso understands that she is to be put to death on February 5, 2014 and what death means. Moreover, she understands why the state is imposing the penalty.").

**41.** *See* Tex. Ct.'s Findings of Fact ¶ 22 (Rec. Doc.3–3).

**42.** *Roman v. Western Mfg., Inc.,* 691 F.3d 686, 692 (5th Cir.2012) (internal quotation marks and citation omitted).

and associated motion for a stay of execution.

IT IS THEREFORE ORDERED that Petitioner's application for a COA is DENIED.

IT IS FURTHER ORDERED that appellant's motion for stay of execution scheduled for Wednesday, February 5, 2014 is DENIED.

**Stephen MANLEY, Plaintiff–Appellant**

v.

**INVESCO, also known as Invesco Investment Services, also known as Invesco Group Services, Incorporated, also known as Invesco Management Group; Matrix Resources, Incorporated; National Prosource, Incorporated, Defendants–Appellees.**

No. 13–20209
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Feb. 5, 2014.

Stephen Manley, Houston, TX, pro se.

Yvette Vanessa Gatling, Esq., Littler Mendelson, P.C., Houston, TX, Carolyn Ann Russell, Ogletree Deakins, P.C., Houston, TX, Michael S. Alfred, Hallett & Perrin, P.C., Dallas, TX, Stacy R. Obenhaus, Gardere Wynne Sewell, L.L.P., Dallas, TX, Cristina Portela Solomon, Gardere Wynne Sewell, L.L.P., Houston, TX, for Defendants–Appellees.

Before DAVIS, SOUTHWICK, and HIGGINSON, Circuit Judges.

PER CURIAM: *

Plaintiff–Appellant, Stephen Manley, sued Defendants–Appellees, alleging discrimination based on race, color, and gender in violation of Title VII of the Civil Rights Act of 1974, the Civil Rights Act of 1991, and Section 605 of the Fair Credit Reporting Act. The district court granted Defendants' motions for summary judgment and dismissed Manley's claims. We AFFIRM.

## FACTUAL BACKGROUND

In 2010, Invesco contracted with two employment agencies, Matrix and Pro-Source, to fill a temporary job opening for a junior "Siebel developer." When the job opening was not filled after a few months, Invesco instructed Matrix and ProSource to broaden their search to consider candidates qualified for a junior Structured Query Language ("SQL") developer position who Invesco would then train on Siebel. Matrix found Plaintiff's resume on Monster.com, contacted him about the opening, recommended him to Invesco, and forwarded his resume to Rakhee Matlapudi, a senior recruiter at Invesco. Matlapudi determined that, as Manley had eight years of SQL experience, he was overqualified for the position and did not send Plaintiff's resume to Invesco's hiring manager for further consideration.

Independent of Matrix and Invesco's activities, ProSource contacted Manley about the same Invesco job opening. Manley sent ProSource a written application, in which he indicated that he had never "been convicted of a crime" and authorized Pro-Source to run his criminal background report. By signing the application, Manley stated that he "underst[ood] that any mis-representation, falsification, or omission of information may be grounds for termination of the interview process, refusal to hire, or, if hired, termination of employment." ProSource subsequently interviewed Manley, administered a skills test, and contracted with a third party credit reporting agency for Manley's criminal background report. The criminal background report revealed that Manley had been convicted of driving with an invalid license in 2006, assault causing bodily injury in 2001, and theft of between $20 and $500 in 1995. ProSource thereafter decided not to refer Manley to Invesco for the SQL developer position. Later, without the assistance of Matrix or ProSource, Invesco found and hired a candidate—a woman with one year and eight months of SQL experience—to fill the SQL/Siebel developer position.

On June 24, 2011, Manley, proceeding *pro se*, filed an Original Complaint raising disparate treatment and impact discrimination claims based on race, color, and gender. Manley asserts that Defendants Invesco, ProSource, and Matrix have "a pattern and a blanket policy to deny employment opportunity [sic] to individuals with criminal records which disparately impacts and adversely affects the minority applicant pools who are protected classes under law" in violation of Title VII of the Civil Rights Act of 1974, the Civil Rights Act of 1991 (42 U.S.C. § 1981), and Section 605 of the Fair Credit Reporting Act ("FCRA"). Manley further alleged that "the retrieved criminal information antedated seven years which also violated plaintiff's rights under the FCRA § 605 and was used as the sole determinant in denying plaintiff an employment opportunity." Defendants moved for summary

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

judgment. On March 5, 2013, the district court issued a final judgment and dismissed the case with prejudice. Manley timely appeals.[1]

## STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *LeMaire v. Louisiana*, 480 F.3d 383, 386–87 (5th Cir. 2007). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We construe all facts and evidence in the light most favorable to the non-moving party. *United Fire & Cas. Co. v. Hixson Bros., Inc.*, 453 F.3d 283, 285 (5th Cir.2006).

## DISCUSSION

Manley makes three arguments challenging the district court's dismissal of his claims.[2] Manley first argues that the district court erred in dismissing his disparate impact and disparate treatment claims against Invesco, Matrix, and ProSource.[3] Second, he maintains that the district court erred in denying his motion for recusal. Lastly, Manley asserts that the district court erred in its discovery rulings.

### A. "Disparate Treatment" and "Disparate Impact" Claims

Manley first argues that the district court committed reversible error in granting Defendants' motions for summary judgment and dismissing his disparate impact and disparate treatment claims against Invesco, Matrix, and ProSource.

The summary judgment analysis is the same for claims of discrimination under Title VII and 42 U.S.C. § 1981. *Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 342 (5th Cir.2002). Section 1981 ensures that all persons have the same right to make and enforce contracts, including "the making, performance, modification, and termination of [employment] contracts." 42 U.S.C. § 1981. Title VII of the Civil Rights Act of 1964 prohibits employers from "fail[ing] or refus[ing] to hire ... any individual ... because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C.

---

1. Appellees argue that Manley's brief fails to comply with the requirements set forth in Rules 28 and 32 of the Federal Rules of Appellate Procedure and in the Rules and Internal Operating Procedures of the Fifth Circuit. Specifically, Appellees assert that Manley's brief is twice the allowed page limit, hard to decipher, repetitive, raises issues for the first time on appeal, fails to cite to the record to support assertions of purported error, and impugns the district court. While pro se pleadings are to be construed liberally, nonconforming briefs should not be considered when doing so prejudices an opposing party. *Grant v. Cuellar*, 59 F.3d 523, 524 (5th Cir.1995). However, as the legal issues presented are straightforward, we do not reach Appellees' arguments as to the form and content of Manley's brief.

2. Appellant's brief presents twenty-five issues. These issues can be grouped into three buckets for analytical clarity, as the Appellees do in their responsive briefs.

3. The district court also granted Defendants' motion for summary judgment as to Manley's claims for FCRA violations; the court held that Manley's FCRA claims failed as a matter of law since Invesco, Matrix, and ProSource were not "credit reporting agencies" as required for liability under FCRA. Manley does not dispute the district court's findings with respect to FCRA anywhere in his brief. Therefore, he waived his FCRA claims on appeal.

§ 2000e2(a)(1). Title VII also makes it unlawful for an employment agency "to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(b).

Under Title VII, courts recognize both disparate treatment claims (involving deliberate discrimination) and disparate impact claims (involving facially neutral practices that fall more harshly on one group than another and cannot be justified by business necessity). *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir.2000); *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 860 (5th Cir.2002) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). To establish a *prima facie* case of disparate treatment, the plaintiff must demonstrate that he "(1) is a member of a protected class; (2) was qualified for [his] position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or ... that others similarly situated were treated more favorably." *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir.2001). To establish a *prima facie* disparate impact claim, a plaintiff must (1) "identify the employment practice that has the allegedly disproportionate impact" and (2) "establish causation by offering statistical evidence to show that the practice in question has resulted in prohibited discrimination." *Stout*, 282 F.3d at 860.

■ The district court granted summary judgment dismissing Manley's disparate treatment and disparate impact claims against Matrix and Invesco for lack of standing. "In order to have standing, a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State. Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir.2008). The district court correctly found that Manley did not meet his burden of establishing injury-in-fact fairly traceable to Matrix. In fact, Matrix referred Manley for employment (despite his criminal record of which Matrix was unaware) and played no role in Invesco's decision not to hire Manley. As Matrix's alleged policy of declining to refer applicants with criminal records did not cause Manley injury, his disparate impact challenge against the facially neutral policy as discriminatory against Black or male applicants likewise fails. The district court also acted properly in holding that Manley could not show an injury fairly traceable to Invesco's conduct. Manley offered no evidence that, when Invesco made its decision not to interview him after viewing his resume, the company knew his race or color, as would be required to establish that Invesco's reason for not hiring him, i.e. that he was overqualified, was pretextual and to support a disparate treatment claim. As Invesco was similarly unaware of his criminal background, Manley cannot establish that Invesco's alleged policy of declining to hire individuals with criminal records had a disparate impact on him.

■ The district court likewise acted appropriately in dismissing Manley's claims that ProSource discriminated against him when it refused to refer him to Invesco for employment because of his criminal record. Persons with criminal records are not a protected class under Title VII, preventing Manley from basing his Title VII claim on this status, and he does not allege that ProSource failed to refer him because he was Black or male. In any event, ProSource has previously referred Blacks and males who had crim-

inal records while failing to refer Whites who, like Manley, made misrepresentations as to their criminal records—ProSource's stated reason for declining to refer him. "[M]isrepresentations on employee documents can be a legitimate, nondiscriminatory reason for an adverse employment decision, like declining to hire or firing an employee." *E.E.O.C. v. Chevron Phillips Chem. Co., LP,* 570 F.3d 606, 622 (5th Cir.2009). Manley's conclusory allegations to the contrary are insufficient to establish a genuine issue of material fact that ProSource's legitimate, nondiscriminatory reason for not referring him was false or pretextual; he thus failed to meet the summary judgment burden for his disparate treatment claim against ProSource. Given the absence of admissible statistical data or other evidence that ProSource's policy disparately impacts Blacks or males, Manley similarly failed to meet his summary judgment burden for his disparate impact claims against ProSource; these claims were appropriately dismissed.

## B. Denial of Motion for Recusal

■ Manley also argues that the district court erred by denying his Motion to Recuse based on 28 U.S.C. § 455 and § 144. "Under either statute, the alleged bias must be 'personal', as distinguished from judicial, in nature." *Phillips v. Joint Legislative Comm.,* 637 F.2d 1014, 1020 (5th Cir.1981). "Thus, a motion for disqualification ordinarily may not be predicated on the judge's rulings in the instant case or in related cases, nor on a demonstrated tendency to rule any particular way, nor on a particular judicial leaning or attitude derived from his experience on the bench." *Id.; see United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Manley has failed to present any evidence that the district court held any personal bias against him.

Instead, Manley's assertion that the district court should have recused himself is based solely on judicial rulings in the case. Accordingly, the district court was correct in denying his Motion to Recuse.

## C. Discovery Rulings

■ Manley appears to contend that the district court's abatement of discovery interfered with his ability to obtain admissible discovery. It is well established that a district court can "exercise its sound discretion to restrict what materials are obtainable" in discovery. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 28 F.3d 1388, 1394 (5th Cir.1994) (quoting *Harris v. Amoco Prod. Co.,* 768 F.2d 669, 684 (5th Cir. 1985)). "In reviewing a district court's curtailment of discovery under the Federal Rules of Civil Procedure, errors made with regard to the allowance of discovery do not require reversal unless they result in substantial prejudice to a party's case." *Id.* (quoting *United States v. Garrett,* 571 F.2d 1323, 1326 (5th Cir.1978)). Manley did not indicate what particular admissible evidence he was prevented from obtaining, and whether such discovery would constitute competent summary judgment evidence. Nor did he even allege much less demonstrate that the district court's discovery rulings caused him "substantial prejudice." Moreover, while "Rule 56 does not require that *any* discovery take place before summary judgment can be granted," the district court specifically allowed Manley to conduct additional discovery before granting ProSource's Third Motion for Summary Judgment. *Id.* at 1396 (quoting *Washington v. Allstate Ins. Co.,* 901 F.2d 1281, 1285 (5th Cir.1990)). Absent specifics as to what discovery was erroneously excluded and what prejudice such exclusion did or did not cause the

plaintiff, we find no error in the district court's discovery rulings.

## CONCLUSION

Accordingly, we AFFIRM the district court's orders of dismissal.

**Aubrey KILCHRIST, Plaintiff–Appellant, Cross–Appellee**

v.

**SIKA CORPORATION, Defendant–Appellee, Cross–Appellant.**

No. 12–10902.

United States Court of Appeals,
Fifth Circuit.

Feb. 6, 2014.

Matthew C. Matheny, Provost Umphrey Law Firm, L.L.P., Beaumont, TX, for Plaintiff–Appellant, Cross–Appellee.

Lee Lemon Cameron, Rebecca Michelle Alcantar, Allison Jayne Maynard, Esq., Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P., Dallas, TX, for Defendant–Appellee, Cross–Appellant.

Before REAVLEY, PRADO, and OWEN, Circuit Judges.

PER CURIAM: *

This is a slip-and-fall case where the jury returned a verdict for the plaintiff, and the district court granted judgment as a matter of law for the defendant—premises on the grounds that it owed the plaintiff no duty as a matter of law. We affirm.

## I. FACTS

Plaintiff Aubrey Kilchrist ("Kilchrist") was employed by Distribution Technologies ("DisTech") as a truck driver. Defendant Sika Corporation ("Sika") engaged DisTech as an independent contractor to

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

provide trucking services to the Sika plant in question. Sika produces a chemical known as admix that comes in a variety of colors and is especially slippery. Sika implemented policies for frequent water rinses to remove any slippery admix from the floor. Thus, the floor was often wet.

The Sika plant is equipped with several large bays for loading and unloading trucks. The loading and unloading area is surrounded by a dike to prevent water and other materials from washing into the street. Sika insists that it notified DisTech of these conditions and that DisTech in turn briefed its employees, including Kilchrist, regarding the risk. Kilchrist apparently had rubber soles added to his work shoes to prevent him from slipping.

On September 15, 2009, Kilchrist arrived at the plant to fill his truck with a load of admix. However, the bays were occupied, and he was forced to wait. Before going to lunch, Kilchrist arranged to have another driver pull his truck into a bay when one became available. Upon returning, Kilchrist entered the Sika plant through the front office and stepped over the dike and into the loading bay area. Kilchrist testified that he saw that the floor of the plant was wet. He proceeded to approach his truck, which was in the loading bay as arranged. At this point, Kilchrist slipped on a liquid that he believed to be water, but that allegedly contained admix. The contents of the liquid are disputed. Kilchrist claims that the liquid on the floor was clear and indistinguishable from water. As a result of his fall, Kilchrist has undergone several surgeries and has not been able to return to work as a truck driver.

## II. PROCEDURAL HISTORY

On August 16, 2010, Kilchrist filed a premises liability case in state court against Sika for damages he sustained as a result of his fall. On December 16, 2010, the case was removed to the United States District Court for the Northern District of Texas. The district court bifurcated the trial: the jury would first make a determination on liability and then, if necessary, a second phase would take place to determine damages. During trial, Sika moved for judgment as a matter of law under Federal Rule of Civil Procedure Rule 50 on the grounds that Sika owed no duty to an independent contractor's employee to warn of, or make safe, an open and obvious hazard of which the plaintiff was already aware. The court reserved its ruling on the issue, noting that it was a close call as to whether the presence of admix in the puddle was known and obvious or was instead a concealed hazard. The court explained that it was only the statement by Kilchrist that he "had no way of knowing that what appeared to be ordinary water was actually something much more hazardous" that allowed his case to survive the motion and proceed to trial for the time being.

The jury returned a verdict on liability of 60% for Sika, 40% for DisTech, and 0% for Kilchrist. Sika re-urged its Rule 50 motion for judgment as a matter of law, and after hearing the arguments of counsel and reviewing the trial transcript, the district court granted the motion and entered a take nothing judgment for Sika. In granting the judgment as a matter of law in favor of Sika, the district court found that Sika had no duty because Kilchrist was aware of the danger. The court was particularly influenced by Kilchrist's testimony at trial that he had known for several months both that the area was always wet and that it could contain admix. Thus, "the alleged hazard was not concealed" because Kilchrist knew that "admix could be [present]" in the area where he slipped.

Kilchrist timely appealed the district court's grant of Sika's motion for judgment as a matter of law.[1]

## III. DISCUSSION

"We review de novo the district court's ruling on a motion for judgment as a matter of law." *Flowers v. S. Reg'l Physician Servs.*, 247 F.3d 229, 235 (5th Cir.2001). Again, the trial court held that, as a matter of law, because Kilchrist knew both that the area was actually wet and that it could contain admix, the risk was "commonly known or already appreciated by the employee" such that Sika had no duty to warn. *See Brookshire Grocery Co. v. Goss*, 262 S.W.3d 793, 795 (Tex.2008) (per curiam) (citation omitted).

Kilchrist contends he had no actual knowledge admix was present near his truck on the day he fell. He argues that the fact that he knew admix *could* be on the floor does not mean that he actually knew that admix *was* on the floor, and thus that he did not appreciate the risk. This is a distinction without a difference. Kilchrist appreciated the risk admix posed and the substantial likelihood it was present in the facility. Kilchrist testified that the area near where his truck was parked "was always wet." He agreed, on cross-examination that he had known for months preceding the accident that the ground "was always wet with water, admix, and

potentially other chemicals." He testified that on the day of his fall, the entire area inside the dike was wet and he agreed that there was not a single dry spot. Although he stated he had not seen admix on the side of the truck where he slipped, he conceded that he had seen admix inside the dike system. He knew that the floor where he stepped was wet and that it could contain admix and that admix was a particularly slippery substance. We hold that Sika owed no duty to warn Kilchrist of a danger he already appreciated. *See Goss*, 262 S.W.3d at 795; *see also Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006) (per curiam) (citation omitted).

Finally, we note that this case is distinguishable factually and legally from *Austin v. Kroger Tex. L.P.*, 731 F.3d 418 (5th Cir.2013). In *Austin*, the plaintiff's duties as the floor maintenance person included cleaning spills on the floor. *Austin*, 731 F.3d at 429. Thus, the plaintiff had "no choice but to confront" the hazard; here, Kilchrist was not specifically required to step in the puddle. Thus, Kilchrist was not faced with the same "quit, or clean" dilemma confronted by the plaintiff in *Austin*. *Id.* Moreover, this case does not invoke the issues raised by *Austin*. Specifically, *Austin* "does not center on an alleged failure to warn," *id.*, while this case on appeal is only about an alleged failure to warn.[2]

1. Assuming this Court were to remand, Kilchrist raised additional issues: the trial on remand should be limited to damages only; and in the event that liability is retried, the district court should be directed to conduct a unitary, rather than bifurcated trial. Sika cross-appealed, arguing that the district court erred in refusing to submit Sika's special jury instruction. Specifically, Sika had sought to have a statement regarding an independent contractor's duty to warn its employees of potential hazards included in the jury instructions. Because we affirm, we do not reach either parties' issues concerning remand.

2. Although Kilchrist initially raised negligence on several different grounds, including failure to maintain premises in a safe condition and failure to correct a dangerous condition, he abandoned those arguments before the district court. By not arguing Sika's alleged failure to maintain a safe premises and failure to correct a dangerous condition before the district court, Kilchrist has waived those arguments. *See Celanese Corp. v. Martin K. Eby Constr. Co. Inc.*, 620 F.3d 529, 531 (5th Cir.2010).

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the trial court's grant of judgment as a matter of law.

UNITED STATES of America, Plaintiff–Appellee

v.

Nicholas ALBARADO, Defendant–Appellant.

United States of America, Plaintiff–Appellee

v.

Joshua Cisneros, Defendant–Appellant.

Nos. 12–11167, 13–10107.

United States Court of Appeals, Fifth Circuit.

Feb. 6, 2014.

James Wesley Hendrix, Assistant U.S. Attorney, U.S. Attorney's Office, Dallas, TX, for Plaintiff–Appellee.

Kenneth Gerald Leggett, Gravley & Leggett, Abilene, TX, for Defendant–Appellant.

Before KING, CLEMENT, and GRAVES, Circuit Judges.

PER CURIAM: *

Nicholas Albarado and Joshua Cisneros appeal from the denial of their motions to suppress evidence seized from a residence. For the reasons that follow, we AFFIRM.

## I. Factual and Procedural Background

Nicholas Albarado and Joshua Cisneros were indicted on multiple counts including conspiracy to distribute methamphetamine, possession with intent to distribute methamphetamine, possession with intent to distribute cocaine, possession with intent to distribute marijuana, and possession of a firearm in furtherance of a drug trafficking crime. Before trial, they moved to suppress the drug and gun evidence seized from a residence in Abilene, Texas. They argued that, following an initial "knock and talk," law enforcement agents had entered the residence without a warrant, without probable cause, and in the absence of any exigent circumstances.

A hearing was held on the defendants' suppression motions. Ismael Jaimes, an agent with the Abilene Police Department, Special Operations Division, testified at the hearing. He testified that, on the morning of August 30, 2011, he and his partner planned to approach the subject residence to conduct a "knock and talk" investigation. This was based on a tip that another agent had received from a confidential informant, who claimed that the residence was a marijuana stash house for the "Mexican Mafia" organization. Agent Jaimes stated that he had been unaware of this residence or its occupants prior to receiving the tip. However, he testified that he knew that the Mexican Mafia was a dangerous organization, that its members were involved in drug- and firearms-related crimes, and that its members and other narcotics traffickers often possessed firearms near any drugs.

The agents arrived at the residence in an unmarked car, wearing plain clothes, and with police badges visible around their

---

* Pursuant to 5TH CIR R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

necks. Albarado answered their knock. Agent Jaimes testified that he immediately noticed a "strong odor" of burning and fresh marijuana coming from inside the residence. He also testified that he immediately recognized Albarado from prior drug investigations and that he knew from another confidential informant that Albarado was involved with the Mexican Mafia and the sale of illegal drugs.

Agent Jaimes showed Albarado his badge and identified himself and his partner as police officers. When asked if he lived at the residence, Albarado answered no. Agent Jaimes then asked if the agents could come inside and speak with Albarado, but Albarado replied that he could not give them permission to enter because he was not the owner of the residence. The agents then asked to speak with the owner. Albarado replied that he would have to retrieve her from the back of the residence.

Albarado turned away and tried to close the door. The agents stopped the door from closing and entered the residence. Agent Jaimes testified that they entered to prevent the destruction of evidence and for safety reasons. On cross-examination, Agent Jaimes acknowledged that Albarado did not appear to be a threat at that time and made no attempt to flee.

Once inside, the agents followed Albarado to the door of a bedroom, where he called out to a woman lying on the floor, who was later identified as Ana Mar Landini. When Landini stood up, the agents identified themselves and showed her their badges. Agent Jaimes told Landini why they were at the residence, said that he could smell marijuana, and asked if there was more marijuana in the house. Landini replied that the residents had smoked marijuana the previous evening and that there was "a little bit" left over. She surrendered a partially smoked marijuana cigarette. Agent Jaimes said he did not believe Landini's explanation due to the strong odor of "fresh" marijuana in the residence. When asked if anyone else was inside, Landini roused Joshua Cisneros off the bedroom floor. The agents then escorted everyone back into the living room.

Agent Jaimes explained why the agents were at the residence, read everyone their rights, and asked for consent to search the residence for more marijuana. Albarado and Cisneros said they could not give consent since they did not live there, and Landini said she could not give consent because her roommate was not present. Agent Jaimes then called for another agent to come to the residence to assist while he left to prepare a search warrant application. The residents were not handcuffed, and they were allowed to play video games while they waited.

After the warrant was obtained and executed, the agents found approximately 324.6 grams of methamphetamine, 52 grams of cocaine, 678 grams of marijuana, three firearms, scales, a cutting agent, and more than $5,700 in cash. Agent Jaimes denied conducting any search of the residence prior to obtaining the warrant.

Based on this testimony, and the parties' arguments, the district court denied the motions to suppress. The district court found that the entry was justified by safety concerns and that the agents conducted a limited protective sweep of the residence. Albarado then pleaded guilty to one count of possession with intent to distribute 50 grams or more of methamphetamine and one count of possession of a firearm in furtherance of a drug trafficking crime. Cisneros proceeded to a bench trial and was found guilty on all counts. Each defendant was sentenced to a total of 216 months' imprisonment. The defendants timely appealed the denial of the suppres-

sion motions, and their appeals were consolidated.

## II. Standard of Review

"[W]here a police officer acts without a warrant, the [G]overnment bears the burden of proving that the search was valid." *United States v. Waldrop,* 404 F.3d 365, 368 (5th Cir.2005). The district court's findings on a motion to suppress are reviewed for clear error, and its ultimate conclusion as to whether the Fourth Amendment was violated is reviewed de novo. *United States v. Scroggins,* 599 F.3d 433, 440 (5th Cir.2010).

## III. Discussion

■ On appeal, the defendants raise several challenges to the justifications for, and scope of, the agents' protective sweep of the residence. We note initially, however, that the defendants do not challenge the officers' use of a "knock and talk" strategy, which we have recognized as a valid investigatory technique, not requiring a warrant, when law enforcement officials seek to gain consent to search or reasonably suspect criminal activity. *See United States v. Jones,* 239 F.3d 716, 720 (5th Cir.2001).

The defendants' first argument is that, after conducting the "knock and talk," the agents lacked probable cause to enter the residence. *See id.* at 719 n. 2 ("In order to vindicate a warrantless search by proving exigent circumstances, the government must also show probable cause."). Before they knocked, the agents had received a tip that the residence was a marijuana stash house for the Mexican Mafia. Once Albarado opened the door, the agents could smell the odor of burned and fresh marijuana. *See United States v. Pierre,* 958 F.2d 1304, 1310 (5th Cir.1992) (en banc) (finding that the smell of marijuana can give rise to probable cause). The

agents also recognized Albarado from past drug investigations, and knew of a separate tip that Albarado was involved with the Mexican Mafia. We find that once the agents spoke with Albarado, they had probable cause to believe a crime was being committed.

■ The defendants' second argument is that there were no exigent circumstances justifying the agents' warrantless entry into the residence. "As a general rule, exigent circumstances exist when there is a genuine risk that officers or innocent bystanders will be endangered, that suspects will escape, or that evidence will be destroyed if entry is delayed until a warrant can be obtained." *United States v. Menchaca–Castruita,* 587 F.3d 283, 289 (5th Cir.2009). A reviewing court must consider the circumstances objectively as they would appear to a reasonable and prudent person. *United States v. Troop,* 514 F.3d 405, 409 (5th Cir.2008). However, when reasonable minds may disagree, a court should "not second guess the judgement of experienced law enforcement officers concerning the risks of a particular situation." *Menchaca–Castruita,* 587 F.3d at 290 (internal quotation marks and citation omitted). A district court's determination that exigent circumstances existed is a factual finding that this court reviews for clear error. *Troop,* 514 F.3d at 409.

We agree with the district court that the warrantless entry was justified by the agents' reasonable concern for their safety. As previously noted, when the agents approached the residence, they already had a tip that the residence was associated with the Mexican Mafia, which they knew to be a violent drug trafficking organization. When the door opened, one agent immediately recognized Albarado from past drug investigations, knew that Albarado had been linked to the Mexican Mafia by another tip, and smelled marijuana inside the

house. The agents also knew from their training and experience that drug traffickers often keep firearms near their drugs.

Additionally, permitting the door to close would have given Albarado the opportunity to alert the residence's other occupants to the agents' presence and would have afforded the occupants the opportunity to arm themselves. Albarado told the agents that there was at least one other person somewhere inside the house, whom the agents could not see. If, after the "knock and talk," the agents had waited at the front of the house for Albarado to return, they would have been vulnerable to an attack. In light of these facts, the district court did not clearly err in determining that exigent circumstances existed based on the agents' objectively reasonable belief that they were in danger from an unknown and likely armed person somewhere inside the residence. *See United States v. Maldonado,* 472 F.3d 388, 393–94 (5th Cir.2006) (holding that there was a reasonable concern for safety justifying a protective sweep of a trailer where agents were in a vulnerable location), *abrogated in part on other grounds by Kentucky v. King,* —— U.S. ——, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011).

■ In addition, although not relied on by the district court as justification for the warrantless entry, an agent also testified that the entry was based on a belief that the residents might try to destroy any evidence. *See Sojourner T. v. Edwards,* 974 F.2d 27, 30 (5th Cir.1992) (stating this court may affirm on any basis supported by the record). Albarado was aware of the presence of law enforcement. If allowed to reenter the house unaccompanied, he could inform anyone else inside. The agents knew from their training and experience that drug traffickers will try to destroy evidence when confronted by police. We conclude that the agents had an objectively reasonable belief that the residents would try to destroy any evidence while the agents tried to obtain a search warrant. *See United States v. Webster,* 750 F.2d 307, 326–27 (5th Cir.1984).

■ The defendants' third argument is that the agents failed to conduct a proper protective sweep of the residence. The protective sweep doctrine allows government agents, without a warrant, to conduct a quick and limited search of premises for the safety of the agents and others present at the scene. *See United States v. Gould,* 364 F.3d 578, 581 (5th Cir.2004) (en banc), *abrogated in part on other grounds by King,* —— U.S. ——, 131 S.Ct. 1849. As discussed above, the initial entry into the residence was justified by exigent circumstances. Based on Albarado's statement that someone else was present and the known connections between Albarado, the residence, and the Mexican Mafia, the agents had a reasonable suspicion that another person, most likely in possession of a firearm, was inside. In light of these concerns, the "sweep" in this case was not overly broad or long. It consisted of following Albarado to a bedroom, watching him wake two other persons, and then escorting everyone to the living room. The individuals in the residence were not handcuffed, and they were allowed to play video games while they waited. Once the residence was secured, the agents sought and received a search warrant, and conducted a more thorough search. We conclude that the protective sweep was proper. *See id.* at 587.

Finally, the defendants argue that the agents' decision to knock on the door of the residence created any exigent circumstances. This argument is foreclosed by the Supreme Court's decision in *Kentucky v. King,* —— U.S. ——, 131 S.Ct. 1849. In that case, the Supreme Court held that a warrantless entry to prevent the destruc-

tion of evidence is permissible as an exigent circumstance as long as the officers acted reasonably and did not create the exigency through any actual or threatened Fourth Amendment violations. *Id.* at 1858. In doing so, the Court rejected a rule that police may not rely on an exigency for a warrantless search if it was "reasonably foreseeable" that their legally permissible tactics would create the exigent circumstances. *Id.* at 1859–60. In this case, the agents' "knock and talk" investigation was a legally valid investigatory tactic. Albarado voluntarily opened the door, revealing himself to the agents and allowing them to smell the marijuana inside. He then chose to answer the agents' questions, alerting them to the presence of another unknown person inside the house. The actions of the agents were permissible and did not create any exigent circumstances. *See id.* at 1858.

### IV. Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of the defendants' motions to suppress.

**UNITED STATES of America,**
**Plaintiff–Appellee**

v.

**Juanetta T. MARTIN; Morrique Turner, Sr., Defendants–Appellants.**

**No. 12–31275.**

United States Court of Appeals, Fifth Circuit.

Feb. 6, 2014.

Cristina Walker, Assistant U.S. Attorney, Earl M. Campbell, U.S. Attorney's Office, Shreveport, LA, for Plaintiff–Appellee.

Elizabeth Cary Dougherty, Esq., Dougherty Law Firm, L.L.C., Baton Rouge, LA, Douglas Lee Harville, Harville Law Firm, L.L.C., Shreveport, LA, for Defendants–Appellants.

Before KING, CLEMENT, and GRAVES, Circuit Judges.

PER CURIAM: *

Juanetta T. Martin challenges the sufficiency of the evidence supporting her conviction on two counts of committing health care fraud, in violation of 18 U.S.C. § 1347. She also challenges the district court's loss calculation and restitution award. Morrique Turner, Sr., challenges the sufficiency of the evidence for his conviction of conspiracy to commit health care fraud and mail fraud, in violation of 18 U.S.C. §§ 371, 1347, and 1341. For the following reasons, we AFFIRM the defendants' convictions and Martin's sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. Factual Background

1. Medicaid

Juanetta T. Martin, a licensed practical nurse ("LPN"), worked full-time at Morehouse General Hospital ("Morehouse General") in Bastrop, Louisiana. Martin also owned and operated a home health care business, Bayou Home Bureau, Inc. ("Bay-

---

* Pursuant to 5TH CIR R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

ou"). Bayou was incorporated in 1999 to provide residential personal care to elderly and invalid patients. Morrique Turner, Sr., Martin's son, was a Bayou employee who provided homecare services.

From 1999 until 2009, Bayou acted as a Medicaid provider, eventually providing home sitting and nursing care for between fifty and sixty Medicaid patients.[1] As a Medicaid provider, Bayou submitted claims for payment to Medicaid based on fifteen-minute "units" of care. Bayou also was required to maintain the last five years' worth of timesheets and nurse notes including the caretaker's name, as well as a description of the type of care provided.

Abigail Emery, Turner's ex-wife and Martin's former daughter-in-law, was responsible for submitting claims on behalf of Bayou to Medicaid. Emery was trained by Henry Cotton, a consultant and Martin's friend. Cotton instructed Emery to bill the maximum allowable number of units approved by Medicaid each week. Emery eventually became concerned about Bayou's billing practices when Medicaid audited Bayou. As part of the audit, Medicaid asked to see Bayou's timesheets and nurse notes.

After reading Medicaid's manuals and learning that billing was to be done based on timesheets and nurse notes, Emery brought her concerns about Bayou's maximum billing practices to Martin and Cotton. Despite Emery's warning, Martin and Cotton did not instruct her to change how she submitted claims to Medicaid. In particular, Emery continued receiving timesheets from Bayou's employees twice

per month, making it impossible for her to submit accurate information to Medicaid, which required weekly billing.[2]

Furthermore, the billing information Emery received, and which was submitted to Medicaid, did not accurately reflect the care patients were provided. Some Bayou employees would not complete their own timesheets and nurse notes. Turner, for example, paid someone in the office to prepare the nurse notes for him. Sitters also would report caring for patients even when those patients were hospitalized and could not receive the stated care. In one example, Bayou billed Medicaid for care Turner purportedly provided to a patient on September 20, 23, and 25, 2005, despite that patient being hospitalized from September 16 to September 26, 2005. In another example, Lizzie Smith, Martin's co-worker at Morehouse General and a Bayou employee, turned in timesheets and nurse notes stating that she cared for a child patient. In reality, the child was being cared for by her family. Smith asked Martin if this was allowed. Although Martin initially said no because doing so would mean engaging in fraud, Martin several weeks later brought Smith the necessary paperwork to fill out. Martin told Smith that billing Medicaid was "okay" provided that someone was watching the patient.

Partly as a result of these practices, Medicaid repeatedly audited Bayou. In response to each audit, Emery and other Bayou employees would gather the necessary records, including timesheets and nurse notes. If a record did not exist, Martin and Cotton instructed Bayou's employees to create it. Although, after the

1. Medicaid is a public health care benefit program designed to provide free and below-cost health coverage primarily to economically disadvantaged individuals.

2. Unsurprisingly, Martin fiercely contested much of Emery's testimony at trial. Cotton

testified that Emery acted contrary to how he had trained her. In her brief to this court, Martin largely blames Emery for Bayou's billing errors. To the extent Emery was instructed to utilize maximum billing, Martin maintains that the idea was Cotton's, not Martin's.

first audit, Medicaid provided Bayou with an "education letter" advising Bayou how to avoid overlapping care issues, Bayou did not change its billing practices. In all, Medicaid sanctioned Bayou eight times for a total of approximately $68,000 for repeatedly billing for services allegedly rendered when a patient was hospitalized.

As a result of Bayou's continuing problems, the Medicaid Fraud Control Unit of the Louisiana Attorney General's Office initiated a criminal investigation. As part of the investigation, certain of Bayou's timesheets and nurse notes were subpoenaed. Bayou produced only some of the required documents. A search warrant executed on Bayou's office revealed a "very unorganized" state of affairs with "documents strewn about." After a criminal indictment was filed, Martin gave three employees, including Smith and Turner, each a form entitled "Affidavit of No Plea Agreement," in which the employee agreed to produce an affidavit stating that he did not wish to take any sort of plea agreement that was offered. Martin had Smith sign and notarize the document.

#### 2. Blue Cross/Blue Shield

In addition to operating Bayou and working at Morehouse General, Martin, in her individual capacity, enrolled as an LPN provider with Blue Cross/Blue Shield ("Blue Cross").[3] In that role, she cared for two Blue Cross-insured patients, C.S. and E.D. Billing to Blue Cross was based on current procedural technology ("CPT") codes. CPT codes were developed by the American Medical Association, and consist of five-digit codes that represent a specific service provided by the biller. Each claim included information about the patient, the insured, and the services provided.

Although initially billing Blue Cross between $450 and $500 per day of care for each of her two patients, Martin, in less than a year, began submitting daily care charges for as much as $800, and for as much as $1,600 a short time later. Martin's submission of claims exceeding $800,000 "in a very short period of time" led Blue Cross to commence an investigation. As part of this investigation, Blue Cross asked Martin for the patients' records. Martin proved "not very cooperative," and Blue Cross had to make repeated efforts to get Martin to produce the requested documents. Blue Cross was also contacted by a woman identifying herself as Susan Turner, who stated that she would be Martin's point-of-contact. Susan Turner was "very aggressive" and challenged Blue Cross's authority to access the records. Blue Cross eventually warned Martin that if the records were not provided, it would seek to recoup the over $800,000 Blue Cross had paid her.

Martin supplied the records Blue Cross demanded in December 2008. Unlike the claims Martin had previously filed utilizing CPT codes, these records consisted of nurse notes, which included, among other things, the date and times care was provided; the type of care; and patient information such as vital signs, fluid intake and output, and bowel movements. The nurse notes were signed by Martin.

Comparing Martin's nurse notes with the times Martin clocked in to her full-time job revealed that Martin was billing Blue Cross for services allegedly performed on days she was working at Morehouse General. For example, on February 12, 2007, Martin's records state that C.S. was dressed, bathed, fed, and transferred; his urine output and bowel movements were measured; and medications were provided

---

**3.** Although not disputing that she enrolled as an individual LPN provider, Martin contends that Cotton advised and assisted her in obtaining her provider number.

at 11 a.m., 2 p.m., 5 p.m., and 10 p.m. Martin billed Blue Cross $500 for these services. That same day, Martin began work at Morehouse General at 6:35 a.m., and remained there until 6:56 p.m.

Additional analysis of Martin's records showed that on three occasions she billed Blue Cross for services provided to a patient while he was hospitalized. In one instance, C.S. was hospitalized on February 6, 2007, and discharged on February 8, 2007. Martin's records stated that C.S. was provided homecare on each of the three days he was in the hospital, for which Martin billed Blue Cross a total of $1,500. Martin also continued to work fulltime at Morehouse General during this time.

As already noted, Martin's billing practices also fluctuated significantly between February 2007 and September 2008. Although the services for which Martin billed Blue Cross did not change, the amount she charged increased, with isolated exceptions, substantially. As to E.D., Martin's claims increased from $450 per day of care in July 2007, to $600 in September 2007, and finally to $800 in December 2007. For C.S., Martin billed Blue Cross $500 per day of care from February 2007 to May 2007. From June 2007 to November 2007, Martin increased her daily charges to $700. Between February 2008 and September 2008, Martin's daily care charges then ranged from as low as $800 to as high as $1,600, before settling at $1,000. In all, Blue Cross paid Martin $813,422.50, of which $200,853 was for services allegedly rendered on days she worked at Morehouse General, or while C.S. was hospitalized.

## B. Procedural Background

On April 29, 2010, Martin, Turner, Smith, and three other Bayou employees were charged in a ten-count indictment alleging two health care fraud schemes designed to defraud Blue Cross and Medicaid. As relevant to this appeal, Count 1 of the indictment charged all defendants with conspiracy to commit health care fraud and mail fraud, in violation of 18 U.S.C. §§ 371, 1347, and 1341. Count 2 charged Martin with committing mail fraud, in violation of 18 U.S.C. § 1341. Counts 3 and 4 charged her with committing health care fraud relating to her treatment of E.D. and C.S., in violation of 18 U.S.C. § 1347. Count 7 charged Turner with health care fraud pertaining to the scheme to defraud Medicaid, in violation of 18 U.S.C. § 1347.

One of the defendants named in the indictment pleaded guilty to health care fraud prior to trial. A jury trial as to the remaining defendants commenced on August 6, 2012. Smith pleaded guilty on the second day of trial. The other defendants moved for judgments of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure at the close of the government's casein-chief. The district court denied the defendants' motions. At the close of the evidence, the defendants re-urged their Rule 29 motions, which, again, were denied. The jury found Martin guilty on Counts 1, 3, and 4, and found her not guilty on Count 2. Turner was convicted on Count 1, but acquitted on Count 7. Martin and Turner filed post-trial motions for new trials and judgments of acquittal. The district court denied the motions.

Martin's presentence investigation report ("PSR") issued on September 18, 2012. Martin filed numerous objections, and the PSR was subsequently revised on October 17, 2012. The revised PSR calculated Martin's offense level to be 22, based on a base offense level of 6, a fraud loss calculation of $921,021.50 resulting in a fourteen-level enhancement, and a two-level enhancement for Martin's role as "orga-

nizer, manager, or supervisor" in the criminal activity. Together with a Criminal History Category of I, the advisory Guidelines sentence range for Martin was forty-one to fifty-one months' imprisonment. The PSR recommended restitution in the amount of $921,021.50, of which $813,422.50 would be due Blue Cross, and $107,599 would be due Medicaid.

At sentencing, the government presented testimony by Federal Bureau of Investigation Agent Palmer Allen in support of the PSR's loss calculation. Martin's attorney read a letter sent by E.D. attesting to the care Martin had provided her. Martin's counsel also called another witness to testify about the proper restitution amount for Medicaid. Finally, counsel called Rufus Martin, Jr., to testify that his mother, Martin, would take him with her while she visited E.D. and C.S. in the mornings before he had to go to school. After listening to this testimony, the district court determined that the total actual loss suffered by Blue Cross and Medicaid was only $232,310.12. Of that amount, Blue Cross's actual loss was $200,853, of which $185,800 was attributed to C.S., and $15,053 to E.D. The remaining loss of $31,457.12 was suffered by Medicaid. The lower total loss figure reduced Martin's offense level by two points, resulting in a revised Guidelines sentencing range of thirty-three to forty-one months' incarceration. The district court sentenced Martin to thirty-nine months' imprisonment, a three-year term of supervised release, and restitution in the amount of $200,853 as to Blue Cross and $31,457.12 as to Medicaid. Turner was sentenced to a two-year term of supervised probation.

Martin timely filed a notice of appeal challenging her conviction as to Counts 3 and 4, and her sentence. Turner then timely filed a notice of appeal challenging his conviction as to Count 1.

## II. DISCUSSION

Martin and Turner appeal their convictions, each on the basis that the evidence was insufficient to support the jury's verdict. Martin further challenges the district court's loss calculation and its restitution award because it failed to include the value of the services provided. We consider each issue in turn.

### A. Evidentiary Sufficiency

#### 1. Standard of review

We review properly preserved sufficiency-of-the-evidence claims de novo. *See United States v. Ollison*, 555 F.3d 152, 158 (5th Cir.2009). While our review is de novo, this court must view all of the evidence, resolve all credibility determinations, and make all reasonable inferences in favor of the jury verdict. *United States v. Winkler*, 639 F.3d 692, 696 (5th Cir. 2011). We must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Pruett*, 681 F.3d 232, 238 (5th Cir.2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). "To be sufficient, the evidence need not exclude every reasonable hypothesis of innocence, so long as the totality of the evidence permits a conclusion of guilt beyond a reasonable doubt." *United States v. Hicks*, 389 F.3d 514, 533 (5th Cir.2004).

#### 2. Martin's conviction

Martin argues that the evidence was insufficient to support the jury's verdict as to Counts 3 and 4 of the indictment, which charged her with committing health care fraud upon Blue Cross. The crux of her argument is that the trial

evidence showed that she in good faith believed she could bill Blue Cross under her individual provider number for the services of her employees. In support, she states that she never attempted to hide the fact that other LPNs were providing nursing services to E.D. and C.S., and that she engaged in extensive research, including conversations with Blue Cross, before obtaining an individual provider number with Blue Cross. Martin also argues that her understanding that services provided by other LPNs could be charged to Blue Cross is supported by Blue Cross's billing structure, which paid a fixed fee for specific CPT-coded procedures. She explains her escalating billing rate as a billing error by Blue Cross.

The government responds that, viewing the evidence in the light most favorable to the verdict, a rational jury could have convicted Martin of health care fraud beyond a reasonable doubt based on her failure to provide the care described in the nurse notes. It states that "[c]ontrary to Martin's argument, the government did not assert that it was fraud if Martin billed for services rendered by another," but rather "[t]he government proved that Martin billed Blue Cross for services that were not rendered." The government counters Martin's explanation for her escalating charges by observing that the wide variations occurred over a relatively short period of time (between February 2007 and September 2008), and without any accompanying change in services.

18 U.S.C. § 1347, the statute under which Martin was convicted, provides that

(a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations,

or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both . . . .

(b) With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.

18 U.S.C. § 1347.

After considering Martin's sufficiency-of-the-evidence argument, we find the following evidence sufficient to affirm Martin's conviction. Martin applied for an individual provider number from Blue Cross. Although she could have created a business entity and applied for a provider number that would allow her to bill Blue Cross for services rendered by her employees, she instead elected to obtain a provider number as an individual. In that capacity, she billed Blue Cross over the course of several months vastly different amounts for the same services. As to one of her two patients, Martin submitted claims that fluctuated between $450 per day of care in July 2007 and $800 per day of care in December 2007. As to her other patient, Martin submitted claims for $500 per day of care from February 2007 to May 2007, before eventually filing daily claims for as much as $1,600 in March 2008.

When Blue Cross requested supporting billing documentation, Martin was "not very cooperative." After Blue Cross persisted in its demand for the records it was contacted by Susan Turner, Martin's new point-of-contact, who proved "very aggressive" and challenged Blue Cross's authority to access the records.

The nurse notes that eventually were sent to Blue Cross contain Martin's signature at the bottom of each note in the section reading "Nurse's Signature." Trial testimony by Blue Cross investigator Kandyce Cowart stated that such a signature represented that the signing nurse provided the care detailed in the note. Martin does not dispute that on at least some of the days when she was working at Morehouse General (or when one of her patients was hospitalized), she did not personally provide all the care listed in the nurse notes.

This evidence was sufficient for the jury to find Martin guilty of committing health care fraud, in violation of 18 U.S.C. § 1347. Martin's arguments to the contrary are unpersuasive. She relies on Cotton's testimony that she carefully researched Blue Cross's billing practices, and on E.D.'s testimony that the billed-for services were provided, but the jury was entitled to find those witnesses not credible.

Martin also attacks her conviction by relying on Blue Cross's billing structure. She describes Blue Cross's purported reason for not allowing an individual to bill for employees' services—double-billing—as nonsensical because if two providers billed Blue Cross for the same care to the same client, then Blue Cross would surely investigate. Martin appears to suggest that the mere fact that a scheme to defraud an insurance company would likely fail due to that company's safeguards bolsters her good-faith-belief defense. To the extent this argument is in any way persuasive, the jury was able to consider it, and evidently rejected it in rendering a guilty verdict.

Paradoxically, while Martin argues that Blue Cross's ability to catch mistakes like double-billing supports her understanding of Blue Cross's billing structure, she also argues that Blue Cross's propensity for making mistakes explains her escalating billing rates. Martin quotes Cowart's trial testimony that Blue Cross would mistakenly pay claims without cross-checking whether the amount matched what Blue Cross had agreed to pay under a particular plan. Martin's argument appears to be that there must have been nothing wrong with her billing if Blue Cross paid it. As the government rightly observes, "the evidence that [Martin] cites explains only why Blue Cross paid the ridiculously high bills she was submitting. It does not address why she submitted them."

Turning to the nurse notes, Martin contends that Blue Cross did not pay claims according to the amount of time it took to complete a procedure, but only based on whether the service was provided. From this premise, Martin leaps to the conclusion that the jury should not have interpreted the nurse notes to mean that the signing nurse was required to provide the care detailed therein. We understand Martin to mean that because Blue Cross allegedly was concerned only with whether the procedure was performed, not how long it took, Blue Cross also must not have been concerned with who provided the care, so long as it was provided by an LPN like Martin. Whatever persuasive value Martin's argument might have in isolation from the other trial evidence is undone by considering that evidence in its entirety. As we have observed, Cowart's trial testimony was that by signing the nurse notes, Martin represented that she herself provided the care in question. Martin also charged an ever-changing amount for the same services. Additionally, she charged Blue Cross for care that neither she, nor any other LPN in her employ, could have provided because the patient who purportedly received it was, at that, hospitalized.

In addressing sufficiency-of-the-evidence arguments, we ask only "whether a ration-

al trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Grant,* 683 F.3d 639, 642 (5th Cir.2012) (internal quotation marks and citation omitted). Here, the jury heard evidence of Blue Cross's billing structure and was unpersuaded by Martin's novel interpretation of it. The jury acted as a rational trier of fact in finding Martin guilty in light of the trial evidence. Accordingly, we affirm Martin's conviction for health care fraud.

### 3. Turner's conviction

■ Like Martin, Turner challenges the sufficiency of the evidence in this case. Turner argues that there was insufficient evidence to convict him on Count 1 of the indictment, which charged him with conspiracy. According to Turner, the only evidence potentially linking him to the conspiracy relates to two distinct time periods: August 28 to August 31, 2005; and September 16 to September 26, 2005. Turner's argument as to both of these periods is the same. He does not dispute that timesheets, nurse notes, and paychecks show that he purportedly provided homecare services to a Medicaid patient on those dates. He also does not dispute that the patient listed in those records could not have received the stated care because the patient was hospitalized. Turner instead argues that this overlap is insufficient to convict him of conspiracy because he worked more hours that were not billed to Medicaid caring for the patient while the patient was not in the hospital, than hours that were billed while the patient was hospitalized. In other words, he asserts that Medicaid made a net gain.

The government in its response contends that the evidence at trial established a pattern of fraudulent billing by Bayou. It relies on nurse notes that show that Turner provided care to a patient, J.M.,

while that patient was hospitalized. The government draws a parallel to other care purportedly provided by other Bayou caretakers, which it says was similarly fraudulent. Relying on *United States v. Stephens,* 571 F.3d 401, 404 (5th Cir.2009), the government contends that "[t]his evidence of concerted action establishes the conspiracy and Turner's knowing participation in it."

Under 18 U.S.C. § 371, the government was required to prove three elements beyond a reasonable doubt to convict Turner of conspiracy to commit health care fraud: "(1) [that] two or more persons made an agreement to commit health care fraud; (2) that [Turner] knew the unlawful purpose of the agreement; and (3) that [Turner] joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *Grant,* 683 F.3d at 643. "The [g]overnment is not required to provide direct evidence of the conspiracy." *Stephens,* 571 F.3d at 404. "Circumstantial evidence can prove knowledge and participation." *United States v. Njoku,* 737 F.3d 55, 63 (5th Cir.2013).

Turner's arguments largely amount to asking us to vacate his conviction because there was no direct evidence of his participating in or knowing of the conspiracy. However, "voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *Stephens,* 571 F.3d at 404 (citation omitted). Here, the trial evidence showed that timesheets and nurse notes were submitted at Turner's behest, which represented that he provided homecare to a patient who was, at the time, hospitalized. The jury was free to consider Turner's untruthful timesheets and nurse notes in the context of other Bayou employees submitting similarly inaccurate reports, which also alleged care that was not actually provided. For exam-

ple, one patient was admitted into a hospital on June 14, 2008, and discharged on July 16, 2008. Bayou nevertheless billed Medicaid for home services during this time, and nurse notes by one of Turner's co-defendants documented care from June 16 through June 22, 2008. Another patient was hospitalized from December 3 to December 19, 2005. Bayou billed for services rendered from December 5 to December 11, 2005, and nurse notes by another co-defendant stated that services were rendered on December 5 through December 9, and December 13 through December 15, 2005. From these examples and others, the jury had sufficient evidence of fraudulent activity to compare to Turner's own dishonest acts, and infer Turner's willing participation in Bayou's scheme to defraud Medicaid.

That Turner did not personally prepare the timesheets or nurse notes is irrelevant because other trial evidence showed that Turner paid another employee to prepare them for him. Specifically, Emery testified that Dewanda Turner prepared the forms for Turner. Moreover, trial testimony by Bryan Edwards, an investigator with the Louisiana Attorney General's Office, showed that it was the caretaker's responsibility to accurately fill out the timesheets. The jury thus could conclude that the information contained in the timesheets and nurse sheets was provided by Turner.

It likewise is irrelevant that Medicaid may have been charged less than the number of hours Turner worked. The operative grounds for Turner's conviction was his submission of timesheets and nurse notes seeking payment for care Turner did not, in fact, provide. It is that act which caused Medicaid's injury, and permitted the jury to find him guilty of conspiracy. Because there was sufficient evidence from which the jury could infer Turner's partic-

ipation in the scheme to defraud Medicaid, his conspiracy conviction is affirmed.

## B. Loss Calculation and Restitution Award

### 1. Standard of review

This court reviews a district court's application of the Guidelines de novo and reviews its findings of fact at sentencing for clear error. *United States v. Klein,* 543 F.3d 206, 213 (5th Cir.2008). A court "review[s] de novo the district court's method of determining loss, while clear error review applies to the background factual findings that determine whether or not a particular method is appropriate." *United States v. Isiwele,* 635 F.3d 196, 202 (5th Cir.2011). "The determination of the amount of loss is a factual finding reviewed for clear error," and "[w]e give the district court wide latitude to determin[e] the amount of loss." *United States v. Cothran,* 302 F.3d 279, 287 (5th Cir.2002).

The legality of a restitution order is reviewed de novo. *United States v. Adams,* 363 F.3d 363, 365 (5th Cir.2004). A legal restitution order is reviewed for abuse of discretion. *Cothran,* 302 F.3d at 288. This court "may affirm in the absence of express findings 'if the record provides an adequate basis to support the restitution order.'" *United States v. Sharma,* 703 F.3d 318, 322 (5th Cir.2012) (footnote omitted), *cert. denied,* ―― U.S. ――, 134 S.Ct. 78, 187 L.Ed.2d 30 (2013).

### 2. Martin's sentence

■ The district court found that Blue Cross's actual loss was $200,853 and ordered restitution for the same. Martin asserts that the district court erred in its loss calculation, and consequently also entered an erroneous restitution order, by failing to credit the value of the LPN services she provided. Because her Blue Cross patients received all the care Blue

Cross was billed for, Martin argues, the actual loss (and subsequent restitution award) should only have been $31,457—the amount of loss Medicaid suffered from Bayou's fraudulent billing. Revised thusly, the loss amount would have resulted in an offense level of only 14, instead of 20. Together with a Criminal History Category of I, Martin's Guidelines sentence range would have been fifteen to twenty-one months, likely resulting in a sentence lower than the thirty-nine months' imprisonment the district court imposed.

The government asks us to affirm the district court's loss calculation and restitution order because "the evidence established that no services were actually rendered."[4]

Section 2B1.1 of the United States Sentencing Guidelines ("U.S.S.G.") increases the offense level of a defendant convicted of fraud based on the actual or intended loss, whichever is greater. U.S.S.G. § 2B1.1 cmt. n. 3(A). "Actual loss" is the reasonably foreseeable pecuniary harm that resulted from the offense, while "intended loss" is "the pecuniary harm that was intended to result from the offense." *Id.* The district court need only make a reasonable estimation based upon the available information. *Cothran,* 302 F.3d at 287. The burden is on the government to prove loss by a preponderance of the evidence. *United States v. Nelson,* 732 F.3d 504, 521 (5th Cir.2013). However, where "the fraud [is] so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a showing that particular

amounts are legitimate." *United States v. Hebron,* 684 F.3d 554, 563 (5th Cir.2012).

At sentencing, the government requested that the district court adopt the PSR's loss calculation of $813,422.50—the total amount Blue Cross paid Martin. The district court rejected the government's argument. It instead found that Blue Cross suffered the lower actual loss figure of $200,853. This number comported with the amount Martin claimed for services rendered on days when she worked at Morehouse General, or when one of her Blue Cross patients was hospitalized. The exact calculation was based on charts presented by Cowart and Agent Allen. Pursuant to U.S.S.G. § 2B1.1, the district court imposed a twelve-level enhancement for fraud-based losses of more than $200,000, but less than $400,000. It then sentenced Martin to thirty-nine months' imprisonment. The district court also ordered $200,853 in restitution for Blue Cross.

We uphold the district court's loss calculation and restitution order. First, there was no legal error with the method by which the district court reached the $200,853 loss amount. The district court based this figure on the amount Martin billed Blue Cross for services she herself could not have provided either because she was working at Morehouse General or because a patient was hospitalized. Martin does not challenge this method of calculation, and we conclude that it bears a reasonable relation to the actual harm of the offense. *See United States v. Randall,* 157 F.3d 328, 331 (5th Cir.1998). Second, although Martin does not take issue with the district court's method of calculating loss,

4. The government also argues that this court should review Martin's arguments only for plain error, as Martin did not object below to the amount of loss calculated or the amount of restitution imposed. Because we affirm the district court's sentence, we do not consider this argument, other than to note that Martin, in her objections to the PSR, disputed the loss calculation as to Blue Cross, and, at sentencing, repeatedly made clear that she objected to any finding of loss.

she does contend that the calculation was in error because it did not include the value of the services rendered. In making this argument, Martin does not challenge any particular date on which services were or were not provided. Instead, she broadly argues that the loss amount, and the restitution award on which it was based, should be zero because her Blue Cross patients received the billed-for care when Martin visited them, before or after her full-time job, or when another LPN did so.

Martin made the same argument, unsuccessfully, in her motions for judgments of acquittal and for a new trial. The district court observed that

> Martin's nurse notes represented that *she* cared for E.D. on certain dates when Martin was on duty at Morehouse General Hospital. Blue Cross ... was charged for and paid the claims Martin submitted for E.D.'s care, relying on the records that showed Martin was providing the care. The evidence did not bear out Martin's theories that another Bayou nurse performed these services for E.D. or that she routinely performed these services before and after her shifts at the hospital, and the jury was entitled to reject these theories accordingly.

The district court reached the same conclusion as to Martin's other Blue Cross patient, C.S.

We find no error in the district court's reasoning. Although a defendant is entitled to a credit for services she performs, *see United States v. Jones*, 475 F.3d 701, 706 (5th Cir.2007), Martin's objection to her sentence is simply a repackaging of the arguments she relies on to challenge the sufficiency of the evidence supporting her conviction. Just as we have found that evidence sufficient to uphold her conviction for health care fraud, we similarly conclude that, in light of all the evidence already discussed, the district court did not err in rejecting her claims that she or another LPN cared for the Blue Cross patients. Martin's is not a case in which the government's proposed loss calculation was based on unsubstantiated claims that particular health care services were not rendered. *See id.* at 705–07. Here, the district court was able to rely on the same evidence heard by the jury, which showed that in signing her name and obtaining an individual provider number, Martin represented that she personally provided the care described in the nurse notes. The district court also heard testimony by Agent Allen at sentencing that, based on the times Martin clocked in and out of work at Morehouse General, Martin could not have provided all the care listed in the nurse notes. Accordingly, we hold that Martin has not shown that the district court's loss calculation of $200,853 was clearly erroneous or misapplied the law. We thus affirm the district court's sentence.

## III. CONCLUSION

For the aforementioned reasons, we AFFIRM Martin's and Turner's convictions, and Martin's sentence.

**In re Torvos SIMPSON, Movant.**

**No. 13–40718.**

United States Court of Appeals, Fifth Circuit.

Feb. 7, 2014.

370

James Warner Huggler, Jr., Esq., Law Office of James Huggler, Tyler, TX, for Movant.

Before HIGGINBOTHAM, DENNIS, and GRAVES, Circuit Judges.

PER CURIAM: *

Torvos Simpson, federal prisoner # 47110–078, moves for authorization to file a successive 28 U.S.C. § 2255 motion challenging his life sentence without possibility of parole. In 1995, together with two co-defendants, Simpson pleaded guilty to carjacking in violation of 18 U.S.C. § 2119, and possession of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1). The carjacking resulted in the death of another teenager. Simpson was under eighteen at the time of the offense. Simpson was sentenced to life without the possibility of parole, plus a consecutive 60–month sentence.[1]

Section 2255(h) bars a federal prisoner from filing a second or successive motion to vacate, set aside, or correct a sentence unless the court of appeals certifies that the petition either (1) contains "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense," or (2) is premised on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2255(h). Simpson seeks leave to file a successive § 2255 motion on the grounds that the United States Supreme Court's recent decision in *Miller v. Alabama*, —— U.S.

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1. Given the procedural posture of the motion, we have minimal information regarding Simpson's sentencing proceedings. However, we do note that Simpson was sentenced prior to *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), when the United States Sentencing Guidelines were mandatory, *see, e.g., id.* at 233–34, 125 S.Ct. 738.

——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), which held that mandatory life sentences without the possibility of parole for juvenile offenders violate the Eighth Amendment's ban on cruel and unusual punishment, announced a new rule of constitutional law made retroactively applicable on collateral review by the United States Supreme Court. He argues that *Miller* renders his sentence unconstitutional, because he was a juvenile at the time of the charged offenses. The government does not oppose Simpson's motion.

Simpson must make a prima facie showing that his motion satisfies the § 2255 requirements for second or successive motions in order to obtain permission to proceed in the district court. *See Reyes–Requena v. United States*, 243 F.3d 893, 897–99 (5th Cir.2001) (holding that the prima facie standard is incorporated into § 2255). A "prima facie showing" is "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court." *Id.* at 899 (quoting *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997)).

We do not resolve the ultimate issue of the retroactivity of *Miller*.[2] However, we find that the Supreme Court's actions in *Miller* and the procedural posture of *Miller* itself satisfy Simpson's burden to make a prima facie showing that his petition rests on a new rule of law made retroactive by the Supreme Court on collateral review. *Miller* involved two companion cases; *Miller v. Alabama*, which was on direct appeal of conviction and sentence, *Miller*, 132 S.Ct. at 2462–63, and *Jackson v. Hobbs*, which involved a petition for habeas corpus in the Arkansas state court, brought after the conviction had been affirmed on direct appeal, *id.* at 2461–62. The Supreme Court specifically held that the new rule it announced applied not only to the defendant on direct appeal in *Miller*, but also to the defendant in *Jackson* on collateral review. *See id.* at 2463, 2475; *State v. Ragland*, 836 N.W.2d 107, 116 (Iowa 2013). The Court considered both cases together, applied its reasoning and holding to both cases, and specifically held that the defendant in *Jackson* should be given an individualized sentencing hearing. *See Miller*, 132 S.Ct. at 2468–69; *see also Jackson v. Norris*, 2013 Ark. 175, at *1–2, 426 S.W.3d 906, 907–08, 2013 WL 1773087 (2013) (remanding for resentencing in accordance with *Miller*). "There would have been no reason for the Court to direct such an outcome if it did not view the *Miller* rule as applying retroactively to cases on collateral review." *Ragland*, 836 N.W.2d at 116. Further, in *Teague v. Lane*, the Supreme Court stated that "once a new rule is applied to the defendant in the case announcing the rule, even-handed justice requires that it be applied retroactively to all who are similarly situated." 489 U.S. 288, 300, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). This principle further supports the proposition that the Court's own application of the *Miller* rule to a case on collateral review indicates that the Court considered the rule to be retroactive.

Given the Supreme Court's action in *Miller*, we conclude that Simpson has

---

**2.** There is disagreement among federal and state courts about whether *Miller* has been made retroactive to cases on collateral review. *Compare Johnson v. United States*, 720 F.3d 720, 721 (8th Cir.2013) (granting a motion for leave to file a successive § 2255 petition based on *Miller*), *State v. Ragland*, 836 N.W.2d 107, 116 (Iowa 2013) (holding that *Miller* is retroactive), *Jones v. Mississippi*, 122 So.3d 698, 703 (Miss.2013) (same), *and State v. Simmons*, 2011–1810 (La.10/12/12), 99 So.3d 28 (applying *Miller* retroactively), *with In re Morgan*, 713 F.3d 1365, 1368 (11th Cir.2013) (holding that *Miller* is not retroactive), *and Craig v. Cain*, No. 12–30035, 2013 WL 69128, at *2 (5th Cir. Jan. 4, 2013) (same) (unpublished).

made a prima facie showing that his successive petition is based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable." § 2255(h)(2). This grant is, however, " 'tentative in the following sense: the district court must dismiss the motion that we have allowed the applicant to file, without reaching the merits of the motion, if the court finds that the movant has not satisfied the requirements for the filing of such a motion.' The district court then is the second 'gate' through which the petitioner must pass before the merits of his or her motion are heard." *Reyes–Requena,* 243 F.3d at 899 (quoting *Bennett,* 119 F.3d at 470); *see also In re Morris,* 328 F.3d 739, 741 (5th Cir.2003).

We accordingly GRANT Simpson's motion for authorization to file a successive § 2255 motion in the district court.

**Edith IHEGWORD, Plaintiff–Appellant,**

v.

**HARRIS COUNTY HOSPITAL DISTRICT, d/b/a Ben Taub General Hospital, d/b/a Lyndon Baines Johnson General Hospital, d/b/a Quentin Mease Community Hospital, d/b/a Various Community Health Centers, Defendant–Appellee.**

No. 13–20186
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Feb. 12, 2014.

Sufi Nasim Ahmad, Cline Ahmad, The Woodlands, TX, for Plaintiff–Appellant.

Bruce Stephen Powers, Houston, TX, for Defendant–Appellee.

Before STEWART, Chief Judge, and JOLLY and SOUTHWICK, Circuit Judges.

PER CURIAM: *

Plaintiff–Appellant Edith Ihegword brought suit under the Fair Labor Standards Act ("FLSA") against Defendant–Appellee Harris County Hospital District ("HCHD"). The district court granted summary judgment in favor of HCHD and dismissed Ihegword's claims with prejudice. We affirm.

## I.

Ihegword, who is Nigerian, began working as a nurse for Ben Taub Hospital in 1988 and in 2002, transferred to Quentin Mease Community Hospital ("Quentin") to work in the Geriatric Progressive Care Unit ("GPCU"). In 2006, Jimmie Anglin, an African–American female, became the Nurse Manager for the GPCU and consequently, became Ihegword's supervisor. On May 29, 2009, HCHD discharged Ihegword from her employment. HCHD cited as reasons for Ihegword's termination poor job performance, loss of confidence, and inability to get along with co-workers.

Ihegword ultimately brought suit in federal district court alleging: (1) discrimination on the basis of national origin in violation of VII of the Civil Rights Act of 1964

as amended; (2) discrimination on the basis of disability in violation of the Americans with Disabilities Act ("ADA"); (3) failure to pay overtime wages in violation of both the FLSA and Chapter 60 of the Texas Labor Code; and, (4) retaliation. HCHD filed for summary judgment as to all claims and the district court subsequently granted judgment in favor of HCHD. Ihegword only appeals the district court's ruling with respect to her claim for unpaid overtime wages in violation of the FLSA.

## II.

Ihegword contends that the district court erred in finding that she had failed to produce sufficient evidence for a jury to find that she performed uncompensated overtime work and that HCHD was aware that Ihegword had performed the uncompensated overtime work. We disagree.

This court reviews a district court's grant of summary judgment de novo. *Nat'l Cas. Co. v. W. World Ins. Co.*, 669 F.3d 608, 612 (5th Cir.2012) (citation omitted).

The FLSA mandates that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 441 (5th Cir.2005) (quoting 29 U.S.C. § 207(a)(1)).[1] "An employer who is armed

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1. 29 U.S.C. § 207(a)(1) provides:

Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek

with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation." *Id.* at 441 (alteration in original) (citations and internal quotation marks omitted). "[I]f the employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of § 207." *Id.* (alteration in original) (citation and internal quotation marks omitted).

"An employee bringing an action pursuant to the FLSA, based on unpaid overtime compensation, must first demonstrate that she has performed work for which she alleges she was not compensated." *Id.* (citing *Anderson v. Mount Clemens Pottery Co.,* 328 U.S. 680, 687–88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946)). An employee has met her requisite burden of proof if she proves that she has performed work for which she was improperly compensated and if she produces sufficient evidence to show the amount and extent of that work as a matter of "just and reasonable inference." *Id.* (citation omitted). "The burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to [negate] the reasonableness of the inference to be drawn from the employee's evidence." *Id.* (citation omitted). "If the employer fails to produce such evidence, the court may then award damages to the employee even though the result may only be approximate." *Id.* (citation omitted).

Ihegword asserts that while working for HCHD she was told by her supervisor, Anglin, that she was required to have her paperwork and filing completed before she left work each day. According to Ihegword, however, there were staffing shortages and nurses were often required to stay past their shift and work overtime to complete their job duties. For this reason, Ihegword was not always able to complete her paperwork by the end of her shift. Ihegword also claims that because she often worked as Charge Nurse, she had extra duties assigned to her in addition to her regular duties which made it even more difficult to complete all of her duties before the end of the work day. As a result, Ihegword asserts that she often worked in excess of forty hours during a seven-day workweek.

Additionally, however, Ihegword claims that HCHD management stated during employee meetings that it discouraged overtime and required approval before nurses were allowed to work overtime hours. Management approved overtime for certain types of work such as meetings and training and generally, overtime of less than one hour. According to Ihegword though, Anglin instructed nurses who needed to work more than an hour of overtime to clock out and then complete their work, resulting in many hours of uncompensated overtime. Ihegword avers that she began keeping a detailed log of her uncompensated overtime hours and stored the log in her locker but was never permitted to retrieve her personal belongings from her locker after she was terminated. Consequently, Ihegword estimates from memory alone that she worked approximately twelve hours of uncompensated overtime a week, or four hours at the end of each twelve-hour shift, typically working three shifts a week.

---

longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

In response to Ihegword's argument, HCHD points to Ihegword's written declaration in opposition to its motion for summary judgment wherein Ihegword claims that she was instructed to clock out before completing her work and often worked approximately four hours of overtime after each shift, or twelve hours a week, and that she was paid for some but not all of her overtime work. HCHD then points to Ihegword's deposition testimony wherein she claimed not to remember how often she worked overtime and that on the days she remembers working overtime, it could have been "three or two or one" hours. Additionally, in her deposition, Ihegword stated that she tried "as much as possible not to show in [her time card reports] the extent that [she worked overtime]" after clocking out. Moreover HCHD points to the time card reports contained in the record which reflect that Ihegword's regularly scheduled workweek was usually *less* than forty hours per week and on a number of occasions, was less than thirty hours per week. In conclusion, HCHD argues that Ihegword failed to produce sufficient evidence of uncompensated overtime or evidence that HCHD knew she performed overtime work for which she was not paid.

In his memorandum opinion and order, the district judge noted the contradictions in Ihegword's deposition testimony and her written declaration. The district judge also cited to the declaration of Ihegword's co-worker Sheila Carter, who stated that she and Ihegword rarely worked past their normal workday shifts, however, when they did so, it was on, and not off, the clock. Another co-worker testified that she worked the shift following Ihegword's and only occasionally would Ihegword stay past her scheduled shift into the following shift. The district judge then looked to the time card reports evidencing that Ihegword rarely worked an entire forty-hour work week, a prerequisite be-fore an employee could begin working overtime, and reasoned that the reports "soundly refuted" her allegations of clocking out and continuing to perform uncompensated overtime work. Moreover, the district judge noted the complete lack of evidence, other than Ihegword's unsubstantiated assertions speculated from memory, to prove that she actually worked overtime for which she was not compensated. Finally, the district judge pointed to Ihegword's failure to produce sufficient evidence that anyone at HCHD knew of the alleged uncompensated overtime Ihegword claimed to have worked each week. Consequently, the district judge held that Ihegword failed to raise a genuine issue of material fact that HCHD permitted her to work overtime hours for which she was not paid. We agree. As noted by the district judge, "an unsubstantiated and speculative estimate of uncompensated overtime does not constitute evidence sufficient to show the amount and extent of that work as a matter of just and reasonable inference." *Ihegword v. Harris Cnty. Hosp. Dist.*, 929 F.Supp.2d 635, 668 (S.D.Tex.2013) (citing *Harvill*, 433 F.3d at 441); *see also* 29 U.S.C. § 207(a)(1). Accordingly, we hold that the district court did not err in granting summary judgment in favor of HCHD.

### III.

After considering the parties' arguments as briefed on appeal, and after reviewing the record, the applicable statutory and case law, and the district court's judgment and reasoning, we AFFIRM the district court's summary judgment in favor of Defendant–Appellee Harris County Hospital District and adopt its analysis in full.

UNITED STATES of America,
Plaintiff–Appellee

v.

Omar CORREA–HUERTA,
Defendant–Appellant.

No. 13–10454
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Feb. 12, 2014.

James Wesley Hendrix, Assistant U.S. Attorney, U.S. Attorney's Office, Dallas, TX, for Plaintiff–Appellee.

Kevin Joel Page, Federal Public Defender's Office, Dallas, TX, William Ernest Hermesmeyer, Assistant Federal Public Defender, Federal Public Defender's Office, Fort Worth, TX, for Defendant–Appellant.

Before BARKSDALE, HAYNES, and HIGGINSON, Circuit Judges.

PER CURIAM: *

Omar Correa–Huerta challenges the 71–month sentence imposed following his guilty-plea conviction for illegal reentry (2008) following deportation (2007). Cor-

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR R. 47.5.4.

rea contends his sentence is substantively unreasonable because it is the product of provisions in the advisory Sentencing Guidelines that lead to unwarranted sentencing outcomes.

Specifically, he disagrees with the application of certain Guidelines provisions, which increase defendant's criminal-history category for prior sentences imposed within ten years of the commencement of defendant's instant offense. *See* U.S.S.G. §§ 4A1.1, cmt. 2 (Criminal History Category), 4A1.2(e)(2) (Definitions and Instructions for Computing Criminal History). Correa maintains his six-month sentence from 23 February 1998, for a controlled-substance offense, would not have resulted in the imposition of criminal-history points had the ten-year period been measured from the date of sentencing on the instant offense (April 2013) rather than from the date of his illegal reentry (2008). According to Correa, it is irrational to subject illegal-reentry defendants who live in the United States without incident—as he claims he did from 2008 to 2012—to a longer look-back period than those who engage immediately in criminal activity upon their return to the United States.

Although post-*Booker*, the Guidelines are advisory only, and a properly preserved objection to an ultimate sentence is reviewed for reasonableness under an abuse-of-discretion standard, the district court must still properly calculate the Guideline-sentencing range for use in deciding on the sentence to impose. *Gall v. United States*, 552 U.S. 38, 48–51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). In that respect, for issues preserved in the district court, its application of the Guidelines is reviewed *de novo;* its factual findings, only for clear error. *E.g., United States v. Cisneros–Gutierrez,* 517 F.3d 751, 764 (5th Cir.2008); *United States v. Villegas,* 404 F.3d 355, 359 (5th Cir.2005). Correa does

not claim procedural error; he maintains only that his sentence is substantively unreasonable.

He did not, however, *object* to his sentence in district court; rather, he requested a lesser sentence than ultimately imposed. As he concedes, under this court's precedent, his failure to object results in only plain-error review. *See United States v. Peltier,* 505 F.3d 389, 391–92 (5th Cir. 2007). Correa notes, however, the circuits are divided on whether defendant must object specifically to his sentence to preserve error, and he wishes to preserve the issue for possible further review.

Under the plain-error standard, Correa must show a clear or obvious forfeited error that affected his substantial rights. *See Puckett v. United States,* 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009). Even if he shows such reversible plain error, we have the discretion to correct the error, but should do so only if it seriously affects the fairness, integrity, or public reputation of the proceedings. *See id.* Correa's challenge to his sentence based on the calculation of his criminal history category fails.

■ "Where a deported alien enters the United States and remains here with the knowledge that his entry is illegal, his remaining here until he is 'found' is a continuing offense". *United States v. Santana–Castellano,* 74 F.3d 593, 598 (5th Cir. 1996) (citation omitted). In a recent unpublished opinion, a panel of this court upheld a sentence for illegal reentry under similar facts. *United States v. Munoz–Garcia,* 533 Fed.Appx. 364, 366 (5th Cir. 2013) (citing *Santana–Castellano* in upholding sentence under *de novo* review where appellant contended date of arrest, rather than reentry six years earlier, made application of enhancement improper). Although *Munoz–Garcia* is not precedential, we find its reasoning persuasive and directly on point.

"A discretionary sentence imposed within a properly calculated guidelines range is presumptively reasonable." *United States v. Campos–Maldonado,* 531 F.3d 337, 338 (5th Cir.2008) (citations omitted). Correa can rebut the presumption of reasonableness by "showing that the sentence does not account for a factor that should receive significant weight, it gives significant weight to an irrelevant or improper factor, or it represents a clear error of judgment in balancing sentencing factors". *United States v. Cooks,* 589 F.3d 173, 186 (5th Cir.2009) (citation omitted). His disagreement with the assignment of criminal-history points for prior convictions is insufficient to demonstrate that the within-Guidelines sentence was substantively unreasonable; restated, the district court did not plainly err in imposing it. *See, e.g., United States v. Gomez–Herrera,* 523 F.3d 554, 565–66 (5th Cir.2008); *United States v. Rodriguez,* 523 F.3d 519, 526 (5th Cir.2008).

AFFIRMED.

**ATLANTIC SOUNDING COMPANY, INCORPORATED, and Weeks Marine, Incorporated, Plaintiffs–Appellees,**

v.

**Maurice FENDLASON, Defendant–Appellant.**

No. 13–30885

**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Feb. 14, 2014.

Matthew Francis Popp, Waits, Emmett & Popp, L.L.C., New Orleans, LA, for Plaintiffs–Appellees.

David Christopher Whitmore, Esq., Lawrence Blake Jones, Esq., Senior Attorney, Scheuermann & Jones, L.L.C., New Orleans, LA, for Defendant–Appellant.

Before DAVIS, SOUTHWICK, and HIGGINSON, Circuit Judges.

PER CURIAM: *

This is an appeal from the dismissal with prejudice of litigation between a maritime employer and its injured employee. As discussed in detail below, the employee failed to attend several discovery proceedings and a hearing before the district court. For the reasons that follow, we affirm the dismissal.

## I.

In May 2012, Plaintiffs, Atlantic Sounding Co., Inc., and Weeks Marine, Inc., ("Plaintiffs," collectively) filed a declaratory judgment action seeking a declaration that they did not owe Maurice Fendlason, an injured seaman-employee, maintenance and cure benefits. Fendlason filed an Answer and counterclaim against Plaintiffs seeking damages for negligence or unseaworthiness, as well as maintenance and cure.

Beginning in the fall of 2012, Fendlason repeatedly failed to appear for various proceedings, and failed to comply with district court orders. On October 10, 2012, Fendlason did not attend a scheduled deposition. On November 28, 2012, the district court granted a Motion to Withdraw filed by counsel for Fendlason, who claimed that Fendlason had not only failed to attend his deposition, but had also failed to attend meetings with him and to return counsel's phone calls. The motion by counsel included Fendlason's current address and telephone number. The district court also ordered Fendlason to enroll new counsel of record or notify the court of his intention to proceed *pro se* within 30 days. Fendlason failed to take action in response to the Order. On December 5, 2012, Fendlason was again absent at a deposition despite having been served with a subpoena to appear.

On January 9, 2013, Plaintiffs filed a motion to dismiss the action under Rule 37 of the Federal Rules of Civil Procedure due to Fendlason's failure to attend the October and December depositions, or alternatively for failure to prosecute. Service of the motion was completed on January 11, 2013, at Fendlason's mother's residency using the address provided by Fendlason's counsel. A hearing was scheduled on Plaintiffs' motion to dismiss for January 30, 2013. On January 28, 2013, the district court entered an order (the "Show Cause Order") which continued the hearing on the motion to dismiss until February 22, and also ordered Fendlason to "show cause why the Court should not dismiss the ... action with prejudice for failure to prosecute or, alternatively, as a sanction for failure to attend his deposition or abide by this Court's order issued on November 28, 2012." On February 3, 2013, the Plaintiffs served the Show Cause Order at the address provided in the motion to withdraw. Despite proper service and notice, Fendlason failed to appear for the hearing on Plaintiffs' motion to dismiss and Show Cause Order on February 22, 2013. As a result, the district court granted Plaintiffs' motion and issued an order dismissing the action with prejudice.

On March 4, 2013, after the dismissal, Fendlason filed an ex parte motion to enroll new counsel of record. On March 21, 2013, Fendlason, through his new attorney, subsequently filed a motion for reconsideration of the district court order dismissing

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

the action with prejudice, which the district court denied. Fendlason appeals.

## II.

We review the district court's imposition of sanctions for an abuse of discretion.[1] The district court's factual findings underlying the imposition of sanctions are reviewed for clear error.[2] Dismissal with prejudice is the "severest sanction possible," [3] and we affirm such a dismissal only if: "(1) there is a 'clear record of delay or contumacious conduct by the plaintiff,' and (2)'lesser sanctions would not serve the best interests of justice.'" [4] "[D]ismissal with prejudice is a more appropriate sanction when the objectionable conduct is that of the client, and not the attorney." [5]

## III.

On appeal, Fendlason argues that the district court abused its discretion when it dismissed the action with prejudice because it failed to consider alternative lesser sanctions. Fendlason contends that the district court could have entered an order for Fendlason to appear for his deposition under threat of dismissal.

This court "normally only affirms the sanction of dismissal with prejudice where the district court has also found that 'lesser sanctions would not serve the best interests of justice.'" [6] However, this court has also recognized that a district court may "implicitly reject[ ]" lesser sanctions as inappropriate when it determines that dismissal was the only effective option.[7]

Here, the district court dismissed the action because of Fendlason's repeated failure to attend properly noticed depositions and comply with court orders. This conduct is directly attributable to Fendlason, and not his attorney, as it took place both before and after his original counsel withdrew from representation. In addition, Fendlason's failure to act was one of the reasons that drove original counsel to withdraw, as discussed above.

We find that the district court did not abuse its discretion when it dismissed the instant action with prejudice. Fendlason's lack of action shows a "clear record of delay or contumacious conduct" [8] sufficient to warrant dismissal. In addition, our cases "have recognized that advance warnings of possible default mitigate the requirement that the district court consider lesser sanctions." [9] Fendlason had at least two warnings that dismissal was possible in this case. The first came on January 9, 2013, when the Plaintiffs filed their Motion

---

1. *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 76 (5th Cir.2011) (citation omitted).

2. *Id.*

3. *Brinkmann v. Dallas Cnty. Deputy Sheriff Abner*, 813 F.2d 744, 749 (5th Cir.1987).

4. *Brown*, 664 F.3d at 77 (citing *Sturgeon v. Airborne Freight Corp.*, 778 F.2d 1154, 1159 (5th Cir.1985)).

5. *Brown*, 664 F.3d at 77 (citation omitted).

6. *Imperial ED Promotions, L.L.C. v. Pacquiao*, 13–40448, 549 Fed.Appx. 295, 2013 WL 6660478 (5th Cir. Dec. 18, 2013) (citing *Brown*, 664 F.3d at 77).

7. *Brown*, 664 F.3d at 79.

8. *Id.* at 77 (citation omitted).

9. *Pacquiao*, 549 Fed.Appx. 295, 2013 WL 6660478 (citing *Ramsay v. Bailey*, 531 F.2d 706, 709 n. 2 (5th Cir.1976) (because "plaintiff was fully and repeatedly apprised of the possible imposition of the ... sanction [of dismissal]" the district court need not consider "possible alternative sanctions"); *Diaz v. S. Drilling Corp.*, 427 F.2d 1118, 1127 (5th Cir. 1970) ("Thus the default judgment was a foreseeable and appropriate response to [plaintiff's actions], and we hold that the trial court did not abuse its discretion in ordering it.")).

to Dismiss. The second, stronger warning occurred on January 28, 2013, when the district court issued its Show Cause Order in which it made clear that dismissal was imminent should Fendlason fail to appear before the court on February 22, 2013. Fendlason avers that a lesser sanction, such as requiring attendance at a deposition with the threat of dismissal, should have been considered by the district court. However, the Show Cause Order offered an identical threat—attend or have your case dismissed—and Fendlason failed to appear. The district court was not required to repeat the same warning. The district court did not abuse its discretion when, after adequate warning, it dismissed the action with prejudice.

## IV.

For the above reasons, we AFFIRM the district court's dismissal with prejudice.

**UNITED STATES of America,**
**Plaintiff–Appellee**

v.

**Geary Mohammed MILLS,**
**Defendant–Appellant.**

**No. 13–40510.**

United States Court of Appeals,
Fifth Circuit.

Feb. 14, 2014.

382

Daniel Steven Goodman, U.S. Department of Justice, Washington, DC, Traci Lynne Kenner, Assistant U.S. Attorney, U.S. Attorney's Office, Tyler, TX, Ernest Gonzalez, Assistant U.S. Attorney, U.S. Attorney's Office, Plano, TX, for Plaintiff–Appellee.

Gary Alan Udashen, Sorrels, Udashen & Anton, Dallas, TX, for Defendant–Appellant.

Before JONES, ELROD, and HAYNES, Circuit Judges.

PER CURIAM: *

A jury convicted Geary Mohammed Mills of conspiring to possess with the intent to distribute 210 grams or more of a substance containing a detectable amount of "Ecstasy," in violation of 21 U.S.C. §§ 841(a)(1), 846 and possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). The district court sentenced Mills to 248 months of imprisonment. Mills appeals his conviction and sentence. We AFFIRM.

## I. Background

Law enforcement officers arrested Mills without a warrant after codefendant La-

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR R. 47.5.4.

mon Donnell—who had been recently arrested as a part of an extensive Ecstasy trafficking investigation—provided incriminating information about Mills and called Mills to set up a purported drug transaction. From their investigation, officers knew that Donnell distributed Ecstasy to numerous individuals, although they did not have any prior information on Mills. When Mills arrived at the agreed-upon location in the car predicted by Donnell, officers arrested him. A search of Mills's person revealed a 9–millimeter handgun in his waistband, and a search of his car revealed approximately $20,000 and ammunition for the handgun. According to officers, Mills then waived his *Miranda* rights and confessed that he was there to purchase Ecstasy from Donnell.

A federal grand jury indicted Mills and ten other individuals on one count of conspiring to possess with the intent to distribute 210 grams or more of a substance containing a detectable amount of Ecstasy in violation of 21 U.S.C. §§ 841(a)(1), 846. The indictment further alleged that Mills knowingly possessed a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). Mills was the only defendant charged with the firearm possession count. Mills pleaded not guilty, while his codefendants pleaded guilty. Prior to trial, Mills filed a motion to suppress his confession and the evidence discovered at the time of his arrest on the ground that they were the fruit of a warrantless arrest made without probable cause. The district court denied the motion.

At trial, numerous individuals testified regarding Mills's participation in the Ecstasy trafficking conspiracy. Donnell testified that in October 2009, he received a shipment of approximately 300,000 tablets of Ecstasy from a Canadian supplier.

Donnell also testified that in December 2009, the owner of Club Iniquity introduced Mills to Donnell so that Mills could supply Ecstasy for the club's patrons. After an initial meeting, Mills began buying Ecstasy from Donnell. This continued on a weekly basis for approximately three months, up until the night when the two were arrested. Donnell estimated that he sold approximately 120,000 tablets of Ecstasy to Mills. While testimony revealed that Mills's resale of the Ecstasy occurred independently of the other codefendants, codefendant Charles Duffy testified that Mills would sometimes come over to Donnell's house, where Donnell's large shipment of Ecstasy was stored, and that they would count Ecstasy tablets together. Codefendants Chris Brown, Josh Willsie, Jeremiah Sala, and Chrystopher Persheff testified that they met Mills at Donnell's house under similar circumstances. The codefendants further testified that Mills was Donnell's largest seller of Ecstasy. There was also testimony from law enforcement regarding the night of Mills's arrest and from individuals who stated that Mills had talked to them while in jail about his Ecstasy distribution activities.

The jury found Mills guilty of both counts of the indictment. Mills filed a timely post-trial motion for judgment of acquittal, which the district court denied. Mills also filed a motion for a new trial based on "newly discovered evidence" (Donnell's unsuccessful motion to withdraw his guilty plea), which the district court likewise denied. The district court sentenced Mills to 188 months of imprisonment for the conspiracy count and 60 consecutive months of imprisonment for the firearm count. Mills timely appealed.

## II. Discussion

### A. *Mills's Motion to Suppress*

Mills contends that officers lacked probable cause to arrest him because their

knowledge regarding him came from Donnell, a first time informant. He therefore argues that the district court erred in denying his motion to suppress the evidence obtained as the fruit of his arrest. When reviewing the district court's denial of Mills's motion to suppress, we review legal issues *de novo* and findings of fact for clear error, viewing all evidence in the light most favorable to the Government. *United States v. Powell*, 732 F.3d 361, 369 (5th Cir.2013). We may affirm the district court on any basis established by the record. *Id.*

If a warrantless arrest is not based on probable cause, the evidence discovered as a result of the arrest is subject to suppression as the " 'fruit' of an illegal arrest." *United States v. Wadley*, 59 F.3d 510, 512 (5th Cir.1995). Probable cause exists when the totality of the facts and circumstances are sufficient for a reasonable person to conclude that the suspect committed an offense or was in the process of committing an offense. *United States v. Ochoa*, 667 F.3d 643, 649 (5th Cir.2012). It is a "fair probability" determination, which requires more than a bare suspicion but less than a preponderance of the evidence. *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir.1999). Where, as here, an informant's tip is used to supply probable cause, the informant's veracity and basis of knowledge should be considered within the totality of the circumstances; although, a deficiency in either may be compensated for by a strong showing as to the other, or by other indicia of reliability. *See Illinois v. Gates*, 462 U.S. 213, 233, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *cf. United States v. Delario*, 912 F.2d 766, 768 (5th Cir.1990) ("[P]rior performance [of an informant] is not the only indicia of reliability.").

■ We have reviewed the evidence presented to the district court regarding

Donnell, the basis for his knowledge, corroboration of his information, and other indicia of reliability the officers had. We conclude that the totality of the facts and circumstances within the officers' knowledge was sufficient for a reasonable person to believe that Mills was in the process of committing a drug trafficking offense. *See Ochoa*, 667 F.3d at 649. The evidence obtained pursuant to Mills's arrest was not subject to suppression.

### B. Evidence of Other Drugs

At trial, a DEA agent and a detective testified about the search of Donnell's stash house, where they found Ecstasy, methamphetamine, and cocaine. The Government then offered exhibits of the drugs and drug paraphernalia found at the house and testimony from Donnell about selling methamphetamine and cocaine. Mills's counsel did not object to the testimony, and he affirmatively stated that he had no objection to the admission of the exhibits; he also elicited information about these drugs through cross-examination and used this evidence in closing arguments to argue against Donnell's credibility.

Mills now argues that the district court erred in allowing admission of the testimony and evidence of other drugs. Because he affirmatively stated at trial that he had no objection and then used the testimony and evidence to his benefit, his argument now is arguably waived. *See United States v. Andino–Ortega*, 608 F.3d 305, 308 (5th Cir.2010) ("A waiver occurs by an affirmative choice by the defendant to forego any remedy available to him, presumably for real or perceived benefits resulting from the waiver." (citation and internal quotation marks omitted)). Even if we were to conclude that the error was only forfeited, review would be for plain error. *See United States v. Garcia*, 567 F.3d 721, 726 (5th Cir.2009). Because

Mills has not satisfied "*his* burden of demonstrating the requisite prejudice," he has failed to show plain error warranting reversal. *See id.* at 726–27.

## C. *Sufficiency of the Evidence to Support Mills's Conspiracy Conviction*

■ In the district court, Mills filed a timely post-trial motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(c), arguing that there was insufficient evidence to sustain a conspiracy conviction against him and, alternatively, that the evidence demonstrated at most multiple conspiracies. Mills reasserts both arguments on appeal. Since Mills raised these issues before the district court, we consider them *de novo. See United States v. Thomas,* 690 F.3d 358, 366 (5th Cir.), *cert. denied,* —— U.S. ——, 133 S.Ct. 673, 184 L.Ed.2d 477 (2012).

When reviewing the sufficiency of evidence underlying a conviction, we consider whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also Thomas,* 690 F.3d at 366. Likewise, when reviewing the sufficiency of the evidence to support a single-conspiracy finding, the analysis is whether "the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt." *United States v. Mitchell,* 484 F.3d 762, 769 (5th Cir.2007) (quoting *United States v. Morris,* 46 F.3d 410, 415 (5th Cir.1995)) (internal quotation marks omitted).

The elements of a conspiracy under 21 U.S.C. § 846 are "(1) an agreement existed between two or more persons to violate federal narcotics law, (2) the defendant

knew of the existence of the agreement, and (3) the defendant voluntarily participated in the conspiracy." *Thomas,* 690 F.3d at 366 (quoting *Ochoa,* 667 F.3d at 648) (internal quotation marks omitted). The essence of the crime of conspiracy is the agreement to commit an unlawful act. *Iannelli v. United States,* 420 U.S. 770, 777, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). The agreement need not be explicit, but can inferred from the facts and circumstances of the case. *Id.* at 777 n. 10, 95 S.Ct. 1284.

When viewed in the light most favorable to the Government, the extensive evidence presented at trial would allow a rational trier of fact to find beyond a reasonable doubt that Mills knowingly participated in a conspiracy to distribute drugs. *See, e.g., Thomas,* 690 F.3d at 366; *United States v. Delgado,* 672 F.3d 320, 334 (5th Cir.) (en banc) (noting that a large quantity of drugs can serve as evidence of a conspiracy), *cert. denied,* —— U.S. ——, 133 S.Ct. 525, 184 L.Ed.2d 339 (2012); *United States v. Olguin,* 643 F.3d 384, 394 (5th Cir.2011).

In addition, contrary to Mills's primary argument, the evidence as a whole demonstrates that the relationship between Donnell and Mills went well beyond that of a "single buy-sell agreement." *Delgado,* 672 F.3d at 333. The jury could readily infer that their transactions were agreed upon, regular, and over multiple months, having ended only at the instance of their arrest. *Cf. Thomas,* 690 F.3d at 366 (observing that an indication of an ongoing, mutually dependent relationship can be evidence of membership in a conspiracy). As in *Delgado,* Mills's argument in this regard "misunderstands the scope of the so-called 'buyer-seller exception' in this circuit and ignores substantial evidence." 672 F.3d at 333. The evidence against Mills supports a finding that he was a distributor of

drugs, not a mere acquirer or street-level user for which the rule was intended. *Id.*

Mills alternatively contends that the evidence was insufficient to prove the single conspiracy charged in the indictment and, at most, the evidence demonstrated two separate conspiracies: a two-man conspiracy involving Donnell and Mills, and a multi-party conspiracy involving Donnell, Duffy, and the other codefendants. To determine whether the evidence supports a single-conspiracy finding, we look to: "(1) the existence of a common goal or purpose; (2) the nature of the scheme; and (3) overlapping participants in various dealings." *United States v. Franklin,* 561 F.3d 398, 402 (5th Cir.2009) (citation and internal quotation marks omitted). "This does not require that the participants in the conspiracy know the other participants, nor that each participate in every conspiracy action." *Id.*

This court has "adopted an expansive notion of a 'common purpose.'" *Morris,* 46 F.3d at 415. Here, the evidence is sufficient to allow a jury to find that the defendants shared the common purpose to distribute Donnell's large shipment of Ecstasy for profit. *See, e.g., Olguin,* 643 F.3d at 394 (common purpose to "distribut[e] drugs in the Dallas/Fort Worth area"); *Mitchell,* 484 F.3d at 770 (common purpose "to derive personal gain from the sale of crack cocaine in Paris[, Texas]"); *Morris,* 46 F.3d at 415 (common purpose "to derive personal gain from the illicit business of buying and selling cocaine").

For the nature-of-the-scheme factor, the inquiry is whether "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect or to the overall success of the venture." *Mitchell,* 484 F.3d at 770 (quoting *Morris,* 46 F.3d at 416) (internal quotation marks omitted). In this case, although Mills did not jointly sell drugs with the other sellers, each participant in the conspiracy was aware of the others' involvement, with each aiding in the larger plan of distributing Donnell's large shipment of Ecstasy. *See Morris,* 46 F.3d at 416.

The third factor examines the interrelationships among the participants in the conspiracy. *Mitchell,* 484 F.3d at 770. Sufficient interrelationships are shown where participants conspire with a pivotal member to carry out a common goal. *See id.* (citing *Morris,* 46 F.3d at 416). In this case, Donnell was that pivotal member with whom the other participants conspired.

In light of the foregoing, we conclude that the evidence was sufficient to allow reasonable jurors to find beyond a reasonable doubt that Mills knowingly participated in the single conspiracy charged in the indictment.[1]

### D. Mills's Motion for a New Trial

■ After Mills's trial, codefendant Donnell filed a *pro se* motion to withdraw his guilty plea. In turn, Mills filed a motion for a new trial, arguing that Donnell's motion constituted newly discovered evidence that would likely result in an acquittal if his case were retried. The district judge denied Donnell's motion to withdraw his guilty plea because "he did not allege sufficient facts which, if proven, would entitle him to the relief he requested." Thereafter, the same district judge denied Mills's motion for a new trial, finding Mills's argument moot in light of the court's denial of Donnell's motion to withdraw his guilty plea. On appeal, Mills argues that the district court abused its

---

1. We do not reach Mills's venue argument because it is contingent on us finding that the evidence was insufficient to support the single conspiracy charged in the indictment.

discretion in denying his motion for a new trial.

Federal Rule of Criminal Procedure 33 allows a district court to grant a new trial "if the interest of justice so requires." FED.R.CRIM.P. 33(a). To receive a new trial based on newly discovered evidence, a defendant must demonstrate the following:

> (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence introduced at a new trial would probably produce an acquittal.

*United States v. Ebron,* 683 F.3d 105, 157–58 (5th Cir.2012) (citations and internal quotation marks omitted), *cert. denied,* —— U.S. ——, 134 S.Ct. 512, 187 L.Ed.2d 365 (2013). We review a district court's denial of a motion for a new trial based on newly discovered evidence for abuse of discretion. *Id.* at 157.

Mills describes Donnell's Motion as a "recantation of his guilty plea." However, Donnell did not recant either his statements underlying his guilty plea or his testimony at Mills's trial.[2] He instead requested that he be allowed to withdraw his guilty plea because he believed he received ineffective assistance of counsel; the gist of his motion is that his attorney did not give due consideration to his various legal theories.[3] The motion is not traditional recantation evidence, as it is not a statement by a witness that his prior testimony was false. *See, e.g., United States v. Gresham,* 118 F.3d 258, 267 (5th Cir.1997); *United States v. Nixon,* 881 F.2d 1305, 1311 (5th Cir.1989); *United States v. Adi,* 759 F.2d 404, 408 (5th Cir.1985). The motion also does not draw into question Donnell's honesty or credibility as a witness. It therefore is not newly discovered evidence relevant to Mills's guilt or innocence. What is more, Mills clearly fails to demonstrate that the purported evidence is material and that it would probably produce an acquittal. The district court did not abuse its discretion in denying the motion for new trial.

## E. Mills's Sentence

We review sentencing decisions for reasonableness under an abuse-of-discretion standard of review. *Gall v. United States,* 552 U.S. 38, 46, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). We employ a bifurcated review process, first ensuring that "the district court committed no significant procedural error, such as failing to calculate (or

---

**2.** Although Mills seeks a new trial based on Donnell's motion, the parties do not cite to the motion, and it is not included in the record on appeal. We take judicial notice of the motion since it is a public record of the district court, which was before the district judge in deciding Mills's motion for a new trial. *See ITT Rayonier Inc. v. United States,* 651 F.2d 343, 345 n. 2 (5th Cir. Unit B July 1981); *cf. NCNB Tex. Nat'l Bank v. Johnson,* 11 F.3d 1260, 1263 n. 2 (5th Cir.1994) (taking judicial notice of documents in the record of a companion case). Furthermore, the parties had access to the motion and referred to it in their briefs, and neither party objected to our taking judicial notice when we raised the issue at oral argument.

**3.** Donnell stated that "counsel constantly refuse[d] to give [him] answers to the many different aspects of his innocence, rights and defenses guaranteed under Uniform Commercial Code(s), common law, common equity law, laws of admiralty, and commercial liens and levies." Donnell further stated that counsel "would act dumfounded when [he would] assert his innocence to the fact that there can be no violation of any of these laws unless there is a victim consisting of a natural flesh and blood man or woman who has been injured."

improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.* at 51, 128 S.Ct. 586. If no procedural error is found, we then consider the substantive reasonableness of the sentence. *Id.*

The district court calculated Mills's base offense level by attributing to him at least 120,000 tablets of Ecstasy. Mills argues that this was procedurally unreasonable because the amount of drugs was based primarily on Donnell's testimony, which he believes "was wholly without *any* indicia of trustworthiness or reliability." When making the factual finding of the amount of drugs involved in a drug trafficking offense, "the district judge may consider any information that has 'sufficient indicia of reliability to support its probable accuracy,' including a probation officer's testimony, a policeman's approximation of unrecovered drugs, and even hearsay." *United States v. Huskey,* 137 F.3d 283, 291 (5th Cir.1998) (quoting U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 6A1.3). "The district court has broad discretion in considering the reliability of the submitted information regarding the quantities of drugs involved. Such credibility determinations rest within the province of the trier-of-fact." *Huskey,* 137 F.3d at 291 (citations and internal quotation marks omitted). We find no procedural error in the district court's reliance on Donnell's testimony.

Mills further contends that his sentence is substantively unreasonable because he received a longer sentence than most of his coconspirators who pleaded guilty and cooperated with the Government. It is well settled that "a disparity of sentences among co-defendants does not, without more, constitute an abuse of discretion."

*United States v. Stalnaker,* 571 F.3d 428, 442 (5th Cir.2009) (citation and internal quotation marks omitted). "This is especially true when the co-defendants pled guilty and cooperated with the government. The sentences of such co-defendants are obviously the result of leniency. . . ." *United States v. Sparks,* 2 F.3d 574, 587 (5th Cir.1993) (citation and internal quotation marks omitted). Such is the case here.

 The record as a whole reveals that Mills is not similarly situated to his codefendants and that the disparity among their sentences is warranted by the Guidelines. *See United States v. Duhon,* 541 F.3d 391, 397 (5th Cir.2008) (disparity due to a defendant providing substantial assistance is warranted); *United States v. Candia,* 454 F.3d 468, 476 (5th Cir.2006) ("Congress intended that certain disparities be caused by application of the federal guidelines, and a sentencing disparity intended by Congress is not unwarranted." (citation and internal quotation marks omitted)). The record thus belies Mills's unsupported assertion that "[t]he only possible explanation" for the differences among the sentences is that the district court impermissibly punished him for exercising his constitutional right to a jury trial. Mills has not shown that his sentence is substantively unreasonable.

AFFIRMED.

UNITED STATES of America,
Plaintiff–Appellee

v.

Gerardo CASTILLO–CHAVEZ, also known as Cachetes, also known as Armando Garcia, Defendant–Appellant.

No. 12–41200.

United States Court of Appeals,
Fifth Circuit.

Feb. 14, 2014.

Kirby A. Heller, Esq., U.S. Department of Justice, Washington, DC, Renata Ann Gowie, Assistant U.S. Attorney, U.S. Attorney's Office, Southern District of Texas, Houston, TX, for Plaintiff–Appellee.

Roberto Balli, Attorney, Oscar A. Vela, Jr., Esq., Attorney, Law Office of Oscar A. Vela, Jr., P.C., Laredo, TX, for Defendant–Appellant.

Before JONES, ELROD, and HAYNES, Circuit Judges.

PER CURIAM: *

A jury convicted Defendant–Appellant Gerardo Castillo–Chavez ("Castillo") of conspiracy to possess cocaine and marijua-

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

na, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846 (Count 1); two counts of interstate and foreign travel in aid of a business enterprise involving controlled substances, in violation of the Travel Act, 18 U.S.C. § 1952(a)(2)(B) (Counts 28 and 33); and two counts of possessing and discharging a firearm in furtherance of a crime of violence and a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), (C)(i) (Counts 29 and 34). The district court sentenced Castillo to life imprisonment on Count 1, concurrent terms of 20 years of imprisonment on Counts 28 and 33, and a consecutive 40–year term of imprisonment on Count 34, to be followed by five years of supervised release.[1] Castillo appeals his conviction and sentence. We AF-FIRM.

### Factual and Procedural History

The Gulf Cartel, a drug trafficking organization, moves large quantities of cocaine and marijuana across the Mexican border into the United States. The enforcement arm of the Gulf Cartel, the Zetas, includes individuals known as "sicarios" (hired assassins). In the spring of 2006, Miguel Trevino, a high-ranking commander in the Zetas who operated in the Nuevo Laredo area, ordered a group of sicarios to kill Jesus "Chuy" Resendez ("Chuy Resendez"), a member of the rival Sinaloa Cartel. On March 18, 2006, a group of three sicarios arrived at an address in Laredo, where Chuy Resendez resided. After Gerardo Ramos, Chuy Resendez's nephew, informed the sicarios that his uncle was not home, the sicarios opened fire, wounding Ramos. On March 31, 2006, a group of sicarios again arrived at the same address in Laredo, and again the sicarios opened fire, this time wounding Julio Resendez, Chuy Resendez's

brother. On April 2, 2006, the sicarios located Chuy Resendez, and shot and killed him, as well as Chuy Resendez's other nephew, Mariano Resendez. The Government alleged that Castillo was a sicario involved in all three shootings and that the shootings were carried out in furtherance of the Gulf Cartel's drug trafficking enterprise.

Pertinent to this appeal, a grand jury indicted Castillo (under the name "Armando Garcia, a/k/a 'Cachetes' "), charging him with one drug conspiracy count (Count 1), one Travel Act count based on the April 2, 2006, shooting of Chuy Resendez and Mariano Resendez (Count 35), and one firearm count based on the April 2, 2006, shooting (Count 36). Two superseding indictments followed; the charges against Castillo remained the same.

Castillo first proceeded to trial on January 25, 2010. The Government argued that Castillo worked as a sicario for the Zetas and presented evidence that Castillo participated in the shooting deaths of Chuy Resendez and Mariano Resendez on April 2, 2006, and did so in furtherance of the Gulf Cartel's drug trafficking enterprise. Castillo did not dispute that a group of sicarios shot and killed Chuy Resendez and Mariano Resendez. Instead, Castillo argued that he was not a sicario and that he was not "Armando Garcia, a/k/a 'Cachetes.' " The jury acquitted Castillo of the firearm count (Count 36) and could not reach a verdict on the drug conspiracy count (Count 1) or the Travel Act count (Count 35).

The Third Superseding Indictment was filed on February 17, 2010. Counts 1, 35 (later dismissed), and 36 (later dismissed)

---

1. Pursuant to the Government's motion, the district court vacated Castillo's conviction on Count 29 at sentencing. Accordingly, we will not address it further.

remained as they were in the prior superseding indictment. The indictment included four new counts: one Travel Act count (Count 28) and one firearm count (Count 29) (later dismissed) based on the shooting of Ramos on March 18, 2006, and one Travel Act count (Count 33) and one firearm count (Count 34) based on the shooting of Julio Resendez on March 31, 2006.

Castillo filed, and the district court granted, a motion to dismiss the charge on which Castillo was acquitted at the first trial, the firearm count based on the April 2, 2006, shooting (Count 36). Pertinent here, Castillo's motion to dismiss Counts 1, 28, 33, and 34, based upon his argument that that the prosecution of those charges would violate the Double Jeopardy Clause, was denied. Castillo appealed, and we affirmed. *See United States v. Garcia,* 432 Fed.Appx. 365, 366 (5th Cir.2011) (unpublished).

The second trial commenced on January 17, 2012. The Government sought to prove that Castillo was part of a group of sicarios who, in furtherance of the Gulf Cartel's drug trafficking enterprise, participated in the shootings of Ramos on March 18, 2006, and Julio Resendez on March 31, 2006. To this end, over Castillo's objections, the Government presented the testimony of Castillo's co-conspirators.[2] Castillo moved for a judgment of acquittal after the Government rested its case and again after the close of all evidence. The district court denied both motions. Castillo was convicted and subsequently sentenced by the district court.

---

**2.** This evidence included: (1) Rosalio Reta's testimony that Castillo had participated in a grenade attack in Monterrey, Mexico; (2) Raul Jasso's testimony concerning statements made to the police by Gaby Cardona implicating Castillo; (3) Jasso and Reta's testimony regarding Castillo's role in the April 2, 2006, shootings of Chuy Resendez and Mariano Resendez; and (4) Mario Alvarado's testimony that he feared for his safety as a result of testifying against Castillo.

*Discussion*

Because Castillo timely objected to the district court's evidentiary rulings that he challenges on appeal, we review them for abuse of discretion. *See United States v. Diaz,* 637 F.3d 592, 599 (5th Cir.2011). If we find error, we must then decide whether the error was harmless. *Id.* We also review a district court's denial of a motion for a continuance and denial of a motion for a mistrial for abuse of discretion. *United States v. Stalnaker,* 571 F.3d 428, 439 (5th Cir.2009) (motion for continuance); *United States v. Valles,* 484 F.3d 745, 756 (5th Cir.2007) (motion for mistrial).

## 1. Evidentiary Rulings

### A. Grenade Attack Evidence

Castillo challenges the admission of evidence regarding a grenade attack in which he was allegedly involved. According to Reta's testimony, he and three other sicarios, including Castillo, went to El Punto Vivo Bar, in San Nicolas, Nuevo Leon, discharged their grenades and firearms, and killed four people. After the attack, the group went to a nearby gas station where a surveillance system captured video of the four men.

Castillo moved to exclude this evidence at trial and renews his arguments on appeal, asserting that: (1) under Rules 401 and 402, the grenade attack was irrelevant; (2) under Rule 403, the prejudicial effect of the evidence substantially outweighed its probative value; and (3) under Rule 404, the grenade attack was extrinsic, and thus improper character evidence, because it was not listed in the Third Superseding

Indictment.[3] With respect to the gas station surveillance video, Castillo argues that the evidence was improperly admitted because the video was not properly authenticated under Rule 901(a) and was disclosed to him only one week before trial, denying him due process.

■ The district court did not abuse its discretion in admitting evidence concerning the grenade attack. The central issue at trial was whether Castillo was a sicario for the Zetas, and the evidence concerning the grenade attack makes the fact that Castillo was a sicario more probable than it would be without this evidence. *See* FED.R.EVID. 401. Moreover, because Castillo's violent activities in furtherance of the conspiracy were at issue, the district court acted within its discretion in concluding that the evidence was not unfairly prejudicial. *See* FED.R.EVID. 403; *see also United States v. Baptiste*, 264 F.3d 578, 590 (5th Cir.2001) ("The argument for inadmissibility of the murders and attempted murders under [Rule] 403 because of their prejudicial effect is ... easily rejected.... Although the evidence of the murders and attempted murders was prejudicial, it was necessary for the jury to understand the brutal nature

of the conspiracy."), *withdrawn in non-relevant part*, 309 F.3d 274 (5th Cir.2002).

■ Turning to the Rule 404(b) argument, even assuming without deciding that the district court abused its discretion in ruling that the evidence was intrinsic and, therefore, outside the strictures of Rule 404(b), we conclude any such error is harmless. Under Rule 404(b), this evidence, even if extrinsic, could be admitted for the purpose of proving Castillo's knowledge of and intent to participate in the charged conspiracy. *See Diaz*, 637 F.3d at 599; *see also* FED.R.EVID. 404(b).

■ Further, a proper foundation existed for admitting the gas station surveillance tape. Because Reta had knowledge about the individuals and the gas station and explained that the video was an accurate depiction of the events, his testimony authenticated the video. *See* FED.R.EVID. 901(b). Also, the video was relevant because it made Castillo's presence in the area, and therefore participation in the conspiracy, more likely than not. FED.R.EVID. 401. Accordingly, the district court did not abuse its discretion in admitting the surveillance tape.[4] *See United States v. Isiwele*, 635 F.3d 196, 200 (5th Cir.2011) ("Once the proponent has made the requisite showing, the trial court

---

3. At the outset, we note that Castillo's argument that the evidence was extrinsic because it was not listed as an overt act in the indictment is meritless because the Government need not list its evidence in the indictment. *See United States v. Powers*, 168 F.3d 741, 749 (5th Cir.1999).

4. The district court's denial of Castillo's motion for a continuance to "verify" the accuracy of the surveillance video was also without error. Although the Government disclosed the video shortly before trial, the Government explained that it had requested the video from the Mexican gas station over two years prior to the trial, but had only received it the week prior to the trial and that the Government produced the video to Castillo the same day it

received it. Finding "good cause" for the late disclosure, and finding that steps to "verify" the video with the Mexican gas station could take another two years, the district court concluded that a continuance was not warranted. Castillo did not offer at trial, and does not offer now, any reason that a further investigation would reveal inaccuracies in the video. As a result, the district court did not abuse its discretion in denying the continuance. *See Stalnaker*, 571 F.3d at 439 ("If the challenged decision is neither arbitrary nor unreasonable, we must uphold the trial court's decision to deny the continuance, even when we consider the decision to be a harsh one." (citation and internal quotation marks omitted)).

should admit the exhibit ... in spite of any issues the opponent has raised about flaws in the authentication. Such flaws go to the weight of the evidence instead of its admissibility." (citation and internal quotation marks omitted)).

B. *Hearsay Challenge*

Castillo also maintains that the district court erred in admitting evidence from a witness, Jasso, regarding statements made by another sicario, Cardona. Jasso testified that Cardona had confessed to his participation in the conspiracy at issue here and had received a life sentence. Jasso also testified that Cardona had identified Castillo to the police as being a co-conspirator in connection with the investigation of the April 2 shooting. The district court overruled Castillo's hearsay objection to the first statement, but sustained his objection to the second. The district court also ordered that this second statement be stricken from the record and instructed the jury to disregard it. Castillo moved for a mistrial on Confrontation Clause grounds, which the district court denied.

■ We review a Confrontation Clause challenge *de novo*, subject to harmless error analysis. *United States v. Alvarado–Valdez,* 521 F.3d 337, 341 (5th Cir.2008). Jasso's testimony that Cardona confessed to his own participation, even if erroneously admitted, is harmless error as to Castillo.

■ Turning to the second statement, even assuming it constituted hearsay in violation of the Confrontation Clause, the district court did not abuse its discretion in denying the motion for mistrial because, when viewed in light of the evidence as a whole, the statement was not "so highly prejudicial that it would have had a substantial impact on the jurors' verdict." *See United States v. Delgado,* 672 F.3d

320, 340 (5th Cir.) (en banc) (citation and internal quotation marks omitted), *cert. denied,* —— U.S. ——, 133 S.Ct. 525, 184 L.Ed.2d 339 (2012). Jasso's testimony regarding Cardona's statement to the police that Castillo was involved in the April 2 shooting "did little more than repeat a fact of which the jury was already well aware." *See id.* Further, Castillo was not charged in connection with the April 2 shooting and any error was mitigated when the district court immediately sustained defense counsel's objection to Jasso's testimony and instructed the jury to disregard it. *See id.* Accordingly, the district court did not abuse its discretion in denying Castillo's motion for a mistrial.

C. *Prosecutor's Questions Concerning Witness's Fear*

Castillo argues that the prosecutor improperly elicited testimony from Alvarado regarding whether he had placed himself in danger by testifying. The district court overruled Castillo's objection and denied his motion for mistrial because there was nothing in the line of questioning that implied that Castillo would take action against the witness. Castillo also argues that the prosecutor's closing remarks were inappropriate to the extent they sought to bolster the credibility of the Government's witnesses by pointing out that they could face retribution from the Zetas and the Gulf Cartel on account of their testimony. The district court denied Castillo's motion for a mistrial based on these comments.

We review properly preserved allegations of prosecutorial misconduct in two steps. First, we determine, on *de novo* review, whether the prosecutor made an improper remark. *United States v. McCann,* 613 F.3d 486, 494 (5th Cir.2010). If an improper remark was made, we then must decide, under an abuse-of-discretion

standard, whether the remark affected the substantial rights of the defendant. *Id.*

■ Turning to Alvarado's testimony, neither Alvarado nor the prosecutor implied that Castillo would be involved in any sort of retribution for Alvarado's testimony. Moreover, the questioning arose only after defense counsel attacked Alvarado's motive to lie. As a result, defense counsel opened the door to Alvarado's motives in testifying and the prosecutor merely sought to rehabilitate Alvarado through questions concerning whether he feared for his safety after testifying against Castillo. Furthermore, even if the questioning was improper, Castillo fails to establish that the evidence affected his substantial rights, especially in light of the fact that the evidence did not concern Castillo. Accordingly, the district court did not abuse its discretion in denying the motion for a mistrial. *See id.*

■ Castillo similarly fails to show that the prosecutor's closing argument constituted misconduct. A prosecutor is permitted to "argue fair inferences from the evidence that a witness has no motive to lie, but cannot express a personal opinion on the credibility of the witnesses." *Id.* at 495 (citation and internal quotation marks omitted). The prosecutor's statements concerning the potential retribution faced by the witnesses from the Zetas and the Gulf Cartel as a result of their testimony were fairly drawn from the evidence describing the potential consequences of cooperating with the Government. In addition, the Government is permitted to "argue that the jury can or should infer from

the relevant facts that a witness does not have a reason to lie." [5] *United States v. Martinez–Larraga,* 517 F.3d 258, 271 (5th Cir.2008). Accordingly, the prosecutor did not engage in misconduct and the district court acted within its discretion in denying the motion for a mistrial. *See McCann,* 613 F.3d at 494.

## 2. Double Jeopardy

Castillo challenges the introduction of testimonial evidence concerning his participation in the April 2 murder of Chuy Resendez under the collateral estoppel component of the Double Jeopardy Clause. Pertinent here, Castillo previously sought the dismissal of Counts 1, 28, 33, and 34 based on this same theory, arguing that because the jury acquitted him on the firearm count in the former indictment it necessarily decided that he was not a sicario and that he was not involved in the conspiracy. *Garcia,* 432 Fed.Appx. at 366. Affirming the district court's denial of Castillo's motion to dismiss, we concluded that "Castillo has shown *only a possibility* that the jury could have founded its verdict of acquittal upon a finding that he was not a sicario and was not involved in the conspiracy. Such is insufficient to invoke the doctrine of collateral estoppel." *Id.* (emphasis added) (explaining that "Castillo has not shown that it would have been irrational for the jury to have grounded its verdict of acquittal [concerning the firearm count] on a determination that the Government failed to prove the possession element of the offense").

**5.** Castillo's reliance on *Gradsky v. United States,* 373 F.2d 706 (5th Cir.1967) is misplaced. Unlike in *Gradsky* where the prosecutor wrongly stated that "the government has every opportunity to check out and to judge the credibility and truthfulness of [the testifying co-conspirators] in this case, and in

that context, we offered you their testimony," nothing in the prosecutor's remarks here indicated that the prosecutor personally was vouching for the credibility of the witnesses' testimony. *See id.* at 710 (quoting prosecutor's statement).

■■■■ To the extent Castillo seeks to essentially relitigate this issue, we are prevented from considering his arguments under the law-of-the-case doctrine. *See United States v. Grosz*, 76 F.3d 1318, 1329 (5th Cir.1996) ("[T]he law of the case doctrine prohibits this court from reconsidering an earlier decision denying a double jeopardy claim raised during an interlocutory appeal."). Further, although the prior jury acquitted Castillo of the charge of possessing a firearm in connection with the April 2 shooting (Count 36), the evidence at the subsequent trial revolved around Castillo's involvement in the planning of and scouting for this shooting.[6] The jury's consideration of Castillo's involvement in the April 2 shooting—and its potential use of this evidence to find Castillo guilty of the charged conspiracy—in no way disturbs the prior jury's acquittal of Castillo for the firearm offense. Therefore, there was no error in allowing introduction of the facts surrounding the April 2 shooting.

Castillo's challenge of the district court's instruction on this matter is also without merit. Despite Castillo's request, the district court refused to instruct the jury that Castillo had been acquitted of the events described by Jasso, reasoning that Jasso's testimony related to events that were part of the overall conspiracy—a charge of which Castillo was not acquitted. Instead, the court instructed the jury that it would hear testimony involving the defendant's alleged conduct on April 2, 2006, and reminded the jury that it could consider the evidence to determine if Castillo was guilty of the charged offenses, but that it should not consider whether Castillo was guilty as to the events or offenses of April 2.

■■■■ The court's refusal to instruct the jury that Castillo had been acquitted of the events of April 2 was not an abuse of discretion. *See United States v. Freeman*, 434 F.3d 369, 377 (5th Cir.2005). Castillo was only acquitted of the use and possession of a firearm on April 2, 2006; he was not acquitted of being involved in the search for Chuy Resendez. Indeed, the fact that the jury hung on Count 35 (the Travel Act count relating to the April 2, 2006, shooting) in the first trial belies any notion that Castillo was acquitted of the conduct Jasso described.

### 3. Motion for Acquittal

We review *de novo* a district court's denial of a motion for a judgment of acquittal. *United States v. Xu*, 599 F.3d 452, 453 (5th Cir.2010). The evidence at trial is sufficient when, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

### A. Conspiracy Conviction (Count 1)

With respect to the drug conspiracy charge, the Government was required to prove that: (1) two or more persons, directly or indirectly, reached an agreement to possess with the intent to distribute a controlled substance; (2) Castillo knew of the agreement; (3) Castillo voluntarily participated in the agreement; and (4) the overall scope of the conspiracy involved at least 5 kilograms of a substance containing cocaine and/or 1,000 kilograms of a substance contained marijuana. *See United States v. Jimenez*, 509 F.3d 682, 689 (5th Cir.2007); *see also* §§ 841(a)(1), (b)(1)(A),

---

**6.** Indeed, Jasso did not explicitly testify that Castillo possessed a firearm on April 2, 2006, and the district court ruled at trial that the Government was collaterally estopped from arguing or presenting evidence that Castillo possessed a firearm in connection with the April 2 shooting.

and 846. A reasonable jury may "infer the existence of a conspiracy from the presence, association, and concerted action of the defendant with others." *United States v. Curtis*, 635 F.3d 704, 719 (5th Cir.2011) (citation and internal quotation marks omitted).

Castillo does not deny that there was a conspiracy that involved the necessary quantity of drugs, but instead only argues that the evidence was insufficient to establish that he knew about[7] or participated in[8] the conspiracy. Importantly, however, the evidence need not link Castillo *directly* to the drugs themselves to be sufficient for a conspiracy conviction. "[T]here are many different roles that participants in a drug conspiracy may play, for example: supervisor and manager, distributor, collector, courier, gunman and enforcer, and firearms procurer and storer." *United States v. Cole*, 423 Fed.Appx. 452, 459 (5th Cir.2011) (unpublished); *see also United States v. Tolliver*, 61 F.3d 1189, 1195 (5th Cir.1995), *vacated on other grounds, Moore v. United States*, 519 U.S. 802, 117 S.Ct. 40, 136 L.Ed.2d 4 (1996).[9]

 Here, the evidence viewed in the light most favorable to the Government would allow a reasonable jury to conclude that Castillo was a sicario for the Zetas who participated in activities that furthered the Gulf Cartel's drug trafficking enterprise. For example, co-conspirator Wenceslao Tovar, a self-identified sicario, testified that he met and spent time with Castillo at a "training camp" that was restricted to members of the Zetas. Julio Resendez, a shooting victim, identified Castillo as being involved in the shootings on March 18 and March 31, which occurred because the sicarios were looking for Chuy Resendez, a member of the rival Sinaloa Cartel. Both Jasso and Reta testified that Castillo was part of that group of sicarios who sought out and killed Chuy Resendez at the behest of Trevino. Jasso testified that Castillo was part of a group that was actively trying to locate Chuy Resendez. Further, according to Reta, Castillo "[b]ragg[ed] about" taking part in Chuy Resendez's murder. Reta also testified that Castillo participated in a grenade attack at a bar on behalf of the Zetas, and this testimony was corroborated by a surveillance video placing Castillo near the scene of the crime. Importantly, the fact that the evidence consisted largely of testimony from co-conspirators does not render the evidence insufficient. *See United States v. Turner*, 319 F.3d 716, 721 (5th Cir.2003). In light of this evidence, a rational jury could conclude that Castillo's participation in the described shootings

---

7. Castillo's suggestion that he personally did not know of the amount of drugs involved is inapposite because a conviction under §§ 841 and 846 does not require the Government to prove that the defendant knew of the quantity of drugs, only that the necessary quantity was involved. *See United States v. Patino–Prado*, 533 F.3d 304, 309–10 (5th Cir.2008).

8. Castillo's argument that there was no evidence that he participated in any overt act listed in Count 1 of the Third Superseding Indictment is inapposite. Proof that Castillo participated in an overt act is not required to convict him of the charged drug conspiracy. *See United States v. Shabani*, 513 U.S. 10, 11, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994).

9. Other circuits similarly recognize the various roles of individuals in a drug conspiracy. *See, e.g., United States v. Jenkins*, 419 F.3d 614, 620 (7th Cir.2005) ("Different people play different roles in a drug conspiracy, be it supplier, lookout, courier, or enforcer."); *United States v. Soto–Beniquez*, 356 F.3d 1, 18 (1st Cir.2003) ("Advancing the aim of the conspiracy can involve performing ancillary functions such as processing and cooking drugs, procuring weapons, collecting monies, enforcing discipline, chastising rivals, accounting, and the like, as long as such actions are performed with the aim of furthering the conspiracy.").

was part of the Gulf Cartel's "war" with the Sinaloa Cartel and, therefore, that Castillo voluntarily participated in the activities of the Zetas and knew that those activities were conducted in furtherance of the drug trafficking business.[10]

### B. Travel Act and Firearm Convictions (Counts 28, 33 and 34)

To convict Castillo on the Travel Act counts, the Government was required to prove that: (1) Castillo traveled in interstate or foreign commerce or used any facility in interstate or foreign commerce; (2) with the specific intent to commit a crime of violence in furtherance of "a business enterprise" involving a controlled substance; and (3) performed or attempted to perform the crime of violence. See § 1952(a)(2)(B). With regard to the Travel Act convictions, Castillo does not dispute that the crimes of violence—the attempted murder of Ramos (Count 28) and the attempted murder of Julio Resendez (Count 33)—were committed in furtherance of the Gulf Cartel's drug trafficking enterprise,

as required by the second element. He also does not contest that he traveled in interstate commerce in satisfaction of the jurisdictional element of the crime. Instead, Castillo argues that there was insufficient evidence to establish that he participated in either crime of violence.

■■■ Based on the evidence at trial, a rational jury could conclude that Castillo participated in these crimes of violence. While Castillo points out that Ramos could not identify him as the person who shot him, Julio Resendez, an eye-witness, testified that Castillo was in the car with a group of men who shot Ramos on March 18. Julio Resendez also testified that Castillo fired shots at him on March 31, 2006.[11] Therefore, in addition to the evidence of Castillo's more general involvement with the Zetas described above regarding Count 1, which made it more likely that Castillo was involved in the shootings for the purpose of furthering the drug trafficking business, the evidence of Castillo's involvement with the events of March 18 and March 31 is sufficient to convict under

---

**10.** Castillo also contends that the district court erred in not giving a multiple conspiracies instruction. This instruction is relevant where the defendant is charged in an overall conspiracy but the evidence only shows that the defendant was involved in a separate conspiracy. See United States v. Carbajal, 290 F.3d 277, 291 n. 25 (5th Cir.2002). Because Castillo timely requested a multiple conspiracies instruction, we review for an abuse of discretion and consider whether there is any evidence supporting the issuance of the charge. See United States v. Castaneda–Cantu, 20 F.3d 1325, 1333–34 (5th Cir.1994); see also United States v. Stowell, 953 F.2d 188, 189 (5th Cir.1992) (explaining that there must be more than a "scintilla" of evidence supporting a defense theory because the evidence "must be sufficient for a reasonable jury to rule in favor of the defendant on that theory"). The district court denied this instruction after concluding that there was not an evidentiary basis for a separate conspiracy

apart from the charged conspiracy involving the Gulf Cartel. We agree. Here, almost all of the evidence pertained to the charged conspiracy and involved Castillo's conduct related to the shootings in furtherance of the conspiracy. Furthermore, Castillo's conviction for the Travel Act counts (which required the jury to find that Castillo was involved in interstate or foreign commerce) undercuts Castillo's suggestion that the jury relied solely on his arrest in Houston to convict him of the charged conspiracy. Accordingly, the district court did not abuse its discretion in declining to give a multiple conspiracies instruction.

**11.** Castillo also improperly seeks to impugn Julio Resendez's credibility on appeal. When reviewing the sufficiency of the evidence, we assume that the jury made all credibility determinations in the light most favorable to the Government. See United States v. Mendoza, 522 F.3d 482, 489 (5th Cir.2008).

§ 1952 as to both Count 28 and Count 33.[12]

 To establish Castillo's guilt with respect to the firearm offense, the Government had to prove that: (1) Castillo committed either a crime of violence (i.e., Count 33) or a drug trafficking crime (i.e., Count 1); and (2) Castillo knowingly discharged a firearm during and in relation to the commission of the crime of violence or the drug trafficking crime. *See* § 924(c)(1)(A)(iii). The same evidence that supports Castillo's convictions under the Travel Act charges supports his conviction for the firearm offense. Specifically, based on the evidence at trial, a reasonable jury could have concluded that he possessed a firearm when he shot Julio Resendez.[13]

### 4. Sentencing

Castillo challenges two of the district court's findings with respect to his sentence. We review the factual findings for clear error. *United States v. Cisneros–Gutierrez,* 517 F.3d 751, 764 (5th Cir.2008) (explaining there is no clear error if the finding is plausible in light of the record as a whole).

 Castillo challenges the district court's findings as to the amount of drugs attributable to him. Castillo's presentence investigation report recommended a base offense level of 38 for Count 1, which applies to a defendant convicted of a drug crime to whom 150 kilograms or more of cocaine are attributable. *See* U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 2D1.1(c)(1) (2011). Under U.S.S.G. § 1B1.3(a)(1), the base offense level for a conspiracy is determined based on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity[ ] that occurred during the commission of the offense . . ., in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." Based on the evidence, the district court's findings that Castillo worked as an enforcer in furtherance of the conspiracy and that there were massive quantities of drugs involved in the conspiracy were not clearly erroneous. Accordingly, the district court did not err in adopting the base offense level of 38 for Count 1.

Castillo also challenges the district court's finding with respect to the Travel Act counts (Counts 28 and 33) that he received something of pecuniary value for undertaking the attempted murders of March 18 and 31. This finding was not clearly erroneous in light of the evidence suggesting that the sicarios were paid $10,000 for each person killed, that 100 pounds of marijuana and one ounce of cocaine were used as compensation for a murder, and that the sicarios were paid $50,000 to kill Chuy Resendez. Accordingly, the four-level upward adjustment for Counts 28 and 33 was proper. *See* U.S.S.G. § 2A2.1(b)(2).

### Conclusion

For the reasons explained above, Castillo's convictions and the district court's sentence are AFFIRMED.

---

**12.** Because we conclude that the evidence was sufficient to convict Castillo under § 1952, we need not decide whether the evidence was sufficient to convict him under theories of co-conspirator or aiding-and-abetting liability.

**13.** Because we conclude that the district court did not reversibly err on any issue presented in this appeal, Castillo's argument based on the "cumulative error doctrine" is meritless.

**UNITED STATES of America,
Plaintiff–Appellee**

v.

**Michael Ladell ALLEN, Defendant–
Appellant.**

No. 13–60218
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Feb. 17, 2014.

Clyde McGee, IV, Esq., Assistant U.S. Attorney, U.S. Attorney's Office, Oxford, MS, for Plaintiff–Appellee.

Gregory Scott Park, Assistant Federal Public Defender, Federal Public Defender's Office, Oxford, MS, for Defendant–Appellant.

Before JOLLY, SMITH, and CLEMENT, Circuit Judges.

PER CURIAM: *

Michael Ladell Allen pleaded guilty to one count of conspiring to distribute and to possess with the intent to distribute cocaine. The presentence report attributed 160 kilograms of cocaine and 2,400 pounds of marijuana to Allen, using this drug quantity to determine Allen's base offense level for sentencing purposes. After considering testimony put forward at the sentencing hearing, the district court concurred with this finding. The court imposed a 300–month prison sentence, which was within the advisory guidelines range, to be followed by a five-year term of supervised release. Allen challenges that sentence, arguing that the court found him responsible for too high a quantity of drugs. Where a defendant, like Allen, is convicted of a drug trafficking crime, his base offense level is determined by the quantity of drugs involved. *See United States v. Rhine,* 583 F.3d 878, 885 (5th Cir.2009); U.S.S.G. § 2D1.1(a)(5), (c). We review the district court's drug quantity determination for clear error. *United States v. Betancourt,* 422 F.3d 240, 246 (5th Cir.2005).

The district court heard detailed testimony from two drug couriers regarding the amount of drugs they delivered to Allen. They both testified that Allen used other couriers as well and that Allen was in charge of the conspiracy's drug distribution throughout much of Mississippi. Allen faults the testimony of the couriers on the grounds that they were able only to estimate the amount of drugs they delivered to him; however, both explained that they were told the quantity they were transporting, and, in any event, a district court is permitted to rely on reasonable, reliable estimates of drug quantities. *See id.;* § 2D1.1, comment. (n.5). Moreover, though Allen would have preferred that the district court base its drug quantity determination only on the amount of drugs that authorities actually recovered, we have explained that the drug quantity attributable to a defendant is not limited to the amount of drugs seized. *Betancourt,* 422 F.3d at 246–47. Allen did not establish that the information relied on by the district court was materially untrue, inaccurate, or unreliable. *See United States v. Zuniga,* 720 F.3d 587, 591 (5th Cir.2013).

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

The court committed no clear error in determining the quantity of drugs that Allen was accountable for.

AFFIRMED.

**UNITED STATES of America, Plaintiff–Appellee**

v.

**Montray Lorenzo CATO, Defendant–Appellant.**

**No. 13–10247**

**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Feb. 17, 2014.

James Wesley Hendrix, Assistant U.S. Attorney, U.S. Attorney's Office, Dallas, TX, for Plaintiff–Appellee.

Leigh Warren Davis, Bedford, TX, for Defendant–Appellant.

Before HIGGINBOTHAM, DENNIS, and GRAVES, Circuit Judges.

PER CURIAM: *

Montray Lorenzo Cato was convicted of robbing two separate branches of the First Convenience Bank on June 13, 2012, and July 28, 2012, respectively. *See* 18 U.S.C. § 2113(a). He now appeals.

Cato argues that the district court violated his due process rights when, in response to the Government's request that the jury be able to see his face, it seated him near the jury instead of having him stand in front of the jury for a short time. He contends that the arrangement prevented the jury from seeing his face. Cato did not challenge the decision in the district court. Accordingly, we will review the district court's actions for plain error only. *See Puckett v. United States*, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009); *United States v. Fields*, 483 F.3d 313, 340 (5th Cir.2007). To prevail on plain-error review, Cato must show that an error occurred, that the error was clear or obvious, and that the error affected his substantial rights. *See Puckett*, 556 U.S. at 135, 129 S.Ct. 1423. If those factors are established, we have the discretion to correct the forfeited error, but our discretion should not be exercised unless the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *See id.*

The record confirms that the jury did not have an opportunity to clearly see Cato's face. However, nothing indicates that the jury's view was obstructed as a result of the seating arrangement. Rather, Cato intentionally hid his face throughout the trial. Cato has not shown plain error.

Cato next argues that the district court violated his due process rights by admitting an impermissibly suggestive in-court identification and by clarifying and noting for the record that the witness had identified Cato as the perpetrator of the June

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

robbery. As Cato did not challenge those actions in the district court, plain error review applies. *Fields,* 483 F.3d at 340. The in-court identification may have been suggestive. *See United States v. Rogers,* 126 F.3d 655, 658 (5th Cir.1997). However, the district court did not err in its admission. There was no "substantial likelihood of irreparable misidentification" in Cato's case. Nor did the district court err when it clarified and noted for the record that the witness identification of Cato. Its comments did not stray from neutrality. *See United States v. Lankford,* 196 F.3d 563, 573 (5th Cir.1999).

Finally, Cato argues that the evidence was insufficient to support his conviction of the July robbery. We review the sufficiency of the evidence to determine "whether, viewing all the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence in support of the verdict, a rational trier of fact could have found that the evidence establishe[d] the essential elements of the offense beyond a reasonable doubt." *United States v. Ferguson,* 211 F.3d 878, 882 (5th Cir.2000). Cato contends that the Government failed to establish that he was the perpetrator of the July robbery. He was, however, identified at trial as the perpetrator of the June robbery. The clothes of the perpetrator of the July robbery, as well as Cato's clothing when he was arrested the next month and the clothes in his car at that time, were substantially similar to those Cato wore in the June robbery. In both robberies, the perpetrator wore a heavy black coat and a black hat with sunglasses perched on the visor; he covered his face during the offense by pretending to talk on a cell phone, distracted the teller by making reference to a money order, demanded money by passing the teller a note, and retrieved the note before exiting the building. "[A] number of common features of lesser uniqueness, although insufficient to generate a strong inference of identity if considered separately, may be of significant probative value when considered together." *United States v. Myers,* 550 F.2d 1036, 1045 (5th Cir.1977). A review of the record shows that there was sufficient evidence for the jury to find beyond a reasonable doubt that Cato committed the July offense. *See Ferguson,* 211 F.3d at 882.

AFFIRMED.

**Manning Nelson ROLLERSON,
Plaintiff–Appellant**

v.

**CITY OF FREEPORT, TEXAS; Freeport Police Department; Chris Bryant; Other Unknown Police Officers of the Freeport Police Department, Defendants–Appellees.**

**No. 13–20500
Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Feb. 17, 2014.

Joseph Rutherford Willie, II, Willie & Associates, P.C., Houston, TX, for Plaintiff–Appellant.

William S. Helfand, Chamberlain, Hrdlicka, White, Williams & Aughtry, Houston, TX, for Defendants–Appellees.

Before WIENER, OWEN, and HAYNES, Circuit Judges.

PER CURIAM: *

Plaintiff–Appellant Manning Nelson Rollerson sued the Defendants–Appellees for damages that he alleged resulted from an altercation between himself and Defendant–Appellee Bryant. Rollerson filed this action in the district court claiming civil rights violations under 42 U.S.C. § 1983, and violations of his constitutional rights under the Fourth, Fifth and Fourteenth Amendments. Defendants–Appellees sought dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, and Rollerson failed to respond. After granting the dismissal motion of Defendants–Appellees under Rule 12(b)(6), the district court ordered Rollerson to replead and amend his complaint. When Rollerson failed to do so, the district court dismissed his action with prejudice.

We have reviewed the facts as alleged and the applicable law as set forth in the briefs of the parties and in the extensive Opinion and Order rendered by the district court on May 16, 2013. As a result, we are convinced that the court committed no reversible error and, to the contrary, correctly decided the case under the circumstances. Accordingly, the Judgment of the district court is, in all respects,

AFFIRMED.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR R. 47.5.4.

**Kirk Martin BAGBY, Plaintiff–Appellant**

v.

**Jerry R. KARRIKER, III, Ex Officer Stg; Francine Soukup, Correctional Officer 4; Delbert Purvis, Stg; Greagory Ball, Lieutenant; Regener Oliver, Ex Sub Counsel; Jody Hefiner, Major; K.A. January, Captain, Defendants–Appellees.**

No. 13–40657.

United States Court of Appeals, Fifth Circuit.

Feb. 17, 2014.

Kirk Martin Bagby, Tennessee Colony, TX, pro se.

Before HIGGINBOTHAM, DENNIS, and GRAVES, Circuit Judges.

PER CURIAM: *

Kirk Martin Bagby, Texas inmate # 1582340, filed a 42 U.S.C. § 1983 complaint against Sergeant Jerry R. Karriker, III, and other prison employees alleging that on December 22, 2011, Karriker wrote a false disciplinary case claiming that Bagby attempted to assault a prison officer. Bagby alleged that the other prison employees and a counsel substitute conspired to have him found guilty of the false charge and disciplined. The district court

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

dismissed the complaint pursuant to 28 U.S.C. § 1915A as malicious and frivolous because it duplicated the complaint in *Bagby v. Karriker*, No. 6:12–CV–266, 2013 WL 1644337 (E.D.Tex. Apr. 16, 2013). Bagby thereafter filed this appeal and moved for leave to proceed in forma pauperis (IFP). The district court denied Bagby's IFP motion, certifying than his appeal was not taken in good faith.

Now, Bagby moves this court for authorization to proceed IFP. Bagby's motion is construed as a challenge to the district court's certification decision. *Baugh v. Taylor*, 117 F.3d 197, 202 (5th Cir.1997). Our inquiry into whether the appeal is taken in good faith "is limited to whether the appeal involves legal points arguable on their merits (and therefore not frivolous)." *Howard v. King*, 707 F.2d 215, 220 (5th Cir.1983) (internal quotation marks and citation omitted). If we uphold the district court's certification decision, Bagby must pay the appellate filing fee or the appeal will be dismissed for want of prosecution. *See Baugh*, 117 F.3d at 202. However, if the appeal is frivolous, we may dismiss it sua sponte under Fifth Circuit Rule 42.2. *Id.* at 202 n. 24.

Bagby argues that the district court erred in finding that the instant complaint was duplicative of his complaint in No. 6:12–cv–266 given that the complaint in No. 6:12–cv–266 concerned Karriker's alleged excessive use of force. The district court may sua sponte dismiss a prisoner's complaint against a governmental officer or employee if the action is frivolous or malicious. § 1915A(b)(1). An action may be dismissed as malicious or frivolous if it duplicates claims raised by the same plaintiff in previous or pending litigation. *See Wilson v. Lynaugh*, 878 F.2d 846, 849–50 (5th Cir.1989); *Pittman v. Moore*, 980 F.2d 994, 994–95 (5th Cir.1993).

Our review of the record supports the district court's conclusion that the instant complaint was duplicative of the complaint filed in No. 6:12–cv–266. The two suits raised similar claims that fairly may be viewed as arising "from the same series of events," to wit, the December 22, 2011, allegedly false disciplinary case. *See Bailey v. Johnson*, 846 F.2d 1019, 1021 (5th Cir.1988). Bagby has not shown that the district court erred in certifying that his appeal was not taken in good faith, and his IFP motion is denied. *See Baugh*, 117 F.3d at 202. The instant appeal is without arguable merit and is dismissed as frivolous. *See id.* at 202 n. 24; *Howard*, 707 F.2d at 219–20; 5th Cir. R. 42.2.

The dismissal of this appeal as frivolous and the district court's dismissal of Bagby's complaint as frivolous and malicious count as two strikes. *See Adepegba v. Hammons*, 103 F.3d 383, 387–88 (5th Cir. 1996). We remind Bagby that, because he had accumulated, prior to the conclusion of this case, at least three strikes for purposes of 28 U.S.C. § 1915(g), *see Bagby v. Karriker*, 539 Fed.Appx. 468 (5th Cir.2013), he may no longer proceed IFP in any civil action or appeal filed while he is incarcerated or detained in any facility unless he is under imminent danger of serious physical injury. § 1915(g). Additionally, we warn Bagby that frivolous, repetitive, or otherwise abusive filings will invite the imposition of sanctions, including dismissal, monetary sanctions, and/or restrictions on his ability to file pleadings in this court and any court subject to this court's jurisdiction. Bagby is further warned that, in order to avoid the imposition of sanctions, he should review any pending appeals and actions and move to dismiss any that are frivolous. Bagby's motion for appointment of counsel is denied.

APPEAL DISMISSED; MOTION FOR LEAVE TO PROCEED IFP DENIED; MOTION FOR APPOINTMENT OF COUNSEL DENIED; 28 U.S.C. § 1915(g) BAR RE–IMPOSED; SANCTION WARNING ISSUED.

Derwin ROGERS, Petitioner–Appellant

v.

The State of MISSISSIPPI; Christopher B. Epps, Commissioner, Mississippi Department of Corrections, Respondents–Appellees.

No. 12–60760
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Feb. 19, 2014.

Julie Ann Epps, Esq., Canton, MS, for Petitioner–Appellant.

Jerrolyn M. Owens, Office of the Attorney General, Jackson, MS, for Respondents–Appellees.

Before WIENER, OWEN, and HAYNES, Circuit Judges.

PER CURIAM: *

Petitioner–Appellant Derwin Rogers, Mississippi prisoner # L2701, appeals the dismissal of his 28 U.S.C. § 2254 application in which he challenged his conviction on four counts of forcible rape. The district court granted a certificate of appealability (COA) on whether Rogers sustained his burden of demonstrating that the procedural bar set out in Miss.Code Ann. § 99–39–21(1) was not consistently and regularly applied to claims identical or similar to Rogers's claims challenging (1) the denial of a continuance which, in turn, he alleges, resulted in denial of his counsel

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

of choice, and (2) the denial of an amendment to his indictment.

We "review de novo a district court's denial of federal habeas review based on a state procedural ground." *Stokes v. Anderson,* 123 F.3d 858, 859 (5th Cir.1997). Under the procedural-default doctrine, federal courts are precluded from federal habeas review where the last state court to consider the claims raised by the applicant based its denial of relief on an independent and adequate state-law procedural ground. *Coleman v. Thompson,* 501 U.S. 722, 729–30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). To satisfy the "independent" and "adequate" requirements, the state court's dismissal must clearly and expressly reflect that it rests on a state procedural bar, and the bar must be strictly or regularly applied by state courts to the vast majority of similar claims. *Martin v. Maxey,* 98 F.3d 844, 847 (5th Cir.1996). As the applicant, Rogers has the burden of establishing that the state did not strictly or regularly follow a procedural bar around the time of his denial of relief in state court. *Stokes,* 123 F.3d at 860.

Rogers contends that his claims concerning the denial of counsel of choice and the substantive amendment to the indictment constitute errors that affected his fundamental rights. He argues that these errors are now excepted from the procedural bar set forth in Miss. Code Ann. § 99–39–21(1). Relying on *Rowland v. State,* 42 So.3d 503 (Miss.2010), he insists that he has sustained his burden of showing that Mississippi courts have not been consistent in applying the procedural bar to issues affecting fundamental rights.

Although Rogers cites cases purporting to establish that the rights underlying his claims of denial of counsel of choice and improper substantive amendment of the indictment are "fundamental rights," none shows that such claims are exempt from the procedural bar of § 99–39–21(1) or that the Mississippi Supreme Court has failed to apply the procedural bar at issue to claims identical or similar to those that Rogers seeks to raise. As Rogers has not identified specific instances when the Mississippi Supreme Court did not apply the procedural bars to claims identical or similar to those he seeks to raise, he has not met his burden of establishing that the procedural bars were not strictly or regularly applied "to the vast majority of similar claims." *Martin,* 98 F.3d at 847 (internal quotation marks and citation omitted); *see also Stokes,* 123 F.3d at 860–61.

The judgment of the district court is AFFIRMED.

**UNITED STATES of America,**
**Plaintiff–Appellee**

v.

**Alejandro Aragon CENICEROS,**
**Defendant–Appellant.**

No. 13–10281
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Feb. 19, 2014.

James Wesley Hendrix, Assistant U.S. Attorney, U.S. Attorney's Office, Dallas, TX, for Plaintiff–Appellee.

Douglas C. Greene, Sr., Esq., Greene Law Firm, Arlington, TX, for Defendant–Appellant.

Before WIENER, OWEN, and HAYNES, Circuit Judges.

PER CURIAM: *

Defendant–Appellant Alejandro Aragon Ceniceros (Aragon) appeals his jury trial conviction of conspiracy to possess with intent to distribute five kilograms or more of cocaine and possession with intent to distribute 500 grams or more of cocaine. Aragon contends that the district court violated his due process rights by prohibiting him from presenting testimony from a defense witness, Jose Flores. He asserts that the government substantially interfered with Flores's decision whether to testify by threatening that he would be indicted for additional crimes and that his plea agreement would be invalidated if he testified for the defense.

The existence of substantial governmental interference with a defense witness's free and unhampered choice to testify is a factual question that we typically review for clear error. *United States v. Thompson*, 130 F.3d 676, 686–87 (5th Cir.1997). As Aragon did not raise a claim of substantial interference in the district court, however, our review is for plain error only. *See Puckett v. United States*, 556 U.S. 129, 134, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009); *United States v. Binker*, 795 F.2d 1218, 1228 (5th Cir.1986). And, he cannot succeed on plain error review because his claim of substantial interference could have been resolved if he had properly raised it in the district court. *See United States v. Chung*, 261 F.3d 536, 539 (5th Cir.2001).

In any event, Aragon cannot demonstrate error, plain or otherwise, with regard to his claim of substantial interference. *See Puckett*, 556 U.S. at 134, 129 S.Ct. 1423; *United States v. Viera*, 839 F.2d 1113, 1115 (5th Cir.1988) (en banc); *Thompson*, 130 F.3d at 686–87. He has failed to show that the government substantially interfered with Flores's free decision to testify or that his defense was prejudiced by any such interference. *See*

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

*Viera*, 839 F.2d at 1115. The record does not reflect that the government made any threats, express or implied, directed at Flores or related to him. There is no indication that the government's discussion with Flores's counsel or its arguments to the district court about the likely consequences of Flores's testimony were improper. *See id.; Thompson*, 130 F.3d at 687. Furthermore, the record reflects that Flores's decision not to testify was an informed choice based on his concerns about self-incrimination and future prosecution and was not the result of impermissible interference by the government. *See United States v. Girod*, 646 F.3d 304, 312 (5th Cir.2011); *United States v. Bieganowski*, 313 F.3d 264, 291 (5th Cir.2002). Neither has Aragon shown that Flores's testimony would have been material or exculpatory. *See Viera*, 839 F.2d at 1115; *Puckett*, 556 U.S. at 135, 129 S.Ct. 1423.

AFFIRMED.

**Dallas C. TAYLOR, Petitioner–Appellant**

v.

**Burl CAIN, Warden, Louisiana State Penitentiary, Respondent–Appellee.**

No. 13–30081

**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Feb. 19, 2014.

Dallas C. Taylor, Angola, LA, pro se.

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under

Burl Cain, Warden, Louisiana State Penitentiary, West Monroe, LA, pro se.

Before WIENER, OWEN, and HAYNES, Circuit Judges.

PER CURIAM: *

Dallas C. Taylor, Louisiana prisoner # 334258, was convicted by a jury of aggravated rape, armed robbery, possession of a firearm by a convicted felon, and aggravated burglary; he received a life sentence for the rape, concurrent terms of 12 years for the firearm possession and 15 years for the burglary, and a consecutive 30–year sentence for the armed robbery. The district court denied Taylor's 28 U.S.C. § 2254 petition challenging these convictions, concluding in relevant part that Taylor's challenges to the denial of his suppression motion and his allegations of prosecutorial misconduct during closing arguments were "unexhausted" because the state courts relied on an adequate and independent procedural ground to reject the claims. Taylor maintains that he exhausted his state remedies on this ground because he presented the allegations to the Louisiana Supreme Court. Contrary to the respondent's contentions, Taylor sought writs from the state appellate court and the Louisiana Supreme Court after the trial court rejected his first state postconviction application. *See State ex rel. Taylor v. State*, 67 So.3d 1259, 1259 (La. 2011). Because he fairly presented the substance of his constitutional claims to

the limited circumstances set forth in 5TH CIR. R. 47.5.4.

the state's highest court, he did exhaust his state remedies. *See Nobles v. Johnson,* 127 F.3d 409, 420 (5th Cir.1997); *see also Rocha v. Thaler,* 626 F.3d 815, 820 (5th Cir.2010) (stating that a claim dismissed by the state's highest court on procedural grounds is procedurally defaulted rather than unexhausted).

The district court's decision also arguably gave rise to the conclusion that Taylor's claims were procedurally defaulted. Before this court, Taylor maintains that his first state postconviction application was timely, but he concedes that the State argued that the suppression-denial and prosecutorial-misconduct claims raised in that motion should have been raised on direct appeal. He does not argue that this does not constitute an adequate or independent state procedural bar that would preclude review of the merits of his claims. *See Fairman v. Anderson,* 188 F.3d 635, 641 (5th Cir.1999). Additionally, he makes no showing of cause and prejudice overcoming the default, and he has not shown that a failure to consider his claims "will result in a fundamental miscarriage of justice" because he is actually innocent. *Smith v. Johnson,* 216 F.3d 521, 524 (5th Cir.2000). Consequently, the judgment of the district court is AFFIRMED.

**Ronnie M. LYLES, Plaintiff–Appellant**

**v.**

**SEACOR MARINE, INCORPORATED, Defendant–Appellee.**

**No. 13–30561**

**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Feb. 19, 2014.

Ronnie M. Lyles, Angie, LA, pro se.

William B. Schwartz, Baldwin Haspel Burke & Mayer, L.L.C., New Orleans, LA, for Defendant–Appellee.

Before JOLLY, SMITH, and CLEMENT, Circuit Judges.

PER CURIAM: *

Ronnie M. Lyles appeals the district court's denial of his Federal Rule of Civil Procedure 60(b) motion for relief from the judgment that dismissed his claims under the Jones Act and general maritime law against Seacor Marine, Incorporated. Lyles sought damages for a back injury that he alleges he suffered while he was employed as a deckhand by Seacor on the M/V ADAM McCALL. The district court determined that Lyles did not show that Seacor was negligent or that the M/V ADAM McCALL was unseaworthy; the district court also denied Lyles's request to assert a maintenance and cure claim, which he raised for the first time at trial.

---

* Pursuant to 5TH CIR R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

We affirmed the district court's judgment on direct appeal.

Almost ten years after the entry of the district court's judgment, Lyles filed the instant motion entitled "Motion for Relief from Judgment pursuant to FRCVP 60(b)(3) Insurance Fraud," reasserting his claims. The district court denied the motion. On appeal, Lyles reasserts his claims against Seacor, and again contends that the district court erred by not allowing him to add a claim for maintenance and cure. He also raises numerous allegations of fraud and misconduct by the district court, as well as a conspiracy between the court and Seacor to deny his claims. In particular, he argues that the trial judge has a strong personal bias and a racial bias against him and that manifest injustice will occur if the court does not consider his claims of fraud committed by the district court.

We review the denial of a Rule 60(b) motion for an abuse of discretion. *Bailey v. Cain*, 609 F.3d 763, 767 (5th Cir.2010). Under this standard, "[i]t is not enough that the granting of relief might have been permissible, or even warranted—denial must have been so unwarranted as to constitute an abuse of discretion." *Northshore Dev., Inc. v. Lee*, 835 F.2d 580, 582 (5th Cir.1988) (quoting *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402 (5th Cir. 1981)). A Rule 60(b) motion is not an opportunity to rehash prior arguments. *See Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 269 (5th Cir.2007) (noting that, as a general proposition, a Rule 60(b) motion is not a permissible method for a party to "relitigate its case").

Lyles has not shown that the district court abused its discretion in determining that he was precluded from challenging the judgment. *See United States v. Teel*, 691 F.3d 578, 583 (5th Cir.2012). Lyles's Rule 60(b)(3) motion alleging fraud also

was not timely filed within one year of the judgment as required by Rule 60(c)(1). *See Wilson v. Johns–Manville Sales Corp.*, 873 F.2d 869, 871–72 (5th Cir.1989); *see also Sojourner T. v. Edwards*, 974 F.2d 27, 30 (5th Cir.1992) (this court may affirm on any alternative ground apparent from the record). Further, Lyles did not present clear and convincing evidence of fraud, misrepresentation, or misconduct by Seacor or by the district court that prevented him from fully and fairly presenting his case. *See Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 641 (5th Cir.2005).

Lyles may not reargue in a Rule 60(b) motion issues that were raised in his complaint or raise arguments that could have been raised on direct appeal. *See Triple Tee Golf, Inc.*, 485 F.3d at 269. Lyles did not present evidence to support his claim that the district court judge had a personal or racial bias against him. Lyles's claim that the district court judge should have recused herself lacks merit as adverse judicial rulings alone are insufficient to establish bias. *See Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). To the extent that Lyles is raising new claims, including numerous allegations of fraud and misconduct by the district court, we do not consider claims raised for the first time on appeal. *See Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 342 (5th Cir.1999); *Stewart Glass & Mirror v. U.S. Auto Glass Discount Cntrs., Inc.*, 200 F.3d 307, 316–17 (5th Cir.2000). The district court's judgment is affirmed.

In conjunction with his appeal, Lyles has filed several motions. The motions are denied.

Finally, Lyles's allegations of misconduct by the district court are without a factual basis, are speculative, and are frivolous. He also attempts to relitigate the issues previously decided by the district

court and affirmed by this court on direct appeal. Pro se litigants do not have "unrestrained license to pursue totally frivolous appeals." *Clark v. Green,* 814 F.2d 221, 223 (5th Cir.1987). Lyles is warned that future frivolous, repetitive, or otherwise abusive filings may result in the imposition of sanctions, including dismissal, monetary sanctions, and restrictions on his ability to file pleadings in this court or any court subject to this court's jurisdiction.

AFFIRMED; MOTIONS DENIED; SANCTION WARNING ISSUED.

**UNITED STATES of America,
Plaintiff–Appellee**

v.

**Larry Wayne BRUCE, Defendant–
Appellant.**

**No. 13–30582
Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Feb. 19, 2014.

Camille Ann Domingue, Assistant U.S. Attorney, U.S. Attorney's Office, Lafayette, LA, for Plaintiff–Appellee.

Carol B. Whitehurst, Assistant Federal Public Defender, Federal Public Defender's Office, Lafayette, LA, for Defendant–Appellant.

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Before KING, DAVIS, and ELROD, Circuit Judges.

PER CURIAM: *

Larry Wayne Bruce appeals his 60–month sentence for willfully failing to collect and pay over taxes owed and his concurrent 12–month sentence for willfully failing to file tax returns; the combined sentences fell below the applicable guidelines range.

Regardless whether he was the sole participant in the criminal conduct at issue, Bruce fails to show that he played either a minimal or minor role such that the district court erred by declining to grant him a U.S.S.G. § 3B1.2 adjustment. *See United States v. Cisneros–Gutierrez,* 517 F.3d 751, 764 (5th Cir.2008). Although he claims that his sentence is substantively unreasonable, *see Gall v. United States,* 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007), Bruce did not object to the sentence following its imposition, and we therefore review only for plain error. *See United States v. Peltier,* 505 F.3d 389, 391–92 (5th Cir.2007). Bruce does not attempt to satisfy the plain error standard. *See Puckett v. United States,* 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009).

AFFIRMED.

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Eduardo Enrique RECIO–ESTRADA,
Defendant–Appellant.**

**No. 13–40293
Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Feb. 19, 2014.

Renata Ann Gowie, Assistant U.S. Attorney, U.S. Attorney's Office, Houston, TX, for Plaintiff–Appellee.

Kimberly S. Keller, Keller Stolarczyk P.L.L.C., Boerne, TX, for Defendant–Appellant.

Before WIENER, OWEN, and HAYNES, Circuit Judges.

PER CURIAM: *

The attorney appointed to represent Eduardo Enrique Recio–Estrada has moved for leave to withdraw and has filed a brief in accordance with *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *United States v. Flores,* 632 F.3d 229 (5th Cir.2011). Recio–Estrada has not filed a response. We have reviewed counsel's brief and the relevant portions of the record reflected therein. We concur with counsel's assessment that the appeal presents no nonfrivolous issue for appellate review. Accordingly,

counsel's motion for leave to withdraw is GRANTED, counsel is excused from further responsibilities herein, and the APPEAL IS DISMISSED in part as frivolous, *see* 5TH CIR. R. 42.2, and in part as moot, *see United States v. Rosenbaum–Alanis,* 483 F.3d 381, 382–83 (5th Cir. 2007).

**UNITED STATES of America,
Plaintiff–Appellee**

v.

**Ramiro ORTIZ–HINOJO, Defendant–Appellant.**

**No. 13–50156
Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Feb. 19, 2014.

Joseph H. Gay, Jr., Assistant U.S. Attorney, U.S. Attorney's Office, San Antonio, TX, for Plaintiff–Appellee.

Jacques Lawrence De La Mota, De La Mota & Company, Limited, Del Rio, TX, for Defendant–Appellant.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under

the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Before HIGGINBOTHAM, DENNIS, and GRAVES, Circuit Judges.

PER CURIAM: *

Ramiro Ortiz–Hinojo appeals the 28–month within-guidelines sentence he received following his guilty plea to illegal reentry into the United States after deportation. Ortiz–Hinojo argues that his sentence is greater than necessary to meet the sentencing goals of 18 U.S.C. § 3553(a) because the district court did not consider his mitigation arguments, particularly his assertion that his criminal history was overstated due to the impermissible double counting of a previous conviction.

Because Ortiz–Hinojo did not challenge the substantive reasonableness of his sentence in the district court, we review for plain error only. *See United States v. Peltier,* 505 F.3d 389, 392 (5th Cir.2007). Ortiz–Hinojo's double-counting argument is currently foreclosed by this court's precedent. *See United States v. Duarte,* 569 F.3d 528, 529–31 (5th Cir.2009); *United States v. Calbat,* 266 F.3d 358, 364 (5th Cir.2001).

Furthermore, the record reflects that the district court expressly considered the relevant § 3553(a) factors as well as Ortiz–Hinojo's arguments for mitigating his sentence but implicitly overruled those arguments and concluded that a within-guidelines sentence was appropriate. *See United States v. Rodriguez,* 523 F.3d 519, 525 (5th Cir.2008). Accordingly, we decline Ortiz–Hinojo's invitation to reweigh the § 3553(a) factors because "the sentencing judge is in a superior position to find facts and judge their import under § 3553(a) with respect to a particular defendant." *United States v. Campos–Maldonado,* 531 F.3d 337, 339 (5th Cir.2008).

Ortiz–Hinojo's general disagreement with the propriety of his sentence and the district court's weighing of the § 3553(a) factors is insufficient to rebut the presumption of reasonableness that attaches to his within-guidelines sentence. *See United States v. Ruiz,* 621 F.3d 390, 398 (5th Cir.2010); *United States v. Cooks,* 589 F.3d 173, 186 (5th Cir.2009); *United States v. Cisneros–Gutierrez,* 517 F.3d 751, 766 (5th Cir.2008).

Because Ortiz–Hinojo has not demonstrated error, plain or otherwise, in the imposition of his within-guidelines 28–month prison term, the judgment of the district court is AFFIRMED. *See Gall v. United States,* 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007); *Peltier,* 505 F.3d at 392.

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**David James WEST, Defendant–Appellant.**

**No. 13–10691**
**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Feb. 20, 2014.

Brian W. McKay, Esq., Assistant U.S. Attorney, U.S. Attorney's Office, Dallas, TX, for Plaintiff–Appellee.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Patrick Michael Megaro, Esq., Robert Lawrence Sirianni, Jr., Esq., Brownstone, P.A., Winter Park, FL, for Defendant–Appellant.

Before JOLLY, SMITH, and CLEMENT, Circuit Judges.

PER CURIAM: *

David West ("West") appeals his jury conviction of the unlawful sale and disposition of a firearm to Donald West ("Donald"), who had been convicted of a felony and who West knew or had reason to believe had been convicted of a felony. West contends that his trial counsel rendered ineffective assistance on various grounds; the record, however, is insufficiently developed to allow consideration of West's claims of ineffective assistance; such claims generally "cannot be resolved on direct appeal when the claim[s have] not been raised before the district court since no opportunity existed to develop the record on the merits of the allegations." *United States v. Cantwell,* 470 F.3d 1087, 1091 (5th Cir.2006) (internal quotation marks and citation omitted). We thus decline to consider those claims on direct appeal. *See United States v. Gulley,* 526 F.3d 809, 821 (5th Cir.2008).

West further contests the denial of his motion for severance under Federal Rule of Criminal Procedure 14. He maintains that he was prejudiced by being jointly tried with Donald because the evidence of Donald's guilt had a "spillover effect" that prejudiced the jury's ability to evaluate fairly the charges against him. Severance was not needed, though, because this case did not involve inflammatory facts or complex crimes that precluded the jury from being able to assess the evidence against each defendant separately and individually. *See United States v. Rocha,* 916 F.2d 219, 229 (5th Cir.1990); *United States v. Bermea,* 30 F.3d 1539, 1572–74 (5th Cir.1994).

Even if there was a "spillover effect," West has not shown that the district court failed to protect him from any prejudice by issuing instructions that directed the jury to review the evidence against each defendant separately and individually and to render an impartial verdict for each defendant. *See United States v. Posada–Rios,* 158 F.3d 832, 863 (5th Cir.1998); *United States v. Pofahl,* 990 F.2d 1456, 1483 (5th Cir.1993). Thus, West has not shown that the court abused its discretion by denying severance on this basis. *See United States v. Erwin,* 793 F.2d 656, 665–66 (5th Cir. 1986).

West claims that he should have been granted a severance because he and Donald had "mutually antagonistic defenses." Because West failed to raise this argument in the district court, the issue is subject to plain-error review only. *See United States v. Bernard,* 299 F.3d 467, 475 (5th Cir. 2002); *see also Puckett v. United States,* 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009).

The record reflects that the defenses offered by West and Donald, neither of which the jury believed, were not inherently irreconcilable or contradictory such that the jury, in order to believe the core of one defense, had to disbelieve the other. *See United States v. Rojas–Martinez,* 968 F.2d 415, 419 (5th Cir.1992). As noted, the court instructed the jury to consider the evidence as to each defendant separately and

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

individually and not to treat the comments made by counsel, including Donald in his *pro se* capacity, as substantive evidence. Those jury instructions adequately protected West against any prejudice, and he has not shown that the court plainly erred by denying his motion to sever on this basis. *See United States v. Mann,* 161 F.3d 840, 863 (5th Cir.1998); *Bernard,* 299 F.3d at 475.

Finally, West argues that joinder was improper under Federal Rule of Criminal Procedure 8(b) because he was not charged with being a conspirator in, or an accomplice to, the bank robbery committed by Donald, and thus he should not have been charged in the same indictment. Because West did not raise in the district court an improper-joinder argument under Rule 8(b), he has likely waived any argument on this basis. *See Bermea,* 30 F.3d at 1572.

In any event, West's claim of improper joinder is unavailing. West and Donald did not need to be charged together in each count of the indictment or to have engaged in all of the same act or acts. Rule 8(b); *United States v. McRae,* 702 F.3d 806, 821 (5th Cir.2012). The record reflects that West and Donald were alleged to have engaged in the same transaction or series of acts—i.e., the transfer of a firearm—that constituted criminal offenses, so joinder was proper. *See* Rule 8(b).

AFFIRMED.

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Phil Andrew WILSON, Defendant– Appellant.**

**No. 13–30657**

**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Feb. 20, 2014.

Cristina Walker, Assistant U.S. Attorney, U.S. Attorney's Office, Shreveport, LA, for Plaintiff–Appellee.

Phil Andrew Wilson, Bennettsville, SC, pro se.

Before JOLLY, SMITH, and CLEMENT, Circuit Judges.

PER CURIAM: *

Phil Wilson, federal prisoner # 11370–035, appeals the denial of his motion for reconsideration of the denial of his 18 U.S.C. § 3582(c)(2) motion to reduce his sentence based on the amendments to the crack-cocaine sentencing guideline. Wilson contends that (1) the district court erroneously denied relief based on the 2007 amendments to the guideline instead of the 2010 amendments, and (2) he was eligible for a sentence reduction pursuant to U.S.S.G. § 1B1.10(b)(2)(B) because, after the district court had denied his § 3582

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

motion, his sentence was reduced based on the government's motion pursuant to Rule 35 of the Federal Rules of Criminal Procedure, which, in turn, reduced his guideline range under the Fair Sentencing Act of 2010 ("FSA").

We review the denial of a motion for reconsideration for an abuse of discretion. *United States v. O'Keefe,* 128 F.3d 885, 892 (5th Cir.1997); *United States v. Caulfield,* 536 Fed.Appx. 509, 509–10 (5th Cir.), *cert. denied,* —— U.S. ——, 134 S.Ct. 708, 187 L.Ed.2d 570 (2013). A motion for reconsideration "must clearly establish either a manifest error of law or fact or must present newly discovered evidence" and "cannot be used to raise arguments which could, and should, have been made before the judgment issued" or "to argue a case under a new legal theory." *Simon v. United States,* 891 F.2d 1154, 1159 (5th Cir.1990) (internal quotation marks and citation omitted).

Wilson's position is without merit. First, the record reflects that the district court properly construed his § 3582 motion as arising under the 2010 amendments. In its order denying the motion, the court stated that the FSA did not reduce Wilson's guideline range. Second, because Wilson argues that he is entitled to a sentence reduction pursuant to a new legal theory, i.e., U.S.S.G. § 1B1.10(b)(2)(B), that was not presented to the district court, he has not shown a manifest error of law or fact. *See Simon,* 891 F.2d at 1159. Third, even if we assume that Wilson has shown that his guideline range was reduced by the FSA, the court exercised its discretion and decided that a further sentence reduction was not warranted based on the 18 U.S.C. § 3553(a) factors and specifically noted that Wilson distributed significant amounts of cocaine, that he was a leader or manager of the conspiracy, and that he received

an obstruction-of-justice enhancement. *See Dillon v. United States,* 560 U.S. 817, 826–27, 130 S.Ct. 2683, 177 L.Ed.2d 271 (2010).

The court did not abuse its discretion in denying the motion for reconsideration. *See O'Keefe,* 128 F.3d at 892. AFFIRMED.

**UNITED STATES of America,
Plaintiff–Appellee**

v.

**Albert CRAFT, Jr., Defendant–
Appellant.**

**No. 13–60388
Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 2014.

Gaines H. Cleveland, Assistant U.S. Attorney, Annette Williams, Assistant U.S. Attorney, U.S. Attorney's Office, Gulfport, MS, for Plaintiff–Appellee.

John William Weber, III, Assistant Federal Public Defender, Federal Public Defender's Office, Gulfport, MS, for Defendant–Appellant.

Before JOLLY, DeMOSS, and ELROD, Circuit Judges.

PER CURIAM: *

Albert Craft, Jr., appeals from his jury-trial conviction for being a felon in possession of a firearm and the 63–month sentence imposed by the district court. He contends that the district court erred by denying his motion to suppress evidence. When reviewing a denial of a motion to suppress evidence, we review a district court's factual findings for clear error and its legal conclusions de novo. *United States v. Pack,* 612 F.3d 341, 347 (5th Cir.2010).

Police officers observed Craft and his cousin engage in a heated argument with a group of men. A sergeant, who knew of Craft's extensive criminal history and the history of gun violence in the neighborhood, heard both groups of men threatening to shoot. Upon spotting a marked police cruiser, Craft left the scene and parked in his cousin's driveway a few blocks away. When questioned, the group of men involved in the exchange informed the police that Craft had threatened them by brandishing a handgun. Craft subsequently flagged down the police officer who had followed his car from the scene of the argument and complained to the officer that the other men had threatened him with a weapon. Craft refused to provide consent to search his vehicle. Officers then requested a drug-detecting canine which eventually alerted on the driver's side of the vehicle. The resulting search of Craft's vehicle revealed the firearm.

The totality of the circumstances indicates that, prior to the dog sniff, there was sufficient probable cause to believe that Craft, a known felon, had a firearm in his vehicle. *See United States v. Banuelos–Romero,* 597 F.3d 763, 767 (5th Cir.2010); *United States v. McSween,* 53 F.3d 684,

686 (5th Cir.1995). That Craft's car was parked in the driveway of his cousin's residence is of no moment, since Craft had no legitimate expectation of privacy there. *See United States v. Briones–Garza,* 680 F.2d 417, 420 (5th Cir.1982). Because probable cause existed to search Craft's vehicle before the canine unit arrived, *see Banuelos–Romero,* 597 F.3d at 767, we need not address Craft's assertion that the dog sniff itself constituted a warrantless search. The judgment of the district court is AFFIRMED.

**Marcus Dwayne MAYBERRY,
Petitioner–Appellant**

v.

**William STEPHENS, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent–Appellee.**

No. 12–11226
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 2014.

Marcus Dwayne Mayberry, Amarillo, TX, pro se.

Joseph Peter Corcoran, Assistant Attorney General, Office of the Attorney General, Austin, TX, for Respondent–Appellee.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Before WIENER, OWEN, and HAYNES, Circuit Judges.

PER CURIAM: *

Plaintiff–Appellant Marcus Dwayne Mayberry, Texas prisoner # 605575, filed a motion in his original 1997 habeas proceeding for free copies of documents filed in his case. The magistrate judge (MJ) denied the motion because Mayberry's habeas case was closed and he had not established any basis for further filings in the case. The district court denied Mayberry's objection to the MJ's order and his motion for reconsideration, and Mayberry now appeals the district court's denial of those motions.

We do not consider Mayberry's argument, raised for the first time on appeal, that his constitutional rights have been violated based on his inability to obtain free copies of court records. *See Yohey v. Collins,* 985 F.2d 222, 225 (5th Cir.1993). Neither will we consider the arguments raised for the first time in Mayberry's reply brief, which include his complaints concerning the dismissal of his appeal in *Mayberry v. Thaler,* No. 13–10077. *See United States v. Jimenez,* 509 F.3d 682, 693 n. 10 (5th Cir.2007).

Contrary to Mayberry's contention, neither 28 U.S.C. § 2250 nor 28 U.S.C. § 1915(c) provides him with a basis for requesting free copies of documents filed in his closed habeas case. Mayberry's motion for documents was a "meaningless, unauthorized motion" over which the district court had no jurisdiction. *See United States v. Early,* 27 F.3d 140, 142 (5th Cir.1994). We therefore AFFIRM district court's orders denying Mayberry's objection to the MJ's order and denying his motion for reconsideration. We also WARN Mayberry that if he continues to file repetitious and frivolous filings requesting free copies of court records, he could face sanctions, including dismissal, monetary sanctions, or restrictions on his ability to file pleadings in this court or any court subject to this court's jurisdiction.

**Leslie T. HOLMES, Plaintiff–Appellant**

v.

**Carolyn W. COLVIN, Acting Commissioner of Social Security, Defendant–Appellee.**

**No. 13–40486**
**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Feb. 20, 2014.

Peter F. Doyle, Jr., Port Arthur, TX, for Plaintiff–Appellant.

Martin Wayne Long, Assistant Regional Counsel, William Winston Newbill, Assistant General Counsel, Social Security Administration Office of the General Counsel Region VI, Dallas, TX, for Defendant–Appellee.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Before JOLLY, SMITH, and CLEMENT, Circuit Judges.

PER CURIAM: [*]

Leslie T. Holmes filed suit in federal district court under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g). He appeals the district court's affirmance of the Commissioner of Social Security's partially-favorable decision, which found that he was disabled and entitled to certain benefits from May 31, 2002 through March 3, 2009, but not thereafter. Holmes claims that he was entitled to continuing disability benefits after March 3, 2009, and that the administrative law judge's decision finding otherwise lacked substantial evidence, failed to develop the administrative record, and incorrectly weighed the evidence. We hold that neither the administrative law judge ("ALJ") nor the Appeals Council erred, and affirm the district court's decision.

"Our standard of review of social security disability claims is exceedingly deferential and limited to two inquiries: whether substantial evidence supports the ALJ's decision, and whether the ALJ applied the proper legal standards when evaluating the evidence." *Taylor v. Astrue,* 706 F.3d 600, 602 (5th Cir.2012). Evidence is "substantial" when it is enough for a reasonable mind to support the conclusion. *Id.* This court has held that "[t]he evidence 'must be more than a scintilla, but it need not be a preponderance.'" *Id.* (quoting *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir.1995)). Findings of fact supported by substantial evidence are conclusive, and we

"may not reweigh the evidence in the record, nor try the issues *de novo,* nor substitute [our] judgment" for that of the Commissioner. *Bowling v. Shalala,* 36 F.3d 431, 434 (5th Cir.1994).

The ALJ's decision stated that from May 31, 2002 through March 2, 2009, Holmes was unable to perform past relevant work, and that there were no jobs that existed in significant numbers in the national economy that he could have performed. But it also found that Holmes experienced medical improvement related to his ability to work as of March 3, 2009. Specifically, it stated that since March 3, 2009 the "claimant has had the residual functional capacity [RFC] to perform and maintain a limited range of sedentary work," and that he regained the RFC to perform an eight-hour workday without missing more than twelve days from his employment in a calendar year.

We hold that the ALJ reached his conclusions based on substantial evidence. The record shows that he ordered a consultative examination by Dr. George Isaac, who considered Holmes's medical history. The ALJ considered the medical evidence, including Dr. Isaac's findings, in reaching his RFC conclusions. Because "we have consistently held that the [Commissioner], not the courts, has the duty to weigh the evidence, resolve material conflicts in the evidence, and decide the case," we will not overturn the ALJ's RFC determination that Holmes was able to return to the workforce, albeit in a limited capacity. *Johnson v. Bowen,* 864 F.2d 340, 347 (5th Cir.1988).

We also hold that both the ALJ and the Appeals Council properly considered and handled Holmes's post-hearing and post-decision evidence, and that the ALJ acted within his discretion in interpreting the

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under

the limited circumstances set forth in 5TH CIR. R. 47.5.4.

evidence before him. Holmes entered into evidence examination reports by Dr. Kim Garges to support his claim of continued disability. But the ALJ discussed the competing evidence at length in his decision, comparing the observations and findings of Dr. Isaac and Dr. Garges. He concluded: "In short, with respect to the period since March 3, 2009, the undersigned gives greater weight to Dr. Isaac's findings and opinions than to those of Dr. Garges." Because "the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly,'" we hold that he did not commit reversible error in his weighing of the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir.1994) (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir.1985)).

For the foregoing reasons, the decision of the district court is AFFIRMED.

**UNITED STATES of America,
Plaintiff–Appellee**

v.

**Jose VILLANUEVA–TORRES,
Defendant–Appellant.**

No. 13–40713
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 2014.

Renata Ann Gowie, Assistant U.S. Attorney, U.S. Attorney's Office, Houston, TX, for Plaintiff–Appellee.

Omar Weaver Rosales, Rosales & Associates, L.L.P., Harlingen, TX, for Defendant–Appellant.

Jose Villanueva–Torres, Raymondville, TX, pro se.

Before HIGGINBOTHAM, DENNIS, and GRAVES, Circuit Judges.

PER CURIAM: *

The attorney appointed to represent Jose Villanueva–Torres has moved for leave to withdraw and has filed a brief in accordance with *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *United States v. Flores*, 632 F.3d 229 (5th Cir.2011). Villanueva–Torres has not filed a response. We have reviewed counsel's brief and the relevant portions of the record reflected therein. We concur with counsel's assessment that the appeal presents no nonfrivolous issue for appellate review. Counsel's motion for leave to withdraw is GRANTED, counsel is excused from further responsibilities herein, and the APPEAL IS DISMISSED. *See* 5TH CIR. R. 42.2.

In light of the magistrate judge's explanation during the rearraignment hearing of the exceptions to the appeal waiver and the absence of such exceptions in Villanueva–Torres's plea agreement, we pretermit any determination concerning the validity of the appeal waiver. *See United States v. Robinson*, 187 F.3d 516, 517–18 (5th Cir.1999).

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

UNITED STATES of America,
Plaintiff–Appellee

v.

Constantino GAMEZ–TENERIA, also
known as Constantino Gamez–Mar-
tinez, Defendant–Appellant.

No. 12–40777
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 2014.

James Lee Turner, Assistant U.S. Attor-
ney, Renata Ann Gowie, Assistant U.S.
Attorney, U.S. Attorney's Office, Houston,
TX, for Plaintiff–Appellee.

Marjorie A. Meyers, Federal Public De-
fender, Margaret Christina Ling, Assistant
Federal Public Defender, H. Michael Soko-
low, Assistant Federal Public Defender,
Federal Public Defender's Office, Houston,
TX, for Defendant–Appellant.

Before JONES, BARKSDALE, and
HAYNES, Circuit Judges.

PER CURIAM: *

Constantino Gamez–Teneria pleaded
guilty to being unlawfully present in the
United States following removal. The dis-
trict court sentenced Gamez to 27–months'
imprisonment, less 190 days of credit for
state custody, and did *not* impose a super-
vised-release term.

* Pursuant to 5TH CIR. R. 47.5, the court has
determined that this opinion should not be
published and is not precedent except under

For his only issue on appeal, Gamez
contends the court erred in concluding his
Illinois involuntary-manslaughter convic-
tion warranted a 12–level enhancement un-
der Sentencing Guideline
§ 2L1.2(b)(1)(A)(ii) (unlawfully entering or
remaining in United States after felony
conviction for crime of violence). Because
Gamez has been released from prison and
removed from the United States (24 June
2013), his appeal is moot. *See United
States v. Rosenbaum–Alanis*, 483 F.3d
381, 383 (5th Cir.2007).

DISMISSED.

Eddie Alexander GONZALEZ–
BONILLA, Petitioner

v.

Eric H. HOLDER, Jr., U.S. Attorney
General, Respondent.

No. 13–60248
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 2014.

Amen Omoruyi Obas, Esq., Amen Law
Firm, Houston, TX, for Petitioner.

Susan Bennett Green, Trial Attorney,
Tangerlia Cox, U.S. Department of Justice
Office of Immigration Litigation, Washing-
ton, DC, for Respondent.

the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

Before JOLLY, SMITH, and CLEMENT, Circuit Judges.

PER CURIAM: *

Eddie Alexander Gonzalez–Bonilla, a native and citizen of Honduras, petitions this court for review of the Board of Immigration Appeals' (BIA) decision dismissing his appeal of the Immigration Judge's (IJ) denial of the motion to reopen his in absentia removal proceedings. He contends that his failure to appear should be excused because his counsel did not give him proper notice of the hearing and failed to submit supporting documents that showed that his vehicle had mechanical problems while he was driving to the hearing.

The BIA did not abuse its discretion in concluding that Gonzalez–Bonilla failed to demonstrate exceptional circumstances to excuse his failure to appear. See Rodriguez–Manzano v. Holder, 666 F.3d 948, 952 (5th Cir.2012); 8 U.S.C. § 1229a(b)(5)(C)(i), (e)(1). Although Gonzalez–Bonilla asserts that his absence from the hearing was attributable to the ineffectiveness of his attorney, he has not alleged or shown that he complied with the procedural requirements set forth in Matter of Lozada, 19 I. & N. Dec. 637 (BIA 1988), overruled in part by In re Compean, 24 I. & N. Dec. 710 (BIA 2009), and has not otherwise contested the BIA's conclusion that his ineffective-assistance claims should be rejected on that basis. See id. at 954; Lara v. Trominski, 216 F.3d 487, 496 (5th Cir.2000); Soadjede v. Ashcroft, 324 F.3d 830, 833 (5th Cir.2003). Also, while he notes that he had mechanical problems with his car on the day of the merits hearing, he does not brief whether these problems rose to the level of an exceptional circumstance that excused his absence and, thus, he has abandoned this issue. See Soadjede, 324 F.3d at 833. Therefore, Gonzalez–Bonilla has not shown that the BIA's decision was capricious, racially invidious, without foundation in the evidence, or otherwise so irrational that it was arbitrary. See Rodriguez–Manzano, 666 F.3d at 952.

Gonzalez–Bonilla also contends that he should be granted relief on the merits of his application for relief and that this case should be remanded for further proceedings. However, his arguments for relief need not be addressed because he has not shown that the BIA abused its discretion in denying his motion to reopen, and the merits of his application for relief from removal are not otherwise at issue on appeal. See Yu Chun Lian v. Mukasey, 294 Fed.Appx. 163, 164 (5th Cir.2008) (citing INS v. Orlando Ventura, 537 U.S. 12, 16–17, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002)); INS v. Abudu, 485 U.S. 94, 104, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988). His claim that he is entitled to temporary protected status (TPS) because the current conditions in Honduras render the country incapable of handling the return of nationals also need not be addressed because he did not properly exhaust his administrative remedies with respect to the claim. See Wang v. Ashcroft, 260 F.3d 448, 452–53 (5th Cir. 2001); Goonsuwan v. Ashcroft, 252 F.3d 383, 388–89 (5th Cir.2001). Gonzalez–Bonilla also has not shown that his case should be remanded based on his wife's filing of a petition for an alien relative because he

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

has failed to address the BIA's reason for rejecting this claim.

PETITION DENIED.

Shawn A. STEWART, Plaintiff–
Appellant,

v.

Joaquin GUZMAN, Lieutenant; Patrick
Martin, Sergeant of Security; Cory G.
Clinkenbeard, Security Officer; Jason
Combs, Security Officer; Lee Wilson,
Security Officer; Molly S. Cedillo, Se-
curity Officer; Johnny G. Brown, Se-
curity Officer; A. Wester; Brandon
M. Sarkisian, Defendants–Appellees.

No. 13–10139.

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 2014.

Shawn A. Stewart, Abilene, TX, pro se.

Christopher Lee Lindsey, Assistant At-
torney General, Office of the Attorney
General, Austin, TX, for Defendants–Ap-
pellees.

Before STEWART, Chief Judge, and GARZA and SOUTHWICK, Circuit Judges.

PER CURIAM: *

Plaintiff–Appellant Shawn A. Stewart appeals the district court's grant of summary judgment in favor of Defendants–Appellees ("Appellees") based on their defense of qualified immunity. Stewart filed suit in the district court pursuant to 42 U.S.C. § 1983, alleging, *inter alia,* that Appellees were deliberately indifferent to his safety and health. We REVERSE and REMAND for further proceedings.

## I. FACTUAL & PROCEDURAL HISTORY

### A. Facts

Stewart is incarcerated at French M. Robertson Unit in Abilene, Texas. This appeal centers on five days during Stewart's imprisonment—July 8, 2009; September 8, 2009; October 22, 2009; November 23, 2009; and January 4, 2010. On each of the above-listed dates, Stewart suffered an asthma attack, which he contends was either caused or exacerbated by Appellees. The parties provide vastly divergent accounts of what transpired each day.

#### 1. July 8, 2009

Stewart alleges that Officers Joaquin Guzman, Patrick Martin, Cory G. Clinkenbeard, and Jason M. Combs observed him have an asthma attack in the 4–Building, which is where Stewart was housed. However, rather than transport him to the prison infirmary for assistance, Stewart contends that they watched him lying on the floor. Stewart argues that, because of this delay, he was forced to suffer "wanton and unnecessary pain" longer than he would have had Appellees simply made an Incident Command System ("ICS") emergency call. Stewart further asserts that the officers were aware that Stewart had recently been hospitalized due to a previous asthma attack.

Another inmate, Harvey Leroy Sossamon, III, corroborated Stewart's version of the incident. Sossamon informed Combs and Clinkenbeard that Stewart had been hospitalized recently due to an asthma attack and asked whether he could transport Stewart to the infirmary for treatment. Not only did Combs and Clinkenbeard fail to respond to Sossamon's warning concerning Stewart's medical condition, but they also refused to permit Sossamon to transport Stewart to the infirmary. Guzman and Martin then entered the building and observed the situation but failed to assist Stewart. At this point, Stewart contends that he was lying on the flooring gasping for air. In fact, Stewart alleges that Martin asked him if something was wrong.[1] Officer Charles Wright then entered the building. Upon Wright's arrival, Sossamon informed Wright of Stewart's past hospitalization and requested that he secure medical treatment for Stewart. Subsequently, Wright made a phone call, left, and returned with a wheelchair. Wright was accompanied by Sergeants Susan Sabin and Allen Merchant. Wright, Sabin, and Merchant transported Stewart to the infirmary. Stewart remained in the

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1. Sossamon also stated that Martin laughed at Stewart's predicament.

infirmary for two days. Several weeks later, Stewart filed a formal complaint concerning Guzman, Martin, Clinkenbeard, and Combs's response to his request for medical treatment.

Combs responds that he contacted the prison medical staff as soon as he was informed that Stewart needed medical attention and was told to send Stewart to the infirmary. Because the 4–Building was on lockdown, Combs alleges that Stewart had to be escorted to the infirmary. However, Combs was unable to escort Stewart because he was assigned as the security desk officer and prison policy mandated that he remain at the desk. Accordingly, Combs states that he called Sabin to request an escort for Stewart. Sabin was otherwise occupied and, so, could not immediately transport Stewart. While Combs waited for Sabin, Wright arrived, and Combs asked him to escort Stewart. At this point, Stewart was unable to walk and Wright had to get a wheelchair to transport Stewart. Due to the length of time that passed before Wright returned with a wheelchair, Combs called the infirmary again to request a wheelchair. Combs contends that although several officers offered to assist him, he did not accept their offers because he was told that a wheelchair was forthcoming. Combs proceeded to initiate an ICS for emergency assistance. Stewart was then escorted to the infirmary by Sabin, Merchant, and Wright. According to Combs, Sossamon's offer to transport Stewart was refused for safety concerns and also because another officer was bringing a wheelchair.

Clinkenbeard and Guzman's accounts of the incident also differ from Stewart's. Clinkenbeard contends that Stewart was sitting on the floor when he arrived at the 4–Building. Moreover, Clinkenbeard states that he would have escorted Stewart to the infirmary but was unable to due to Stewart's inability to walk. Clinkenbeard also maintains that he was told that someone was coming with a wheelchair. Guzman simply asserted that he did not know of Stewart's asthma attack and Stewart failed to alert him to his medical condition. Similarly, Martin states that he was unaware of Stewart's medical emergency. Indeed, Martin contends that he never saw Stewart.[2] Rather, Martin stated that he was performing cell shakedowns in the D–Wing and E–Wing whereas Stewart was assigned to the F–Wing.

### 2. September 8, 2009

In addition, Stewart alleges that Officer Lee Wilson prevented him from going to the infirmary to receive an oxygen treatment, which would have forestalled another asthma attack. Stewart contends that not only did he press the call button and bang on a window to get Wilson's attention but other inmates also began knocking on windows to help Stewart. Instead of assisting Stewart, Stewart claims that Wilson "flip[ped] the bird at" him. According to Stewart, approximately ten minutes passed before Wilson allowed him to leave. Because of this delay, Stewart contends that he suffered an asthma attack and was transferred to Hendricks Hospital. Stewart again filed a complaint regarding this incident. Other inmates—Christopher Flores, Michael Ralston, and Anthony Ramsey—corroborated Stewart's account. They also stated that, as time progressed, it became apparent that Stewart was having difficulty breathing.

---

**2.** In an email concerning Stewart's complaint, Martin stated that Stewart reported that Wright did not do anything.

Wilson, however, claims that "he did not flip [ ] Stewart off and ignore him." Wilson contends that he did not hear any banging on the window. At the time in question, Wilson claims that he was observing another officer pass out mail in another section of the 4–Building to ensure that the officer's safety was not jeopardized. Wilson states that he heard a call signal from Stewart's section but only observed a black inmate who did not seem to be suffering from any medical condition.[3] Thus, Wilson returned to observe the officer passing out mail, reasoning that the officer's safety was a higher priority than the unidentified inmate.[4] Wilson stated that he later heard banging, saw that Stewart was in need of assistance, and opened the door for Stewart. While Wilson admits that he erred, he contends that he was merely negligent.[5] Officer Johnny Snyder reported that he observed Stewart collapse and then initiated an ICS.

### 3. October 22, 2009

Similarly, Stewart alleged that Officer Molly S. Cedillo refused to permit him to go to the infirmary for an oxygen treatment. Stewart contends that, consequently, an ICS was implemented and he had to receive emergency medical treatment. Yet again, Stewart filed a grievance.

In his grievance complaint, Stewart stated that he attempted to get Cedillo's attention by knocking on the glass-walls. Stewart then proceeded to press the emergency call button because he was beginning to suffer from an asthma attack; however, he contends Cedillo responded that he should stop pushing the emergency button. He

alleges that he then began to suffer from an asthma attack. Stewart claims that Cedillo still failed to assist him. Other inmates attested that Cedillo ignored Stewart's attempts to request her assistance. These inmates also noted that it was apparent that Stewart was having an asthma attack. Several of Stewart's fellow inmates therefore began to knock on their doors in an attempt to get Stewart help. Corey D. Woodberry, another inmate, stated that he used the intercom to inform Cedillo of Stewart's need to go to the infirmary. She allegedly responded that Stewart should not have pressed the call button and could wait until she finished removing the inmates in another section. Officer Tschope became aware of Stewart's medical condition and an ICS was initiated.[6] Stewart was then transported to the infirmary for emergency treatment. Woodberry contends that Stewart was passed out when Stewart was finally permitted to go to the infirmary.

In the investigation into Stewart's grievance, Appellees provided an account of a video tape capturing the incident. According to Appellees, Stewart does not appear distressed and did not attempt to get Officer Tschope's attention, although he could have based on the proximity between the two. Tschope reported that, while he was in the F-wing, Stewart never requested his help. Rather, it was not until he was in another section that Tschope heard knocking and so walked over to Stewart's section to investigate. It was at this time that Stewart showed him his medical pass and

---

3. Throughout the investigation process, Wilson has given conflicting evidence with regards to whether he heard the call signal.

4. Wilson contends that he would have immediately assisted Stewart had he recognized him.

5. Wilson is no longer employed by the Texas Department of Criminal Justice.

6. Woodberry also claimed that, at first, Tschope instructed Cedillo to permit Stewart to leave, but she refused to do so.

Tschope had Cedillo open the door for Stewart.

Cedillo also refutes Stewart's account of the incident. According to Cedillo, she did not ignore Stewart's requests for assistance. She maintains that Stewart never requested her assistance and did not appear to be in medical distress. Rather, another prisoner notified her that Stewart was suffering from an asthma attack. Cedillo does acknowledge that she was aware that Stewart was prone to have asthma attacks.

### 4. November 23, 2009

Stewart also alleged in his complaint that Officer Johnny G. Brown barred Stewart from going to the infirmary for an oxygen treatment. Because of this delay, Stewart was again hospitalized. Like the previous instances, Stewart filed a written complaint, arguing that Brown knew that the failure to permit him to get the treatment would result in an asthma attack. Stewart alleged that Brown had repeatedly ignored his requests to go to the infirmary for treatment on previous occasions. Stewart claims that he repeatedly pressed the call button and waved his medical pass at Brown to no avail. Instead, Brown mocked him, despite the onset of Stewart's asthma attack. Stewart also maintains that he signaled to Brown that he was choking.

Brown, however, maintained that he in no way inhibited Stewart from receiving his treatment. When Stewart requested to go to the infirmary, Brown contends that a number of inmates were in the area because lunch was being served. Brown states that as soon as he was able to remove the inmates from the area, he al-lowed Stewart to leave. Throughout this time period, Brown claims that Stewart did not appear to be in distress.

### 5. January 4, 2010

In addition, Stewart alleged that Officers A. Wester and B. Sarkisian ignored him when he had an asthma attack in his cell.[7] Moreover, Stewart claims that none of the officers were in the vicinity of his cell so as to provide him assistance. Stewart contends that he flashed the lights in his cell repeatedly to get Wester and Sarkisian's attention. Ortiz claimed that Stewart also knocked on the door to alert Sarkisian and then asked Ortiz for his help in contacting Sarkisian. After knocking on the door for approximately six to seven minutes, Sarkisian responded to Stewart and Ortiz. Ortiz contends that once he told Sarkisian that Stewart was having difficulty breathing, Sarkisian simply turned off the speaker to the cell. At this point, additional inmates began knocking on their doors to get help for Stewart. According to Ortiz, Wester then came and called for assistance. During this process, Stewart alleges that he suffered an intense asthma attack, resulting in a great deal of pain and lack of sufficient oxygen. Due to the delay in receiving treatment, Stewart argues that Officer Wendy Doan and two others had to place him on a stretcher to receive treatment. Stewart was transferred to Hendricks Hospital, and he later filed a grievance regarding this incident.

In response, Wester claims that as soon as he observed the lights flashing in Stewart's cell, he sent officers to investigate and opened the cell when they discovered Stewart's condition. Sarkisian confirms Wester's version of the incident. Accord-

---

**7.** Stewart's cellmate, Aaron Ortiz, stated that Stewart had warned Wester of his medical condition before the asthma attack occurred. We note that, unlike the affidavits provided by the other inmates, Ortiz's affidavit does not completely align with Stewart's version of what transpired.

ing to Sarkisian, Wester sent him to check on Stewart. When he saw that Stewart was having an asthma attack, Sarkisian claims that he removed Stewart from his cell.

### B. Procedural History

In February 2011, Stewart filed suit against Appellees as well as a number of other prison employees, alleging failure to protect, deliberate indifference to his medical health and safety, failure to train, and conspiracy. The district court dismissed the claims against the other prison employees, leaving only Stewart's claim of deliberate indifference against Appellees remaining.[8] Appellees then moved for summary judgment, arguing, *inter alia,* that they were entitled to qualified immunity. The district court granted summary judgment in favor of Appellees, dismissing Stewart's suit. The district court concluded that Stewart failed to provide sufficient evidence to rebut Appellees' claims of qualified immunity. Stewart filed a motion to reconsider, which the district court denied, and he timely appealed.

## II. DISCUSSION

Stewart raises several issues on appeal. First, he argues that the district court erred when it granted Appellees' motion for summary judgment because, contrary to the district court's conclusion, he did provide competent summary judgment evidence rebutting Appellees' qualified immunity defense. Stewart further contends that the district court engaged in credibility determinations which were improper at this stage of the litigation. Second, he argues that the district court abused its discretion by not permitting him to depose some of his witnesses and denying his

motion to conduct additional discovery. Appellees respond that Stewart has only demonstrated, at most, gross negligence, and that the district court did not abuse its discretion with its discovery rulings.

### A. Standard of Review

We review the district court's grant of summary judgment de novo, applying the same standard used by the district court. *Haverda v. Hays Cnty.,* 723 F.3d 586, 591 (5th Cir.2013). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). We draw all reasonable inferences in favor of Stewart, the nonmoving party. *Haverda,* 723 F.3d at 591. "A genuine dispute as to a material fact exists when, after considering the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, a court determines that the evidence is such that a reasonable jury could return a verdict for the party opposing the motion." *Id.* We neither engage in credibility determinations nor weigh the evidence. *Vaughn v. Woodforest Bank,* 665 F.3d 632, 635 (5th Cir.2011).

### B. Qualified Immunity

When a government official asserts a qualified immunity defense, the plaintiff carries "the burden of negating qualified immunity." *Brown v. Callahan,* 623 F.3d 249, 253 (5th Cir.2010). To determine whether Appellees are entitled to qualified immunity, we must ask two questions: "(1) whether the plaintiff has alleged a violation of a clearly established constitutional right; and (2) if so, whether the defendant's con-

8. These proceedings were conducted by the magistrate judge with the consent of the parties. For ease of reference, however, we will refer to the magistrate judge as the district court.

duct was objectively unreasonable in the light of the clearly established law at the time of the incident." *Stidham v. Tex. Comm'n on Private Sec.*, 418 F.3d 486, 490 (5th Cir.2005) (internal quotation marks and citation omitted). "If we . . . answer either of the above questions in the negative, then the defendant is entitled to qualified immunity." *Id.*

The Eighth Amendment is violated when prison guards are deliberately indifferent to the serious medical needs of prisoners. *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir.1999) (stating that prison guards are deliberately indifferent when they "intentionally deny[ ] or delay[ ] access to medical care or intentionally interfer[e] with the treatment once prescribed." (citation omitted)); *see also Williams v. Certain Individual Emp. of the Tex. Dep't of Criminal Justice–Institutional Div. at the Jester III Unit*, 480 Fed.Appx. 251, 256 (5th Cir.2010) (unpublished) (per curiam). To prove deliberate indifference, Stewart must show that Appellees were aware of "and disregard[ed] an excessive risk to [his] health or safety." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir.2006) (internal quotation marks and citation omitted). Thus, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (internal quotation marks and citation omitted). If the risk is obvious, however, we may infer knowledge. *Id.* "Deliberate indifference is an extremely high standard to meet." *Horn v. Vaughan*, 469 Fed.Appx. 360, 363 (5th Cir. 2012) (per curiam) (unpublished) (citation and internal quotation marks omitted).

A delay in providing medical care violates the Eighth Amendment only when "there has been deliberate indifference [that] results in substantial harm." *Easter*, 467 F.3d at 464 (alteration in original) (emphasis, citation, and internal quotation marks omitted). A medical need is serious if it "is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Lewis v. Evans*, 440 Fed.Appx. 263, 264 (5th Cir.2011) (per curiam) (unpublished) (internal quotation marks and citation omitted). Stewart must prove "that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* at 265 (citation and internal quotation marks omitted). However, gross negligence does not constitute deliberate indifference. *Id.*

A government official violates clearly established law "if it is sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Easter*, 467 F.3d at 465 (alteration in original) (internal quotation marks and citation omitted). The specific act engaged in by the official need not have been held unlawful. *Id.* Rather, "prior [cases must give] reasonable warning that the conduct then at issue violated constitutional rights." *Id.* (citation and internal quotation marks omitted).

■ As an initial matter, we note that the district court erroneously found the unsworn affidavits Stewart proffered as well as the factual allegations in Stewart's complaint to be inadequate summary judgment evidence.[9] While unsworn affidavits are usually insufficient to raise a genuine issue of material fact, *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 382 n. 2 (5th Cir.2013), an "unsworn declaration . . . in writing of

---

9. Notably, Appellees do not attempt to justify the district court's conclusion that Stewart's

summary judgment evidence was incompetent.

[a] person which is subscribed by him, as true under penalty of perjury and dated" may substitute for a sworn declaration. 28 U.S.C. § 1746. Stewart attached a signed declaration to his complaint, stating that, "under the penalty of perjury," the facts alleged in his complaint were "true and correct." Moreover, Stewart relied on his two unsworn declarations and multiple unsworn affidavits from fellow inmates, which contained declarations that they were "true under penalty of perjury[ ] and dated." *See* 28 U.S.C. § 1746; *see also Ion,* 731 F.3d at 382 n. 2. Therefore, we will consider the facts Stewart alleges in his verified complaint, his two unsworn declarations, as well as the unsworn affidavits when determining whether he raised a genuine issue of material fact. *See Hart v. Hairston,* 343 F.3d 762, 765 (5th Cir.2003) ("On summary judgment, factual allegations set forth in a verified complaint may be treated the same as when they are contained in an affidavit.").

Viewing the evidence in the light most favorable to Stewart, *see Haverda,* 723 F.3d at 591, it is apparent that summary judgment is inappropriate at this time. The parties present conflicting accounts of what transpired between Stewart and Appellees, thereby rendering any grant of summary judgment improper. *See* Fed.R.Civ.P. 56(a). Whereas Stewart's account of the dates at issue depicts repeated intentional disregard for his health, Appellees' version suggests that the officers merely followed prison protocol and any mistakes were inadvertent.

An issue of material fact exists in regards to whether Appellees were deliberately indifferent to Stewart's health and safety. There is evidence indicating that Appellees repeatedly delayed providing Stewart with medical treatment, although they were aware that he frequently suffered from asthma attacks. *See Williams,* 480 Fed.Appx. at 256 ("A prison guard is deliberately indifferent if he intentionally denies or delays access to medical care." (internal quotation marks omitted) (quoting *Walker v. Butler,* 967 F.2d 176, 178 (5th Cir.1992))). Moreover, the parties agree that Stewart's medical condition was known by the prison guards. Our review of the summary judgment evidence indicates that Appellees also intentionally disregarded the established treatment plan for Stewart. *See Chapman v. Johnson,* 339 Fed.Appx. 446, 448 (5th Cir.2009) (per curiam) (unpublished) (stating that a defendant is not entitled to summary judgment based on qualified immunity when the defendant knew of prisoner's injury and treatment protocol but failed to follow it); *see also Easter,* 467 F.3d at 465 (holding that summary judgment was improper on qualified immunity grounds when defendant was aware of prisoner's need for medical treatment but failed to provide it). Accordingly, the district court erred when it granted Appellees summary judgment based on qualified immunity.

## III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment to Appellees on their qualified immunity defense, and we REMAND for further proceedings consistent with this opinion.[10]

---

**10.** Because we reverse the district court's grant of summary judgment to Appellees, we need not address the other issue raised by Stewart on appeal regarding the district

**UNITED STATES of America,**
**Plaintiff–Appellee**

v.

**Taylor Michael MENDEZ,**
**Defendant–Appellant.**

**No. 13–10483**
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 2014.

James Wesley Hendrix, Assistant U.S. Attorney, U.S. Attorney's Office, Dallas, TX, for Plaintiff–Appellee.

Brian George O'shea, Dallas, TX, for Defendant–Appellant.

Before JONES, BARKSDALE, and HAYNES, Circuit Judges.

PER CURIAM: *

Taylor Michael Mendez challenges his within-Guidelines sentence, imposed following his guilty-plea conviction on one count of conspiracy to possess with intent to distribute 100 grams or more of heroin. Mendez was sentenced, *inter alia*, to 180–months' imprisonment. The district court rejected Mendez' request for his sentence to be concurrent with two state convictions that were included as relevant conduct in the instant offense.

Mendez contends: his sentence is substantively unreasonable, including, because

of the court's failing to provide sufficient reasons for its length and its being consecutive to the state convictions. Although post-*Booker*, the Sentencing Guidelines are advisory only, and a properly preserved objection to an ultimate sentence is reviewed for reasonableness under an abuse-of-discretion standard, the district court must still properly calculate the Guideline-sentencing range for use in deciding on the sentence to impose. *Gall v. United States,* 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). In that respect, for issues preserved in district court, its application of the Guidelines is reviewed *de novo;* its factual findings, only for clear error. *E.g., United States v. Cisneros–Gutierrez,* 517 F.3d 751, 764 (5th Cir.2008); *United States v. Villegas,* 404 F.3d 355, 359 (5th Cir. 2005). Mendez expressly does not claim procedural error. Again, he maintains only that the sentence is substantively unreasonable.

The sentence, including its being consecutive, is in accord with proper rules and Guidelines calculations; therefore, it is presumed reasonable. *See United States v. Candia,* 454 F.3d 468, 474 (5th Cir.2006). To rebut this presumption, Mendez must show "the sentence does not account for a factor that should [have] receive[d] significant weight, ... gives significant weight to an irrelevant or improper factor, or ... represents a clear error of judgment in balancing sentencing factors". *United States v. Cooks,* 589 F.3d 173, 186 (5th Cir.2009).

The district court gave sufficient explanation for the sentence. *See United States v. Mondragon–Santiago,* 564 F.3d 357, 362 (5th Cir.2009) (noting within-Guidelines

court's discovery rulings and, thus, decline to do so.

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**434**

sentences require little explanation). Mendez essentially asks this court to substitute his assessment of the sentencing factors for the district court's well-reasoned assessment; this would be directly contrary to the deferential review dictated by *Gall.* *See* 552 U.S. at 46, 128 S.Ct. 586.

AFFIRMED.

**UNITED STATES of America,
Plaintiff–Appellant**

**v.**

**Karen E. TUCKER, Defendant–
Appellee.**

**No. 13–10616
Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 2014.

Karen E. Tucker, Marlton, NJ, pro se.

Before DAVIS, SOUTHWICK, and HIGGINSON, Circuit Judges.

PER CURIAM: *

Karen E. Tucker pleaded guilty in 1998 to one count of Medicare fraud on the basis that she submitted claims for podiatric services that she provided without the required authorization of the attending physician, in violation of Medicare policy. She did not timely appeal but later filed an unsuccessful 28 U.S.C. § 2255 motion asserting that her conduct did not violate Medicare policy and that her counsel thus rendered ineffective assistance by advising her to plead guilty. In 2012, she filed a second § 2255 motion, asserting the same ineffective-assistance claim as well as claims of withholding of evidence, entrapment, and various constitutional violations by the government. Her claims were again premised on her assertion that she pleaded guilty to an offense she did not commit. The district court transferred the matter to this court as an unauthorized successive motion. As Tucker was no longer in custody, § 2255 relief was not available, and we returned the matter to the district court to consider her motion as seeking a writ of coram nobis. The district court denied the writ, and Tucker now appeals.

"The writ of *coram nobis* is an extraordinary remedy available to a petitioner no longer in custody who seeks to vacate a criminal conviction in circumstances where the petitioner can demonstrate civil disabilities as a consequence of the criminal conviction, and that the challenged error is of sufficient magnitude to justify the extraordinary relief." *Jimenez v. Trominski,* 91 F.3d 767, 768 (5th Cir.1996). We review factual findings for clear error, legal determinations de novo, and the ultimate decision to deny the writ for abuse of discretion. *Santos–Sanchez v. United States,* 548 F.3d 327, 330 (5th Cir.2008), *vacated on other grounds,* 559 U.S. 1046, 1046, 130 S.Ct. 2340, 176 L.Ed.2d 559 (2010). The "regurgitation" of claims al-

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

ready presented in an unsuccessful § 2255 petition does not make "the necessary showing of a complete miscarriage of justice." *See United States v. Esogbue,* 357 F.3d 532, 535 (5th Cir.2004) (internal quotation marks omitted). We agree with the district court that Tucker has failed to make the necessary showing for coram nobas relief. *See id.*

In addition to challenging her conviction, Tucker seeks monetary damages for various alleged constitutional and statutory violations relating to her conviction and withholding of Medicare payments. Neither a § 2255 motion nor a writ of coram nobis is the proper vehicle for such claims.

AFFIRMED.

**Vada DE JONGH, Plaintiff–Appellant**

v.

**STATE FARM LLOYDS; Dwight Johnson, Defendants–Appellees.**

**No. 13–20174**
**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Feb. 20, 2014.

Richard David Daly, Esq., Richard Daly Law Firm, Houston, TX, Melissa Waden Wray, Waco, TX, for Plaintiff–Appellant.

Levon G. Hovnatanian, Christopher Weldon Martin, Robert Tresch Owen, Esq., Martin, Disiere, Jefferson & Wisdom, L.L.P., Houston, TX, for Defendants–Appellees.

Before WIENER, OWEN, and HAYNES, Circuit Judges.

PER CURIAM: *

Vada de Jongh ("Jongh") appeals the district court's take-nothing judgment in favor of State Farm Lloyds ("State Farm") and Dwight Johnson ("Johnson") on her Texas state law claims. We VACATE the final judgment and REMAND with instruction to remand to state court.

## I. Background

Jongh, a Texas resident, filed an original petition in the 149th Judicial District Court of Brazoria County, Texas, against State Farm Lloyds, Inc. ("Lloyds"), a Texas resident, and Johnson, also a Texas resident. Jongh sought damages for breach of contract, breach of the duty of good faith and fair dealing, and violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act. In her original petition, Jongh alleged that her home and property were damaged in a storm and that, thereafter, she filed a claim on her property insurance policy issued by Lloyds for the damages sustained. She further alleged that Johnson, who was assigned as an individual adjuster on her claim, conducted a substandard investigation and inspection, prepared an incomplete report that omitted certain damages, and undervalued other damages. Jongh asserted that, as the result of Johnson's investigation, she was underpaid on her claim. She also claimed that Lloyds and Johnson performed an "outcome-oriented investigation" of her claim, which resulted in an inaccurate evaluation of her losses.

State Farm filed an answer, asserting that it had been "incorrectly named" as Lloyds.[1] However, State Farm did not move to intervene or otherwise request that the state court substitute it as the proper party in interest. One week later, State Farm removed the case to federal court on the basis of diversity of citizenship pursuant to 28 U.S.C. §§ 1332(a) & 1441(a). In its notice of removal, it alleged that: (a) Jongh had improperly named Lloyds, instead of State Farm, as a defendant; (b) State Farm was a citizen of Illinois, Florida, and Pennsylvania; (c) Johnson had been improperly joined for the purpose of destroying federal diversity jurisdiction; and (d) complete diversity existed among the real parties in interest, namely State Farm and Jongh, and the amount in controversy exceeded $75,000 exclusive of interest and costs.

Although Jongh did not move to remand, the district court never dismissed Lloyds or Johnson. After a one-day bench trial, the district court entered a take-nothing judgment in favor of Johnson and State Farm; the final judgment did not address Lloyds. Jongh timely appealed.

## II. Standard of Review

We review all questions of subject matter jurisdiction de novo. *See Gasch v. Hartford Acc. & Indem. Co.*, 491 F.3d 278, 281 (5th Cir.2007). We may consider subject matter jurisdiction sua sponte, as "subject-matter delineations must be po-

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1. State Farm and Lloyds are distinct legal entities. State Farm sells insurance under a so-called "Lloyd's plan," which consists of a group of underwriters who combine to issue insurance through an attorney in fact—in this case, Lloyds. *See* Tex. Ins.Code Ann. § 941.001. "[T]he attorney in fact acts as an agent for the Lloyd's group." *Royal Ins. Co. of Am. v. Quinn–L Capital Corp.*, 3 F.3d 877, 882 (5th Cir.1993) (emphasis omitted). The attorney in fact does not bear risks and has no contractual relationship with the insured. *Id.*

liced by the courts on their own initiative." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999).

Under 28 U.S.C. § 1441(a), any civil action brought in state court over which the federal courts have subject matter jurisdiction may be removed by a defendant to federal court. However, when, as in this case, subject matter jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332, a defendant may not remove a civil action from state court "if any of the parties in interest properly joined and served as defendants is a citizen of the State in which [the] action is brought." 28 U.S.C. § 1441(b)(2). The removing party bears the burden of showing that federal jurisdiction exists and that removal was proper. *See Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir.2002). To determine whether jurisdiction is present for removal, we consider the claims in Jongh's original petition as they existed at the time of removal. *See id.* Any doubts regarding whether removal jurisdiction is proper should be resolved against federal jurisdiction. *See Acuna v. Brown & Root Inc.*, 200 F.3d 335, 339 (5th Cir.2000).

## III. Discussion

Jongh asserts that the district court lacked subject matter jurisdiction for two related reasons.[2] First, State Farm was not a party and, therefore, lacked the authority to remove this action to federal court. Second, all of the actual parties in

this action—Jongh, Lloyds, and Johnson—were Texas residents.

Under 28 U.S.C. § 1441(a), only a defendant may remove a civil action from state court to federal court. A non-party, even one that claims to be a real party in interest, lacks the authority to institute removal proceedings. *See Salazar v. Allstate Tex. Lloyd's, Inc.*, 455 F.3d 571, 575 (5th Cir. 2006) ("[W]here an entity has not properly been made a party in state court, removal jurisdiction cannot be premised on its presence in the action."); *Hous. Auth. of City of Atlanta, Ga. v. Millwood*, 472 F.2d 268, 272 (5th Cir.1973) (holding that, where removal is initiated by a non-party, the district court is without subject matter jurisdiction).

Here, State Farm never became a party in this action. Jongh did not name State Farm as a defendant in her original petition; although it asserted in its answer and notice of removal that Jongh incorrectly named Lloyds as a defendant, State Farm did not move to intervene or otherwise request that the district court substitute it as the proper party in interest. Consequently, it lacked the authority to remove this action to federal court. *See Salazar*, 455 F.3d at 575; *Millwood*, 472 F.2d at 272.

State Farm asserts that Jongh's identification of Lloyds in her original petition was analogous to a misnomer and that it is the correct defendant in this action, as it issued Jongh's insurance policy and adjusted her claim.[3] *See Chilkewitz v. Hyson*, 22

---

**2.** In her initial brief, Jongh focused on the question of whether Johnson was fraudulently joined. It was not until her reply brief that she raised these points. However, subject matter jurisdiction cannot be waived. State Farm was permitted to file a supplemental brief addressing these arguments.

**3.** State Farm asserts that Lloyds and Johnson are fraudulently joined defendants because

Lloyds did not issue Jongh's insurance policy or adjust her claim and Johnson was, in fact, not the adjuster on Jongh's claim. However, fraudulent joinder does not apply here because Jongh did not sue even one diverse defendant. *See Salazar*, 455 F.3d at 574 (holding fraudulent joinder analysis inapplicable where plaintiff sued only a non-diverse defendant, because the plaintiff was not at-

S.W.3d 825, 828 (Tex.1999) ("Misnomer arises when a plaintiff sues the correct entity but misnames it.").[4] Jongh disputes this characterization; she served notice of her original petition on Lloyds and continues to assert that her claim lies against Lloyds, not State Farm. It is axiomatic that Jongh "is the master of [her] complaint." *Elam v. Kansas City S. Ry. Co.,* 635 F.3d 796, 803 (5th Cir.2011). Generally, federal courts permit plaintiffs to craft their complaints to avoid federal jurisdiction. *See id.* ("A plaintiff ... may allege only state law causes of action, even when federal remedies might also exist."); *Standard Fire Ins. Co. v. Knowles,* —— U.S. ——, 133 S.Ct. 1345, 1350, 185 L.Ed.2d 439 (2013) ("[F]ederal courts permit individual plaintiffs, who are the masters of their complaints, to avoid removal to federal court, and to obtain remand to state court, by stipulating to amounts at issue that fall below the federal jurisdictional require-

ment."). This includes a plaintiff's decision as to which parties to sue. *See Lincoln Prop. Co. v. Roche,* 546 U.S. 81, 91, 126 S.Ct. 606, 163 L.Ed.2d 415 (2005) ("In general, the plaintiff is the master of the complaint and has the option of naming only those parties the plaintiff chooses to sue, subject only to the rules of joinder [of] necessary parties.") (citation and quotations omitted) (alteration in original). The district court lacked the authority to disregard Jongh's choice to sue Lloyds, not State Farm, and assert diversity jurisdiction. *See Salazar,* 455 F.3d at 575. In *Salazar,* we held, under facts nearly identical to those here, that a district court cannot "create removal jurisdiction based on diversity by substituting parties." *Id.* at 573.

State Farm never properly became a defendant and therefore lacked the authority to remove this action to federal court;

---

*Chilkewitz,* 22 S.W.3d at 828. A misidentification, unlike a misnomer, does not toll the statute of limitations. *See id.* at 830. However, an exception to this rule in the limitations context exists where "there are two separate but related entities that use a similar trade name and the correct entity had notice of the suit and was not misled or disadvantaged by the mistake." *Id.* Here, Jongh served Lloyds, not State Farm, with notice of the suit, so the rules regarding misidentification appear applicable. Because State Farm and Lloyds are separate but related entities that use a similar trade name and State Farm had notice of the suit and was not misled or disadvantaged by the mistake, one could argue that this case falls within the "misidentification exception" line of cases. However, critical to this analysis is the fact that Jongh—the author of the petition—disputes State Farm's assertion that she named Lloyds as a defendant in her original petition in error. Additionally, we are not here dealing with the issue of statute of limitations under state law but the question of whether State Farm was a party to the case who could remove the action under federal law.